# EXHIBIT 2

# VIDEOTAPED DEPOSITION OF
# RHONDA ROBINSON

## August 23, 2006

## Pages 1 through 174

## CONDENSED TRANSCRIPT AND CONCORDANCE
## PREPARED BY:

**Haislip, Ragan, Green, Starkie & Watson, P.C.**
**566 South Perry Street**
**Post Office Box 62**
**Montgomery, AL  36104**
**Phone: (334) 263-4455**
**Fax: (334) 263-9167**
**E-mail: haislipragan@charter.net**

Page 1

1    IN THE UNITED STATES DISTRICT COURT
2    FOR THE MIDDLE DISTRICT OF ALABAMA
3         NORTHERN DIVISION
4
5    JAMES E. CROUCH,
6         Plaintiff,
7    Vs.              CIVIL ACTION NO.
                      2:06-CV-00111-MEF
8    AMSOUTH BANK, INA SUE
     CROUCH and JOHN and
9    JANE DOES 1-10,
10        Defendants.
11
12    * * * * * * * * * * * *
13
14    VIDEOTAPED DEPOSITION OF RONDA ROBINSON,
15    taken pursuant to stipulation and agreement before
16    Lisa J. Nix, Registered Professional Reporter and
17    Commissioner for the State of Alabama at Large, in
18    the Law Offices of Balch & Bingham, Suite 200, 105
19    Tallapoosa Street, Montgomery, Alabama on
20    Wednesday, August 23, 2006, commencing at
21    approximately 3:19 p.m.
22
23    * * * * * * * * * * * *

Page 2

1         APPEARANCES
2
3    FOR THE PLAINTIFF:
4    Mr. Samuel S. McHard
     Ms. Erica McHard
5    BRYAN NELSON P.A.
     6524 U.S. Highway 98
6    Post Office Drawer 18109
     Hattiesburg, MS 39404-8109
7
8    FOR THE DEFENDANT AMSOUTH:
9    Mr. Charles B. Paterson
     BALCH & BINGHAM
10   Suite 200
     105 Tallapoosa Street
11   Montgomery, Alabama 36104
12
     FOR THE DEFENDANT INA SUE CROUCH:
13
     Ms. Glenda W. Hughes
14   Attorney at Law
     103-B Commerce Street
15   Wetumpka, AL 36092
16
     ON BEHALF OF LINCOLN NATIONAL:
17
     Mr. E. Glenn Waldrop, Jr.
18   Mr. Mitchell D. Greggs
     LIGHTFOOT, FRANKLIN & WHITE
19   400 20th Street North
     Birmingham, AL 35203
20
21   ALSO PRESENT:  Jeff Baker, Videographer
          ·    Ms. Ina Sue Crouch
22        Mr. James Crouch
23

Page 3

1              EXAMINATION INDEX
2
     RONDA ROBINSON
3    BY MR. MCHARD . . . . . . . . . .  8
     BY MR. PATERSON . . . . . . . . . .  156
4    BY MR. GREGGS . . . . . . . . . .  161
     BY MR. MCHARD . . . . . . . . . .  162
5    BY MR. PATERSON . . . . . . . .  167
     BY MR. MCHARD . . . . . . . . . .  170
6
7
              EXHIBIT INDEX
8
                   MAR
9    PLAINTIFF'S EXHIBIT
     6  Personnel File for Ronda Robinson        20
10      (ASO/AIS 0029-0081)
11   8  Ronda Robinson File - Licensing File     48
12   9  Documents produced by AmSouth (ASO       32
        82-183)
13
     15  5/18/98 letter to Ronda Robinson from    66
14      Andrea L. Lewis, New Business Services
        Lincoln National Life
15
     17  New Business Worksheet               104
16
     18  Documents from AmSouth Bank's file      92
17
     19  Affidavit of Ronda T. Robinson         150
18
     20  Declaration of Ronda Robinson in Support  109
19      of the Motion to Transfer
20   27  Memo to the file of James E. Crouch    125
21
22   (PX-9 was retained by counsel and is not attached.)
23

Page 4

1              STIPULATION
2         It is hereby stipulated and agreed by and
3    between counsel representing the parties that the
4    deposition of RONDA ROBINSON is taken pursuant to
5    the Federal Rules of Civil Procedure and that said
6    deposition may be taken before Lisa J. Nix,
7    Registered Professional Reporter and Commissioner
8    for the State of Alabama at Large, without the
9    formality of a commission, that objections to
10   questions other than objections as to the form of
11   the question need not be made at this time but may
12   be reserved for a ruling at such time as the said
13   deposition may be offered in evidence or used for
14   any other purpose by either party provided for by
15   the Statute.
16        It is further stipulated and agreed by and
17   between counsel representing the parties in this
18   case that the filing of said deposition is hereby
19   waived and may be introduced at the trial of this
20   case or used in any other manner by either party
21   hereto provided for by the Statute regardless of
22   the waiving of the filing of the same.
23        It is further stipulated and agreed by and

Page 5

1    between the parties hereto and the witness that the
2    signature of the witness to this deposition is
3    hereby waived.
4
5         * * * * * * * * * * * * *
6
7              RONDA ROBINSON
8         The witness, after having first been duly
9    sworn to speak the truth, the whole truth and
10   nothing but the truth testified as follows:
11             MR. MCHARD:  Let the Record show
12        that this is the deposition of
13        Ronda Robinson taken pursuant
14        to notice and agreement of the
15        parties.
16             Now, do you want to
17        reserve your right to read and
18        sign the deposition
19        transcript, or do you waive
20        that right?
21             THE WITNESS:  You mean to refer to
22        it?
23             MR. MCHARD:  No.  To look at what

Page 6

1         the court reporter types up
2         after she gets that
3         completed.
4              MR. PATERSON:  Let me counsel with
5         her about that since I
6         provided counsel to her about
7         this deposition.
8              MR. MCHARD:  Well, are you -- are
9         you the attorney for her,
10        Mr. Paterson?
11             MR. PATERSON:  Yes, I am.  I
12        represent her --
13             MR. MCHARD:  Oh, you represent
14        her?
15             MR. PATERSON:  -- as well as
16        AmSouth.
17             MR. MCHARD:  You're representing
18        her individually?
19             MR. PATERSON:  For the purpose of
20        this deposition.
21             MR. MCHARD:  Only?
22             MR. PATERSON:  Yes.  Yes.
23             You have the right to

Page 7

1         waive your signature.  This
2         court reporter here has been
3         doing this about 30 years.
4         And she takes this down, and
5         she puts it in a written
6         tablet.  And you have the
7         right to read it and see if
8         there are any errors.  She
9         records it as well as takes it
10        down manually.
11             And it is perfectly safe
12        for you to waive your
13        signature, or you can elect to
14        read it and see if there's any
15        errors in it.  You can't
16        change what you said, but you
17        can see if there are any
18        errors in it and then sign
19        your name to it.
20             You can elect to do
21        either one.  It doesn't matter
22        to us, whatever you choose to
23        do.  So you can either waive

Page 8

1         it or you can elect to read
2         the transcript and sign it
3         before it's distributed.
4              THE WITNESS:  I'll waive it.
5              EXAMINATION
6    BY MR. MCHARD:
7    Q.  Would you please state your name and
8        address.
9    A.  Ronda Robinson.  132 Forest Avenue,
10       Wetumpka, Alabama 36092.
11   Q.  How long have you resided in Wetumpka?
12   A.  I'm 38 years old.  I've been there 38
13       years.
14   Q.  How long have you known Ina Sue Crouch?
15   A.  I was employed at AmSouth from 1986 up
16       until 2004.  I don't recall the particular
17       year that I became their personal banker,
18       but during that time, I met them.  But to
19       give you an exact date, I don't know.
20   Q.  You've brought certain documents with you
21       here today?
22   A.  What I have is a copy of my affidavit and a
23       copy of Mrs. Crouch's affidavit.

Page 9

1  Q.  How did you receive those?
2  A.  From Mr. Paterson.
3        MR. PATERSON:  I gave them to her
4        for the record.
5  Q.  Have you retained Balch & Bingham or
6        somebody from that firm, including
7        Mr. Paterson, to be your attorney?
8  A.  He is -- Well, have I retained them?
9  Q.  Yeah.
10  A.  Do you mean --
11  Q.  Did you hire him?
12  A.  I have not hired him, no.
13  Q.  Now --
14        MR. PATERSON:  Let me say for the
15        record, AmSouth is providing
16        counsel to this witness
17        through me.  This witness is a
18        former employee, and it's
19        providing counsel for this
20        witness.  And I'm serving as
21        counsel for her in this
22        deposition at the request of
23        AmSouth and with her

Page 10

1        permission.
2  Q.  Well, have you talked with Mr. Paterson
3        about that?
4  A.  Yes.
5  Q.  When was that?
6        MR. PATERSON:  Let me tell you
7        something.  You don't have to
8        tell him the subject of what I
9        talked to you about, your
10        representation.
11        THE WITNESS:  Okay.
12  A.  You want to know dates that I talked to
13        him?  Because I don't have that if you want
14        to know dates.
15  Q.  Well, I want to know the date that you --
16        When was it that you understood that
17        Mr. Paterson or somebody from Balch &
18        Bingham was retained to represent you in
19        connection with this deposition as I
20        understand it?
21  A.  Well, again, I would have to give you a
22        date, and I don't have that.
23  Q.  Well, when is your understanding of when he

Page 11

1        was hired to represent you?
2  A.  I don't have a date for you.  I'm sorry.
3  Q.  Well, your deposition hasn't been scheduled
4        for more than six weeks.  Within the last
5        six weeks?
6  A.  For -- I don't know if that was the first
7        time I ever talked to Mr. Paterson.
8  Q.  No.  No.  I'm just talking about when he --
9        when you understood he was represented
10        to -- when he was retained by AmSouth to
11        represent you in connection with this
12        deposition.
13  A.  Well, that would be upon -- the first
14        conversation or whenever that I knew that
15        there was a case going on or whatever and
16        he was representing AmSouth and trying to,
17        I guess, put the case together.  So to give
18        you a date, I don't -- I don't know.
19  Q.  Well, you understood that he was hired to
20        represent your interest when Balch &
21        Bingham was first hired to defend this
22        lawsuit for AmSouth?
23  A.  I don't know that I understand exactly

Page 12

1        where you're coming from there.
2  Q.  When was it you first found out that your
3        deposition was going to be taken in this
4        case?
5  A.  Well, it would have been -- I guess it
6        would have been a few weeks prior to
7        actually doing the deposition.  This says
8        March of 2006, so I would have been given
9        some time, I'm sure, to gather the
10        information.
11  Q.  Well, the notice of this deposition didn't
12        go out until June 23rd of this year, well
13        after your affidavit.  Do you see that?  Do
14        you see your notice of deposition here?
15  A.  Let's see.  So what are you asking me now?
16  Q.  When --
17  A.  When, you wanted to know?
18  Q.  When was Balch & Bingham hired to provide
19        counsel for you in connection with this
20        deposition that was not noticed until June
21        the 23rd of this year?
22        MR. PATERSON:  If you know, answer
23        him.  If you don't know, tell

Page 13

1    him you don't know.
2    A.  I don't know.
3    Q.  Well, it would certainly be after the
4        notice of deposition, correct?
5    A.  I can't answer that because I don't know.
6    Q.  Well, in connection with the dispute
7        involving AmSouth and the annuity involving
8        the Crouch family, I want you to tell me
9        every time you've ever had a communication
10       with the attorneys for -- Balch & Bingham.
11   A.  I can't tell you that.
12   Q.  Well, it's been lots of them, hasn't it?
13   A.  Well, I can't tell you that.  I don't -- I
14       didn't take notes every time I spoke with
15       someone, so I can't -- I can't answer that
16       honestly.
17   Q.  Did you start you off dealing with Paul
18       DelCambre?  Did you talk with him --
19   A.  I don't recall.
20   Q.  -- from Mississippi?
21   A.  That is a possibility, but I don't have
22       notes of everyone I've talked to about this
23       case, so I can't answer your question.

Page 14

1    Q.  Did you save the communications that
2        they -- the written communications that
3        they sent you?
4    A.  The only written things that I have is
5        what's in front of me.
6    Q.  Have you thrown everything else away?
7    A.  That's a good possibility.
8    Q.  Well, was that a yes, that you have thrown
9        everything else away?
10   A.  I would think that probably I no longer
11       have it.
12   Q.  Have you ever been deposed before?
13   A.  I'm sorry?
14   Q.  Have you ever been deposed before?
15   A.  No.
16   Q.  What documents have you reviewed in
17       preparation for this deposition that served
18       to refresh your recollection?
19   A.  The affidavit and the exhibits.
20   Q.  Your affidavit and --
21   A.  Mine along with Mrs. Crouch's.
22   Q.  Is that all?
23   A.  Yes.

Page 15

1    Q.  Would you agree that you have been
2        discussing this matter with attorneys for
3        Balch & Bingham for several years prior to
4        your deposition here today?
5    A.  No, I don't -- I don't think several years.
6    Q.  Well, when did they first start?
7    A.  I don't know.  I don't know.
8    Q.  You first started to work for AmSouth Bank
9        in 1986, correct?
10   A.  That's correct.
11   Q.  And what was your name then?
12   A.  In 1986, I was Ronda Talley.
13   Q.  Was that your maiden name?
14   A.  Yes.
15   Q.  And what are the other names that you have
16       had since 1986?
17   A.  I was an Olson.
18   Q.  You were known as Ronda Olson?
19   A.  At one time, I was.
20   Q.  All right.  From when to when?
21       THE WITNESS:  Do I have to answer
22       that?
23       MR. PATERSON:  He has a reasonable

Page 16

1        right to know who your
2        relatives or former
3        relatives --
4    A.  Well, gosh, if I had known that, I would
5        have brought my calendars from years back.
6        MR. PATERSON:  -- your relatives
7        or former relatives.
8    A.  Okay.  From October of 1986 for about four
9        years, I was known as Ronda Olson.
10   Q.  And were you married to Mr. Olson?
11   A.  Yes.
12   Q.  What was his full name?
13   A.  George.
14   Q.  And where does he live now?
15   A.  Panama City, Florida.
16   Q.  Do you have an address?
17   A.  I wish I did, but no.
18   Q.  And that ended in divorce; is that correct?
19   A.  Yes, sir.
20   Q.  Then what other names have you gone by
21       since your divorce from George Olson?
22   A.  I was a Ronda Walker for a nine-month
23       period in 1993.

Page 17

1   Q. What was Mr. Walker's name?
2   A. Timothy.
3   Q. And where does Timothy Walker live?
4   A. I have no idea.
5   Q. Were there any children born of either of
6       those marriages or --
7   A. I have one son --
8   Q. -- that resided with you?
9   A. -- by George Olson.
10  Q. And then after your divorce from Timothy
11      Walker, did your name change?
12  A. It changed in December of '93.
13  Q. To?
14  A. Robinson.
15  Q. And were you married at that time to
16      Mr. Robinson?
17  A. In '93, December of '93.
18  Q. What's his name?
19  A. Millard.
20  Q. Millard?
21  A. Yes.
22  Q. And are you still married to Millard
23      Robinson?

Page 18

1   A. Yes.
2   Q. Now, you said that you left AmSouth Bank in
3       '04. When, exactly, in '04 did you
4       terminate or was that --
5   A. It was in June.
6   Q. Do you know what date?
7   A. Of '04. I'm sorry. I don't know the date.
8   Q. Why did you stop working at AmSouth?
9   A. Because I was offered another position with
10      another bank.
11  Q. Which bank?
12  A. Peoples Bank & Trust.
13  Q. Did you ever move to Chattanooga, Tennessee
14      or accept a position to work in
15      Chattanooga, Tennessee?
16  A. No.
17  Q. You've resided for 38 years in Wetumpka,
18      correct?
19  A. Yes.
20  Q. Did you ever review your personnel file
21      with AmSouth?
22  A. Well, there's 18 years worth of stuff in
23      there, so, no, I haven't reviewed it.

Page 19

1   Q. Well, the -- can you tell me what your jobs
2       were with AmSouth?
3   A. For the whole 18 years?
4   Q. Yeah. Give me the progression.
5   A. Okay. Well, I can't give you years. I
6       would have brought a resume if I had known
7       I needed that information.
8           MR. PATERSON: For the record, he
9           has your personnel file.
10          THE WITNESS: He has that
11          information?
12          MR. PATERSON: He has that
13          information. That was
14          produced in discovery in this
15          case. If you need to see
16          anything, I'm sure he'll make
17          it available to you.
18  Q. Go ahead, ma'am.
19  A. Well, I guess I'm going to need that file
20      to give you that information.
21          MR. PATERSON: Just give him your
22          best recollection and then he
23          can -- that may speed it

Page 20

1           along.
2   A. Okay. Well, I was hired as a teller, and I
3       was a teller for approximately four to five
4       years. I then trained as a customer
5       service representative.
6   Q. When?
7   A. It was after about four years of
8       employment. Now, if you want specifics,
9       you're going to need to give me that file
10      because I don't have dates.
11  Q. Well, all I can provide you is -- are
12      AmSouth Bank production documents 29
13      through 81, which is all that's been
14      provided to us with regard to that.
15          (Plaintiff's Exhibit 6 was marked
16          for identification.)
17  Q. Do you see it?
18  A. Well, it doesn't appear that the documents
19      are in order as far as the year to date.
20      They're a little scattered, so --
21  Q. I agree. These are in the condition that
22      they were provided to me, ma'am, and you
23      can see that from the Bates stamping.

Page 21

1    A. I can give you approximate times. I can
2        tell you the positions I've held.
3    Q. That's fine. That's what I'm asking.
4    A. I was a customer service representative. I
5        was a branch operations supervisor. I
6        served in that capacity.
7    Q. Well, when were you a customer service rep,
8        from what approximate dates to --
9    A. Well, that particular position is one that
10       you kind of don't get rid of, so, I mean, I
11       did the duties of a customer service rep
12       once I was trained in that area.
13           So I was a teller, and then for four
14       years I was doing customer service work,
15       which meant that I waited on customers and
16       doing new accounts.
17   Q. So from what years would those -- that have
18       been?
19   A. Approximately 1990 until 2004.
20           And I did receive some promotions
21       during that time, which was -- I was
22       promoted to an assistant branch manager. I
23       don't know -- I don't know the year of that

Page 22

1        promotion.
2            There's a salary review form here
3        that's dated 2002, and it shows my title at
4        that point being assistant branch manager.
5    Q. Okay.
6    A. But I don't know that that's the year that
7        I was promoted.
8    Q. In connection with your work for AmSouth
9        Bank, did you ever work at any facility
10       other than the Wetumpka AmSouth branch
11       bank?
12   A. On occasion, there would be times when I
13       would go to different branches to fill in.
14       They were shorthanded.
15   Q. But your primary work site assigned by
16       AmSouth Bank was the Wetumpka location?
17   A. That's correct.
18   Q. Throughout '86 through 2004, correct?
19   A. That is correct.
20   Q. And your employer throughout that period of
21       time was always AmSouth Bank, wasn't it?
22   A. That's not correct. We also -- AmSouth
23       implemented a program for investments where

Page 23

1        that we also worked as an AmSouth
2        Investment Service representative. So we,
3        in essence -- or I was working for AmSouth,
4        but I was also employed by AmSouth
5        Investment Services.
6    Q. Did you get a separate W-2 from AmSouth
7        Investments?
8    A. No.
9    Q. All your money, all your compensation for
10       the work that you did at the AmSouth branch
11       bank location in Wetumpka or wherever
12       AmSouth Bank assigned you was from AmSouth
13       Bank, correct?
14   A. That's not correct. AmSouth Investment
15       Services did not pay as a separate salary,
16       but we did get commissions based on our
17       sales.
18   Q. From whom? Who paid you the commissions
19       with regard to sales that were made?
20   A. For the investment sales, it was AmSouth
21       Investment Services.
22   Q. So you got a 1099 from them each year for
23       commissions?

Page 24

1    A. No.
2    Q. Or it was just included in your
3        compensation that you got from AmSouth
4        Bank?
5    A. I'm not real sure how all that worked.
6    Q. Well, I mean --
7    A. But as far as getting a separate W-2, no.
8        I got a W-2 form --
9    Q. From AmSouth Bank?
10   A. -- from AmSouth Corporation.
11   Q. For every year that you worked there,
12       right?
13   A. Yes.
14   Q. That would include all of the income that
15       you earned, whether it was your regular
16       salary or the commissions that you earned
17       from the sale of annuity products, correct?
18   A. I'm sure that it would be separated somehow
19       on the W-2 form, but I'm not -- I'm not
20       sure exactly how.
21   Q. But it was one W-2 form under the employer
22       ID of AmSouth Bank issued to you every
23       year, correct?

Page 25

1    A.  I'm not sure exactly how the employer ID
2        numbers worked with the bank and the
3        investment side. I'm not sure how that
4        works.
5    Q.  When did you -- When was this work in
6        selling investments begun by you?
7    A.  We went through training as far as -- as
8        far as becoming licensed to sell certain
9        products, so we had to obtain certain
10       license. And I think there's copies of all
11       that in here.
12   Q.  Were you licensed to sell any investment
13       products for anybody other than AmSouth in
14       connection with their contract with Lincoln
15       National Life Insurance Company?
16   A.  I'm not quite sure I understand your
17       question.
18   Q.  Was Lincoln the only investment product you
19       sold?
20   A.  As far as insurance products, no. I was --
21       I was licensed for certain insurance
22       products, and I had a Lincoln National
23       product and at one point, I had a -- I had

Page 26

1        a New York Life product.
2    Q.  Well, how long did you -- What insurances
3        did you sell?
4    A.  I sold fixed rate annuities for Lincoln
5        National and fixed rate annuities for New
6        York Life.
7    Q.  During what period of time?
8    A.  Well, let's see. That would be ... I
9        believe it was in '97.
10   Q.  You weren't authorized by Lincoln to start
11       selling any products in Alabama until
12       November the 26th of '97, correct?
13   A.  Do you have documentation or would it be in
14       this that I'm looking at?
15   Q.  I believe that's what -- I know that I got
16       that information from the documents that
17       were provided, yes, ma'am.
18   A.  If you can show me that document, then I
19       can verify that yes or no.
20   Q.  I believe there was a letter dated December
21       the 8th of 1997 from Lincoln National. If
22       you would, read that out loud, please.
23   A.  Okay. It says: Ronda T. Robinson is now

Page 27

1        authorized to sell Lincoln National Life
2        Insurance Company products in Alabama as of
3        November 26, 1997, based on the marketing
4        arrangement.
5    Q.  What marketing arrangement?
6    A.  I would assume that that is talking about
7        based on what AmSouth Investment Services
8        would authorize us to -- us to sell.
9    Q.  Did you ever see the national marketing
10       agreement that's referenced in that letter?
11   A.  At some point, I could have.
12   Q.  Well, do you know?
13   A.  At some point, I could have seen it. I
14       mean --
15   Q.  Do you know what the date of that agreement
16       was?
17   A.  No, I wouldn't know that.
18   Q.  Prior to the time that you were authorized
19       on November the 26th of 1997 to sell
20       Lincoln's annuities, did you receive any
21       education or training with regard to that
22       activity?
23   A.  Sure.

Page 28

1    Q.  What?
2    A.  AmSouth had set guidelines as far as the
3        training that we had to do before we would
4        be able to sell any -- any product, and
5        that training was from AmSouth Investment
6        Services. They would actually call in
7        Lincoln National to do the training, and we
8        would have attended that.
9    Q.  How do you know that AmSouth had guidelines
10       for that?
11   A.  Well, I know there was things I had to do
12       before I would be able to sell. Even
13       though I had my insurance license, I still
14       had to go through the training, be trained
15       by Lincoln National. These were products
16       we were not familiar with, and so we had to
17       be trained about the -- about the products
18       and how they worked.
19   Q.  You had never been licensed to sell those
20       investment products or any insurance
21       products prior to the fall of 1997,
22       correct?
23   A.  Well, that's not exactly correct. In

Page 29

1    1993 -- I believe that's the year, the best
2    I can remember -- the bank implemented a
3    mutual fund program where we were actually
4    licensed to sell mutual funds through
5    AmSouth Investment Services.
6         So during that time, it was a Series 6
7    and a Series 63 license that I had to
8    obtain in order to be able to sell those
9    mutual funds. That program lasted about a
10   year, and so I was licensed at that time to
11   sell those investments.
12   Q.  Mutual funds?
13   A.  At that particular time, it was mutual
14       funds.
15   Q.  In '93 for a year, correct?
16   A.  Yes.
17   Q.  But you didn't have any insurance license?
18   A.  Until '97.
19   Q.  Right. And you've never sold insurance or
20       been involved in the insurance business,
21       correct?
22   A.  That's correct.
23   Q.  And you've never sold annuities or been

Page 30

1    involved with annuities prior to 1997,
2    correct?
3    A.  That is correct.
4    Q.  Walk me through the training that Lincoln
5        came and did after November of 1997 to
6        train you to sell the Lincoln annuities.
7    A.  I wouldn't be able to do that. I can tell
8        you that after we obtained our license,
9        there was training classes scheduled. We
10       would go there for product training,
11       learning about the particular product that
12       we would be -- that we would be selling
13       and -- probably a series of those classes,
14       and then classes that would actually show
15       us paperwork and how to complete the
16       paperwork and how to get the proper
17       disclosures.
18   Q.  When you say go there, where would you go
19       to get that training?
20   A.  The training was usually held at the
21       Montgomery main office.
22   Q.  That is here?
23   A.  That's correct.

Page 31

1    Q.  The main office of AmSouth?
2    A.  AmSouth Investment Services.
3    Q.  Which is in the AmSouth Bank building or --
4    A.  Well, AmSouth Investment Services, the
5        department would be in the RSA Tower. We
6        considered Montgomery to be kind of our
7        main office for our area.
8    Q.  In the RSA Tower. I'm not familiar with
9        that, ma'am.
10   A.  Okay. That's where AmSouth is located here
11       in Montgomery.
12   Q.  So in AmSouth's main building here in
13       Montgomery, correct?
14   A.  Yes.
15   Q.  The series of trainings, do you recall how
16       long they took or what those series
17       consisted of?
18   A.  I don't remember exactly. It seemed pretty
19       intense to me at the time because it was
20       all new. But, no, I don't remember how
21       long those classes lasted.
22   Q.  Were they all documents that were published
23       by Lincoln National?

Page 32

1    A.  I can't say that all the documents were.
2    Q.  Well, do you know?
3    A.  No.
4    Q.  Well, if I show you what's been produced as
5        all of the training materials, would you be
6        able to look at that and see if that's what
7        you reviewed prior to selling this annuity
8        to the annuitant, James Crouch?
9    A.  I would --
10            MR. PATERSON: Object to the form.
11            THE WITNESS: I'm sorry?
12   Q.  Go ahead and answer.
13            MR. PATERSON: You can answer.
14   A.  I would be able to tell you if I recognized
15       those documents, but I couldn't say that
16       that's everything. It's been several years
17       ago.
18            (Plaintiff's Exhibit 9 was marked
19            for identification.)
20   Q.  Well, I'm going to show you the AmSouth
21       production of documents 82 through 183,
22       which has been marked as Exhibit Number 9,
23       and ask you if those are the documents --

Page 33

1  the training materials that you reviewed in
2  advance of the sale of this annuity.
3        MR. PATERSON: What exhibit number
4        was that?
5        MS. MCHARD: Nine.
6        (Brief interruption.)
7  A. This is the training. This is the -- the
8  best I recall, this is the -- this is the
9  training for the annuity sales.
10 Q. And those would have been the documents
11 that you would have reviewed in advance of
12 this sale; is that correct, ma'am?
13 A. Yes, that would be correct.
14 Q. This, referring to Exhibit 9 that you've
15 just been looking at?
16 A. The only thing I'm not -- I'm not real sure
17 about, I remember there being an Investor's
18 Choice annuity, but then later on there was
19 an Investor's Choice Plus annuity. I don't
20 remember the difference between the two.
21 And the particular one that was sold to
22 Mr. and Ms. Crouch was the Investor's
23 Choice.

Page 34

1  Q. Is there something about Investor's Choice
2  in particular in any of those documents?
3  A. Well, this is pretty much referring to
4  annuities in general. Okay. This would be
5  the product guide for the Investor's Choice
6  Plus. I don't see a product guide for
7  Investor's Choice in here. And like I
8  said, I don't remember the difference
9  between the two.
10 Q. You would agree that what this training
11 materials in Exhibit Number 9 focused on
12 was how to close the sale, correct?
13        MR. PATERSON: Object to the form.
14        MR. WALDROP: Same objection.
15        MR. PATERSON: You may answer.
16        That's just lawyers ...
17 A. Okay. Can you repeat your question again?
18 Q. You would agree that what this training
19 documentation focused on was how to close
20 the sale of the annuity to the client?
21        MR. PATERSON: Same objection.
22        MR. GREGGS: Same objection.
23 A. Well, no, I wouldn't agree with that all

Page 35

1  together. That's training material. It
2  talks about the different features of the
3  product.
4        Actually, I -- I don't -- I'm not sure
5  that there's specific -- from a sales
6  standpoint, I'm not sure there's specific
7  closing instructions in there or closing
8  guidelines on how to close a sale. That
9  would be more of a separate sales type
10 training. This is more of the Lincoln
11 training material.
12 Q. Well, the -- you were instructed to
13 familiarize yourself of the features and
14 benefits of the Lincoln National fixed
15 annuity, correct?
16 A. Yes.
17 Q. And did you know what the contract
18 consisted of, the annuity contract itself?
19 A. Do you mean as far as the -- as far as the
20 specifics of the annuity and how it
21 worked? Is that what you're talking about?
22 Q. Well, yeah. I mean, would you agree that
23 Exhibit Number 12 was the annuity contract

Page 36

1  that's in dispute?
2        MR. GREGGS: Object to the form.
3  A. That is the contract.
4  Q. And were you aware of any other or --
5  different terms other than what's in
6  Exhibit Number 12 for this annuity
7  contract?
8  A. Well, I need to explain that. On this
9  particular contract, when we originally --
10 or when I wrote this contract up, there was
11 an error made when writing up the
12 paperwork.
13 Q. No. What I'm talking about is, are there
14 other pieces of paper when this was
15 written, okay, as of May the 7th or 8th
16 or -- through May the 16th or 18th, were
17 there any other pieces of paper that were
18 part of the annuity contract, or is Exhibit
19 12 the whole thing at that time?
20 A. Well, there was -- there was other
21 paperwork required, so there were other
22 documents other than -- other than this
23 application.

Page 37

1  Q. Well, there was -- there was the
2     authorization and the client confidential
3     profile and the premium receipt.
4  A. That's right.
5  Q. Those are the other papers you're talking
6     about, correct?
7     Are those the other papers you're
8     talking about?
9  A. Those are the other documents that I'm
10     talking about.
11  Q. And with regard to this transaction, that
12     would be Exhibits 10 and 11; is that
13     correct?
14  A. Right.
15  Q. And you've got copies of those in your
16     file, correct?
17  A. That's correct.
18  Q. And did you throughout the period of time
19     of the negotiation for purchase of and
20     administration of this annuity keep your
21     own separate file with regard to the Crouch
22     annuity?
23  A. Yes, we kept -- we kept our own files.

Page 38

1  Q. We meaning did you individually or did --
2  A. Yes --
3  Q. -- AmSouth Investments --
4  A. -- I as an agent.
5  Q. -- or AmSouth Bank?
6  A. I as an agent kept a file.
7  Q. And what other file was kept?
8  A. I'm sorry. I don't understand.
9  Q. I mean, did -- were you aware if somebody
10     else kept a file regarding this contract?
11  A. My instructions were to distribute
12     paperwork to AmSouth Investment Services
13     and to Lincoln National as well as keeping
14     a copy for my file.
15  Q. And how did you maintain that file?
16  A. I'm sorry. What do you mean, how did I
17     maintain the file?
18  Q. Well, how did you, Ronda Robinson, maintain
19     the client file with regard to this
20     annuity?
21  A. There was -- I kept a separate file where
22     all my fixed annuity sales were filed
23     basically in alphabetical order, so ...

Page 39

1  Q. Was that in your desk or in a separate file
2     cabinet?
3  A. That was in a separate file cabinet locked
4     in the office.
5  Q. That was yours, locked in your office,
6     correct?
7  A. That's correct.
8  Q. And when you left, then what happened to
9     that?
10  A. It would have -- well, you're talking about
11     when I left as to --
12  Q. In 2004.
13  A. In 2004? Those files would probably -- or
14     those customers would have probably been
15     assigned to another licensed person.
16  Q. But you don't know what happened to the
17     file after that?
18  A. I have no idea.
19  Q. Did you maintain a separate copy of that
20     file, the file that you maintained with
21     regard to this annuity?
22  A. Did I maintain a separate file?
23  Q. Yeah. I mean, when you left the bank, did

Page 40

1     you keep your own separate Ronda Robinson
2     file that --
3  A. Do you mean did I take files with me when I
4     left?
5  Q. Yeah.
6  A. No.
7  Q. Are the documents that are attached to your
8     affidavit, does that consist of the entire
9     file that you maintained with regard to
10     this?
11  A. It would be hard for me to say that was
12     everything in their file.
13  Q. Well, what was in this file in particular
14     regarding this annuity?
15  A. Well, there would be a copy of these
16     exhibits here. Whether or not there was
17     something else in that file, I wouldn't --
18     I wouldn't -- I mean, I don't know. There
19     could have been.
20  Q. Well, when you say these exhibits here,
21     you're talking about Exhibits 10, 11, and
22     12; is that correct?
23  A. Yeah. There would have been a copy of

10 (Pages 37 to 40)

Page 41

1     those in the file. There --
2   Q.   And there -- Would there have been a copy
3     of the receipt for the premium, Exhibit 13?
4   A.   There probably would have been a copy of
5     the receipt. There would also be another
6     document in this particular file that I
7     don't see a copy of here.
8   Q.   And did you keep as part of that -- of each
9     individual file a chronological listing of
10     every important event that came up after
11     the sales transaction?
12   A.   Usually on the client profile, we would
13     make -- we would make documentation in
14     there if we felt that it was something that
15     we needed to make a record of just so that
16     we could, you know, keep up with what was
17     going on with the customer and better
18     service the customer the next time they
19     were in.
20   Q.   Do you mean on Exhibit Number 11 is where
21     you would make those notes?
22   A.   We would do that.
23   Q.   Well, did you make a chronological listing

Page 42

1     of all the important events in connection
2     with the Crouch annuity?
3   A.   Well, I can't say that everything was
4     listed there, no.
5   Q.   But that was your practice, wasn't it, to
6     list all of the important issues or
7     questions or problems or changes that came
8     up, right?
9   A.   Repeat that again. I'm sorry. I was
10     thinking.
11   Q.   Your custom and habit, practice in
12     connection with the file that you
13     maintained for each annuity would be to
14     write down on this chronological listing
15     for that file the date and whatever your
16     description of the event was that you felt
17     was important as it affected the annuity or
18     the clients to keep the file up to date,
19     correct?
20     MR. PATERSON: Is this in general
21     or with respect to the Crouch
22     file?
23     MR. MCHARD: Both.

Page 43

1   A.   Yeah, in most cases, yes, we would. We
2     would document concerns or we would
3     document things that we would want to keep
4     in mind so that when a customer would come
5     back, we would be familiar with what was
6     going on with them.
7   Q.   And that was your habit that you exercised
8     in connection with this case, too, wasn't
9     it?
10   A.   In most cases, yes.
11   Q.   And exercised in this case, correct?
12   A.   I would -- I would say that there -- yeah,
13     there would be some documentation on the
14     client profile.
15   Q.   That is, on the back side or separate
16     sheet?
17   A.   It could be anywhere on that profile, but
18     it doesn't look like the back copies are
19     here.
20   Q.   That is, there are pieces of paper that are
21     missing from the client profile? Is that
22     what you're saying?
23   A.   Well, it appears there's something that's

Page 44

1     not here.
2   Q.   What is that? What is it to your
3     understanding is missing from Exhibit
4     Number 11?
5   A.   Well, there would be some documentation on
6     there or either it could have been on a
7     separate sheet in the file.
8   Q.   Listing these important events, issues,
9     concerns, correct?
10   A.   There should be some documentation there.
11   Q.   And you would hand write those, it was your
12     habit, onto this separate sheet when that
13     event or concern came up; is that correct?
14   A.   It would be either handwritten or there
15     would be a memo typed for the file.
16     MR. PATERSON: And, again, y'all
17     are talking about the Crouch
18     file individually --
19     MR. MCHARD: Right.
20     MR. PATERSON: -- as opposed to
21     any other file?
22     MR. MCHARD: Right.
23   Q.   Now, the ...

Page 45

1   A.  Can I make a comment about Exhibit 12?
2       This is the actual application for the
3       annuity. This particular paperwork was
4       fairly new. My license were obtained in
5       '97. This was in May of '98. Annuities
6       was not necessarily something that you sell
7       a lot of every day. The paperwork being
8       new -- On a fixed rate annuity, they are
9       annuitant-driven which is --
10  Q.  What do you mean by that?
11  A.  Well, it means that basically you have to
12      name a beneficiary for the annuitant, even
13      though you may have a joint owner. That's
14      not the case with a bank product, with a CD
15      product. Those are -- Those are joint.
16      And our practice --
17  Q.  Those are ownership-driven, the bank ones?
18  A.  The bank ones would be ownership-driven.
19  Q.  As opposed to these that are annuitant-
20      driven, correct?
21  A.  Yes.
22      So in doing the paperwork, this works
23      differently. I made an error on this

Page 46

1       particular application when I completed the
2       paperwork. The Crouches' request was that
3       this be a joint ownership, which is the way
4       they always set up their CDs at the bank.
5       They wanted it set up the same way. The
6       difference being with the annuity product,
7       they would be able to name the beneficiary
8       to the annuity.
9       What I did was, when I wrote up the
10      paperwork, I wrote it up so that it was
11      joint ownership. Mr. Crouch was the
12      annuitant, so Mrs. Crouch should have been
13      the primary beneficiary. And in error, I
14      wrote the primary beneficiary as James
15      Edward Crouch, which is their son.
16      When I submitted the paperwork, Lincoln
17      National always sends back a letter
18      confirming how the contract was written
19      up. And at that particular point when I
20      received that, I realized that I had
21      written the beneficiary up wrong.
22      So at that point, I contacted the
23      Crouches to let them know that I had made

Page 47

1       an error on the paperwork and that in order
2       to fix it the way that they wanted it to
3       be, it would require a separate document.
4       So Exhibit 12 was written up, but it is an
5       incorrect -- it was written up incorrect by
6       me.
7   Q.  Well, let's go over that in a minute.
8       But the -- with regard to your annuity
9       license, did you ever see any rules,
10      regulations and procedures of Lincoln
11      National Life?
12  A.  I'm sure I did.
13  Q.  What did those consist of?
14  A.  It could have consisted of a lot of things.
15  Q.  I mean, was there a manual with the rules,
16      regulations and procedures of Lincoln
17      National Life?
18  A.  If you're asking me whether or not I had a
19      manual, I can't answer that. I'm not
20      sure. It was a lot of -- a lot of
21      paperwork, a lot of -- a lot of manuals.
22  Q.  Well, in connection with your licensing
23      file, you applied to get your annuity

Page 48

1       license with Lincoln National Life
2       Insurance Company, known as LNL, on August
3       the 20th of 1997, correct?
4   A.  That -- I mean, that sounds -- that sounds
5       correct. I know we discussed the date of
6       the actual license a few minutes ago.
7   Q.  Well, I'm showing you the ...
8           (Plaintiff's Exhibit 8 was marked
9           for identification.)
10  Q.  I'm showing you Exhibit 8, the Ronda
11      Robinson licensing file that has been
12      provided by Lincoln National Life Insurance
13      Company, if you'll look at page 73 of that
14      document.
15  A.  Page 73?
16  Q.  Well, I guess they numbered them different,
17      provided different things at different
18      times.
19      Well, in this copy, to speed this up,
20      do you see this annuity license only
21      agreement with Lincoln's letterhead at the
22      top, correct?
23  A.  Uh-huh. (Positive response.)

Page 49

1    Q. Yes?
2    A. Yes.
3    Q. And is this your signature on the bottom of
4       that dated August 20th, '97?
5    A. That's correct.
6    Q. And you specifically agreed in paragraph
7       four to comply with the rules, regulations
8       and procedures of Lincoln National Life,
9       didn't you?
10   A. That's correct. Yes.
11   Q. And what I'm trying to find out, after you
12      certified to that, what rules, regulations
13      and procedures of Lincoln National Life did
14      you receive, review and attempt to follow?
15   A. Well, that would be information presented
16      to us in our training. But you asked
17      specifically about a manual, and I'm sure
18      that there was manuals there. But, you
19      know, to tell you where that manual was at
20      that particular time, I can't tell you
21      that. I don't know.
22   Q. You also agreed not to alter, modify, waive
23      or change any of the terms or forms of

Page 50

1       contract of Lincoln National Life, didn't
2       you?
3    A. Okay. Repeat that again.
4    Q. You also agreed as a condition of becoming
5       licensed to sell annuities for Lincoln
6       National Life not to alter, modify, waive
7       or change any of the terms or any of the
8       forms of contracts of Lincoln National
9       requirement – Lincoln National Life.
10      Paragraph five.
11   A. Okay. An altercation or a modification –
12   Q. Alteration.
13   A. Yeah.
14   Q. Alteration. You agreed not to change any
15      of the requirements, didn't you?
16   A. Yeah, that would be correct.
17   Q. Now, in these rules, regulations and
18      procedures of Lincoln National Life, was
19      there anything in there that described this
20      annuity-driven concept and the distinction
21      that's in the application between annuitant
22      beneficiary designees and owner-designated
23      beneficiaries?

Page 51

1    A. I'm sure it was.
2    Q. You remember that, don't you?
3    A. Well, I know -- I know that the annuities
4       are annuitant-driven. And part of my
5       learning is experience and dealing with the
6       annuities.
7    Q. And your experience was for you to
8       understand that difference, right, that
9       these didn't operate like CDs, owner-driven
10      with rights of survivorship as owners,
11      correct?
12   A. That's correct.
13   Q. And you would agree that as part of your
14      licensing file, even your -- even the fee
15      to get you licensed with the State of
16      Alabama was drawn on AmSouth Bank and
17      submitted with your request to become
18      licensed, correct?
19   A. It's an AmSouth Bank cashier's check.
20   Q. Right. AmSouth Bank's, right?
21   A. It's an AmSouth Bank cashier's check.
22   Q. Drawn on AmSouth Bank as the drawer as it
23      says right here, correct, ma'am?

Page 52

1    A. It's an accounts payable, right.
2    Q. Why was it that your Lincoln National Life
3       insurance license to sell this annuity
4       product was terminated?
5    A. I'm sorry?
6    Q. Why was your license to sell the annuities
7       with Lincoln terminated?
8    A. Upon resigning from AmSouth, once I left
9       the bank, I did not – I did not go to an
10      institution where I continued my license,
11      so that's why.
12   Q. And you would agree that the bank -- that
13      is, the bank-chartered institution that you
14      were an employee of, AmSouth Bank, was the
15      only bank in the AmSouth collection of
16      companies or corporations, correct?
17   A. Well, I think where you're coming from is,
18      AmSouth -- AmSouth Bank, I was employed
19      with AmSouth Bank, but I also worked for
20      AmSouth Investment Services, which is their
21      investment company.
22   Q. AmSouth Bank's investment company?
23   A. However that works.

Page 53

1   Q. And you would agree that with regard to the
2       application that is part of-- in your
3       licensing file that deals with the
4       commission structure that allows how commissions
5       are to be paid vis-a-vis Lincoln for these
6       matters, that Keith MacDougall, the
7       vice-president of development, specifically
8       signed that -- he described your company as
9       a bank that was going to be in charge of
10      paying these commissions, correct?
11              MR. WALDROP: Object to the form.
12  A. Let me ..
13              MR. PATERSON: Just for the
14              record, he's referring to the
15              Lincoln Bates stamped document
16              87.
17  Q. You agree that's what the document says,
18      ma'am?
19              MR. WALDROP: Object to the form.
20  A. Well, this is not a document with my
21      signature on it. I assume you have a
22      purpose for going in this direction,
23      but ...

Page 54

1       I don't know that I'm in a capacity to
2       answer exactly what this form is and what
3       it says.
4   Q. Ma'am, with regard to the next document
5       that's attached to that with regard
6       to ... well, I'll follow up ...
7       You would agree that there's nothing in
8       the training materials that you have that
9       we've identified in Exhibit Number 9 that
10      deals with that annuitant-driven concept
11      that we've talked about; is that right?
12              MR. PATERSON: Object to the form.
13  A. To tell you that, I would have to go back
14      through that information.
15  Q. Well, the –
16  A. The annuity training should explain and the
17      paperwork instructions should explain –
18      should explain the annuitant ...
19  Q. Well, the documents at page 98 specifically
20      indicate you're supposed to familiarize
21      yourself with the features and benefits of
22      the Lincoln National fixed annuity,
23      correct?

Page 55

1   A. That's correct.
2   Q. And you would gather those by reviewing
3       what's on the application, correct?
4   A. That's true.
5   Q. And that points out that it's annuity-
6       driven -- annuitant-driven, correct?
7              MR. PATERSON: Object to the form.
8   A. Does the application point out that ...
9   Q. Right.
10  A. To someone that was not familiar with the
11      application --
12  Q. No.
13  A. -- no, I mean --
14  Q. No, but to you.
15  A. Well, to me, in completing the application,
16      I mean, basically I made an error and it
17      was one that needed correcting because it
18      was not what the Crouches had requested.
19      The primary beneficiary should have been
20      Mrs. Crouch, and the contingent beneficiary
21      should have been Mr. James Edward Crouch.
22  Q. Well, let's just go back here to the
23      documentation, what we know in terms of the

Page 56

1       training. Annuitant was specifically
2       defined for you as the person whose life
3       the annuity is based upon, correct?
4              MR. PATERSON: What page are you
5              reading from there?
6              MR. MCHARD: 113.
7              MR. PATERSON: I'm sorry? What?
8              MR. MCHARD: 113.
9   Q. And the beneficiary is the -- specifically
10      defined as the person who receives the
11      proceeds of the annuity upon the death of
12      the annuitant, correct?
13  A. Right.
14  Q. You understood that, correct?
15  A. I understood that. That is correct.
16  Q. And you understood that the primary
17      beneficiary was the person who first -- who
18      is first in line to receive the annuity
19      proceeds on the death of the annuitant,
20      correct?
21  A. That is correct. But, however, when
22      writing up the paperwork, I wrote the
23      paperwork up wrong when it came to the

Page 57

1    primary beneficiary.
2    Q. Well, with regard to fixed annuities, you'd
3    also agree that who is involved -- that is,
4    the parties involved that have rights in
5    and to the contract are specifically listed
6    in the Lincoln training materials as the
7    owner, annuitant and beneficiary, correct?
8        MR. WALDROP: Let me just object.
9    Q. Is that correct, ma'am?
10       MR. WALDROP: Object to the form.
11       MR. PATERSON: What page?
12       MR. MCHARD: 114.
13   Q. Is that correct?
14   A. That's correct.
15   Q. And that the beneficiary -- under
16   beneficiary, it specifically states that
17   proper identification of beneficiaries for
18   annuity contracts is an important part in
19   setting up a fixed annuity contract. A
20   proper beneficiary designation will enable
21   the exact wishes of the contract owner to
22   be carried out at the death of the
23   annuitant, correct?

Page 58

1    A. That's correct.
2    Q. And you knew all those things, correct?
3    A. Yeah. Unfortunately -- Unfortunately, it
4    was a human error.
5    Q. And you had a copy of the rules and
6    regulations and policies of Lincoln
7    National with regard to how to fill out
8    these forms and the explanation of how to
9    do it and what it meant, correct?
10   A. That's correct.
11   Q. And you also knew that you could call
12   Lincoln National for advice with regard to
13   these matters, correct?
14   A. Well, the realization that I had written it
15   wrong was not -- I didn't realize that I
16   had made the mistake until I received the
17   letter from Lincoln. Do you have a copy of
18   that letter?
19   Q. Well, yes, I have a copy --
20   A. May I look at that, please?
21   Q. I have a copy of a letter that I'll get to
22   in just a moment if you don't mind.
23       I want to focus on the day that the

Page 59

1    Crouches came in.
2    A. Okay.
3    Q. What documents did you -- What was the
4    order in which you went over documents with
5    them?
6    A. You're talking -- I'm sorry. You're
7    talking about the day that they came in on
8    May the 7th --
9    Q. Right.
10   A. -- 1998?
11   Q. Right.
12   A. I'm sorry. What documents?
13   Q. What was the order in which you went over
14   documents with them?
15   A. Well, first of all, we would have had a
16   discussion as to what they were in for that
17   particular day.
18   Q. Did they say they wanted to buy an annuity
19   or did they say that they were there
20   consulting with you to recommend what
21   investment product to buy?
22   A. Well, there's always a concern as to what's
23   paying the most money, what can make --

Page 60

1    what could make me the most money.
2        And in talking with them about CD
3    rates, I did let them know that I was --
4    that I was now licensed and that I could
5    talk to them about some products that
6    AmSouth Investment Services had, which
7    consisted of still a conservative type of
8    investment which is a fixed rate annuity.
9    Q. And did you then go over with them the
10   confidential client profile? Is that the
11   first document you went over with them?
12   A. I don't know if that's the first document.
13   I'm sure we would have had a pretty lengthy
14   conversation in -- in how it works because
15   that was -- this was something new to them,
16   so we would have had a pretty lengthy
17   conversation. But then the customer client
18   profile --
19   Q. Exhibit Number 11, correct?
20   A. Right.
21   Q. And that is the confidential client profile
22   that you prepared with them; is that right?
23   A. That's correct.

Page 61

1   Q. And you did all the writing on the document
2       except for the actual signatures of James
3       Earl Crouch and Sue Crouch on customer's
4       signature on the last page of the document;
5       is that correct?
6   A. That's right.
7   Q. And you were aware that they wanted and you
8       specifically marked that they wanted as
9       their primary and overall objectives tax
10      savings, correct?
11   A. That is correct.
12   Q. Because they were, according to them,
13       earning in excess of $50,000 a year,
14       correct?
15   A. That is the information that I was given at
16       the time.
17   Q. And that their estimate of net worth was
18       $250,001 to $500,000, correct?
19   A. That would be the information given at the
20       time.
21   Q. And you knew from looking at this document
22       that they had significant assets that were
23       held in connection with banking

Page 62

1       relationships that they had with Alliant
2       Bank there in Wetumpka, correct?
3           MR. PATERSON: Object to the form.
4           MR. WALDROP: Same.
5   A. Could you say that again?
6   Q. You filled this form out, we've
7       established, correct?
8   A. That's correct.
9   Q. And you knew that they had a CD at Alliant
10      Bank in Wetumpka, correct?
11   A. According to the profile information given
12       at the time, it does indicate that.
13   Q. And that's a significant dollar amount
14       representing transactions, deposits with
15       another bank in town, correct?
16   A. It says here $135,000.
17   Q. Do you agree that's a significant dollar
18       amount?
19   A. Could be to some.
20   Q. It is to you, right?
21   A. To me, yes.
22   Q. And were you aware of the amount of
23       earnings that came from the CDs, the money

Page 63

1       markets and the -- and the IRA, what
2       earnings those were spinning off?
3   A. Yeah, based on the interest rates given
4       there.
5   Q. Well, did you compute what that was?
6   A. At that time, I'm sure I probably did.
7   Q. But you didn't write it down?
8   A. Probably not.
9   Q. And you knew that they had from assets that
10      were just cursorily listed here assets
11       approaching $500,000, correct?
12   A. Based on what they told me, yes.
13   Q. And you made the recommendation to them
14       that they purchase the Lincoln National
15       Investor's Choice and wrote that on the
16       third page, didn't you?
17   A. That's correct.
18   Q. And then with regard to the next document,
19       Exhibit 10, that would have been the next
20       document that would have been -- that you
21       would have gone over and prepared with them
22       once that recommendation had been made by
23       you to them; is that right?

Page 64

1   A. As far as -- Now, if you're asking in what
2       particular order the documents were
3       completed I'm not sure, but this would be
4       one of the required documents.
5   Q. Well, this document wouldn't have been
6       prepared until after the recommendation had
7       been made by you and an agreement that
8       they -- you know, that they wanted to --
9   A. That's correct.
10   Q. -- to apply for --
11   A. That's correct.
12   Q. -- a fixed annuity, right?
13   A. That's correct.
14   Q. So the first document would have had to
15       have been the confidential client profile
16       of AmSouth, and then -- then this fixed
17       annuity authorization form, right?
18   A. That's correct.
19   Q. And it says: Complete this form and fax
20       the PRD. What's the PRD?
21         I think I misspoke. It says: Complete
22       this form and fax to the PRD at, and it
23       gives an 800 number.

16 (Pages 61 to 64)

Page 65

1    MR. PATERSON: Do you see that
2        language?
3  Q.  See that right under there?
4  A.  Yeah, right here.
5  Q.  What is that?
6  A.  To my recollection, when we did the
7        paperwork, we would have copies that we
8        would send to certain departments, but
9        there was a department that reviewed our
10      paperwork.
11  Q.  All of this paperwork that we've gone
12      over: 10, 11, 12, and 13?
13  A.  More than likely. I mean, honestly, I
14      don't remember every piece that we were to
15      fax to them. I don't remember that.
16  Q.  And there's nothing in the files to
17      indicate and you have no recollection that
18      there was ever any criticism in how you
19      would fill these forms out, right, after
20      they were reviewed by the people you faxed
21      them to, right?
22      Is that right, ma'am?
23  A.  Well, they wouldn't know my conversation

Page 66

1        with the Crouches as to who they -- how the
2        beneficiary was intended to be listed, so
3        they wouldn't know there was anything wrong
4        with this paperwork.
5  Q.  And no comment was ever made about it, was
6        it?
7  A.  Once I received the paper that I asked for
8        a minute ago from Lincoln National, at that
9        point, I knew I had -- I had written the
10      beneficiary down wrong.
11          (Plaintiff's Exhibit 15 was marked
12              for identification.)
13  Q.  Showing you Plaintiff's Exhibit Number 15.
14      That is the letter that ...
15  A.  I'm not sure this is the one. This is one,
16      but I'm not sure this is the one.
17  Q.  That's the letter you're talking about,
18      correct?
19  A.  I'm not sure this is the one I was thinking
20      of.
21          MR. PATERSON: There's -- Let me
22          just state, the process --
23          there's a letter that's got

Page 67

1        some of her handwritten notes
2        on it that we produced to you
3        that's that same document is
4        what she's saying.
5          MR. MCHARD: Well, I don't know
6          that she's saying it. And,
7          again, please, you know, no
8          speaking objection.
9          MR. PATERSON: Fine. Figure it
10        out yourself.
11          MR. MCHARD: Well, no, trust me.
12        I have figured this out
13        myself.
14          MR. PATERSON: I trust you.
15          MR. MCHARD: Thank you.
16  Q.  There was another document, Exhibit Number
17      14, that went to the customer. Is that the
18      document that you're referring to, ma'am?
19  A.  I would have seen a copy of this as well.
20  Q.  How would you have seen that?
21  A.  That's not the document.
22      Because a copy that's sent to the
23      customer is also sent to the agent.

Page 68

1  Q.  Automatically, or would you have to ask for
2        it?
3  A.  No, they automatically send those to the
4        agents.
5  Q.  So you saw Exhibit Number 14 and Number 15,
6        correct?
7  A.  I saw this, but I don't think this is the
8        copy that was in my file.
9  Q.  You mean you saw Exhibit 14 and 15,
10      correct?
11  A.  I saw those exhibits, but I don't think
12      that 15 is the one that I had in my file.
13  Q.  Did you keep both of those in your file, 14
14      and 15? Is that something you would have
15      been required to and, in fact, did retain?
16  A.  I don't know that it's required.
17  Q.  But you did keep it?
18  A.  But I probably would have kept a copy in
19      the file.
20  Q.  The document specifically says in Exhibit
21      Number 14 that -- Dear James E. Crouch,
22      annuitant-driven -- referring to James E.
23      Crouch, the annuitant, that --

Page 69

1    congratulations on your recent annuity
2    purchase.
3        Then it goes on to state: Take a
4    moment to review and verify the information
5    showing -- shown on the attached contract
6    page. All right? And you would agree that
7    the document that's attached to Exhibit
8    Number 14 is the contract page, correct?
9  A. That's one part of it.
10 Q. Well, it just says -- it refers to the
11    attached contract data page. There was
12    only one page that was attached to this
13    letter, and it was the contract data page
14    that is attached to Exhibit 14, correct?
15        MR. WALDROP: Object to the form.
16 A. I can't say that that's exactly correct.
17 Q. Did the document -- The contract data page
18    specifically says that the owner is James
19    E. Crouch, the joint owner is Sue Crouch,
20    the annuitant is James E. Crouch, and that
21    the annuitant's beneficiary is as noted in
22    the application, correct?
23 A. That's what this particular letter says,

Page 70

1    yes.
2  Q. And you would agree that the only
3    beneficiary that was noted in the
4    application, which you also have in front
5    of you as Exhibit 12, is the annuitant-
6    designated beneficiary, James Edward
7    Crouch, listed as primary beneficiary,
8    relationship to annuitant, son. Correct?
9    Is that correct?
10 A. That is what's listed on the application;
11    however, James Edward Crouch was listed as
12    primary beneficiary in error. He was
13    supposed to have been listed as the
14    contingent beneficiary.
15 Q. And there is no contingent beneficiary
16    listed on that document, is there?
17 A. No.
18 Q. And you would agree that it is clear from
19    the annuity application that upon the death
20    of a non-annuitant owner, the proceeds of
21    the annuity would be paid to the surviving
22    owner as beneficiaries -- as beneficiary,
23    correct?

Page 71

1        MR. WALDROP: Object.
2  A. Okay. Read that again.
3  Q. You would agree that upon the death of a
4    non-annuity -- non-annuitant owner, the
5    proceeds from the annuity, the surrender
6    value proceeds, would be paid to any
7    surviving owner or joint owner as the
8    beneficiary, correct?
9  A. That is correct.
10 Q. And you would also agree that the flip side
11    of that is also true, that if you were an
12    annuitant owner, then the proceeds upon
13    death would go to the annuitant-designated
14    beneficiary to the exclusion of any owner
15    beneficiary, correct? You know that?
16 A. That would be correct.
17 Q. And you would also agree that on this document,
18    there was no owner beneficiary designation
19    made, correct? That whole area is blank.
20 A. What are you saying?
21 Q. Under the -- Ma'am, under the area of owner
22    beneficiary information, there was no
23    owner's beneficiary, correct?

Page 72

1  A. Well, that is correct.
2  Q. And you would agree that that would be
3    consistent with the note that Lincoln
4    National put on this that said the owner
5    beneficiary designations as opposed to
6    annuitant designation beneficiaries are
7    applicable only when there is no joint
8    owner, right?
9  A. Okay. Going back to Exhibit 12, under
10    owner beneficiary information, that
11    designation is applicable only when there
12    is no joint owner.
13 Q. Right.
14 A. In this case, there was a joint owner,
15    which was Mrs. Sue Crouch.
16 Q. Right. But it didn't do any good for there
17    to be an owner beneficiary designation if
18    there was a joint owner because as it says
19    above, upon non-annuitant owner's death,
20    the surrender proceeds will go to any
21    surviving owner as beneficiary, just like
22    the regular joint tenancy, correct?
23 A. I'm not quite sure I'm following that. I

Page 73

1    can't answer that correct.
2    Q. Well, that's what it says, isn't it?
3        MR. WALDROP: Objection.
4    A. Well, I'm just not -- I'm not sure. I
5    don't want to answer correct if I'm not
6    totally sure, and I would have to -- I
7    would have to think about exactly what
8    you're saying, so I may be getting a little
9    confused.
10   Q. Well, I'm saying exactly what the document
11   itself says when it speaks. It says: On a
12   non-annuitant owner's death, the surrender
13   value proceeds will be paid to any
14   surviving owner as beneficiary.
15   A. That's what the document says under note.
16   Q. And that's true because where you have an
17   owner who is not the annuitant, if he has
18   or she has a joint owner, then all those
19   proceeds go to the surviving owner,
20   regardless of what the designation is by --
21   with regard to an owner beneficiary,
22   correct?
23       MR. WALDROP: Objection.

Page 74

1    A. On this particular contract, if the
2    annuitant -- in this case, the annuitant
3    and the owner is the same person. That's
4    why the owner information is blank. Joint
5    owner, of course, was Mrs. Crouch.
6        So in this case, the beneficiary
7    follows the annuitant. In the case of
8    the -- and I'm not sure if this is the
9    direction you were going, but I have to say
10   it in my words so that I make sure I say it
11   right.
12       In this case, if the annuitant were
13   to -- were to pass away, then the funds
14   would go to the annuitant's beneficiary.
15   If the joint owner were to pass away, then
16   technically, you know, there would be no
17   corrections or anything needed as the
18   contract, you know, is written as far as an
19   annuitant. It would still have a
20   beneficiary, and it would still have the
21   owner being the same person.
22       I'm not sure that that answered or goes
23   along the lines of what you were talking

Page 75

1    about, but ...
2    Q. And when you signed Exhibit Number 12, your
3    signature is all on one line for agent's
4    signature. I mean, it's not on two
5    separate lines, correct?
6    A. That is correct.
7        (Brief interruption.)
8        (Brief recess was taken.)
9    Q. Look at Exhibit Number 12, I think it is.
10   A. Here it is. Okay.
11   Q. You would agree that there was only one
12   annuitant on this Crouch annuity?
13   A. That's correct.
14   Q. And only the annuitant can change the
15   annuitant beneficiary under this contract,
16   correct?
17       MR. GREGGS: Object to the form.
18   A. No, I don't believe that's correct.
19   Q. Well, what do you base that on, ma'am?
20   A. The owner of the -- I'm not sure I answered
21   your previous question correctly, but the
22   owners are able to make changes on the
23   contract as far as beneficiaries. In most

Page 76

1    cases, there is only one annuitant, and the
2    annuitant is also going to be an owner, so
3    it's --
4    Q. But that's not always true?
5    A. I'm sorry?
6    Q. That's not always true.
7    A. Can you give me an example of when it's not
8    true?
9    Q. Yeah, when the annuitant is somebody other
10   than the person that owns it. I buy an
11   annuity for my daughter, and she is the
12   annuitant. I'm the owner. She's the
13   annuitant, right?
14   A. I can't answer that.
15   Q. She's not the owner.
16   A. I don't know. I don't know.
17   Q. Well, you agree there was only one
18   annuitant on this contract?
19   A. Who was also an owner, that's correct.
20   Q. And there's a distinction made on this form
21   as to annuitant owners and non-annuitant
22   owners, correct?
23   A. The annuitant was also an owner. There was

Page 77

1    a joint owner on this particular contract.
2    Q. And you would agree that pursuant to this
3       contract, only the annuitant can change the
4       annuitant beneficiary designation, correct?
5              MR. WALDROP: Objection.
6              MR. GREGGS: Object to the form.
7    A. Well, the annuitant is also an owner.
8    Q. But somebody who's not the annuitant can't
9       make a change in the designation of the
10      annuitant's beneficiary --
11             MR. WALDROP: Objection.
12             MR. GREGGS: Objection.
13   Q. -- can they?
14   A. No. The thing here is, I'm not familiar
15      with doing a contract where an annuitant is
16      not also an owner. I'm not saying that
17      that couldn't be done. I don't sell
18      annuities anymore. So I'm trying to base
19      and -- answer your questions to the best of
20      my knowledge based on what I remember from
21      when I was an agent.
22         So, you know, I'm just not familiar.
23      Don't remember ever doing a contract where

Page 78

1    an annuitant was not an owner. So to
2    answer your question, I personally am not
3    familiar with an annuitant being able to
4    make changes. It would normally always be
5    the owner and/or joint owner making
6    changes.
7    Q. Well, the only person under this contract
8       who was the annuitant that could make
9       changes to the annuitant beneficiary
10      designation was James Earl Crouch, correct?
11             MR. WALDROP: Objection.
12             MR. GREGGS: Objection.
13   A. I can't say that's correct --
14   Q. You don't know?
15   A. -- because it has a joint owner.
16   Q. So you don't know?
17   A. It should be the owner and the joint
18      owner --
19   Q. Well, you --
20   A. -- that can make changes.
21   Q. I mean, my statement --
22   A. But it would require both signatures.
23   Q. My statement was confirmed by the letter

Page 79

1    that went to you dated May 18th of 1998
2    which you had asked to see and so I
3    provided it to you. That's not it, ma'am.
4       That is Exhibit Number 15 that I'm
5    asking you to look at. That's the one that
6    was sent directly to you.
7    A. That's not the copy that was in my file.
8    Q. No. But this is exactly how you received
9       the letter, isn't it, as it's shown in
10      Exhibit 15?
11   A. Should be, but it's not the copy that was
12      in my file.
13   Q. And what does outstanding requirements
14      mean?
15   A. Outstanding requirements would mean that if
16      there had been an error in paperwork, if
17      there was a form or something that was
18      failed to get signed or a form that was
19      failed to be completed, they would note
20      that to us. That would be how we would
21      know that we had something to follow up on
22      to complete the -- to complete the
23      contracts.

Page 80

1       Also, if there was something a little
2    out of the ordinary, such as on here where
3    they mention that upon the death of the
4    annuitant, all benefits would be payable to
5    the primary beneficiary, that was a
6    notation that they made there so that I
7    would make sure that that was -- that was
8    the way it should have been written, which
9    it was not.
10      That's how I knew that I had made a
11   mistake, and in referring back to the
12   contract, I knew that I had put the
13   beneficiary information under primary where
14   it should have been contingent.
15   Q. Well, ma'am, the closeout date would have
16      been July 17th of '98; that is, anything
17      that was noted under outstanding
18      requirements would need to be finished up,
19      cleaned up on or before July the 17th of
20      1998 with Lincoln, correct?
21   A. If there was -- if there was a particular
22      form or something that was -- that was
23      outstanding, that would be a date that they

|  | Page 81 |  | Page 83 |
|---|---|---|---|
| 1 | would want to get it back, to my understanding. | 1 | I remember giving them a call to let them know that I had filled the paperwork |
| 2 | understanding. | 2 | them know that I had filled the paperwork |
| 3 | Q. Now, subsequent to the -- your receipt of | 3 | out wrong and that I would need them to |
| 4 | the letter on May the 18th of 1998, did you | 4 | come in and sign a paper for me in order to |
| 5 | immediately make a notation in this -- in | 5 | get it set up the way they had originally |
| 6 | your chronological listing of important | 6 | requested. |
| 7 | events or problems or concerns that we | 7 | Q. Well, did you tell them that they'd have to |
| 8 | talked about earlier for this Crouch file? | 8 | do that immediately? |
| 9 | MR. WALDROP: Object to the form. | 9 | A. No, because -- no, I didn't. I didn't give |
| 10 | MR. PATERSON: Object to the form. | 10 | them a specific time. I just let them know |
| 11 | A. Well, the paper that's in my file, if I | 11 | that the way it was set up at that |
| 12 | recall, I had made some notes on this | 12 | particular time, that in the event of the |
| 13 | particular letter, but I don't have a copy | 13 | annuitant's death, that the beneficiary |
| 14 | of that. | 14 | would be the son, not Mrs. Crouch. And |
| 15 | Q. Well, would you have made a note in the | 15 | that was -- that was not what they had |
| 16 | chronological listing? | 16 | originally indicated to me they wanted to |
| 17 | A. I may not have. I may have made my | 17 | do. |
| 18 | comments on this particular -- on this | 18 | Q. In that phone call, did you talk to James |
| 19 | particular page. | 19 | Earl? |
| 20 | Q. But did you talk with the Crouches about | 20 | A. I don't recall if I spoke to Mr. Crouch. |
| 21 | some problem? | 21 | Q. Did you speak with Mrs. Crouch? |
| 22 | A. Yes, I called them. | 22 | A. Probably talked to Mrs. Crouch. |
| 23 | Q. When? | 23 | Q. Well, do you remember? Do you specifically |

|  | Page 82 |  | Page 84 |
|---|---|---|---|
| 1 | A. Well, I have a feeling that's documented -- | 1 | remember who you talked with? |
| 2 | Q. Where? | 2 | A. Not specifically. |
| 3 | A. -- if you have that copy. | 3 | Q. But you told them at that time, which would |
| 4 | MR. PATERSON: Would you like to | 4 | have been immediately after you got this |
| 5 | see this letter? Would that | 5 | letter, according to you, sometime in mid |
| 6 | help you? I don't want to | 6 | May of 1998 that, look, you need to know |
| 7 | interfere with your exam, | 7 | that if James Earl dies, all the benefits |
| 8 | but ... | 8 | are going to go to the primary beneficiary, |
| 9 | Q. Your attorney has handed you another | 9 | James Edward, your son, correct? |
| 10 | letter, right? | 10 | A. That's what I would have told them, yes. |
| 11 | A. No. This is -- this is the one -- this is | 11 | Q. And you would agree that the next notation |
| 12 | Exhibit 15, but this is the copy where I | 12 | that you have to the file -- in fact, the |
| 13 | had made a comment, where I had notated on | 13 | first notation that you had to the file in |
| 14 | here when I received the letter that this | 14 | terms of the chronological listing is that |
| 15 | is not what the customer wanted. Will | 15 | they stopped by two months later, said they |
| 16 | decide what to do and make the change | 16 | were concerned about the safety of the |
| 17 | later. | 17 | investment. You consoled them by telling |
| 18 | That indicates to me that I talked to | 18 | them that they were insured by Lincoln, but |
| 19 | them and explained to them that the way | 19 | that's not FDIC, and that they may want -- |
| 20 | that it was set up, that it didn't get set | 20 | may, meaning might possibly at some point |
| 21 | up exactly like they wanted. And so in | 21 | down the road -- want to consider making |
| 22 | order to fix that, that they would need to | 22 | changes in beneficiaries, right? |
| 23 | come in. | 23 | MR. PATERSON: Object to the form |

Page 85

1          of the question. Let her see
2             the document you're reading
3             from. It's her notes.
4     Q.  Isn't that correct, ma'am?
5          MR. WALDROP: Same objection.
6     A.  I would like to see whatever you're looking
7        at there.
8     Q.  Well, first let me ask you, do you recall
9        that event?
10    A.  Well, that's something that happened six
11       years ago. If I could see what I wrote, it
12       might help me.
13          MR. PATERSON: I'm going to show
14             it to you.
15    Q.  So the only -- the only recollection you
16       would have about that first recorded
17       discussion that you had after the issuance
18       of the annuity with the Crouches would be
19       what's in the file that you maintained and
20       the chronological listing; is that
21       correct?
22          Is that correct, ma'am?
23    A.  What are you asking me?

Page 86

1     Q.  The only reference, the only thing that
2        could help refresh your recollection as to
3        what they said and you said about that
4        event is whatever you had in your
5        chronological listing that you kept in your
6        annuity file for the Crouch annuity; is
7        that right?
8          MR. WALDROP: Objection.
9     Q.  Because if your recollection isn't
10       exhausted, then you're not entitled to see
11       documents to refresh your recollection.
12          MR. WALDROP: Objection.
13          MR. PATERSON: Object to the
14             form.
15          MR. WALDROP: I think that's an
16             incorrect statement of law.
17          MR. PATERSON: You're entitled to
18             see any documents you want to
19             see.
20    Q.  Do you have any recollection of any July
21       discussions with them?
22    A.  I do recall -- I do recall them coming in.
23       Now, the particular dates, I don't know. I

Page 87

1        would like to see the document.
2     Q.  Well, but would that refresh --
3          MR. PATERSON: As a matter of
4             fact, I'm not going to let her
5             be examined by documents you
6             hold in your hand that's her
7             notes and you won't show them
8             to her.
9          MR. MCHARD: No, I'll show it to
10            her if she says --
11          MR. PATERSON: She's asked several
12            times for it.
13          MR. MCHARD: If she has said that
14            her -- No. And you will not
15            hand her documents --
16          MR. PATERSON: I'll hand her what
17            I please.
18             There is the document
19            he's questioning you about,
20            and you may -- you may review
21            your notes and answer his
22            question. He won't give it to
23            you. You've asked several

Page 88

1        times --
2          MR. MCHARD: I will give it to her
3             once she says that her
4             recollection of this event is
5             exhausted.
6     Q.  Without looking at your notes, is your
7        recollection of the discussion --
8          MR. MCHARD: And don't interrupt,
9             please, or we'll ask the court
10            for sanctions because I think
11            what you've done already is
12            sanctionable.
13    Q.  Now, do you have any recollection of the
14       discussion that you held with the Crouches
15       with regard to their -- with regard to the
16       Crouch annuity in dispute here other than
17       what's in your notes?
18          MR. PATERSON: Before you answer,
19            I want to put this on the
20            record.
21             I'm objecting to this
22            because he's asking you about
23            a question where he

Page 89

1   paraphrased some language to
2   you out of your personal
3   notes, yet he won't show you
4   the notes.
5   MR. MCHARD: Ill show it to
6   her --
7   MR. PATERSON: I've handed you the
8   notes. And I have no
9   objection to her answering the
10  question if you'll give her
11  her own notes. I've given it
12  to her, and you -- I'm
13  instructing you, you can look
14  at your own notes before you
15  answer him because he read
16  from them and won't show them
17  to you.
18  MR. MCHARD: Ill show them to her
19  if she says that her
20  recollection is refreshed --
21  MR. PATERSON: If you want to go
22  to the magistrate judge with
23  that, that's fine.

Page 90

1   MR. MCHARD: I will be glad to --
2   MR. WALDROP: I object to the form
3   of the question.
4   Q.  Do you have any recollection of that
5   discussion and event other than what's in
6   your notes?
7   A.  I recall the Crouches coming in with a
8   little bit of concern because this was an
9   investment that they had not done before.
10  So I remember having a discussion with them
11  about -- about their concerns as far as the
12  safety of their money. I remember the two
13  of them coming in and us having that
14  conversation.
15  Q.  Do you recall anything else about that
16  conversation or about that event without
17  looking at your notes?
18  MR. WALDROP: Object to the form.
19  MR. PATERSON: You can look at
20  what you please. If you
21  want --
22  Q.  If you want to refresh your recollection
23  once you say you don't recall any more

Page 91

1   about it, then I'll provide you with a copy
2   not only of your notes, ma'am, as I'm
3   prepared to do, but the entire file that
4   you maintained.
5   So just tell me. Do you have any other
6   recollection with regard to that date, that
7   conversation and that event with the
8   Crouches?
9   MR. PATERSON: And my instruction
10  to you is if you want to
11  review your notes before you
12  answer him, you may.
13  MR. WALDROP: Object to the form
14  of the question.
15  A.  Well, I mean, I think I would have to
16  review the notes to be sure. That's been a
17  long time ago. I don't think you could
18  expect me to recall all the details without
19  reviewing my notes.
20  Q.  You've told me what you recall so far and
21  exhausted your recollection and would now
22  like to refresh your recollection by
23  reviewing these notes; is that correct,

Page 92

1   ma'am?
2   MR. PATERSON: Object to the form.
3   A.  I would like to see the notes.
4   Q.  And that's what you want to do, right?
5   MR. PATERSON: Object to the form.
6   MR. WALDROP: Objection.
7   A.  I would like to see the notes.
8   Q.  And you think that would refresh your
9   recollection about this, ma'am?
10  MR. PATERSON: Object to the form.
11  MR. WALDROP: Objection.
12  A.  Well, yes, I think ...
13  (Plaintiff's Exhibit 18 was marked
14  for identification.)
15  Q.  I'm showing you Exhibit Number 18. Would
16  you agree that Exhibit Number 18 is a true,
17  correct and complete copy of the entire
18  file that you maintained at AmSouth with
19  regard to this transaction as it has been
20  represented by counsel for AmSouth Bank?
21  MR. WALDROP: Object to the form.
22  Do you have an extra copy
23  of that?

Page 93

1      MR. MCHARD: Yes.
2      MR. WALDROP: Thank you.
3   Q. Is it, ma'am?
4   A. These copies in front of me appear to be
5      from the file. I cannot say that there was
6      not other information that was in that
7      file.
8   Q. Are you aware of information that is
9      missing from Exhibit Number 18 that would
10     have been materials that you would have
11     placed in their file while you were an
12     employee at AmSouth Bank in Wetumpka?
13  A. Whether or not there were more notes
14     attached, I honestly cannot remember that.
15     This would appear to be the type of
16     information I would keep in the file. But
17     to say this is all of the file, I can't --
18     I can't say that that's necessarily
19     correct.
20  Q. Is all the handwriting on the first page of
21     that document yours?
22  A. All except the name and phone number at the
23     bottom.

Page 94

1   Q. Whose handwriting is that?
2   A. I have no idea.
3   Q. Do you know when it was placed on the file
4      material?
5   A. I do not know.
6   Q. Or by whom?
7   A. I do not know.
8   Q. I'd like you to read your handwritten entry
9      for July the 2nd of 1998, the first of the
10     handwritten entries on your chronological
11     listing of events.
12  A. July 2nd, 1998. Mr. and Ms. Crouch were in
13     today, a little concerned about the safety
14     of their annuity. Again, I told them they
15     were insured by Lincoln. They understand
16     fully that it is not FDIC. We also talked
17     about beneficiaries. They may want to make
18     some changes on that later.
19  Q. But despite your having told them on the
20     phone that upon the death of the annuitant,
21     all benefits will be payable to the primary
22     beneficiary, James Edward Crouch, there
23     were -- there were no changes in 1998 or

Page 95

1      1999, were there?
2   A. According to the paperwork in this -- in
3      this particular file, no, there does not
4      appear to be anything that transpired.
5   Q. And no request for any such changes,
6      correct?
7   A. Not that I see in here.
8   Q. And you would agree that in the
9      chronological listing that's the first page
10     of Exhibit Number 18, there's no listing of
11     any change having ever been requested or
12     made by the annuitant in this case,
13     correct?
14  A. That's ...
15  Q. Is that correct, ma'am?
16  A. For what date?
17  Q. For any date. If you look at the
18     chronological listing, the front sheet of
19     that -- of your file, the chronological
20     listing of the important events, there is
21     no listing of any request or the execution
22     by the annuitant of any changes in the
23     annuity; is that correct?

Page 96

1   A. The chronological listing is basically for
2      the agent's record. Doesn't indicate that
3      there may or may not have been some changes
4      done. There was a change of beneficiary
5      form completed April the 4th of 2000;
6      however, it's not documented on the Exhibit
7      18. And, again, that's just notes of the
8      agent, not necessarily saying that nothing
9      else took place.
10  Q. And showing you Exhibits 21 and 23, these
11     would be annual statements that would have
12     been sent to the annuitant, correct?
13  A. This appears to be an annual statement.
14  Q. With regard to the Crouch annuity, correct?
15  A. James E., Sue Crouch, that's correct.
16  Q. And the -- it specifically has a provision
17     in there for transaction dates and type of
18     transaction, correct?
19  A. Okay. Say that again.
20  Q. In terms of the transaction summary -- that
21     is, what happened during the period that's
22     being reported upon -- there is a
23     transaction date and a transaction type,

24 (Pages 93 to 96)

Page 97

1    which would include any significant changes
2    in the annuity, correct?
3           MR. WALDROP:  Object to the form.
4           MR. GREGGS:  Object to the form.
5    A.  That would be in regards to withdrawals or
6    deposits.  It would not indicate it on
7    this -- on that particular section if there
8    were a change in beneficiary.
9    Q.  Well, you specifically requested that
10   copies of those statements be faxed to
11   you.  You asked Lincoln to do that, didn't
12   you?
13   A.  Yeah.  I mean, it says here on 5-22, I made
14   a note that they were faxing me some
15   statements.  I would assume this is what we
16   were looking at.
17          Usually request to see the statements
18   just to look and see -- see the earnings on
19   the annuity.
20   Q.  Well, why didn't you just ask the Crouches
21   to see their copy?  Weren't they getting
22   these?  Weren't they getting their
23   correspondence from Lincoln?

Page 98

1    A.  I don't know.
2    Q.  But in any event, you didn't call them, the
3    Crouches, who were five minutes or less
4    away from the bank to simply drop by and
5    let you review that?
6    A.  I wouldn't ask a customer to bring me their
7    statement, not if it were something I had
8    access to.
9    Q.  With regard to the chronological listing,
10   the next item is February the 2nd of '04,
11   just two weeks before the passing of
12   Mr. Crouch, correct?
13   A.  It was 2002 of '01.
14   Q.  February 2 of '01, correct?
15   A.  Of '01.
16   Q.  Right.
17          And do you recall Mrs. Crouch either
18   calling or coming to see you, absent
19   looking at your notes?
20   A.  I don't recall.  Mrs. Crouch was in and out
21   of the branch a lot of times.  We didn't
22   necessarily have a sit-down meeting every
23   time she was in the branch.  I could have

Page 99

1    spoken to her many times in the lobby.
2           This particular day, there must have
3    been a sit-down conversation because I did
4    document her concerns.
5    Q.  So if there was a sit-down conversation,
6    you'd document that, right?
7    A.  In most cases, if it related to the annuity
8    or something that I -- I felt I should
9    probably write down.
10   Q.  And that would be on this form, correct?
11   A.  Not necessarily this form, but it would
12   have -- it would be on something probably
13   in the file.
14   Q.  You specifically assured her that she'd be
15   fine since she had other funds that she
16   could use to pay for any expenses that
17   might be coming up, correct?
18   A.  Her concern according to this was that
19   Mr. Crouch's health was failing.  She was
20   worried about expenses in the event that
21   Mr. Crouch needed extended care.
22          In reviewing her other accounts and
23   information that I had, we discussed that

Page 100

1    she would be able to pull from those funds
2    instead of having to take from her annuity
3    since it was earning her a good interest
4    rate.  It would make more sense to.
5    Q.  And you knew that there was approximately
6    $250,000 of other assets that she could use
7    to do that together with the income that
8    was coming in from his pension and her
9    social security, et cetera, correct?
10   A.  At that particular time, the information
11   that I would have would be her accounts at
12   AmSouth and what was on the profile.
13   Q.  Which would indicate approximately $250,000
14   of other assets?
15   A.  I'm not sure.  I'm not sure what the
16   balances were at that particular time.
17   That was dated 2-2 of '01.
18   Q.  Well, in connection with the ... the client
19   profile, I'd like you to take a look at
20   that for a moment.  It's Exhibit 11.
21   You've got it right there in front of you.
22   A.  Yes, sir.
23   Q.  With regard to that, that document

Page 101

1    indicates that the annuitant had a will,
2    correct?
3    A. It says on the profile, you know, if you
4       have -- I mean, basically if we ask the
5       customer if they have a will and they tell
6       us that they do, we mark whether or not
7       they do.
8    Q. And it's marked yes that they had a will,
9       right?
10   A. It says that they did.
11   Q. And did you ask if you could take a look at
12      that to -- you know, to see what the -- you
13      know, their estate plan and testamentary
14      disposition plan was or -- that of
15      Mr. Crouch?
16   A. No, I would have no reason to look at their
17      will.
18   Q. So you don't know what that was?
19   A. No.
20   Q. Did you ever see the will?
21   A. No.
22   Q. Did Mr. Crouch ever tell you what his will
23      provided?

Page 102

1    A. No.
2    Q. Are you aware that Mr. Crouch had a will
3       that specifically provided one dollar for
4       his children other than James Edward
5       Crouch?
6           MR. WALDROP: Objection.
7    A. No.
8    Q. With regard to the letter that you have in
9       front of you that went on May 18th to the
10      Crouches at the same time that you got a
11      letter, you've got that in the file -- in
12      your file, also, right?
13   A. Let's see. Okay. This is the file.
14      You're saying that I should have a copy --
15   Q. Exhibit Number 14 which went to James --
16      Dear James E. Crouch, you have a copy of
17      that letter that went to him that attached
18      the contract data sheet, correct?
19   A. Yes, I have a letter dated May 18th.
20   Q. And you would agree that consistent with
21      the comments that were on the letter that
22      came from Lincoln National to you of the
23      same date, advised -- Note: Upon death of

Page 103

1    the annuitant, all benefits will be payable
2    to the primary beneficiary. Lincoln told
3    the Crouches on May 18th that they should
4    review and verify the information on the
5    attached contract data page, correct?
6           MR. WALDROP: Objection.
7    Q. In the second paragraph, that's exactly
8       what it says, isn't it?
9    A. That's what the letter says.
10   Q. And that contract data says that the
11      annuitant beneficiary is as listed in the
12      contract, the application, correct?
13   A. It would be listed in the contract. That's
14      correct.
15   Q. I mean, that's exactly what it -- what the
16      document that's attached, the contract data
17      sheet, says, isn't it?
18   A. That's what the contract says.
19   Q. And then it goes on to say: If any
20      corrections or changes were made on the
21      application, there may be an amendment form
22      attached which requires your signature.
23          They were advised that if they needed

Page 104

1    to make changes, that they could either
2    contact AmSouth Investments or the Lincoln
3    National client service department directly
4    to get any changes made that they wanted,
5    correct?
6           MR. GREGGS: Object to the form.
7    A. It says that if you have any questions or
8       need additional information, please contact
9       your representative at AmSouth Investment
10      Services or our client service department
11      directly at the 1-800 number.
12   Q. Right. And you documented the 7-2-98
13      concern that they did have about the safety
14      and insurance that was applicable, correct?
15   A. I did document that they were in to see me
16      7-2-98.
17          (Plaintiff's Exhibit 17 was marked
18          for identification.)
19   Q. Now, did you also receive the new business
20      worksheet that Lincoln National put
21      together with regard to this file effective
22      5-18 of '98 showing you to be the agent,
23      listing the agent number as the ...

Page 105

1    A.  What document are you ... I don't think I
2        have a copy of that.
3    Q.  Showing you Exhibit Number 17. Did you
4        review that new business worksheet
5        information that Lincoln put together?
6    A.  No, I did not review that particular
7        worksheet.
8    Q.  That indicates for agent information. You
9        were the agent. And then it gives an agent
10       number. Is that your individual number or
11       AmSouth Bank or AmSouth Investment or do
12       you know?
13   A.  I don't know.
14   Q.  It specifically says: The institution was
15       AmSouth Bank and the address was care of
16       AmSouth Investment Service, correct?
17   A.  That's what it says, but that's -- this is
18       not my worksheet. I do not see this
19       worksheet.
20   Q.  What does Plan Code AMSAO1 mean?
21   A.  I don't know.
22   Q.  Who would know that?
23   A.  I don't know.

Page 106

1    Q.  The last page of the exhibit shows that the
2        annuitant was James Earl Crouch and the
3        owner was James E. Crouch, joint owner Sue
4        Crouch, and beneficiary designation as
5        noted in the contract, meaning as in the
6        application which is Exhibit 12, correct?
7            MR. WALDROP: Object to the form.
8    A.  And, again, this is not a form that Ive
9        seen. This is not -- This is not something
10       that's in my file.
11   Q.  But you would agree that the beneficiary
12       designation is stated to be as noted in the
13       contract, correct?
14   A.  That's what this particular form says.
15   Q.  And the only beneficiary designation that
16       was noted in the contract was in Exhibit
17       12, the application that showed the primary
18       and only beneficiary to be James Edward
19       Crouch, correct?
20   A.  James E. Crouch is the only beneficiary
21       listed on the application dated 5-7-98;
22       however, there was an annuity service
23       request that was done on April the 4th of

Page 107

1        2000 which changed that beneficiary,
2        listing Mrs. Crouch as the primary and
3        James Edward Crouch as the contingent.
4    Q.  You filled that out; is that correct?
5    A.  I completed the form. That's correct.
6    Q.  Now --
7    A.  You're talking about -- I'm sorry. You're
8        talking about the annuity service request
9        form?
10   Q.  Right. You filled that out, didn't you?
11   A.  Yes.
12   Q.  You would agree that on May the 7th of
13       1997, James Earl Crouch was not weak,
14       correct?
15   A.  On what date?
16   Q.  On May the 7th of 1998.
17   A.  That he was not?
18   Q.  He was not weak.
19   A.  Not weak?
20   Q.  Weak.
21   A.  As in health-wise?
22   Q.  Yeah.
23   A.  No, I didn't -- I didn't -- for a man his

Page 108

1        age, he seemed to be fine to me.
2    Q.  He could read? He could write? He could
3        understand what it was? He frequently came
4        to the bank and wanted to see things to
5        know exactly what he had, didn't he?
6    A.  Yeah.
7    Q.  And he wasn't suffering from any physical
8        or mental incapacity at that time, was he?
9    A.  Not to my knowledge.
10   Q.  And he was not incapable of making his mark
11       or signing his name at that time, was he?
12   A.  No, he could --
13   Q.  And he did so, didn't he?
14   A.  He did sign his name, that's correct.
15   Q.  And how many times have you talked with,
16       met with or provided documents to AmSouth
17       Bank and their attorney in connection with
18       the Crouch matter since you left AmSouth?
19   A.  I don't know.
20   Q.  More than a half a dozen? A dozen, in that
21       range?
22   A.  I don't know. I mean --
23   Q.  Well, how many hours have you spent with

Page 109

1  them?
2  A. I wouldn't say I've spent hours. I mean, I
3  honestly don't know because I did not -- I
4  did not write down every time I got a phone
5  call or every time I spoke with someone. I
6  didn't keep up with that.
7  Q. Now, have they agreed to pay you for the
8  time that you spend assisting them in
9  connection with this lawsuit against them?
10 A. No.
11      (Plaintiff's Exhibit 20 was marked
12      for identification.)
13 Q. Well, showing you Exhibit Number 20, this
14 declaration which carries with it the
15 penalties of perjury being made to federal
16 court, is that your signature on that
17 document?
18 A. It is. This was the first -- this is the
19 first ... There's actually not a date on
20 here it doesn't appear.
21    The best I recall, this was an
22 attorney, I think, from -- I think it would
23 have been maybe from AmSouth in Mississippi

Page 110

1  that had contacted me and asked me just to
2  basically write down or give them the
3  information as far as this particular
4  transaction, what I remembered.
5  Q. And that was Paul DelCambre, wasn't it,
6  from Balch & Bingham in Mississippi?
7  A. Honestly, I don't remember.
8  Q. Did you write this up to -- in fulfillment
9  of his request, did you write down what you
10 remembered at this -- regarding this
11 transaction?
12 A. I can't remember if this was information
13 that I ... seems like I remember writing it
14 down. But, of course, they -- they would
15 have put it in this format.
16    But it does seem like I remember
17 writing it down, but I don't have -- I
18 don't have a rough draft where I wrote it
19 down. I do remember giving them the
20 information within this.
21 Q. And that was all you recalled at the time,
22 correct?
23 A. Well, this is the information I gave them

Page 111

1  at the time.
2  Q. Well, and did you review it after it got
3  typed up before you signed it and sent it
4  back to Balch & Bingham?
5      MR. PATERSON: Let the Record show
6      she doesn't know where she
7      sent this.
8      MR. MCHARD: I don't think so.
9  Q. You know you sent this back to the
10 attorneys for the bank in Mississippi,
11 don't you?
12 A. Honestly, I do not remember where I sent
13 the information. And it may have been that
14 I faxed it. I honestly don't remember. I
15 don't know.
16 Q. But some attorney then typed it up, right?
17 A. Yeah. Yeah, the attorney or their office
18 would have typed it up and asked me to
19 basically sign the declaration.
20 Q. And did he explain to you that it was under
21 penalties of perjury?
22 A. No. He would have -- he would have -- I
23 mean, I wouldn't have given the information

Page 112

1  without it being true, so I wouldn't have
2  minded signing it -- signing it.
3  Q. Well, just for instance, in the second
4  paragraph of this declaration, which is
5  like an affidavit, you say: All of the
6  Crouches' banking transactions and all of
7  their business with AmSouth Bank occurred
8  or took place in the Wetumpka -- at the --
9  Alabama branch of AmSouth Bank, correct?
10 See that?
11      MR. WALDROP: Object to the form.
12 A. This says I assisted the Crouches in
13 completing certain applications --
14 Q. No. It's the last sentence of the second
15 paragraph. Quote: As far as I know --
16      MR. WALDROP: You're on the first
17      page. She's on --
18      MR. GREGGS: She's on the second
19      page.
20      MR. WALDROP: -- the second page.
21      MR. MCHARD: I'm on the first page
22      and quoting it.
23 Q. All of their banking transactions and all

28 (Pages 109 to 112)

Page 113

1    of their business with AmSouth Bank
2    occurred at the Wetumpka, Alabama branch of
3    AmSouth Bank.
4    A. It says as far as I know. That's what I
5    was saying. As far as I know, all of their
6    banking transactions and all of their
7    business with AmSouth occurred at the
8    Wetumpka branch.
9    Q. Well, but you knew that not all of their
10   banking transactions were at AmSouth at the
11   Wetumpka branch because you knew that they
12   had business --
13   A. That's not what --
14   Q. -- significant business at Alliant,
15   correct?
16   A. That's not what it says. It says: As far
17   as I know, all of their banking
18   transactions and all of their business with
19   AmSouth Bank occurred or took place in the
20   Wetumpka, Alabama branch of AmSouth Bank.
21   Q. The period of time that you were employed
22   by AmSouth Bank was not limited to '98
23   through 2001. It was '86 through 2004.

Page 114

1    A. It just says during 1998 and through 2001,
2    I was employed by AmSouth Bank and AmSouth
3    Investment Services. It doesn't speak of
4    the date of hire. It's between those years
5    I was employed at the bank.
6    Q. Well, but it goes on to say at that time,
7    meaning '98 through 2001, you were
8    acquainted and handled the banking and
9    financial transactions for James Crouch.
10   But you had handled them for a much longer
11   period of time, correct?
12   A. I don't recall and I said in the beginning
13   that I'm not sure when I did my first
14   transaction for the Crouches.
15   Q. You go on to state in this declaration
16   that -- with regard to the documentation
17   for change of beneficiary that you assisted
18   them with regard to the documentation
19   signed by them, by Mr. Crouch and by
20   Mrs. Crouch, correct?
21            MR. WALDROP: Objection.
22   Q. Your words, right? That's what it says,
23   isn't it?

Page 115

1    A. I'm trying to find out where you're
2    reading. Where are you at now?
3    Q. Page two, second full sentence.
4    A. Okay.
5    Q. Quote: I later assisted the Crouches in
6    completing certain documentation signed by
7    them, plural, for the change of
8    beneficiary, correct?
9    A. That is what it says.
10   Q. And you would agree "them" is two people
11   signing, isn't it?
12   A. Documentation signed by them for the change
13   of beneficiary.
14   Q. That's what it says, isn't it?
15   A. That's what -- That's what the sentence
16   says, yes. Signed by them for a change of
17   beneficiary.
18   Q. Now, and you also in speaking with Paul
19   DelCambre who represented this as an
20   officer of the court and to the court that
21   you personally witnessed each of the two
22   Crouches signing their respective names to
23   the change of beneficiary form, didn't you?

Page 116

1            MR. PATERSON: Object to the form
2               of that.
3            MR. WALDROP: Objection.
4    A. Well, let me --
5    Q. Didn't you?
6    A. Let me tell you -- let me tell you what
7    happened. The Crouches --
8    Q. No. First, did you tell Mr. DelCambre
9    that?
10           MR. WALDROP: Objection.
11   A. You'll have to let me explain.
12   Q. Well, first of all, you have to answer.
13   Did you tell Mr. DelCambre that?
14           MR. PATERSON: You're not required
15              to give him a yes or no
16              answer. If you want to
17              explain, you give him a full
18              answer to what he's asking
19              you.
20   Q. Well, you can say yes or no and then go on
21   and explain your answer, but I want to know
22   did you tell Paul DelCambre in connection
23   with this litigation that you had seen in

Page 117

1    connection with the change of beneficiary
2    form for the Lincoln life insurance policy
3    in which James Earl Crouch was the
4    annuitant that you had seen James Earl
5    Crouch and Ina Sue Crouch sign their own
6    respective names to the document.
7       MR. PATERSON: Object to the form.
8       MR. WALDROP: Same objection.
9    A. I don't recall having the conversation with
10    this attorney that you're talking about and
11    I don't recall what I specifically told
12    him. I do recall him asking for this
13    information which I gave him, but I don't
14    recall this conversation that you're
15    speaking of.
16       To explain the annuity service request
17    form and me witnessing the signatures,
18    Mr. and Mrs. Crouch came into the bank in
19    my office on April the 4th of 2000. They
20    wanted to go ahead and make the change on
21    the beneficiary form, so I completed -- all
22    it takes to do that is this one particular
23    form.

Page 118

1       And I completed the top section A,
2    which changes the -- which is the
3    beneficiary change. We changed the primary
4    beneficiary to Sue Crouch, the contingent
5    beneficiary to James Edward Crouch.
6       What that would mean is that upon
7    Mr. Crouch's death, the money would go to
8    Sue. In the event that something happened
9    to both of them, the money would go to
10    James Edward Crouch.
11       As far as the signatures at the bottom,
12    Mr. Crouch and Mrs. Crouch were in my
13    office. I asked them to sign. Mr. Crouch
14    said, I forgot my glasses. Sign this for
15    me. It was not unusual for him to let
16    Mrs. Crouch take care of his business. And
17    he sat there and he asked her to sign his
18    name, and I witnessed that.
19    Q. But, ma'am, you're saying that you had seen
20    Mr. Crouch tell Mrs. Crouch to sign
21    Mr. Crouch's name on other important bank
22    documents prior to this date; is that
23    correct?

Page 119

1    A. They --
2       MR. WALDROP: Objection.
3       MR. PATERSON: Object to the form.
4    Q. Is that correct?
5    A. I would have to explain my statement
6    there. It was not unusual for Ms. Crouch
7    to come in and take care of deposits and
8    that kind of stuff on behalf of
9    Mr. Crouch. She basically handled his
10    deposits a lot of times -- or their
11    deposits.
12    Q. So there would be checks that required his
13    signature, and she'd simply sign his name
14    and do the deposits; is that --
15    A. I don't know that I've ever witnessed that
16    part of it before. But as far as hearing
17    her and his conversations, she handled a
18    lot of his stuff.
19    Q. No. I want you to tell me of some other
20    event --
21    A. I don't know of another event other than
22    what I heard them talking about.
23    Q. What do you mean other than what you heard

Page 120

1    them talking about? When?
2    A. In this conversation when he asked her to
3    sign his name -- husband and wife, people
4    do that a lot in banking. A husband may
5    bring in the wife's payroll check to
6    deposit into the bank. Those things
7    happen. Not unusual for husband and wife
8    to deposit each other's payroll checks or
9    whatever.
10       But in this -- in this particular
11    situation, he basically, you know, asked
12    her to sign because he had forgot his
13    glasses at home. He couldn't see the line,
14    so he had her sign for him.
15    Q. Well, do you remember Mrs. Crouch saying,
16    gee, I'll just run home and get your
17    glasses. It's only five minutes or so.
18    Get your glasses, bring them back so you
19    can read it over and sign it, correct?
20       MR. PATERSON: Object to the form.
21    Q. Do you remember that?
22       MR. WALDROP: Objection.
23    A. I don't recall that.

Page 121

1  Q. Do you recall words to that effect?
2  A. Could have been, but I don't recall.
3  Q. It would have only taken five to ten
4     minutes, wouldn't it, for her to go home
5     and get his glasses if he didn't have them
6     or go out to the car to see if they were
7     out in the car and bring them in if he
8     didn't have them, correct?
9  A. I don't know how long that would have
10    taken.
11 Q. Not long, based on how close they lived to
12    the bank, correct?
13 A. I don't know.
14 Q. You're familiar, too, with the practice if
15    somebody else signs -- if somebody signs
16    somebody else's name, they sign their name
17    and then they say by and put their name or
18    their initials? You're familiar with that
19    concept, aren't you?
20        MR. PATERSON: Object to the form.
21        MR. WALDROP: Same objection.
22 A. There are times when documents -- different
23    documents, yeah, you need to sign them that

Page 122

1     particular way. Yeah, I'm familiar with
2     some of that.
3  Q. And you know that for proper banking
4     matters or for $290,000 transactions like
5     that, that would be the appropriate way to
6     designate a situation where somebody was
7     signing, correct?
8        MS. HUGHES: Object to the form.
9        MR. WALDROP: Objection.
10       MR. PATERSON: Object to the form.
11       That calls for a legal
12       conclusion and it is not
13       correct as a matter of law.
14 A. My understanding was that Mr. Crouch was
15    there. I witnessed him ask her to sign for
16    him. You know, and the fact that he
17    couldn't see the line, he was right there.
18    He knew exactly what we were doing. I did
19    not have a problem with him not signing the
20    document. I knew he was well aware of what
21    was going on, so ...
22 Q. Would you agree that you were the person
23    that told Mrs. Crouch not to go home but,

Page 123

1     in fact, to sign her husband's name?
2  A. No.
3  Q. You never said anything like that; is that
4     correct?
5  A. Mr. Crouch asked Mrs. Crouch to sign for
6     him.
7  Q. Did you ever suggest as the initiator of
8     the discussion that Sue Crouch sign James
9     Crouch's name to this document?
10 A. No.
11 Q. And if Ina Sue Crouch testified just to the
12    contrary, one of the two of you is not
13    telling the truth. Do you agree with that?
14       MR. PATERSON: Object to the form.
15       MR. WALDROP: Objection.
16 Q. Do you agree with that, ma'am?
17       MR. PATERSON: Object to the form.
18       MR. WALDROP: Same objection.
19 A. I don't know exactly what you're trying to
20    get me to say there. All I know is that
21    Mr. Crouch asked Sue Crouch to sign his
22    name. I witnessed the fact that both of
23    them were present, both of them knew what

Page 124

1     they were doing on the form, and I signed
2     as the agent and as a witness.
3  Q. You've oftentimes dealt with people that
4     have problems with vision, where you simply
5     point to where the line is and then make
6     either their signature or their mark where
7     you point, correct?
8  A. I'm familiar with that, with people that
9     are not capable of seeing, yeah.
10 Q. And you would agree that on April 4th of
11    2000, James Earl Crouch was not weak, was
12    he?
13 A. On what day, now?
14 Q. April 4th of 2000.
15 A. I'm not familiar with any particular health
16    problems if that's what you're asking me.
17 Q. He was not under a mental incapacity or
18    physical incapacity?
19 A. Not to my knowledge, he wasn't.
20 Q. And he was not incapable of making his mark
21    or signing his name on this or any other
22    form, correct?
23 A. He could not see the line, and he asked his

Page 125

1    wife to sign it for him.
2    Q. Well, when you say he could not see the
3        line, you don't know that he couldn't see
4        the line?
5    A. Well, no, he just said he couldn't. He
6        said, I can't say that. So he asked her --
7        he told her to sign it for him.
8    Q. Now, and you're not the one that said,
9        Mr. Crouch, you're here now, you sign it as
10       the person that initiated the whole
11       discussion about Ina Sue signing her
12       husband's name; is that correct?
13   A. I don't recall. I don't recall that. I
14       recall Mr. Crouch telling her to sign it
15       for him.
16   Q. In your folder that you maintained, you've
17       flipped to the document that I have in
18       front of me which we're going to mark as
19       Exhibit Number 27, a document that is
20       entitled memo to file of James E. Crouch.
21       You're looking at that, right?
22   A. Yes.
23       (Plaintiff's Exhibit 27 was marked

Page 126

1        for identification.)
2    Q. I'm showing you Plaintiff's Exhibit Number
3        27. Is that a true and correct copy of
4        that document?
5    A. Appears to be.
6    Q. And so when you talked with James Edward
7        Crouch who's sitting here, are you saying
8        that the telephone call was on July the 6th
9        of 2001?
10   A. That would be the date that I -- well, yes,
11       because I -- that's the date that I put on
12       the memo and I said received a call today.
13       So I would assume that date is correct.
14   Q. So the call came in, and you made the memo
15       to the file that's reflected here all in
16       one day; is that correct?
17   A. That would appear to be correct.
18   Q. And that was based on your review of the
19       file also that day, correct?
20   A. Well, what do you mean by review of the
21       file?
22   Q. Well, did you review the file before you
23       made the memo?

Page 127

1    A. No. This appears to be just a conversation
2        from the phone the best I remember.
3    Q. Okay. Well, he asked if there was a type
4        of account -- an annuity account where he
5        could name his beneficiary and that
6        beneficiary wouldn't be changed, right?
7        That was his inquiry? That's what the
8        second sentence says, isn't it?
9    A. Where he could name his beneficiary and
10       under no circumstances could it be removed.
11   Q. Right.
12   A. You know, all I can say is what this says.
13       I can -- I can read it to you.
14   Q. Well, you explained to him that annuities
15       were flexible and that you could specify
16       information; that is, if you didn't want to
17       have the annuitant changed, you could
18       specify that, right -- excuse me, if you
19       didn't want to have the beneficiary
20       changed, you could specify that?
21           MR. WALDROP: Objection.
22   Q. That was his concern, right?
23   A. Well, this says that he inquired about

Page 128

1        annuities. Said that he wanted an account
2        where he could name his beneficiary and
3        under no circumstances could it be removed,
4        meaning that no one could coerce him into
5        signing if he mentally or physically wasn't
6        able. I explained that annuities were
7        flexible in the fact that you can specify
8        information. A contract written like that
9        would list him as owner and annuitant with
10       his daughter as beneficiary.
11       I'm not real sure if I was specific
12       enough there in the conversation, but
13       that's -- that's what I wrote that day.
14   Q. All right. And you surmised then that
15       after the Crouches -- at least after
16       Mrs. Crouch executed the April 4th, 2000
17       change of beneficiary form that -- Strike
18       that.
19       You surmised that the Crouches decided
20       to remove James Earl Crouch -- excuse me,
21       James Edward Crouch as the contract
22       beneficiary in light of the $100,000
23       cashier gift; is that right?

Page 129

1  A. Well, on this particular day, I went on to
2  say that -- well, in the second part, it
3  says that Mr. James E. Crouch asked -- went
4  on to say that I did an annuity for his
5  father. Of course, I mean, I told him that
6  I could not release that information one
7  way or the other. Then he said he had the
8  paperwork in front of him.
9      And I went on to write on this
10  particular memo that in reviewing the file,
11  that I felt he was fishing for information
12  to see if -- to see if beneficiaries could
13  be changed and then I said --
14  Q. But you told me earlier that you didn't
15  review the file.
16  A. Well, according to this, it says that -- it
17  says that I did.
18  Q. Well, what did you review?
19  A. Well, I should have finished reading this
20  before I answered the question. This was
21  done five years ago. To specifically
22  remember every detail, I -- I don't.
23      What's here is I would assume what

Page 130

1  transpired on that day and the impression
2  that I got from that particular day. But
3  it does say that in reviewing the file,
4  that I felt he was fishing for
5  information. And then I put that I
6  specifically remembered the Crouches
7  purchasing a $100,000 cashier's check to
8  give to the son and --
9  Q. You said to this son of theirs. What do
10  you mean by this son of theirs?
11  A. This was their son. To my knowledge, this
12  was the son of Mr. and Mrs. Crouch.
13  Q. Their only son, their only child?
14  A. Yeah. Did I word that wrong?
15      And then, you know, I did say that it
16  seems after that, they decided to remove
17  him from the contract as beneficiary.
18      You know, this was my memo that I wrote
19  on that particular day.
20  Q. That was what you assumed based on --
21  A. Yeah. This is my -- this is my personal
22  memo to the file based on conversation.
23  Q. With him, right?

Page 131

1  A. The telephone call, yes.
2  Q. Well, the truth is that if you would have
3  reviewed the file, you would have seen --
4      Have you looked at the check that was
5  given to them?
6  A. Which check that was given --
7  Q. The $100,000 check that you reference in
8  your memo.
9  A. Well, in reviewing the file, it would only
10  be -- I would be talking about the annuity
11  file, which is ...
12  Q. Which is the exhibit that I have in front
13  of you that I gave you the full document.
14  Exhibit Number 18 I believe.
15  A. 18. Yes, that's correct.
16  Q. You made the assumption that, well, if they
17  purchased the annuity and then gave their
18  son $100,000 as a gift, enough to -- that
19  gift, and then they can go ahead and change
20  the beneficiary so that there's more money
21  available for Mrs. Crouch when Mr. Crouch
22  dies, correct?
23      MR. WALDROP: Object to the form.

Page 132

1      MR. PATERSON: Object to the form.
2  A. I can't answer that.
3  Q. Well, that's what this indicates, isn't it?
4      MR. WALDROP: Objection.
5  A. I don't know.
6  Q. You don't know what you meant there?
7  A. Well, you know, again, this was a file -- I
8  mean, this was information that I typed
9  after that conversation. But to know
10  exactly the details of all that and where I
11  was coming from that particular day, I'm
12  really not real clear on everything that
13  transpired on that particular day.
14  Q. Well, you would agree that that assumption
15  that you were making there that, gee, we'll
16  give him $100,000 and then change him from
17  being the primary beneficiary to being a
18  contingent beneficiary, you know, that's
19  fair enough?
20      MR. PATERSON: Object to the form.
21  Q. That assumption would be totally invalid if
22  the gift of $100,000 had been purchased and
23  delivered long before the purchase of the

Page 133

1    annuity that made him the primary
2    beneficiary, right?
3         MR. PATERSON: Object to the form.
4         MR. WALDROP: Object to the form.
5    A.  I don't know.
6    Q.  Well, yeah, you know that.
7         Well, it couldn't be a motivation to
8    remove him as the primary beneficiary that
9    they made him a $100,000 gift if the gift
10   was, in fact, made before they made him the
11   primary beneficiary?
12        MR. WALDROP: Objection.
13   A.  That's not for me to say. I don't know
14   what they --
15   Q.  You said it.
16        MR. WALDROP: Object to the form.
17   A.  This was my words. This was for me just
18   for the purpose so that I could remember
19   the conversation that day.
20   Q.  I'm showing you Exhibit --
21   A.  Knowing what their intentions were and how
22   they felt, I can't answer that. I don't --
23   Q.  You cannot?

Page 134

1    A.  I cannot. I don't know what their
2    intentions were.
3    Q.  And showing you Exhibit Number 7, that is a
4    true and correct copy of the bank draft or
5    official check of AmSouth Bank signed by
6    you transferring $100,000 to James Edward
7    Crouch, my client, correct?
8    A.  This is a cashier's check that was
9    purchased, yeah, and I signed the cashier's
10   check.
11   Q.  So if you had really reviewed the file,
12   what you would have seen was that, in fact,
13   the gift of $100,000 was made before the
14   annuity was purchased and before he was
15   made the primary beneficiary, correct?
16        MS. HUGHES: Object to the form.
17        MR. WALDROP: Objection.
18   Q.  Isn't that correct?
19        MR. WALDROP: Objection.
20   A.  Well, I can't answer that because this
21   particular copy, I don't understand -- I
22   see the copy of the cashier's check, but I
23   don't really -- I don't understand the

Page 135

1    second part of this.
2    Q.  Well, it's showing the deposit -- it's
3    showing the deposit --
4    A.  Okay. So this is showing where Mr. Crouch
5    deposited the check they gave him --
6    Q.  Right.
7    A.  -- into an IRA? That's what the second
8    part is, right?
9    Q.  Well, it shows that it's deposited at the
10   Bank of Mississippi BancorpSouth,
11   Hattiesburg Main Office in what appears to
12   me a CD for 12 months at 5.75 percent
13   interest and dates that correspond exactly,
14   which would be consistent with how this
15   check was then obtained recently.
16   A.  So what this copy shows is the cashier's
17   check --
18   Q.  Right.
19   A.  -- that was given to Mr. Crouch, and then
20   the second part of this copy just shows
21   what he did with the funds.
22   Q.  Right. It shows that the gift was
23   completed, meaning not only did you sign

Page 136

1    the cashier's check virtually a year before
2    the annuity was purchased with an annuitant
3    beneficiary being exclusively James Crouch,
4    but that also, that bank check was
5    delivered as a completed gift to Mr. Crouch
6    within a week of the time that you signed
7    that check --
8         MR. WALDROP: Objection to the
9         form.
10   Q.  -- right? That's what it shows, isn't it?
11        MR. WALDROP: Object.
12   A.  Well, I can't say that's what it
13   particularly shows. I can say that, yes, I
14   signed this cashier's check.
15   Q.  Now, what other banking transactions did
16   you handle during the period of 1986
17   through 2004, at least through February
18   14th of 2001 for James Crouch and Sue
19   Crouch?
20   A.  I don't -- I don't know. There could have
21   been many different transactions.
22   Q.  Well, did you assist in, for instance, the
23   drawing of the cashier's check?

Page 137

1. A. I recall Mr. and Ms. Crouch coming into my
2. office. It would have had to have been on
3. that day, August the 28th in '97. However,
4. you know, I don't have the document that
5. would -- that would say what I used to
6. purchase this cashier's check.
7. Q. Well --
8. A. So I can't say particularly this is the one
9. that I'm in reference to. I mean, I don't
10. have the document that went with this
11. cashier's check.
12. Q. Well, what document would that have been,
13. ma'am?
14. A. Anytime you purchase a cashier's check, you
15. purchase it either with funds from a
16. checking account or you're going to
17. purchase it from funds from a CD.
18. Q. This indicates that it was purchased with
19. funds from a CD, doesn't it?
20. A. Well, it's got an account number there. I
21. don't know what the account number is.
22. Q. Well, the bank would have the information,
23. wouldn't they?

Page 138

1. A. They should.
2. Q. As far as you know, they should have the
3. information, shouldn't they?
4. A. The bank -- well, the bank should.
5. Q. And should be able to provide it to us,
6. shouldn't they?
7. A. As long as it's not out of record
8. retention, they could.
9. Q. Well, I mean, this lawsuit was started in
10. 2002. What is the record retention period?
11. A. I don't know for AmSouth. I'm sorry.
12. Q. Well, what was it when you were there?
13. A. I'm not sure. With CDs, I'm not sure.
14. Q. Well, how about with checking accounts?
15. A. I don't know. I'm sorry. Been gone from
16. there for two years. I'm not sure what
17. their retention is. And I don't recall
18. what it was when I was there.
19. Q. Well, did AmSouth Bank or AmSouth
20. Investments or both have a policy,
21. procedure, rules, regulation book that
22. talked about what sort of documentation you
23. had to keep, how one husband could sign for

Page 139

1. his wife or vice versa to bank documents,
2. what the protocols, the rules, the
3. regulations were? Did they have that from
4. 1997 through 2001?
5. A. Did they have what?
6. Q. Rules and regulations, a policy and
7. procedure book, a manual, a set of
8. instructions that would tell you what do
9. you have to do in those circumstances, what
10. do you have to do or keep or get from the
11. client in a request for a cashier's check
12. like this, what the record retention policy
13. was, any of those things.
14. A. Well, there's a record retention policy I'm
15. sure.
16. Q. Was it in the policy and procedure manual,
17. is that what it's called, or standard
18. operating procedures?
19. A. Well, at my current bank, it's just record
20. retention.
21. Q. I know. But aren't there a whole set of
22. instructions and rules and guidelines for
23. how you handle things at the bank by way

Page 140

1. of --
2. A. I'm sure there are.
3. Q. And you've seen that at the bank, correct;
4. that is, at AmSouth during '97 through
5. 2001?
6. A. Sure. I mean, there's instructions.
7. There's manuals.
8. Q. What are they called?
9. A. I don't know.
10. Q. And there were instructions on what you
11. were supposed to do if somebody signed a
12. document for somebody else, weren't there?
13. A. I'm sure that there were.
14. Q. And what were those instructions, those
15. rules, regulations, guidelines, policies,
16. standard operating procedures, whatever you
17. want to call them?
18. A. I think that would depend on your
19. transaction.
20. Q. Are you saying you don't recall what the
21. requirement was at the bank?
22. A. Well, I'm saying that it would depend on
23. the transaction as to what your policy and

35 (Pages 137 to 140)

Page 141

1    procedures were.
2  Q. But without looking at them --that is,
3    getting them from the bank and reviewing
4    them, you wouldn't be able to recall what
5    they are now; is that right?
6  A. I would need to -- I would need to see the
7    instructions to give you specifics.
8  Q. Who at the bank would we talk to to get
9    those documents?
10 A. I don't know. I'm no longer employed
11   there. I don't know who you would talk to.
12 Q. Well, when you were there, who would you
13   have talked to to get a copy of that?
14 A. Well, it would depend on the transaction
15   and what questions I had.
16 Q. Well, is it something that's online that
17   you can access or --
18 A. Well, they were --
19 Q. -- is there a CD for --
20   They were online?
21 A. Some things were online.
22 Q. What was the ability to retrieve canceled
23   checks and bank signature cards for

Page 142

1    specific accounts?
2  A. I can tell you what I think it was, but I
3    can't tell you that that's for certain.
4  Q. Okay.
5  A. But I believe that it was a six-year
6    retention on those records, but I can't be
7    for certain.
8      In other words, if you requested a copy
9    of a check or something today that was six
10   years old or beyond that, you would not be
11   able to retrieve that.
12     Don't hold me to that because I no
13   longer work there. I'm not sure what their
14   retention is.
15 Q. What is it about Exhibit Number 15 that you
16   have in front of you there that makes you
17   jump up and scream I made a mistake?
18 A. Because I remember when --
19 Q. No. Just look at the document.
20     MR. PATERSON: She's answered.
21 Q. Tell me what on that document makes you say
22   I made a mistake.
23     MR. WALDROP: I object to you

Page 143

1      cutting her off. Go ahead,
2      please.
3  Q. All I want you to do at this point is to
4    read what's on there that made you say I
5    made a mistake.
6  A. Anytime there's a note that -- you get an
7    outstanding requirements and there's a
8    note, you pay attention to what it said and
9    make sure that it's what the customer asked
10   for. In this particular case, it was not
11   what my customer instructed me to do, and I
12   knew that I'd made an error on the
13   paperwork.
14 Q. Well, did you report that to any of your
15   supervisors at either AmSouth Bank or
16   AmSouth Investments, I've made a mistake?
17 A. Well, the fact of the matter is, I did
18   notate for my records -- I'm sure that I
19   probably told my manager. I don't feel
20   that it was really required that I tell --
21   that I tell anyone other than to make sure
22   that I get in touch with the Crouches and
23   give them the opportunity to come in and

Page 144

1    sign the correction.
2  Q. If they wanted to make a correction, that
3    they come in and do it right away, correct?
4  A. To get it corrected, I would have to
5    have -- I would have to have them come in.
6  Q. And who was the manager that you say you
7    told --
8  A. Well, I don't know that I told her, but I
9    would think that I would have let her know
10   what happened, but I don't have
11   documentation of that.
12 Q. Is there any documentation about that?
13 A. I'm not aware of there being any.
14 Q. With regard to the annuity service request,
15   explain to me the process of this
16   document.
17     All of the -- All of the writing on
18   this document other than the signatures of
19   James Crouch and Sue Crouch signed by Sue
20   Crouch, all the rest of the writing on that
21   document is yours, isn't it?
22 A. There's -- Yes.
23 Q. And --

Page 145

1.  A.  I completed the form.
2   Q.  And was all of your writing that's on this
3       form put on there before the signatures?
4   A.  Yes.
5   Q.  And your -- you would agree that if we
6       looked at a thousand of your signatures,
7       they would all be on the line where you're
8       supposed to sign, correct?
9   A.  Well, this particular day when I started
10      to -- you'll notice I have an R-O in both
11      of my -- Ronda and Robinson. And on that
12      particular day, I did an R-O-B-I-N-S-O-N
13      first and don't know why I did that, so
14      that's why I behind that put Ronda.
15  Q.  Well, you initially signed this, as you've
16      testified earlier in the sequence, Agent
17      Witness, Ronda on the top line, Robinson on
18      the second line, correct?
19  A.  I'm sorry. I didn't get that. Say that
20      again.
21  Q.  Didn't you originally sign this document
22      Ronda Robinson on the line above and below
23      first?

Page 146

1   A.  No, I don't think so.
2   Q.  You don't know that, do you?
3   A.  I don't --
4   Q.  You don't recall?
5   A.  I ...
6   Q.  You don't recall --
7   A.  No.
8   Q.  -- why you did this, do you?
9           MR. WALDROP: Objection.
10          MR. PATERSON: Object.
11  A.  I would not have written my name -- I would
12      not have signed my signature on two
13      separate lines.
14  Q.  You can't recall exactly why it was that --
15  A.  I know what I did. I've done that before.
16      I started to write my name and I was trying
17      to put my last name first, so that's what I
18      did. And so that's why I put Ronda in
19      front like that.
20  Q.  So you didn't make any notation on that to
21      correct that --
22  A.  I didn't feel any was needed.
23  Q.  Because you didn't feel that it was

Page 147

1       important that you signed on the line,
2       correct?
3   A.  Well, I didn't -- it was just -- I didn't
4       feel it was necessary.
5   Q.  Just like it wouldn't have been necessary
6       if James Crouch's signature would have been
7       exactly on the line where he was supposed
8       to sign, correct?
9           MR. PATERSON: Object to the form.
10  A.  Mr. Crouch --
11  Q.  Is that right?
12  A.  Mr. Crouch asked Mrs. Crouch to sign for
13      him.
14  Q.  But it wouldn't have made any difference if
15      his signature was on the line if he was
16      having difficulty seeing, correct?
17  A.  He just asked her if she'd sign for him.
18  Q.  But it wouldn't -- Just answer my question.
19      It wouldn't have made any difference if his
20      name would have been exactly on that line,
21      correct?
22          MR. PATERSON: Object to the
23          form. Calls for a legal

Page 148

1           conclusion.
2           MR. WALDROP: Objection.
3   A.  I don't know that I --
4   Q.  In your mind.
5   A.  -- know the answer to that.
6   Q.  Just like it didn't make any difference if
7       your name was on --
8   A.  Sir, as an agent, if it had been crooked, I
9       don't guess I would have minded, but he
10      wanted her to sign for him.
11  Q.  And you know that the only signature that
12      was necessary or required or proper to
13      change an annuitant beneficiary designation
14      such as we had in the Crouch annuity was
15      the signature of James Earl Crouch?
16          MR. WALDROP: Objection.
17          MR. PATERSON: Objection.
18  A.  That's false. That's not a true statement.
19  Q.  Based on what?
20  A.  To make changes on an annuity that is joint
21      ownership, it requires both owners to sign.
22  Q.  Where does it say that? In the rules,
23      regulations, policies and procedures again?

Page 149

1    A. Yeah, it would be in there somewhere.
2    Q. Of Lincoln National Life that you said that
3       you were going to comply with when you
4       applied in the fall of 1997?
5           MR. WALDROP: Objection.
6    Q. In those? In those regulations of Lincoln
7       National or in the AmSouth Bank ones or the
8       AmSouth Investment ones or where, or do you
9       know?
10          MR. WALDROP: Same objection.
11   A. Could you repeat all of that one more time?
12   Q. I want --
13   A. Because I think I've gotten lost.
14   Q. I just want to know where the rule,
15      regulation, policy, procedure, standard
16      operating practice or procedure would be
17      and who would have issued it that would
18      deal with who had to sign the Crouch
19      annuity to change the annuitant beneficiary
20      designation that had been made pursuant to
21      the application.
22          MR. PATERSON: Object to the form
23          of that.

Page 150

1           MR. WALDROP: Same.
2    A. I'm sure that I -- at this particular time,
3       I had access to those procedures.
4    Q. Those procedures meaning procedures issued
5       by whom?
6    A. Procedures would have been issued by
7       Lincoln National as to how to complete the
8       form.
9    Q. Did you look it up to find out what the
10      procedure said before you had --
11   A. I think that's something I just -- I knew
12      from training.
13   Q. So you didn't look it up?
14   A. No. I knew that if it's a joint ownership,
15      that I needed both signatures.
16          (Brief interruption.)
17          (Brief recess was taken.)
18          (Plaintiff's Exhibit 19 was marked
19          for identification.)
20   Q. Ma'am, taking your comments during the
21      break to heart, you signed an affidavit for
22      Balch & Bingham also in connection with
23      this case, didn't you?

Page 151

1           MR. PATERSON: For me.
2    A. For -- yeah, this one that's dated March,
3       the 6th day of March.
4    Q. Right. And Mr. Paterson typed it up and
5       gave it to you to sign, didn't he?
6    A. I would have had to have given him the
7       information. His office would have
8       prepared it. I would have proofed it, read
9       it, made sure I agree with it and signed it
10      and send it back.
11   Q. Well, do you have any of the correspondence
12      that indicates that's how it happened?
13          MR. WALDROP: Objection.
14   A. Not with me, no.
15   Q. But you do have --
16   A. If I do, it may be -- it could be from an
17      e-mail possibly.
18   Q. There were e-mails that went back and forth
19      between you and Mr. Paterson's office with
20      regard to this?
21   A. On this right here.
22   Q. Yeah.
23   A. I think we did --

Page 152

1    Q. With regard to Plaintiff's Exhibit Number
2       19, correct?
3    A. I think we -- I think we did through
4       e-mail.
5    Q. And you can provide me copies of those
6       e-mails that went back and forth because
7       they'd still be on your computer, right?
8    A. I would hope.
9    Q. And that would be at home or at work?
10   A. That would be at work.
11   Q. And you don't have any problem providing
12      those to me, do you?
13   A. I wouldn't want to have to hunt them up.
14   Q. Well, you could simply look at --
15   A. I mean, what do you need?
16   Q. Any e-mails that have gone back and forth
17      between you and Balch & Bingham regarding
18      this.
19   A. Well, I would think that -- I would think
20      that the attorney's office would have the
21      same thing I would.
22   Q. Well, I agree and that they probably should
23      have been produced, but they haven't been

Page 153

1    so far. And I'm asking you on the record,
2    will you provide meall of those?
3    A.  Well, since it's on-- since it's on my
4    current employer's computer, I would think
5    I'd have to get their permission to do
6    that.
7    Q.  Well, did you get their permission in order
8    to receive e-mails, send e-mails with
9    regard to this affidavit?
10   A.  They were aware that I was involved in a
11   case from my previous employment.
12   Q.  Your current employer is Peoples Bank.
13   A.  That's right.
14   Q.  So, I mean, I could subpoena your current
15   employer to get that information, but --
16   A.  Sure.
17   Q.  -- just asking you, are you willing to
18   provide that to me?
19   A.  I think you could subpoena it and let them
20   make that decision, and they would have to,
21   I guess.
22   Q.  Is that what you want me to do? You're not
23   willing to do that short of a subpoena; is

Page 154

1    that correct?
2    A.  Well, is that what you really want me to
3    do? You tell me what you want. Are you
4    asking -- are you asking me -- Are you
5    telling me that you need that information?
6    Q.  Yes, ma'am. I want that information.
7    A.  You want it or you need it?
8    Q.  Well, I think it's both, one and the same.
9    I think I want it, need it, and I'm
10   entitled to it.
11   A.  Then I guess you could subpoena it, and
12   then that way the bank would officially
13   have that knowledge that you needed that
14   information.
15   Q.  Who would I send the subpoena to at your
16   bank?
17   A.  I would assume you could send it to -- my
18   employment address would get it to the
19   correct people.
20   Q.  Which is what?
21   A.  148 East Main Street, Prattville, Alabama
22   36067.
23   Q.  Attention whom?

Page 155

1    A.  You could send it to Steve Steele. That's
2    my regional president.
3    Q.  At that address, correct?
4    A.  Uh-huh. (Positive response.)
5    Q.  Yes?
6    A.  Yes. Sorry.
7         MR. MCHARD: Unless you're willing
8         to provide that -- all of that
9         information to me?
10        MR. PATERSON: I don't really know
11        what it is sitting here
12        today. I can't recall what it
13        is frankly. Without seeing
14        it, I won't commit to you one
15        way or the other.
16        I think the safest thing
17        to do -- she's uncomfortable
18        producing her employer's
19        records without a subpoena, so
20        just subpoena the records. In
21        the meantime, I'll search and
22        if there's something that
23        I think I can readily give

Page 156

1         you, I will.
2         MR. MCHARD: They're clearly not
3         her employer's records.
4         MR. PATERSON: Well, they come
5         from --
6         THE WITNESS: They come from my
7         employer's computer, so I
8         would think we need to do it
9         that way. Since I can't call
10        and ask that question, I
11        guess ...
12        MR. MCHARD: No further questions.
13        MS. HUGHES: I don't have any.
14        MR. PATERSON: I've got one quick
15        question, a couple of quick
16        questions of you.
17        THE WITNESS: I'm through with
18        you?
19        (Brief interruption.)
20             EXAMINATION
21   BY MR. PATERSON:
22   Q.  You were asked about an exhibit, Number
23   27. Will you get that exhibit in font of

Page 157

1    you.
2        I think 27 was the notes of the
3    conversation you made with Mr. Crouch. The
4    plaintiff, Mr. Crouch, called you. It's
5    dated July 6, 2001.
6  A.  That's it.
7  Q.  That's it?
8  A.  Yeah.
9  Q.  Okay. You were asked about a sentence in
10   that exhibit. It says: He went on to say
11   that I did an annuity for his father. I
12   told him I could not release that
13   information one way or another. He said he
14   had the paperwork in front of him.
15       And my question to you is, did he tell
16   you he had the paperwork regarding his --
17   the annuity that Mrs. Crouch, the
18   defendant, and the decedent, Mr. Crouch,
19   purchased?
20       MR. MCHARD: Well, I'm going to --
21       I'm going to object to the
22       form of this --
23  Q.  What did he tell you?

Page 158

1        MR. MCHARD: -- to the form of
2        this question.
3  Q.  All right.
4  A.  He led me to believe that he had copies of
5    the annuity that I did, because he said
6    that he -- he told me in the conversation
7    that I did an annuity for his father, and
8    then he went on to say that he had the
9    paperwork in front of him.
10       When I told him I couldn't release that
11   information, he said he had the paperwork.
12   So that just -- according to this -- what I
13   wrote down, it would lead me to believe he
14   had a copy of the annuity contract.
15  Q.  And that was -- that conversation took
16   place on July 6, 2001, correct?
17  A.  That is the date that I typed the memo.
18   And I said I received a call today, so I
19   would assume that's the correct date.
20  Q.  A couple of other quick questions. Do you
21   have any stake in the outcome of this case
22   one way or another?
23  A.  No, sir.

Page 159

1  Q.  Did you do your best to answer questions
2    truthfully?
3        MR. MCHARD: I'm going to object
4        to the form of the last
5        question and ask that it be
6        stricken.
7        MR. PATERSON: Noted.
8  Q.  Did you do your best today to truthfully
9    answer all the questions that were put to
10   you?
11       MR. MCHARD: Same question -- same
12       objection.
13  A.  Yes, I did.
14  Q.  You were asked about an affidavit that you
15   gave at my request dated March 6, 2006.
16       MR. PATERSON: And I don't believe
17       this affidavit has been marked
18       as an exhibit, and I'd like to
19       mark it as Defendant's Exhibit
20       1 to this deposition.
21       MR. MCHARD: Well, I don't know
22       why we would mark a second one
23       because we did, if you were

Page 160

1        paying attention.
2        MR. PATERSON: Did we mark it?
3        MR. MCHARD: Yes, sir.
4        MR. PATERSON: Well, I've had a
5        hard, long day. I can't
6        recall. Why don't you help me
7        out. What was it marked?
8        THE WITNESS: I think it's 19.
9        MR. MCHARD: Exhibit Number 19.
10       MR. PATERSON: Okay. Great. It's
11       already marked Exhibit Number
12       19.
13  Q.  The information that's in that, is that
14   information you supplied to me?
15  A.  Yes.
16  Q.  Looking at the affidavit, do you know of
17   anything in there that is untrue?
18  A.  No.
19  Q.  Would you have signed it if it's untrue, if
20   anything in there was untrue?
21       MR. MCHARD: Object --
22  A.  No.
23       MR. MCHARD: -- as to the leading

Page 161

1        form of this question.
2  Q.  And sitting here today, is there anything
3      you'd change in this affidavit if you were
4      trying to give everybody a true picture of
5      what went on?
6        MR. MCHARD:  Same objection.
7  A.  No.
8  Q.  As far as you know sitting here today, the
9      statements in this affidavit, Exhibit
10    Number 19, are true and correct?
11       MR. MCHARD:  Same objection as
12      to --
13  A.  Yes.
14       MR. PATERSON:  I don't have any
15      further questions.  Thank you.
16       EXAMINATION
17  BY MR. GREGGS:
18  Q.  Based on what you told us today, I take it
19      that you would not have witnessed
20      Mr. Crouch's signature by his wife unless
21      he had authorized her to sign in your
22      presence; is that correct?
23  A.  That's --

Page 162

1       MR. MCHARD:  Object as to form.
2  A.  That's correct. He was there, and I heard
3      him ask her specifically to sign that for
4      him because he had forgotten his glasses.
5       MR. GREGGS:  Thank you.
6       MR. PATERSON:  No further
7      questions.
8       EXAMINATION
9  BY MR. MCHARD:
10  Q.  Did you just e-mail this document back
11      then?
12  A.  I thought I was finished with you.
13  Q.  I know that that's your erstwhile desire,
14      but you -- this affidavit, Exhibit 19, you
15      said that you e-mailed it back and forth.
16  A.  If I recall correctly, I think it was
17      e-mailed to me.
18  Q.  With exhibits that had been scanned in?
19  A.  No, I --
20  Q.  Did you ever see the exhibits that were
21      attached or what?
22  A.  Did I see these?
23  Q.  Yeah.

Page 163

1  A.  Well, I had -- yes, I had a copy of the
2      affidavit and the -- and the forms here.
3  Q.  Had those been supplied to you by
4      Mr. Paterson?
5  A.  Had the affidavit been supplied?
6  Q.  No.  Had the exhibits that are attached to
7      your affidavit been supplied by
8      Mr. Paterson?
9  A.  I can tell you ... I don't know if I have
10    everything that's in here, but I do have a
11    copy of the profile and a copy of the
12    contract.
13  Q.  How did you get the exhibits?
14  A.  When or how did I get these?
15  Q.  How and when, from whom did you get them?
16  A.  This was given to me by Mr. Paterson.
17  Q.  When were you first given the exhibits in
18    connection with the affidavit Mr. Paterson
19    wanted from you?
20  A.  I would need to look at my calendar.  That
21    would have been ...
22  Q.  That's a manual calendar or is that on your
23    computer, too?

Page 164

1  A.  It's a manual calendar.
2  Q.  And you would have kept a notation of when
3      you would have gotten those?
4  A.  I would have -- yeah, I would have made a
5      note on my calendar.
6  Q.  Was that because you came here to get them?
7  A.  No, I did not.
8  Q.  Well, were they mailed to you?
9  A.  No, they were not.
10  Q.  Were they faxed to you?
11  A.  No.
12  Q.  Were they scanned in and e-mailed to you?
13  A.  No, they were not scanned in an e-mail.
14  Q.  Well, then how did you get them from
15    Mr. Paterson?
16  A.  These were -- these were given to me when I
17    saw the -- well, no, it wouldn't have been
18    at that point. Last ... I can't remember
19    if it was Wednesday or if it was maybe
20    Tuesday.
21  Q.  So you didn't see the exhibits until --
22    that were attached to your affidavit until
23    last --

Page 165

1    A.  It was last week.
2    Q.  -- last week; is that correct?
3    A.  That -- that would be correct.
4    Q.  And that's when you came here and got ready
5        for your deposition, discussed the matter
6        with Mr. Paterson?
7    A.  Actually, I did not come here.
8    Q.  Well, how did that work then?
9    A.  Mr. Paterson met me.
10   Q.  For how long?
11   A.  Maybe 20 minutes.
12   Q.  Where?
13   A.  At my --
14   Q.  At work?
15   A.  At work.
16   Q.  And talked about what the deposition was
17       going to be and what questions we were
18       going to be going over?
19   A.  Basically gave me these to review.
20   Q.  That is, the affidavit?
21   A.  Affidavit of myself and Mrs. Crouch.
22   Q.  Both of them, right?
23   A.  Yes.

Page 166

1    Q.  And before that, you had never seen the
2        exhibits that were attached to know what
3        the exhibits were, correct?
4    A.  To the best of my -- I don't remember
5        seeing them before.
6    Q.  And where were you when you signed --
7    A.  Wait.  Wait.  Let me say this.  I did thes
8        documents.  So, I mean, I do remember
9        seeing them, but as far as having a copy of
10       them since I've left the bank, to my
11       knowledge, this is the first copy that I've
12       had.
13   Q.  Yeah, but where were you when you signed
14       the document, when you signed this
15       affidavit?
16   A.  When I signed this?
17   Q.  Yes.
18   A.  I was at my place of employment.  I was at
19       Peoples Bank.
20   Q.  Well, who notarized it?
21           MR. PATERSON:  I did.
22   A.  Mr. Paterson did.
23   Q.  Did he come out there then?

Page 167

1    A.  To do the original.
2    Q.  To get the original signature?
3    A.  Yes.
4    Q.  He came out there another time to get that
5        from you, correct?
6    A.  That was -- he came on this -- whatever
7        this date was.
8    Q.  But didn't give you a signed copy with the
9        exhibits that were -- that he was going to
10       attach at that time, did he?
11   A.  Did he give me the exhibits at that time?
12   Q.  He didn't give you a signed copy of the
13       document with the attached exhibits, did
14       he?
15   A.  I had -- I had a copy of the affidavit.
16   Q.  Right, but not of the exhibits that he
17       attached later?
18   A.  I don't think so.
19           MR. MCHARD:  No further questions.
20           MR. PATERSON:  Just to clear up
21               one thing ...
22
23

Page 168

1           EXAMINATION
2    BY MR. PATERSON:
3    Q.  In your affidavit on page four -- paragraph
4        four on page two, it says:  A true and
5        correct copy of the application forms are
6        attached hereto as Exhibit A.
7            Is Exhibit A to the affidavit a true
8        and correct copy of the application forms?
9        Here is Exhibit A to -- Here is Exhibit A
10       to Defendant's Exhibit Number 19.
11           MR. MCHARD:  I'm sorry.  You can't
12               do that after the fact, once
13               the -- once the horse is out
14               of the barn, sir.
15           MR. PATERSON:  Excuse me.  I was
16               questioning her.
17           MR. MCHARD:  Well --
18   Q.  I'm showing you --
19           MR. MCHARD:  I've been subjected
20               to this all day.
21           MR. PATERSON:  Fine.
22   Q.  Plaintiff's Exhibit Number 19 is an
23       affidavit, okay --

Page 169

1  A. Right.
2  Q. -- signed by you --
3  A. Right.
4  Q. -- that you said is true and correct?
5  A. Right.
6  Q. All right. Now, in paragraph -- it's got
7     Exhibit A attached to it and Exhibit B
8     attached to it and Exhibit C attached to
9     it. Do you see that?
10 A. Uh-huh. (Positive response.) Right.
11 Q. Now, in paragraph four of the affidavit, it
12    says: A correct copy of the application
13    forms are attached as Exhibit A. Is that,
14    in fact, true? Is Exhibit A to the --
15 A. Um-huh. (Positive response.)
16 Q. -- a true and correct copy of the
17    application forms?
18 A. That's true. That's true.
19 Q. Now, so that there's no misunderstanding,
20    turn to paragraph six. It says in
21    paragraph six: A true and correct copy of
22    the annuity service request form that I
23    completed on April 4th, 2000 is attached as

Page 170

1     Exhibit B. Is that correct?
2  A. That is correct.
3  Q. Now, look at paragraph eight. It says: A
4     true and correct copy of the forms I
5     completed and sent to Lincoln National
6     Financial Group for Sue Crouch is attached
7     as Exhibit C. Is that correct?
8  A. That is correct.
9  Q. Exhibits A, B, C all come out of your file
10    that you had there at AmSouth when you
11    worked at AmSouth?
12 A. That's true.
13    MR. PATERSON: Thank you.
14    EXAMINATION
15 BY MR. MCHARD:
16 Q. But, ma'am, you didn't know if Charlie was
17    going to attach Little Bo Peep as the
18    exhibit, did you --
19 A. Well --
20 Q. -- when you signed your affidavit under
21    oath saying that what was attached is a
22    true and correct copy of Exhibits A, B, and
23    C?

Page 171

1     MR. WALDROP: Let me object to the
2        form.
3     MR. PATERSON: Don't yell at her,
4        please.
5     MR. MCHARD: I'm not yelling.
6     MR. WALDROP: Yes, you are.
7     THE WITNESS: Yes, you are.
8     MR. MCHARD: Well, I apologize
9        then.
10    THE WITNESS: Accepted.
11 A. You confused me because I thought you were
12    trying to ask me if I -- if I were
13    maintaining copies of stuff. I thought
14    that's where you were coming from on that,
15    so I was a little confused in what you were
16    asking me.
17    I would not have signed this without
18    looking at the exhibits. But as far as
19    having and maintaining copies of them, no,
20    I did not maintain copies of any exhibits
21    to my knowledge.
22    When I signed the affidavit, I would
23    have -- I would have not signed if I didn't

Page 172

1     make sure that these exhibits were
2     correct. But as far as having a copy of
3     them, you know, holding on to those from
4     March the 6th, no, I do not recall
5     maintaining copies of them.
6     I received the copy -- I had the copies
7     of them last week is when I received this
8     particular packet.
9  Q. When you received an affidavit with the
10    attached exhibits; is that correct?
11 A. It was a copy of it. I had the affidavit,
12    but --
13 Q. Without the exhibits?
14 A. As far as having a copy -- I had a copy of
15    the affidavit, but I didn't recall
16    retaining a copy of the exhibits.
17    MR. MCHARD: No further questions.
18    MR. PATERSON: No further
19       questions. Thank you, ma'am.
20
21    * * * * * * * * * * * *
22    FURTHER DEPONENT SAITH NOT
23    * * * * * * * * * * * *

Page 173

1          REPORTER'S CERTIFICATE
2    STATE OF ALABAMA:
3    MONTGOMERY COUNTY:
4        I, Lisa J. Nix, Registered Professional
5    Reporter and Commissioner for the State of Alabama
6    at Large, do hereby certify that I reported the
7    deposition of:
8            RONDA ROBINSON
9    who was first duly sworn by me to speak the truth,
10   the whole truth and nothing but the truth, in the
11   matter of:
12       JAMES E. CROUCH,
13       Plaintiff,
14       Vs.
15       AMSOUTH BANK, INA SUE CROUCH and JOHN
16       and JANE DOES 1-10,
17       Defendants.
18       In The U.S. District Court
19       For the Middle District of Alabama
20       Northern Division
21       Case Number 2:06-CV-00111-MEF
22   on Wednesday, August 23, 2006.
23       The foregoing 172 computer printed pages

Page 174

1    contain a true and correct transcript of the
2    examination of said witness by counsel for the
3    parties set out herein. The reading and signing of
4    same is hereby waived.
5        I further certify that I am neither of kin
6    nor of counsel to the parties to said cause nor in
7    any manner interested in the results thereof.
8        This 11th day of September 2006.
9
10
11       _____
         Lisa J. Nix, Registered
12       Professional Reporter and
         Commissioner for the State
13       of Alabama at Large
14
15
16
17
18
19
20
21
22
23