# EXHIBIT 3

# VIDEOTAPED DEPOSITION OF
# INA SUE CROUCH

## August 23, 2006

## Pages 1 through 214

# CONDENSED TRANSCRIPT AND CONCORDANCE
# PREPARED BY:

**Haislip, Ragan, Green, Starkie & Watson, P.C.**
**566 South Perry Street**
**Post Office Box 62**
**Montgomery, AL 36104**
**Phone: (334) 263-4455**
**Fax: (334) 263-9167**
**E-mail: haislipragan@charter.net**

**Page 1**

1  IN THE UNITED STATES DISTRICT COURT
2  FOR THE MIDDLE DISTRICT OF ALABAMA
3  NORTHERN DIVISION
4
5  JAMES E. CROUCH,
6  Plaintiff,
7  Vs.                              CIVIL ACTION NO.
                                    2:06-CV-00111-MEF
8  AMSOUTH BANK, INA SUE
   CROUCH and JOHN and
9  JANE DOES 1-10,
10  Defendants.
11
12           * * * * * * * * * * * *
13
14     VIDEOTAPED DEPOSITION OF INA SUE CROUCH,
15  taken pursuant to stipulation and agreement before
16  Lisa J. Nix, Registered Professional Reporter and
17  Commissioner for the State of Alabama at Large, in
18  the Law Offices of Balch & Bingham, Suite 200, 105
19  Tallapoosa Street, Montgomery, Alabama on
20  Wednesday, August 23, 2006, commencing at  .
21  approximately 11:14 a.m.
22
23           * * * * * * * * * * * *

**Page 2**

1              APPEARANCES
2
3  FOR THE PLAINTIFF:
4  Mr. Samuel S. McHard
   Ms. Erica McHard
5  BRYAN NELSON P.A.
   6524 U.S. Highway 98
6  Post Office Drawer 18109
   Hattiesburg, MS 39404-8109
7
8  FOR THE DEFENDANT AMSOUTH:
9  Mr. Charles B. Paterson
   BALCH & BINGHAM
10  Suite 200
   105 Tallapoosa Street
11  Montgomery, Alabama 36104
12
   FOR THE DEFENDANT INA SUE CROUCH:
13
   Ms. Glenda W. Hughes
14  Attorney at Law
   103-B Commerce Street
15  Wetumpka, AL 36092
16
   ON BEHALF OF LINCOLN NATIONAL:
17
   Mr. E. Glenn Waldrop, Jr.
18  Mr. Mitchell D. Greggs
   LIGHTFOOT, FRANKLIN & WHITE
19  400 20th Street North
   Birmingham, AL 35203
20
21  ALSO PRESENT: JeffBaker, Videographer
              Mr. James Crouch
22
23

**Page 3**

1              EXAMINATION INDEX
2
3  INA SUE CROUCH
       BY MR. MCHARD . . . . . . . . . . 6
4      BY MS. HUGHES . . . . . . . . . . 211
5
6
7
8
              EXHIBIT INDEX
9
              MAR
10  PLAINTIFF'S EXHIBIT
11   1  Certificate of Live Birth          12
12   2  Marriage License                   15
13   3  Affidavit of Ina Sue Crouch        20
14   4  Obituary                  10
15   5  Deposition of Ina Sue Crouch taken on    72
        January 22, 2002
16
17   7  8/28/97 official check payable to James   126
        Edward Crouch for $100,00000
18  10  Fixed Annuity Purchase Authorization   132
        Form
19
    11  Confidential Client Profile (AmSouth   112
20      Investment Services)
21  12  Flexible Premium Deferred Fixed Annuity   29
        Application
22
    13  5/7/98 Lincoln National Premium Receipt   125
23      for $250,000

**Page 4**

1          EXHIBIT INDEX (Continued)
2
3  14  5/18/98 letter to James E. and Sue        101
       Crouch from Andrea Lewis, New Business
4      Representative, Lincoln National Life
       Insurance
5
   21  Fixed Annuity Contract - Annual          108
6      Statement for period 12/0 8/98 - 12/08/99
7  22  Annuity Service Request              146
8  23  Fixed Annuity Contract - Annual          108
       Statement for period 05/0 8/99 - 05/08/00
9
   25  Death Certificate                 200
10
11
12
13
14           * * * * * * * * * * * *
15
16
17              STIPULATION
18      It is hereby stipulated and agreed by and
19  between counsel representing the parties that the
20  deposition of INA SUE CROUCH is taken pursu ant to
21  the Federal Rules of Civil Procedure and that said
22  deposition may be taken before Lisa J. Nix ,
23  Registered Professional Reporter and Commissioner

Page 5

1  for the State of Alabama at Large, without the
2  formality of a commission, that objections to
3  questions other than objections as to the form of
4  the question need not be made at this time but may
5  be reserved for a ruling at such time as the said
6  deposition may be offered in evidence or used for
7  any other purpose by either party provided for by
8  the Statute.
9      It is further stipulated and agreed by and
10  between counsel representing the parties in this
11  case that the filing of said deposition is hereby
12  waived and may be introduced at the trial of this
13  case or used in any other manner by either party
14  hereto provided for by the Statute regardless of
15  the waiving of the filing of the same.
16      It is further stipulated and agreed by and
17  between the parties hereto and the witness that the
18  signature of the witness to this deposition is
19  hereby waived.
20
21
22      * * * * * * * * * * * * *
23

Page 6

1          INA SUE CROUCH
2      The witness, after having first been duly
3  sworn to speak the truth, the whole truth and
4  nothing but the truth testified as follows:
5          MR. MCHARD: Let the Record show
6          that this is the deposition of
7          Ina Sue Crouch taken pursuant
8          to notice and agreement of the
9          parties.
10          EXAMINATION
11  BY MR. MCHARD:
12  Q.  Good morning, ma'am.
13  A.  Good morning.
14  Q.  Would you be kind enough to tell us your
15      name and address.
16  A.  Ina Sue Crouch. 360 Old 231 Highway,
17      Wetumpka, Alabama. 36092 is the Zip.
18  Q.  How long have you resided there, ma'am?
19  A.  18 years ... will be the first of
20      September.
21  Q.  And does anyone reside there with you?
22  A.  No, sir.
23  Q.  And has anyone resided there with you other

Page 7

1      than your husband prior to his passing on
2      February the 14th of 2001?
3  A.  No, sir.
4  Q.  Can you tell me at the time that he passed
5      what real estate he had an interest in?
6  A.  This place where we -- I reside now.
7  Q.  And what does that place consist of?
8  A.  A mobile home and seven and a half acres of
9      land.
10  Q.  And when had that been purchased?
11  A.  1986.
12  Q.  And from whom?
13  A.  We bought the first part of the land from
14      Ocie Frank Dennis, and then later we bought
15      the other -- the other part of the land
16      from Mr. Billy Culverson.
17  Q.  And were some of those people relatives of
18      Teresa Crouch, your son James' wife?
19  A.  That was her father we bought it from.
20  Q.  And during the ten years before your
21      husband passed in February of '01, did you
22      or he or both of you own any other real
23      estate?

Page 8

1  A.  Yes, we did. We owned -- We owned three
2      homes and we rented.
3  Q.  And what are the addresses of those
4      properties?
5  A.  One of them was 1747 Champion Street in
6      Montgomery, and one of them was 1724
7      Gardendale Drive, and one was 602 --
8      Alexander City, Alabama.
9  Q.  The first two were here in Montgomery?
10  A.  Yes.
11  Q.  And then the last -- the third one was in
12      Alexander City?
13  A.  Yes, where my father and mother used to
14      reside.
15  Q.  And as to each of those properties, when
16      were those sold or otherwise transferred?
17  A.  Well, we sold them at different times, and
18      I -- it was about five -- five years we
19      sold the last one before his passing.
20  Q.  Five years before he passed?
21  A.  Yes.
22  Q.  By that time, all of them had been sold?
23  A.  Yes.

2 (Pages 5 to 8)

Page 9

1    Q. You were sitting here through James'
2       deposition, correct?
3    A. Yes, sir.
4    Q. And there was discussion about preparing a
5       family tree. Do you recall that?
6    A. Yeah, I remember something about it.
7    Q. Do you recall that in his deposition,
8       right?
9    A. Yeah, I can remember.
10   Q. And you recall talking with him about
11      preparing his family tree, correct?
12   A. Well, I think I remember it being brought
13      up, but I don't think it was ever done. I
14      never remember it.
15   Q. Well, you would agree that you have told
16      James that you and his father had been
17      married for 47 years, over 40 years, prior
18      to his death, correct?
19   A. I don't remember telling him that, so I
20      don't remember that.
21   Q. Well, you have said that in statements
22      under oath, haven't you, ma'am?
23   A. Over 40 years?

Page 10

1    Q. Yes.
2    A. Yeah, we've been married 40 years.
3    Q. Before he died, correct?
4    A. No, I didn't say before he died.
5    Q. Well ...
6    A. I don't remember. I don't recall it. If
7       so, I don't recall saying that.
8    Q. So if you said that in an affidavit that
9       you had been married for over 40 years
10      before he died, that would be untrue,
11      wouldn't it?
12   A. I don't recall saying it.
13   Q. Well, but if you did say it, that would be
14      untrue, correct?
15   A. If I — I don't recall telling anybody
16      that.
17   Q. No. Just answer my question, ma'am. If
18      you said that and you said it under oath,
19      that would be untrue, wouldn't it?
20   A. I don't recall saying it. So if it would
21      be untrue or not — I don't recall saying
22      that under oath.
23          (Plaintiff's Exhibit 4 was marked

Page 11

1          for identification.)
2    Q. Well, did you —did you ever assist in the
3       preparation of your own husband's obituary?
4    A. Yes, I was.
5    Q. And were you careful to see that everything
6       that was stated in his obituary was true
7       and correct?
8    A. No, I didn't — I wasn't — I wasn't able
9       to be responsible for the obituary column.
10      I was barely able to be there.
11   Q. Well, did you ever check it to see whether
12      it was true and correct?
13   A. I never did — I never paid that much
14      attention.
15   Q. Well —
16   A. I put them in the Bible that they gave me
17      at the funeral home, and that's where
18      they're still at.
19   Q. The obituaries?
20   A. Yes.
21   Q. Well, do you have a family tree in your
22      Bible?
23   A. No, I don't.

Page 12

1    Q. Well, you would agree that you had told
2       your son, James, that you and his father,
3       James Earl, were married at the time that
4       he was born, didn't you?
5    A. I don't know where I ever told him that or
6       not. I could take it for granted that he
7       knew we were. Whether we were or whether
8       we weren't — We never discussed things
9       like that. We were there for him, and that
10      was it.
11   Q. And when were you and he married?
12   A. 1966.
13   Q. But James was born March 8th of 1957,
14      wasn't he?
15   A. That's right. You're correct.
16          (Plaintiff's Exhibit 1 was marked
17          for identification
18   Q. I'm showing you Plaintiff's Exhibit 1.
19      That's a true and correct copy of James'
20      birth certificate, correct?
21   A. That's right.
22   Q. And James was the only child born of you
23      and James Earl Crouch, correct?

ment 63-4    Filed 09/18/2006    Page 7 of 57

**Page 13**

1  A. That's right.
2  Q. But on the birth certificate, it says the
3     name was James Carlton Crouch. Why is
4     that?
5  A. Well, I can tell you why. Where he was
6     born at, the courthouse burned, and his
7     mother 'nem had first named him James
8     Carlton. And they didn't know where it was
9     going to come up on his -- how it was going
10    to come up, and they decided to change the
11    name on it. His mother and 'nem did that.
12 Q. Well, there's some handwriting on this
13    birth certificate that says children
14    previously born to this mother; do not
15    include this child. And the handwriting
16    says that there are five other children now
17    living, but the typewritten says four.
18       How many children had you had prior to
19    the birth of James?
20 A. Four.
21 Q. And who are those children?
22 A. Jerry Shaddix, Charles Shaddix, Glenda
23    Shaddix then, and David Shaddix. That was

**Page 14**

1     their name -- that was their father's
2     name. They were Shaddixes.
3  Q. And had you been married to Mr. Shaddix?
4  A. Yes.
5  Q. And when were you married to -- What were
6     the years during which you were married to
7     him?
8  A. I married him in February of '42 and
9     divorced him in June of '53.
10 Q. And when were each of those four children
11    born?
12 A. Jerry was born in December of '42. Charles
13    was born in July of '44. Glenda was born
14    August of '46, and David was born September
15    of '50.
16 Q. Those four children never resided with you
17    and James Earl, did they?
18 A. Yes, some. Yes, the smaller ones did, and
19    all of them did at some time. And when the
20    boys got old enough, 17, 18 years old, they
21    all went in the service. They all left
22    home. They was with me when they went in
23    the service, all of them.

**Page 15**

1  Q. No. But from 1966 on, they never lived
2     with you, did they?
3  A. Yes, part-time, yes.
4  Q. Who?
5  A. They was with their father and me back and
6     forth. We had custody of both -- all of
7     them. They could be with him -- be with me
8     or be with their father, whichever one they
9     chose, summer months or school time,
10    whatever.
11       (Plaintiff's Exhibit 2 was marked
12       for identification.)
13 Q. I'm showing you Exhibit Number 2. This is
14    a true and correct copy of your marriage
15    license to James Earl Crouch, the father of
16    James Edward Crouch, isn't it?
17 A. Yeah, that's a copy of our marriage
18    license, yes, it sure is.
19 Q. And showing that you were, in fact, married
20    to James Earl Crouch, your son Jim's
21    father, September 23, 1966, correct?
22 A. Correct.
23 Q. And you would agree that that was the only

**Page 16**

1     time that you were ever married to
2     Mr. Crouch, correct?
3        MR. PATERSON: Object to the form
4        of that.
5  Q. You weren't married and divorced and
6     remarried, correct?
7  A. No.
8  Q. Is that correct, that you were married to
9     him only once?
10 A. Once.
11 Q. And that as of February the 14th of 2001,
12    you would have only been married for 34
13    years, not over 40 or 47, correct?
14       MR. PATERSON: Object to the form
15       of that.
16 Q. Is that correct, ma'am?
17 A. Well, from '66 to 2001, I would have to
18    count that. I guess it would be 36 years.
19 Q. So whatever the math is.
20 A. Yeah, well, whatever, yeah, that's right.
21 Q. Now, you have prepared a number of
22    affidavits in this case, haven't you?
23 A. One.

4 (Pages 13 to 16)

Page 17

1  Q.  Well, let's -- let me ask you. You have
2     actually consulted on a number of times
3     with the attorneys for AmSouth Bank,
4     haven't you?
5        MR. PATERSON: Object to the form.
6  A.  What do you mean by that?
7  Q.  Well, you've talked with them, and you've
8     sat down and met with them to discuss
9     these -- this matter.
10 A.  With AmSouth?
11 Q.  Yes, with the attorneys for AmSouth Bank.
12 A.  Not no time -- No.
13 Q.  You've never talked with them prior to
14    today? Is that your testimony, ma'am?
15       MR. PATERSON: Sam, let me object
16       to this.
17          I have talked with her,
18       and nobody is trying to say we
19       haven't. I have met with
20       Ms. Crouch and her lawyer --
21    THE WITNESS: One.
22       MR. PATERSON: -- have talked to
23       her on several occasions.

Page 18

1        MS. HUGHES: Just once.
2        MR. PATERSON: On one occasion?
3        THE WITNESS: One occasion.
4          That's the only time.
5        MR. PATERSON: Talked to
6        Ms. Crouch's lawyer on several
7        occasions.
8  Q.  So now you're changing your answer to
9     you've met with him on one occasion; is
10    that correct?
11 A.  Yeah. I didn't know several times. Just
12    one time I spoke with him --
13 Q.  All right. And when --
14 A.  -- in my attorney's presence.
15 Q.  And when was that?
16 A.  About three ... three or four weeks ago.
17 Q.  Three or four weeks ago, ma'am?
18 A.  I think. I don't remember exactly.
19 Q.  And what was said then?
20 A.  I don't recall.
21 Q.  How long was the meeting?
22 A.  I don't recall how long that was either.
23 Q.  Where was it?

Page 19

1  A.  Here.
2  Q.  Here in?
3  A.  Montgomery.
4  Q.  But was it here at Balch and Bingham's
5     office?
6  A.  Yes, it was. It was in a different room,
7     but it was here.
8  Q.  And had you previously met with the bank's
9     attorney, Paul DelCambre?
10 A.  No, I have not.
11 Q.  Well, with regard to the affidavit that you
12    filed in connection with this case, how did
13    that get prepared, ma'am?
14 A.  I have no idea. I've never met him.
15 Q.  Well, how did the affidavit that you signed
16    in connection with the pleadings in this
17    case get prepared?
18 A.  What are you speaking of? The annuity?
19 Q.  No. The affidavit, ma'am.
20 A.  Well, I signed an affidavit, but it wasn't
21    nothing concerning of that.
22 Q.  Well, your attorney is now handing you
23    documents; is that right? And now your

Page 20

1  attorney is talking with you about that
2  document; is that right?
3        MR. PATERSON: Let the Record
4        reflect that she's been handed
5        the affidavit that she gave
6        that's been filed of record
7        with the court in this action,
8        the affidavit she's being
9        questioned about.
10 A.  I already signed the affidavit.
11 Q.  Well, how did that affidavit get prepared?
12 A.  My attorney gave it to me, and I signed it.
13 Q.  No. But how did it get prepared? Your
14    attorney didn't prepare it, did she?
15 A.  No, she didn't prepare it, but I had to go
16    down and sign it.
17 Q.  No. It was prepared by Balch & Bingham,
18    the attorneys for the bank, wasn't it,
19    ma'am?
20 A.  Yes, I guess it was.
21       (Plaintiff's Exhibit 3 was marked
22       for identification.)
23 Q.  And how did Balch & Bingham, the attorneys

Page 21

1    for AmSouth Bank, get the information
2    that's contained in Plaintiff's Exhibit 3,
3    your affidavit?
4        You're reading that document now; is
5    that correct?
6  A. Well ...
7  Q. That's all right if you are. You are
8    reading it, correct?
9  A. Well, I've got the thing here.
10 Q. Well, your attorney has handed you that,
11   and you've read it, correct?
12       Is that correct, ma'am?
13 A. Yes, I read it.
14 Q. And did you read it prior to the time --
15 A. I have that. I have this.
16 Q. You have -- You've reviewed that in advance
17   of your deposition today, haven't you?
18 A. Okay.
19 Q. And did you read it carefully in advance of
20   signing this document?
21 A. Yeah, I read it.
22 Q. Did you see any errors or incorrect
23   statements in the document?

Page 22

1  A. I don't understand what you're getting at,
2    sir.
3  Q. Well, ma'am --
4  A. Explain it a little in my terms there.
5  Q. Yes, ma'am. On page three of the document,
6    is that your signature?
7  A. It sure is.
8  Q. And the date that Balch & Bingham had put
9    on the document was actually a date in
10   February of 2006, but that date got changed
11   by you to March because you didn't get
12   around to signing the document until then;
13   is that correct?
14 A. I signed it whenever it was presented to me
15   to sign.
16 Q. And what you're telling me is that Balch &
17   Bingham prepared this affidavit, sent it to
18   your lawyer, you read it, and the only
19   change that you made on it was to change
20   the date of February to March as indicated
21   immediately above your signature. Is that
22   correct, ma'am?
23 A. That was the day that I signed it.

Page 23

1  Q. And that's the only change that you chose
2    to make after you'd read it, correct?
3  A. Yeah.
4  Q. And you're able to read and understand this
5    document; is that correct?
6  A. Sure.
7  Q. And what is your degree of education?
8  A. 12th grade.
9  Q. Graduated from high school?
10 A. Yes.
11 Q. Where was that, ma'am?
12 A. Daviston, Alabama.
13 Q. And you don't have any problems in reading
14   or writing the English language and
15   documents such as this affidavit, do you?
16 A. I'm sure I don't.
17 Q. And in looking at paragraph one of your
18   affidavit that was prepared by AmSouth
19   Bank, it says that James E. Crouch was your
20   husband for more than 40 years, doesn't it?
21 A. Well, yes, he could've been.
22 Q. Well, that's what it says, isn't it?
23 A. Yeah.

Page 24

1  Q. And that's not true, is it?
2        MR. PATERSON: Object to the form
3          of that.
4  A. Well, we had been together 40 -- over 40
5    years, if that makes sense.
6  Q. You understand, though, the difference in
7    the sanctity of marriage and how long
8    you've been married to somebody, correct?
9        MR. PATERSON: Object to the form
10         of that.
11 Q. Is that correct, ma'am?
12 A. Oh, yes, I know the difference.
13 Q. But you didn't choose to correct that, did
14   you?
15       MR. PATERSON: Object to the form
16         of that.
17 A. No.
18 Q. And with regard to the obituary that was
19   prepared and published in connection with
20   your husband's death, it was passed out
21   both at the Ellison Funeral Home and
22   published in the newspaper, wasn't it,
23   ma'am?

Page 25

1    A. Yes, sir.
2    Q. And that obituary that you assisted in
3       preparing states that Mr. Crouch was
4       survived by his loving wife of 47 years,
5       doesn't it?
6    A. Well, I was at that --
7    Q. Is that what it says, ma'am?
8    A. That's what it says.
9    Q. And that's not true either, is it?
10   A. No. My daughter-in-law and 'em was doing
11      that for me. And, sir, I explained to you
12      that I was not even able to be there. I
13      was sitting in the chair there and I
14      couldn't hardly walk across the funeral
15      home, and they was over there doing it.
16   Q. Well, what about -- your attorney has just
17      showed you a note that she had written.
18      What's the note say?
19   A. Well, just like I explained --
20   Q. What does the note say, ma'am?
21   A. That we lived together. We could have been
22      common law up till we married.
23   Q. Is that your contention?

Page 26

1    A. Well, I think that's kind of irrelevant to
2       the case anyway.
3    Q. Well, do you contend that you were common
4       law husband and wife with -- with James
5       Earl Crouch prior to Your -- to your legal
6       marriage?
7    A. Well, if you want -- want to take it like
8       that.
9    Q. Well, was he, in fact, married to somebody
10      else during that period of time?
11   A. No, he got a divorce.
12   Q. No. When did he get a divorce from his
13      other wife?
14   A. I don't know exactly when he got it.
15   Q. Well, it was shortly before your marriage,
16      wasn't it, ma'am?
17   A. No, it wasn't shortly. I don't know
18      exactly. I can't remember. I wasn't with
19      him when he got it, so ...
20   Q. Ma'am, with regard to the annuity that's
21      the subject of the dispute here, do you
22      know anything about annuities?
23   A. Yes, I know.

Page 27

1    Q. Well, describe for me what an annuity such
2       as the one that is in controversy is.
3    A. Well, I can tell you why -- what ours was
4       for. Ours was for income tax purposes we
5       took out at AmSouth Bank. Had it for six
6       years -- We put it in for income tax
7       purposes. We would pay no interest on the
8       income tax till we took it out in six
9       years.
10   Q. Because you had plenty of other --
11   A. Well, didn't have plenty, but we was just
12      having a write-off like that. And that was
13      what it was put in for, and I'm sure you've
14      got the paper on it where that was what it
15      was.
16   Q. Well, we'll get to that paper in a minute,
17      but that -- you would agree that the
18      purpose for -- that you had in mind in
19      connection with that was to save money on
20      income tax; is that correct?
21   A. Well, that was one thing of it, yes. I
22      wanted to save some money on income tax
23      just like anybody else would.

Page 28

1    Q. Any other purpose?
2    A. No.
3    Q. You would agree that it didn't have
4       anything to do with financial security
5       because, in fact, the annuity was a riskier
6       investment than CDs or money markets,
7       correct?
8           MR. PATERSON: Object to the
9               form.
10   Q. Is that correct?
11   A. I don't know that.
12   Q. You don't know?
13   A. I don't know that it was.
14   Q. Well, you would agree that --
15   A. That's what I -- That's what we chose. Me
16      and my husband chose that.
17   Q. But you would agree that it wasn't
18      purchased for financial security, was it?
19   A. For financial security?
20   Q. Right.
21   A. It was for income tax things, as I told
22      you.
23   Q. And not for financial security?

Page 29

1   A.  Well, if you want to say it was, but I
2      said -- we took it for that -- to keep from
3      paying all the income tax at one time on
4      it, yes.
5   Q.  Now, your affidavit states that on May 7,
6      you completed an application to purchase an
7      annuity; is that correct, ma'am?
8   A.  That's right. May the 7th, '98.
9          (Plaintiff's Exhibit 12 was marked
10         for identification.)
11   Q.  I'm showing you what has been marked as
12      Exhibit 12, recognizing that's not
13      sequential. That's the application that
14      you signed, is it not, on that day; is that
15      correct?
16   A.  The day we invested is what you're saying?
17   Q.  Right. Does that bear your signature?
18   A.  Yes, that's my signature. That's James
19      Earl's signature.
20   Q.  So under signature of owner is James Earl
21      Crouch's signature; is that correct?
22   A.  Yes, sir, and I was the joint owner.
23   Q.  What do you understand, then, the Lincoln

Page 30

1      National Life Insurance Company Investor's
2      Choice annuity contract to be?
3   A.  What do I ... The contract that we invested
4      in.
5   Q.  I know. But what are the contract
6      documents? Because you say that you got
7      that shortly after completing the
8      application. How many days or weeks
9      afterwards?
10   A.  I'm – I don't remember.
11   Q.  Well, what did it look like?
12   A.  It was a letter.
13   Q.  That was the contract?
14   A.  No. The contract ...
15   Q.  Is this the contract?
16   A.  You don't have a copy of the contract?
17   Q.  Well, is this the contract, ma'am?
18   A.  Yes.
19   Q.  Well, that's what Im asking you. Is this
20      the contract?
21          MR. PATERSON: Object to the form.
22          MR. WALDROP: Same objection.
23   A.  Well, mine – I have it, but mine was a

Page 31

1      pink paper. It wasn't like this one. I
2      mean, the same thing, but it wasn't on –
3      like on this.
4   Q.  So you have a pink copy of that; is that
5      correct?
6   A.  Yes, the day that it was took out, yes.
7   Q.  So it wasn't sometime several days or weeks
8      later as you said, but you received a pink
9      copy that same day?
10   A.  Yes, I did.
11   Q.  Well, you would agree that under this
12      contract as a joint owner, that you would
13      receive proceeds as the surviving owner
14      beneficiary only if there wasn't an
15      annuitant beneficiary designation? You
16      understood that, didn't you?
17          MR. PATERSON: Object to the form.
18          MR. WALDROP: Object to the form.
19   A.  No, I don't quite understand you.
20   Q.  Well, you understand that there were –
21      that there were two options that could
22      occur:
23          You could have an annuitant beneficiary

Page 32

1      designation; that is, a designation where
2      the beneficiary of the annuity would be
3      designated by the person who was the
4      annuitant, correct?
5          MR. PATERSON: Object to the form.
6   A.  I understand that we was co- -- joint
7      owners on it. And if he passed, it was
8      mine and if I passed, it was his. That was
9      explained -- that was in there. I was the
10      joint owner of it.
11      And we invested our money together to
12      buy it. We was joint owners on the money,
13      and we bought it with it. And I-- My
14      education is enough to know that if you're
15      joint owners on something, if one passes,
16      it goes to the other.
17   Q.  And that's what you assumed, isn't it?
18   A.  Yes. I know.
19   Q.  And, in fact, it said that for owner
20      beneficiary designations, that those
21      designations in contrast to annuity –
22      annuitant beneficiary designations were
23      applicable only when there is no joint

Page 33

1  owner, correct?
2      MR. WALDROP: Object to the form.
3  Q. Is that correct, ma'am?
4      MR. PATERSON: Object to the form.
5  A. I don't understand you. I don't understand
6      what you keep saying about that, joint
7      owner. I know -- Just like I said, I am
8      the joint owner, and it was the survivor
9      thing. And if -- On everything we had, if
10     one of us died, everything went to the
11     other one.
12 Q. Well, ma'am, look --look at the owner
13     beneficiary information. Do you see that?
14     In this column right here, ma'am, it's got
15     owner beneficiary information. Do you see
16     that? You're reading it.
17 A. No, there's no joint owner -- well ...
18 Q. No. You do see that provision in the
19     policy, the contract, don't you?
20 A. I see that wrote down. I don't see nothing
21     wrote with it.
22 Q. Right. Because under owner beneficiary
23     information, it's blank. There is no owner

Page 34

1  beneficiary, correct?
2      Is that correct?
3  A. Why would you have to have that up here?
4      You've got he's the owner and I'm the joint
5      owner information. That's on there, so ...
6  Q. Ma'am, you would agree that under owner
7      beneficiary information, owner beneficiary
8      is blank here, isn't it?
9  A. Well, there's never been nothing brought up
10     about that. We've never had no -- We just
11     filled this out. Ronda Robinson filled
12     that out, and I think she knew what she was
13     doing at the bank.
14 Q. But you'd agree this is blank, isn't it?
15 A. It's blank. I can see that.
16 Q. And then there's a note that specifically
17     states under that, that owner beneficiary
18     designations are applicable only when there
19     is no joint owner.
20 A. What do you -- What is applicable? What
21     did you mean by that?
22 Q. Well, do you understand what -- what
23     this -- what this says?

Page 35

1  A. No. I want you to tell me what you're
2      trying to say there. I don't understand
3      what you're trying to say.
4  Q. That an owner beneficiary designation
5      doesn't come into play or apply if there
6      are joint owners. That's what this says,
7      isn't it?
8  A. We are joint owners.
9  Q. Right.
10     MR. PATERSON: Object to the form.
11 A. Well, if one passed away, tell me what
12     would be -- it didn't go to the other one,
13     is there anything in there saying that it
14     don't?
15 Q. Well, yes, ma'am, I believe that there is.
16 A. Well, I don't understand that. No, you
17     can't -- I can't understand you saying
18     that, now. I can't understand it.
19 Q. There is a specific annuitant beneficiary
20     designation as opposed to an owner
21     beneficiary designation, isn't there?
22 A. In other words, you're trying to tell me if
23     he passed on, the beneficiary on there got

Page 36

1  the annuity? Is that what you're trying to
2  tell me?
3  Q. Yes, ma'am.
4  A. Well, I think -- I don't agree with you.
5      I'll say that.
6  Q. I beg your pardon?
7  A. I don't agree with you that --
8  Q. You don't agree?
9  A. Not if a beneficiary -- Huh-uh. (Negative
10     response.) No. Whenever -- It was wrote
11     on there that both of us had to be dead
12     before the party got anything.
13 Q. Where does it say that? Where does it say
14     that, ma'am?
15 A. On the contingent beneficiary. If you're
16     speaking of my son over there, he's the
17     contingent beneficiary on there. And if --
18     Talking about my education. I got
19     education enough to know that that means
20     both parties is dead.
21     And that was explained to him when we
22     took that out in his living room. And you
23     didn't bother to say that, but that -- his

Page 37

1    father told him sitting in his living room
2    that we only put him on there for that in
3    case both of us got killed in a car wreck.
4    Q.  Ma'am, just answer my question. There's
5        only --
6    A.  I know --
7    Q.  -- an annuitant beneficiary designation in
8        connection with this, isn't there?
9             MS. HUGHES: Object.
10   Q.  Do you agree? Do you agree, ma'am?
11            MS. HUGHES: The question has been
12            answered.
13            MR. MCHARD: No, it hasn't been
14            answered. I'd ask that the --  .
15   A.  No, I --
16            MR. MCHARD: - others be stricken
17            as non-responsive.
18   A.  No.
19   Q.  Under the annuitant information, there is
20       an annuitant beneficiary, a primary
21       beneficiary as -- filled out as James
22       Edward Crouch --
23   A.  That's the first --

Page 38

1    Q.  -- the son; is that correct, ma'am?
2    A.  Yes, sir. That's the first --
3    Q.  And there is no -- There's nothing filled
4        out for contingent beneficiary, is there,
5        ma'am? Is there?
6    A.  We changed it to a contingent beneficiary
7        later.
8    Q.  No. In the documents --
9             MR. PATERSON: Sam, please.
10            MS. HUGHES: Object.
11            MR. PATERSON: Hold on.
12            MS. HUGHES: Badgering the
13            witness.
14            MR. PATERSON: Ma'am, we can't --
15            the rest of us that are
16            participants in this lawsuit
17            can't get a clear record if
18            y'all talk over each other.
19            So I'd please ask Sam if
20            he would ask the question and
21            then you listen to it and then
22            you give him an answer, and
23            y'all go back and forth like

Page 39

1        that. Don't talk at the same
2        time because we can't follow
3        you.
4             Thank you.
5    Q.  You agree there's no contingent beneficiary
6        listed in the contract; is that correct?
7    A.  No, sir, there wasn't.
8    Q.  So you agree with me, don't you?
9    A.  That there wasn't a contingency at that
10       time.
11   Q.  And you would agree that upon a
12       non-annuitant owner's death --
13            That is, if there was an owner who
14       wasn't -- that is, was not the annuitant.
15            -- then and only then would the
16       surrender value proceeds be paid to the
17       surviving owner as beneficiary?
18            MR. PATERSON: Object to the form.
19            MR. WALDROP: Object to the form.
20   Q.  Correct?
21   A.  I don't understand the question.
22   Q.  Well, ma'am, under the joint owner
23       information, there is an explanation, isn't

Page 40

1    there? Right here. Right here. Do you
2    see that, ma'am?
3    A.  You're talking about here where I'm the
4        owner beneficiary?
5    Q.  Yes, ma'am.
6    A.  I was the owner and beneficiary.
7    Q.  Well, you were joint owner, weren't you?
8    A.  And a beneficiary.
9    Q.  Well, there's nothing in here that you were
10       a beneficiary, is there?
11            MR. WALDROP: Object to the form.
12   Q.  That's nothing in this document that says
13       you were a beneficiary; is that correct?
14   A.  Well, I have --
15   Q.  Is that correct?
16            MR. PATERSON: Object to the form.
17            MR. GREGGS: Object to the form.
18   A.  I don't see where it says -- I don't -- but
19       it says up here -- I just see where it --
20            I was the co-owner of it and the
21       beneficiary of it, so that's all.
22   Q.  Well, show me on the document where it says
23       that you were a beneficiary at all under

Page 41

1    this contract.
2            MR. GREGGS: Object to the form.
3    A.  Well, I was the beneficiary and joint
4    owner.
5    Q.  Well, you just point to anyplace on this
6    contract where that is stated.
7            MR. PATERSON: Object to the form.
8            MR. GREGGS: Same objection.
9            MS. HUGHES: Object.
10           MR. PATERSON: Badgering the
11           witness and asking for legal
12           conclusions when you know she
13           doesn't have legal expertise.
14           MR. WALDROP: Lincoln would just
15           object. That document was
16           attached to and made part of
17           the contract, but I don't
18           think that document that
19           you're showing her constitutes
20           the entire contract.
21               We can get a specimen
22           copy. Not today, but I can
23           get you one.

Page 42

1            MR. MCHARD: Well, this is the
2            document, sir, that after four
3            years of litigation has been
4            provided to us and represented
5            to be the contract. So all --
6            all I can do is based on four
7            years of litigation tell you,
8            this is what's represented to
9            be the contract.
10               If there's another
11           contract and you haven't
12           provided it to us, I'd like
13           you to do that.
14           MS. HUGHES: Well, it states joint
15           owner information --
16           MR. MCHARD: We can recess right
17           now.
18           MR. WALDROP: Sam, you can be as
19           theatrical as you want. Four
20           years is a gross exaggeration
21           to my client. Lincoln
22           National Insurance Company was
23           added to this lawsuit in June,

Page 43

1            I believe, of 2006, a mere
2            couple of months ago.
3            MR. MCHARD: Well, the litigation
4            has been going on --
5            MR. WALDROP: Let me finish.
6            MR. MCHARD: - since December of
7            2002.
8            MR. WALDROP: All right. If you
9            don't want to hear about it,
10           make your speech, that's
11           fine. Go ahead.
12           MR. MCHARD: Well, if you have
13           another document that you --
14           if you want to raise the
15           objection, provide me a copy
16           of the contract --
17           MR. WALDROP: I object. Move on.
18           If you don't want to hear me,
19           go ahead.
20           MR. MCHARD: I want a copy of the
21           contract.
22           MR. WALDROP: Go ahead.
23    Q.  You would agree, ma'am, that upon a

Page 44

1    non-annuitant owner's death, that the
2    surrender value proceeds will be paid to a
3    surviving owner as beneficiary, correct?
4            MS. HUGHES: Object.
5            MR. PATERSON: Objection.
6            MR. WALDROP: Same objection.
7            MS. HUGHES: Badgering the
8            witness.
9    Q.  You can answer. That's what it provides
10   here, isn't it?
11   A.  No, I don't know.
12   Q.  You don't know if that's what it provides?
13   A.  I can't -- I can't understand -- I can't
14   understand you talking about me -- not
15   going -- if I'm a joint owner, not going to
16   me, you ain't made me understand that.
17   Q.  Well, you understand that your husband was
18   an annuitant as well as an owner, correct?
19   A.  Well, I was a joint owner. Don't that mean
20   that if -- I replace him?
21   Q.  Well, ma'am, just answer my question. You
22   would agree you were not an annuitant,
23   correct?

Page 45

1    MS. HUGHES: Object to the form.
2    MR. GREGGS: Object to the form.
3  Q. Is that correct, ma'am?
4    MR. PATERSON: Object to the
5        form. You're asking her for
6        legal conclusions.
7  A. I'm going to say what's on the paper.
8  Q. And what's on the paper --
9  A. I understand that I am the co-owner of it
10   and he was the owner, and that -- and that
11   we was to believe -- took it out like that
12   where if one of us went on, the other one
13   had it. Everything we had was on the
14   tenants with rights of survivorship.
15  Q. Well, you understand your husband was the
16   annuitant under this contract and you
17   weren't, correct?
18     MS. HUGHES: Object.
19     MR. PATERSON: Same objection.
20     MR. GREGGS: Same objection.
21  A. Well, where it says James E. or Sue Crouch,
22   don't that mean me and him, too?
23  Q. Where are you referring to, ma'am?

Page 46

1  A. Right here. Our names.
2  Q. Well, that's a mailing address, isn't it?
3  A. Well, I guess that meant we both owned it
4   if they was going to mail something to us.
5  Q. So you were joint owners, but only he was
6   the annuitant, correct?
7  A. Well, I don't guess you had --
8     MR. GREGGS: Object.
9     MS. HUGHES: Object to the form.
10  Q. That's correct, isn't it, ma'am?
11  A. You didn't have two annuitants on it. We
12   filled it out like it was supposed to have
13   been filled out.
14  Q. Yes. So that there was only one annuitant,
15   and that was your husband, correct?
16  A. I'm -- I don't -- I don't know what you're
17   talking about. I never understood you.
18  Q. Well, your husband was younger than you,
19   wasn't he?
20  A. He sure was.
21  Q. And the annuity was taken out based on his
22   life and only his life, correct?
23  A. No. It was taken out -- if either one of

Page 47

1   us passed, it went to the other one.
2  Q. So you think you were an annuitant under
3   the policy, also?
4     MR. PATERSON: Object to the form.
5     MR. GREGGS: Object to the form.
6     MS. HUGHES: Objection.
7  Q. Go ahead and answer.
8  A. I can't understand you. I'm sorry. I
9   don't understand you, talking about that.
10  Q. Let's proceed here, because I want you to
11   focus on paragraph three of this affidavit
12   that was prepared by AmSouth Bank's
13   attorneys that you read and signed only
14   after you had changed the one thing that
15   you disagreed with; that is, the date.
16   Look at paragraph three. All right?
17  A. Yeah, I'm reading it.
18  Q. All right.
19  A. Oh, no. I don't ... I don't -- if the
20   annuity -- if he passed ...
21  Q. You disagree with paragraph three?
22  A. Would receive the benefit of the annuity.
23  Q. Do you disagree with paragraph three now?

Page 48

1  A. Yeah, I do.
2  Q. Well, what do you disagree with, ma'am,
3   about paragraph three now?
4  A. Where did this information come from, sir?
5  Q. That's what I'm asking you. Where did the
6   information on the affidavit that you
7   signed come from, after having been
8   delivered by AmSouth Bank?
9  A. I didn't never sign nothing that said that
10   the annuity would go to him if he passed
11   away. I've never signed nothing like that.
12  Q. Well, you signed this document. We've
13   already looked at your signature.
14  A. That wasn't on what I signed, sir.
15  Q. So are you saying that this isn't your
16   signature on page three of this document?
17  A. I didn't say it wasn't my signature.
18  Q. Well, did you ever tell AmSouth Bank and
19   their attorneys that the affidavit that
20   they prepared for you to sign was
21   incorrect?
22  A. I've never seen that where it -- anything
23   said that if he passed away, the money went

Page 49

1    to our son. I've never seen that.
2    Q.  Well, it says specifically that: Shortly
3    after completing this application, my
4    husband and I received Lincoln National
5    Life Insurance Company, quote, Investor's
6    Choice, unquote, annuity contract number
7    774944, correct? Correct?
8    A.  Yeah, I see that contract number.
9    Q.  And you've told me that in your opinion,
10   Exhibit Number 12 is that contract, but
11   that the one -- the copy of the contract
12   you received was a pink copy, correct?
13       MR. PATERSON: Object to the form.
14       MR. WALDROP: Object to the form.
15       MR. PATERSON: That's not correct.
16       MS. HUGHES: Object to the form.
17   Q.  Correct?
18   A.  Well, that's one -- that's just the color
19   of the paper it was when we took it out.
20   Q.  Right. So instead of what we see here as
21   Exhibit 12 --
22   A.  Well, that was a copy. The same thing was
23   on it.

Page 50

1    But I don't understand here where
2    you're talking about -- nothing has never
3    been signed or passed -- about where he got
4    the money. If James -- one of us passed
5    on, that's never --
6    Q.  No. But, ma'am, the paragraph three --
7    A.  Yeah, I see that.
8    Q.  The first sentence says: Shortly after
9    completing the application, you received
10   the annuity contract. And we've identified
11   the annuity contract as Exhibit 12.
12       And then the next sentence says --
13       MR. PATERSON: Object to the
14       form.
15       MS. HUGHES: Object to the form.
16   Q.  -- at the time we received the annuity
17   contract, Ronda T. Robinson informed us
18   that she had made a mistake. Do you see
19   that, ma'am?
20   A.  Yes, I do, because she put him primary and
21   we -- and that wasn't what we wanted. We
22   wanted contingents.
23   Q.  Well, just answer my question. Do you see

Page 51

1    where it says that?
2    A.  Yes, I see that.
3        MR. MCHARD: Strike what's
4        non-responsive.
5    Q.  Now, the -- So did Ronda tell you that the
6    same day that you filled this out, that
7    there was a mistake on it?
8        MR. PATERSON: Object to the form.
9    A.  Not the same day.
10   Q.  Well, you told me -- you told me that
11   when -- that you received this contract,
12   Exhibit 12, the pink copy, the same day
13   that you signed it, on May the 7th of 1998,
14   correct?
15   A.  Right.
16   Q.  And --
17       MR. PATERSON: Object to the form
18       of that.
19   Q.  -- the next --
20       MS. HUGHES: Object to the form.
21       MR. GREGGS: Same objection.
22   Q.  -- the next sentence says: At the time we
23   received the annuity contract. That would

Page 52

1    have been on May the 7th of 1998, wouldn't
2    it?
3        MR. PATERSON: Object to the form.
4        MR. GREGGS: Object to the form.
5        MS. HUGHES: Object to the form.
6    A.  That's right.
7    Q.  And why did Ronda Robinson tell you on that
8    same day that there was a mistake in the
9    document that you were sending in?
10   A.  She didn't tell me on the same day.
11   Q.  Well, that's what it says here, doesn't
12   it?
13       MR. PATERSON: Well, Sam, that is
14       incorrect. We object to
15       that. You're intentionally
16       trying to mislead this
17       witness.
18       MR. GREGGS: Same objection.
19   A.  No, it wasn't told on the same day. She
20   saw it, and she called us and told us that
21   and told us to come down to the bank. And
22   we went, and that's when she -- my husband
23   wanted it put in the contingents.

Page 53

1   Q.  Well, ma'am –
2   A.  That's what we did, and I've got the
3       contract on it.
4   Q.  Well, when you say that – Your affidavit
5       says at the time you received the annuity
6       contract, and you've told us that that was
7       on May the 7th, correct?
8           MR. GREGGS:  Object to the form.
9           MR. PATERSON:  Object to the form.
10          MS. HUGHES:  Object to the form
11          MR. PATERSON:  That is incorrect.
12          MR. WALDROP:  Totally misstates
13              her testimony.
14  A.  That was the day it was straightened out.
15          MR. PATERSON:  Right.
16  Q.  Now, ma'am, when did you receive the
17      annuity contract, then?
18  A.  Well, I guess you'd -- She gave me the
19      paper the day we filled it out and gave her
20      the money.
21  Q.  Which was the 7th?
22  A.  Yes.
23  Q.  And you say in your affidavit that that's

Page 54

1       when Ronda Robinson informed us that she'd
2       made the mistake, correct?
3   A.  No.
4           MR. PATERSON:  Object to the form.
5           MR. GREGGS:  Object to the form.
6           MS. HUGHES:  Asked and answered.
7   A.  That's not the day.
8   Q.  Well, did she call you?
9   A.  Yes.
10  Q.  Well, what did she say?
11  A.  We need to come back to the bank.
12  Q.  Well, no.  Tell me everything she said on
13      that phone call.
14  A.  Just what I said:  We need to come back to
15      the bank, that she had made a mistake, what
16      we wanted.  And we went back and redone it
17      with the contingent beneficiary, what we
18      wanted in the first place.  I guess anybody
19      can make a mistake.
20  Q.  So right after she called and told you that
21      she had made a mistake, you went down and
22      filled out the papers to correct the
23      mistake; is that correct, ma'am?

Page 55

1   A.  She had them filled out.  We only went to
2       sign them.
3   Q.  And you did that within -- within a few
4       days after --
5   A.  I don't know exactly how many days.  I
6       don't remember that.
7   Q.  But it was within a few days or weeks; is
8       that correct?
9   A.  Well, I'm sure it was, but I can't -- I
10      can't pinpoint a date.
11  Q.  Now, in your -- in your dealings with your
12      husband ...
13          Who was it that in the ten years prior
14      to his passing signed the -- signed the
15      checks?
16  A.  Well, if he wrote a check, he signed it.
17      And if I wrote one, I signed it.  I wrote
18      out the bills, the utility bills and things
19      like that.
20  Q.  That is, the household bills?
21  A.  Household bills.
22  Q.  But if he went down and got the car fixed
23      or did whatever, he'd write out the check?

Page 56

1   A.  Yes.
2   Q.  And you have -- You and he had bank
3       accounts, correct?
4   A.  Well, sure, we had a bank account.  If
5       didn't, you couldn't have been writing
6       checks.
7   Q.  And with regard to the bank account, did
8       you only have one checking account?
9   A.  Right.
10  Q.  And where was that?
11  A.  AmSouth.
12  Q.  And was that at Wetumpka?
13  A.  Wetumpka.
14  Q.  And did you --
15  A.  It was a joint account.
16  Q.  Did you keep the -- your canceled checks
17      and your monthly statements in connection
18      with your tax returns?
19  A.  Well, no, I didn't keep all of them.  You
20      don't keep all them things for ten years,
21      something like that, no.
22  Q.  Well, you had rental income property during
23      that --

Page 57

1    A. Well, I had some --
2    Q. -- period of time, and you kept --
3    A. Yeah, I had that at that time. I kept the
4        necessary papers for things like that. I
5        knew what to keep.
6    Q. Well, are you saying that you've now
7        destroyed all of your --
8    A. I don't have all that in my possession,
9        sir.
10   Q. Well, do you have any of your --
11   A. No.
12   Q. Please let me finish.
13       Do you have any of your AmSouth Bank
14       checking account records for the joint
15       account that was held between you and your
16       husband?
17   A. No, I don't have it.
18   Q. Well, what did you do with it?
19   A. Well, I -- I cleaned out and -- just
20       cleaned my house up, and I got rid of a lot
21       of things. You don't keep stuff like that
22       forever and a day.
23   Q. Well, you cleaned that up only --

Page 58

1    A. I don't keep all those checks and things.
2        I don't do it right now.
3    Q. No. But you cleaned that up only after his
4        death, didn't you?
5    A. Well, no. Some of it -- I cleaned up some
6        before he died. I don't keep all that
7        junk.
8    Q. But some of it was destroyed after he died,
9        wasn't it?
10   A. Well, maybe -- I don't know where I had any
11       of that in there or not. It wasn't
12       important that I have all of that. I got
13       all the important papers.
14   Q. Now, in connection with the deposition that
15       you gave during the course of the contested
16       probate proceedings that had been
17       instituted by Barbara Middleton, you would
18       agree that you specifically stated that
19       during your marriage to Mr. Crouch, that
20       your children from your prior marriage and
21       Mr. Crouch's children from his prior
22       marriage were grown and already on their
23       own, correct?

Page 59

1    A. They was about grown. They was on up,
2        yeah.
3    Q. And you said they were already grown and --
4    A. Yeah.
5    Q. -- they were on their own, correct?
6    A. And mine was on their own, too.
7    Q. And you would agree that with regard to
8        estate planning, that there was a will that
9        was prepared by John Henig here in
10       Montgomery, Alabama, correct?
11   A. Yes, sir.
12   Q. And Mr. Henig had been a duck hunting buddy
13       of your husband's out on the farm, correct?
14   A. Sure.
15   Q. And that was the only will that was ever
16       prepared for your husband, wasn't it?
17   A. He and I both had one, yes.
18   Q. And in answer to my question, that was the
19       only one --
20   A. Yes.
21   Q. -- that he had?
22   A. Yes.
23   Q. Did you ever get a copy of that --

Page 60

1    A. No.
2    Q. -- from Mr. Henig?
3    A. He didn't keep a copy of it. He didn't do
4        wills. That wasn't his thing. He didn't
5        do wills. He just did that for us. We
6        went to his office, and he did it.
7    Q. And you would agree that was prepared about
8        1975, wasn't it?
9    A. No, I think it was earlier than that.
10   Q. Well, if you said it was '75 in your
11       deposition a few years ago, that would
12       be --
13   A. I think somewhere along there. I don't
14       remember all that. I had it -- I had it in
15       my place where I needed it. And I figured
16       if I needed it, it would be there.
17   Q. You would agree that up until Mr. Crouch's
18       back surgery on September the 20th of 2000,
19       his health was good, wasn't it?
20   A. Yeah. He had back problems and -- like
21       anybody else, something like that. He
22       always had back problems for a while, but
23       it didn't keep him from doing things.

Page 61

1    Q. And you have back problems, and that
2       doesn't prevent you from doing things?
3    A. No, I don't have them.
4    Q. Oh, you don't have problems?
5    A. No, no back problems, I don't.
6    Q. Well, what doctors was he seeing in 2000
7       and 2001?
8    A. His family -- Our family medical doctor was
9       Dr. Bipin Kumar, and the back doctor --
10   Q. And he's in Wetumpka?
11   A. Yes.
12      And the surgeon that did his back
13      surgery was Dr. Peden in Montgomery, but
14      he's a retired doctor. I don't know wehre
15      he's at now.
16   Q. Well, who are the other doctors?
17   A. Well, he didn't have any more doctors till
18      in January. Then he had Dr. Clark that
19      done a brain scan on him.
20   Q. What was Dr. Clark's full name?
21   A. I don't know. I just took him out there to
22      get the brain scan, and I don't remember
23      his full name.

Page 62

1    Q. Out to?
2    A. Baptist Medical Center in Montgomery.
3       That's after -- It was in January.
4       Dr. Kumar and Dr. Peden wanted me to take
5       him to him and have a brain scan thing done
6       on his head, and I did.
7    Q. Well, did he also see Dr. Rigsby, Dr. --
8    A. This is the surgeons, now. This is when he
9       was in the hospital. Dr. Rigsby was the
10      one done the brain surgery, and Dr. Chen
11      was just a medical doctor there in the
12      hospital, Jackson's Hospital.
13   Q. Jackson Hospital here in Montgomery?
14   A. Montgomery.
15   Q. How about Dr. Hunter?
16   A. Dr. Hunter? I don't know him. Hunker.
17      Hunker. He was a lung specialist.
18   Q. At where?
19   A. At Jackson Hospital. He had -- Whenever he
20      had brain surgery there, he had several,
21      several doctors for different things with
22      him. And I don't know. I didn't know all
23      of them's name. I didn't ... I don't

Page 63

1       remember their names. I had never met them
2       before.
3    Q. Well, ma'am, I have here medical
4       authorizations to get the medical records
5       of -- from Dr. Thoma s Wingate Rigsby, from
6       Elmore Community Hospital in Wetumpka, from
7       Dr. Che n, from Baptist Hospital, from
8       Dr. Hunte r, from Dr. Clark, from the
9       Baptist Hospital in Wetumpka. And I'd ask
10      that you execute these at this time so that
11      we may obtain those records.
12         MS. HUGHES: Sa y no.
13         MR. PATERSON: We object to that.
14         MS. HUGHES: Obje ct. Object to
15         form.
16   Q. Ma'am, if you don't have anything to hide,
17      why are you refusing to do it?
18   A. I don't ha ve anything to hide.
19         MR. GREGGS: Obje ct to the form.
20         MR. PATERSON: Obje ction.
21         MS. HUGHES: Obje ct.
22   Q. Why a re you refusing to sign these, ma'am?
23         MS. HUGHES: Ba dgering the

Page 64

1           witness. Object.
2    A. I'm not -- I'm not signing anything like
3       that. I dorìt know -- I don't know the --
4       I just know the doctors was there and I
5       know what was wrong with him, and that's
6       it. He had brain surgery, and he never
7       knew nothing else after he had brain
8       surgery.
9          Those was the doctors attended him, and
10      I have nothing to sign for it.
11   Q. You specifically talked to the doctors that
12      we've discussed --
13   A. Well, what --
14   Q. -- one or more of them about getting powers
15      of attorney for your husband, didn't you?
16   A. No, I did not. No. No. That's never been
17      discussed, no such as that. I don't know
18      where that information came from.
19   Q. And did you ever talk with Attorney
20      Thornton about that?
21   A. No, I did not.
22   Q. And did you talk with Attorney Thornton
23      about his preparing new wills --

Page 65

1    A. No, I did not.
2    Q. -- during that last year of his life?
3    A. No, I did not.
4    Q. Never contacted him?
5    A. I went down one time at my husband's
6        request. He was our attorney for selling
7        property and stuff. And he -- And my
8        husband asked me to go down there. That
9        was before he had back surgery, and he was
10       real sick with his back. And he asked me
11       to go down there and see if he'd come up to
12       the house and do the thing. I went by the
13       office and he was in court, and I never
14       seen him and that was it.
15   Q. Do the thing. Do what thing?
16   A. Make -- Redo the will, update it.
17   Q. Well, who did you talk with --
18   A. I didn't talk to nobody. She said he was
19       out in court -- the secretary, the
20       receptionist -- and that was it.
21   Q. With regard to your husband's vision, you
22       would agree that your husband only had
23       reading glasses, didn't he?

Page 66

1    A. He could not see unless he had his glasses
2        on to sign nothing or read anything. He
3        was a diabetic, and his eyes was very bad.
4        He couldn't hardly get glasses to where he
5        could read.
6    Q. Well, are you saying that he had something
7        other than reading glasses?
8    A. He had bifocals.
9    Q. Who prescribed those?
10   A. I don't know the name of the last -- it was
11       LensCrafters, but I don't know the name of
12       the doctor that did them.
13   Q. LensCrafters here in Montgomery?
14   A. Yes.
15   Q. Well, ma'am, I'm going to tender you an
16       authorization consent for LensCrafters --
17           MS. HUGHES: I object.
18   Q. -- to provide us the --
19           MS. HUGHES: I object.
20   Q. -- records with regard to your husband's
21       vision issues.
22   A. I know --
23   Q. Will you agree --

Page 67

1    A. I knew his vision issues. He could not
2        read without them. He did not -- He didn't
3        keep them on his face all day like I do
4        mine. But if he went to read a paper or to
5        look at a menu or sign anything, he had to
6        have glasses. He had to get up like that
7        to see it.
8    Q. And as you've previously testified, you
9        were the person that always found things
10       for your husband and assisted him, correct?
11   A. Well, that would --
12           MS. HUGHES: Object to the form.
13   Q. Is that correct?
14   A. He read things, and if we went out to eat
15       or anything, if he wanted to read the menu,
16       if he wanted to read the newspaper, I
17       didn't read it for him, but he had to have
18       the glasses to read.
19   Q. You'd carry those in your purse and give
20       them to him, wouldn't you?
21           MS. HUGHES: Object to the form.
22   A. No. No, he carried them in his shirt
23       pocket. No, I didn't carry his glasses,

Page 68

1    no.
2    Q. Well, as to Drs. Peden and Kumar, I have
3        medical authorizations. Are you willing to
4        sign those documents so that we can get
5        those records?
6           MS. HUGHES: Objection.
7    A. I wouldn't think that -- I wouldn't
8        think -- I've done told you. Peden is
9        retired and gone. He's not even in
10       Montgomery. He lived in England or
11       somewhere and he went back. He's not even
12       in Montgomery. He retired shortly after
13       James --
14           MS. HUGHES: Ms. Crouch, you won't
15           be signing these forms.
16           THE WITNESS: I know I'm not
17           signing them.
18   Q. So you refuse to sign these forms also; is
19       that correct?
20   A. That's right. His medical records has got
21       nothing to do with the annuity.
22   Q. You would agree that your son, David,
23       from -- that is, David Shaddix from your

Page 69

1    prior marriage stayed at your home and that
2    of your husband for the two weeks preceding
3    and for some time following your husband's
4    death, correct?
5    A. No, I don't. I don't agree to that.
6    That's not true.
7    Q. Well, was it true when you said that in
8    your prior deposition, ma'am?
9    A. I didn't say he stayed there that long.
10        MR. PATERSON: Let me – For the
11        record, if you're going to try
12        to impeach her with prior
13        sworn testimony, we would ask
14        that it be done properly.
15        Show other counsel here the
16        deposition, show her the
17        deposition, and ask that it be
18        done properly or not at all.
19   A. No, I didn't say that. My son came down
20   there.
21   Q. When?
22   A. He came while – while James was in the
23   hospital after he had brain surgery. He

Page 70

1    came and he stayed with me after he – when
2    he passed away, he stayed three days after
3    he passed away, which our son didn't think
4    enough of me to do it, but my son did. My
5    son didn't think enough of me to even go
6    back to my house. He left the cemetery,
7    and I haven't seen him since until today.
8    And I wouldn't think he cared very much
9    about me.
10   Q. Now, the truth is that your relationship
11   with Mr. Crouch's children had deteriorated
12   prior to his death, hadn't it?
13        MS. HUGHES: Object to the form.
14   A. No.
15   Q. Have you ever made any inconsistent
16   statements or statements that are contrary
17   to what you've just said?
18        MS. HUGHES: Irrelevant.
19        I object.
20        MR. PATERSON: Again, we object to
21        the form.
22   A. I don't know what you're saying.
23        MR. GREGGS: Same objection.

Page 71

1    A. I don't understand your point.
2    Q. Well, have you ever said in depositions or
3    otherwise any statement that's contrary to
4    or inconsistent with your testimony just
5    now?
6        MR. PATERSON: Object to the form
7        of that.
8        MR. WALDROP: Same objection.
9        MS. HUGHES: Object to the form.
10   A. I'm not stating anything to it ...
11   Q. Well, ma'am, do you recall giving your
12   deposition in connection with the Elmore
13   County probate proceedings involving the
14   estate of your husband, James Earl Crouch?
15   A. I know I did that, but there wasn't nothing
16   about me having nothing with them. When we
17   was in court, I guess we didn't -- wasn't
18   on the friendliest terms. We didn't even
19   talk.
20   Q. But your relationship with them had
21   deteriorated prior to his death?
22   A. I don't know where you got that.
23        MS. HUGHES: I object. Asked and

Page 72

1        answered.
2        (Plaintiff's Exhibit 5 was marked
3        for identification.)
4    Q. Showing you Exhibit Number 5. Do you
5    recall giving --
6    A. I want you to show me where -- where we got
7    that at.
8    Q. Just follow along, ma'am. Showing you
9    Exhibit Number 5. Is that a true and
10   correct copy of the deposition that you
11   gave at the -- deposition in connection
12   with the estate of James Earl Crouch?
13   A. I've read it.
14   Q. And you understand that you were sworn
15   under oath to tell the truth at that time,
16   correct?
17   A. I told the truth. I've read that.
18   Q. And when was the last time you read through
19   that, ma'am?
20   A. Just not too long ago.
21   Q. In preparation for this deposition,
22   correct?
23   A. No. I just read things like that sometime.

Page 73

1   Q. Do you recall being asked at page 30 of
2      your deposition: Okay. What was your
3      relationship like with his -- meaning James
4      Earl's children from his first marriage?
5      How would you characterize it over the
6      years?
7      And then following along at line 19:
8      Did it deteriorate after your husband's
9      death? Your answer: Yes.
10     Do you recall that?
11  A. After his death, yes, I did say that. I
12     sure did. If you knew the circumstances,
13     you might say it, too.
14  Q. And you would agree that you intended for
15     Mr. Thornton to update the will, correct?
16  A. My husband wanted it done.
17  Q. Well, is that what you wanted?
18  A. We both wanted it. We agreed that we
19     needed to do it, but he wasn't able to go
20     down there on account of his back bothering
21     him. He didn't want to set up that long.
22     And I never spoke to Mr. Thornton.
23     That was the end of it.

Page 74

1   Q. Well, you'll agree that you went to get
2     Mr. Thornton to write it?
3  A. I went down there, but I did not see him.
4     I went under my husband's request.
5  Q. Now, you would also agree that your husband
6     in 1998 and 1999 and 2000 was able to read
7     and write, correct?
8  A. Certainly.
9  Q. And to understand what he read and wrote?
10  A. Certainly.
11  Q. And you would agree that when the annuity
12     application and the documents that were
13     prepared and submitted in connection with
14     the purchase of the Lincoln National life
15     insurance annuity, when those were prepared
16     and signed by Earl, he was able to read and
17     write and understand them, correct?
18  A. Sure.
19  Q. And that he wasn't weak or suffering from
20     any mental or physical incapacity?
21  A. No, sir.
22  Q. That's correct, isn't it? He was not
23     suffering from those, was he?

Page 75

1  A. Not no mental incapacity, no.
2  Q. Or physical. I mean --
3  A. He just had a back problem as I told you.
4  Q. And even in 1999 and 2000, through April of
5     2000, he wasn't too weak to sign his name,
6     was he?
7  A. Oh, no. Not 2000, no.
8  Q. And you would agree that he wasn't
9     suffering from physical or mental
10     incapacity that would prevent him from
11     signing documents, was he?
12  A. In 2000?
13  Q. Yeah, in April of 2000.
14  A. No, he wasn't mental ...
15  Q. And not suffering any physical --
16  A. He just couldn't see good.
17  Q. And you would agree that even on April the
18     4th of 2000, James Earl was not incapable
19     of making his mark or signing his name on a
20     document, correct?
21  A. He couldn't do it without his glasses. He
22     couldn't sign his name without his
23     glasses. He couldn't see the line.

Page 76

1   Q. Well, you could point a line to him,
2     couldn't you, and he could make his mark
3     and sign his name, correct?
4  A. No, he couldn't -- he asked me to sign his
5     name. He gave me permission.
6  Q. No. He could sign his name, couldn't he?
7  A. He couldn't see it. He told me he
8     couldn't. He looked at it and he said, I
9     can't see it. Would you sign my name on
10     it.
11  Q. Ma'am, just answer my question.
12  A. I did.
13  Q. He was not incapable --
14  A. He could not see without his glasses and he
15     had left them laying on the coffee table.
16  Q. Ma'am, he wasn't too weak, he wasn't
17     suffering any mental incapacity or physical
18     incapacity that would prevent him from
19     signing his name and --
20  A. I've done -- I have answered that for you,
21     sir.
22     MR. PATERSON: Object to the
23     form. Will you say when, Sam,

Page 77

1    please.
2    A. I have answered that for you.
3        MR. PATERSON: When are you
4            talking about?
5        MR. MCHARD: I said April 4th.
6        MR. PATERSON: April 4th?
7        MR. MCHARD: 2000
8    A. That was the day that I signed his name in
9    the presence of Ronda Robinson.
10   Q. And on that day --
11   A. And he was sitting there. He was sitting
12   there.
13   Q. -- he was not too weak, he was not
14   suffering mental incapacity or physical
15   incapacity --
16       MS. HUGHES: I object.
17   Q. -- that made him incapable of signing his
18   mark or his name?
19   A. No, but he didn't --
20       MR. PATERSON: Object to the form.
21       MR. WALDROP: Object to the form.
22   A. -- have his glasses, and he was incapable
23   because he didn't have his glasses to see,

Page 78

1    sir.
2    Q. You would agree that -- You have
3    specifically stated under oath that there
4    were no bank changes to any documents at
5    the bank, no money changes since May 8th of
6    1998 when the annuity was purchased,
7    correct?
8        MR. WALDROP: Objection.
9        MS. HUGHES: Object.
10   Q. Is that correct, ma'am?
11   A. No bank changes? After we bought the
12   annuity, is that what you're saying?
13   Q. Yeah.
14   A. Nothing -- only the CD renewed or something
15   like that.
16   Q. You never made any changes --
17   A. No.
18   Q. -- to any of the financial assets that you
19   and he had after that date, did you?
20   A. Like I said, we renewed CDs.
21   Q. And that's all, wasn't it?
22   A. And we bought the annuity. And after then,
23   there's nothing but CD -- nothing else was

Page 79

1    changed.
2    Q. And you would agree that you have
3    previously said under oath that you have
4    never signed your husband's name to
5    anything because he was always able to sign
6    his own name, correct? Is that correct,
7    ma'am?
8        MR. PATERSON: Object to the form
9            of that. Ask you to please
10           impeach --
11   A. No, I --
12       MR. PATERSON: -- her in a way
13           that --
14   Q. Is that correct, ma'am?
15   A. I don't know whether I said that. If I
16   did, I didn't know -- I didn't know they
17   was talking about the annuity, sir.
18   Q. Well, ma'am, you didn't make any changes to
19   your sworn testimony in the deposition that
20   you gave that's been marked as Exhibit 5,
21   did you? Did you?
22   A. I don't -- If I answered anything other
23   than I signed his name on there, I wasn't

Page 80

1    aware what the question was.
2    Q. You didn't make any changes to your sworn
3    answers to --
4    A. I didn't -- I didn't pay any attention to
5    that. Because if I -- Because I think we
6    all could make a mistake sometime. I
7    didn't know what they were speaking of.
8    The annuity was not brought up. They
9    didn't --
10   Q. You mean in the deposition --
11   A. They didn't say in -- about an annuity.
12   Q. You mean in the course of that deposition,
13   they didn't ask about the annuity? Is that
14   what you're saying?
15   A. Not -- That attorney when I give the
16   deposition didn't. They just asked me if I
17   signed his name.
18   Q. Well, ma'am, you would agree that at -- at
19   that deposition, you were specifically
20   asked -- and I refer you to page 74 of your
21   deposition, line 23 on page 74: Have you
22   ever signed Mr. Crouch's name to anything?
23   Unh-unh.

Page 81

1   A.  That's what I'm --
2   Q.  Question: Never? Unh-unh. Unh-unh.
3        Never. Mr. Crouch was always able to sign
4        his own name whenever we done business.
5        No, I never signed his name to nothing.
6            Did you say that, ma'am?
7   A.  If I said -- they didn't --
8   Q.  No. Did you say that?
9            MR. WALDROP: She's trying to
10               answer your question. Let her
11               answer.
12  A.  They didn't bring out the annuity.
13       Otherwise, no, I've never signed his name
14       to anything except that annuity as long as
15       we lived together.
16  Q.  No. Ma'am, did --
17  A.  I said if I did, I didn't understand the
18       question.
19  Q.  Look at the statement.
20  A.  I can read it.
21  Q.  And it says exactly what I said. You
22       testified that you had never signed your
23       husband's name to anything.

Page 82

1   A.  I said --
2   Q.  Is that correct?
3   A.  -- they did not bring out what it was for.
4        And I said -- I was talking about
5        everything, and they did not say nothing
6        about an annuity.
7   Q.  Ma'am -- ·
8   A.  That wasn't talked about.
9            MS. HUGHES: I object. Badgering
10               the witness.
11  Q.  Just look at page 74 and 75 and answer if I
12       have read the questions and your answers
13       correctly.
14  A.  I answered what I said. I said that I
15       didn't understand the question if that's
16       what they was speaking of, and the annuity
17       was not brought up. And otherwise, no, I
18       never signed his name. That's the only
19       time.
20  Q.  Well, you didn't say anything about the
21       annuity or make any exceptions --
22  A.  Well, I know it wasn't brought up.
23            MS. HUGHES: Object.

Page 83

1            MR. PATERSON: Time out.
2   A.  It wasn't brought up. This was when I was
3        in court the other time.
4   Q.  You never made any exception for signature
5        on any annuity when you gave your
6        deposition, did you?
7            MS. HUGHES: I object.
8   A.  I can't answer --
9   Q.  The answer is no?
10  A.  I've done told you what happened.
11  Q.  Well, you later in the --
12  A.  And I don't want to keep repeating it.
13  Q.  -- deposition said that the only time you
14       ever signed his name was once when you
15       signed his name with regard to some
16       doctors' records, didn't you?
17  A.  I have --
18            MS. HUGHES: Objection.
19  A.  -- signed his name --
20            MS. HUGHES: Where is it located?
21  A.  -- to doctors' records, yes. He never
22       did --
23  Q.  And that that was the only exception that

Page 84

1        you ever made after you reflected on that
2        answer, correct?
3            MS. HUGHES: Objection. Location.
4   Q.  Is that correct, ma'am?
5            MR. PATERSON: Objection to the
6               form of this impeachment.
7               You're asking her about a
8               deposition that was taken --
9            MR. MCHARD: That's in front of
10              her.
11           MR. PATERSON: It was taken in
12              2002, and you're asking her to
13              recall verbatim by line what
14              she said without showing it to
15              her.
16           MR. MCHARD: No. She said she
17              just reviewed that deposition
18              prior to her deposition.
19  A.  I've seen it.
20           MR. WALDROP: That's not exactly
21              what she said.
22  Q.  Well, ma'am --
23  A.  Sir, when I --

Page 85

1  Q. Please take a look at page 104 of your
2     deposition.
3  A. I know. I've seen it.
4  Q. Well, I know. You know what's in it, don't
5     you? Do you know what's in it?
6  A. When they gave me that deposition, I was so
7     near dead from my husband being dead, they
8     didn't let me have one day to even grieve.
9     His children started on me the day they
10    laid the corpse. And do you think you'd
11    have been able to have done something? No.
12 Q. Ma'am, this deposition --
13 A. I know that was a few months after.
14 Q. This deposition that was taken, you were
15    specifically represented at that by your
16    attorney, Glenda Hughes --
17 A. I know that.
18 Q. -- who's with you today, weren't you?
19 A. That didn't make no difference. I was the
20    one that was suffering, not her and nobody
21    else.
22 Q. It was a year after his death, wasn't it?
23 A. That's right.

Page 86

1  Q. And you were specifically asked as -- I've
2     repeatedly asked you to look at page 104.
3     Did you ever need to sign Mr. Crouch's
4     name? Your answer: No, I never did.
5     Well, now, I think I signed it in the
6     doctor's office one time.
7  A. I did.
8  Q. That's what it says, isn't it, ma'am?
9  A. I did sign it in the doctor's office.
10 Q. But you didn't correct it to reference
11    anything about the annuity, did you?
12       MR. PATERSON: Object to the form.
13       MS. HUGHES: Object to the form.
14 A. It wasn't brought up.
15 Q. Well, you said that the annuity wasn't
16    brought up during the course of the
17    deposition, correct? That's what your
18    testimony is, right? Is that correct,
19    ma'am? Is that correct?
20       MR. WALDROP: Objection.
21       MS. HUGHES: Give him that answer.
22 A. I'm not -- this deposition ...
23 Q. Is it your testimony that the annuity was

Page 87

1     never brought up in your deposition as you
2     testified earlier here today?
3        MR. GREGGS: Object to the form.
4        MS. HUGHES: Object to the form.
5  Q. Just answer.
6        (Brief interruption.)
7  Q. Does it, ma'am? Does it reference the
8     annuities? Were you asked about them?
9        MR. PATERSON: Object to the
10       form --
11 A. What page are you on?
12       MR. PATERSON: -- procedure for
13       impeachment.
14       MR. WALDROP: Same objection.
15 A. I don't know where you're talking about. I
16    don't see it.
17 Q. Well, I previously asked you ...
18       So you're saying that -- You're
19    sticking by your prior answer; is that
20    right, ma'am? Is that correct?
21 A. I told you if I answered that question,
22    that I misunderstood it and I -- and I
23    might have made a mistake by answering it.

Page 88

1     Maybe they asked me in such a way that I
2     did not understand.
3  Q. Well, what about a question "did you ever
4     sign your husband's name" don't you
5     understand?
6  A. Yeah, I've signed his name. I signed it at
7     the doctor's office --
8  Q. No. Back then, what didn't you understand
9     about that question?
10       MR. PATERSON: Object to your
11       arguing with the witness.
12 A. I don't know. I don't even understand what
13    you're trying to ask me.
14       MR. MCHARD: Let's change the tape
15       and continue.
16       (Brief recess was taken.)
17 Q. Ma'am, in connection with your prior
18    deposition, you would agree that you were
19    specifically asked at that deposition what
20    about the annuities for which your husband
21    was the beneficiary?
22       MR. PATERSON: What page are you
23       on?

Page 89

1    MR. MCHARD: Page 80 at lines 10
2    and 11.
3  Q.  Correct? Page 80.
4  A.  Yes, I see it.
5  Q.  And you indicated you were the beneficiary
6    for him and he was the beneficiary for you,
7    correct?
8  A.  Uh-huh. (Positive response.)
9  Q.  Is that a yes, ma'am?
10 A.  That's right.
11 Q.  And you would also agree that there were
12   follow-up questions with regard to that.
13   If you'd turn to page 93 --
14 A.  Well, we didn't get all the questions
15   there, did we?
16 Q.  Well, let's go to page 93 for the follow-up
17   questions. All right, ma'am?
18 A.  I don't see where it read that under there
19   where -- (inaudible.)
20   (Brief interruption.)
21 A.  93?
22   MR. WALDROP: I's out of sequence
23   in there. It looks to me like

Page 90

1    it's after page 44 and jumps
2    to page 93. It just got
3    stapled wrong, I think.
4    MR. MCHARD: Thank you.
5  Q.  You were asked -- It's here, ma'am. It's
6    after page -- it's incorrectly collated.
7    It's after page 44.
8    And you've been handed the original of
9    that transcript anyway from your attorney,
10   correct, ma'am?
11 A.  Sir?
12 Q.  You've been handed the original transcript
13   from your attorney.
14 A.  Oh.
15 Q.  If you'd look at page 93, you were
16   specifically asked: Tell me about the
17   annuity that your husband had. I told you
18   that a while ago.
19   Okay. Tell me again. I'm slow. Your
20   answer: Well, we just had an annuity with
21   Lincoln Life Insurance Company.
22   Question: And how many times was
23   the -- has the beneficiary been changed on

Page 91

1    that? Answer -- Your answer is never.
2    Question: Never? So from the first --
3    from the time that it was first purchased
4    until the time of your husband's death, the
5    beneficiary was you? Your answer: Yes.
6    Right.
7    That's what it -- That's the answer you
8    gave --
9  A.  Well, I was -- I was a beneficiary --
10 Q.  -- to the questions --
11 A.  -- and a co-owner.
12 Q.  -- that were asked under oath at that time;
13   is that correct, ma'am?
14 A.  I was a beneficiary and a co-owner, so I --
15   that was my impression that that was right
16   if I were.
17 Q.  But that it was never changed, was it?
18 A.  Yes, it was changed in 2000.
19 Q.  So now you're changing your answer from
20   your prior testimony; is that correct?
21   MR. PATERSON: Object to the form.
22   MR. WALDROP: Object to the form.
23   MS. HUGHES: Object to the form.

Page 92

1  A.  Well, it had been changed.
2  Q.  Well, you also specifically testified and
3    have previously stated that you had a
4    conversation with your son, James Edward,
5    about the annuity, letting him know that he
6    was the beneficiary, correct?
7  A.  We went over to his home, as I have
8    explained to you, and told him we had took
9    it. And we didn't want -- want to put
10   anybody on it, and we talked it over. We
11   decided we would put somebody down in case
12   he -- it was explained to him in his living
13   room that in case -- his daddy said, in
14   case me and your mother both were to get
15   killed instantly in a car wreck, somebody
16   would need to know, and that's it. Now, as
17   far as his daddy saying it's his, no.
18 Q.  Well, ma'am, the -- with regard to your
19   sworn testimony, you again stated on page
20   98 that the last time that you made any
21   major changes to CDs or anything else,
22   referring to your financial assets, was May
23   8th of 1998, correct?

Page 93

1   A. That's right.
2   Q. And that's a true statement; is that
3      correct, ma'am?
4   A. We made no changes, only renewing CDs, what
5      I told you before.
6   Q. Or any of your other financial assets,
7      correct?
8          MR. PATERSON: Tha t's not what the
9           que stion says.
10   Q. Or anything else, correct, ma'am? Is that
11      what it says?
12   A. Which question are you on?
13   Q. You answered May 8th --
14   A. Which question are you on?
15   Q. Page 98, lines 13 through 15. And when was
16      the last time you made any major changes to
17      your CDs or anything else? May 8th, 1998.
18   A. That was --
19   Q. That was your sworn testimony, wasn't it?
20   A. That's right. That was when that -- I told
21      you that's what we did when we bought the
22      annuity, and we never changed nothing else
23      during his life time except renewing CDs.

Page 94

1   Q. Now, with regard to Exhibit Number 12, were
2      there ever any other documents that were
3      provided to you and represented by Lincoln
4      or AmSouth, whether it be AmSouth Bank or
5      AmSouth Investments, that formed a part of
6      the contract, or is Exhibit 12 the whole
7      contract?
8          MR. WALDROP: Object to the form.
9          MR. PATERSON: Object to the form.
10         MS. HUGHES: Object to the form.
11   A. I don't quite understand you.
12   Q. Well, did anybody ever tell you that there
13      was more to the contract than what you've
14      identified as the contract in Exhibit
15      Number 12?
16          MR. WALDROP: Objection.
17          MR. PATERSON: Other than the
18           letter she received that's
19           been identified?
20   A. That's all.
21          MR. MCHARD: Well, in terms of a
22           speaking objection, I'm going
23           to object to that. I don't

Page 95

1          think there's ever any comment
2          about letters forming any part
3          of the contract.
4         MR. PATERSON: There's a letter of
5          enclosure from the -- in the
6          record. I believe the record
7          reflects there's a letter from
8          Lincoln National to Mr and
9          Ms. Crouch saying
10          congratulations on the
11          purchase of your annuity.
12   A. That's exactly right. We got that letter
13      to Mr. and Ms. Crouch. That was right
14      after we --
15         MS. HUGHES: It was brought up
16          earlier.
17   A. Yes, it was. It's done been brought up.
18   Q. Oh, you're saying that that's part of the
19      contract?
20         MS. HUGHES: Object.
21         MR. PATERSON: Object to the form.
22   Q. Is that what you're saying, ma'am?
23         MS. HUGHES: Object to the form.

Page 96

1   Q. Is that your understanding?
2   A. No. The contract was the contract. This
3      was a letter from the insurance company.
4   Q. Meaning the contract was the contract; that
5      is, Exhibit 12 is the contract. There is a
6      separate letter that came later, right?
7         MR. PATERSON: Object to the form.
8         MR. WALDROP: Objection.
9   A. Yes, it was a letter.
10   Q. But the letter wasn't part of the contract,
11      was it?
12   A. No. It was just congratulating us for
13      joining with them.
14   Q. And you specifically testified under oath
15      that you fully understood the actions taken
16      with respect to the purchase and change of
17      beneficiary of the annuity contract number
18      774944, didn't you?
19         MR. PATERSON: Objection.
20         MS. HUGHES: Object to the form.
21          Where are you talking about?
22   A. That's what I want to know. Where are you
23      talking about?

Page 97

1   Q. I'm looking at your affidavit, ma'am.
2         MS. HUGHES: You didn't explain
3         that.
4         MR. PATERSON: Call her attention
5         to what paragraph you --
6         MR. MCHARD: In the affidavit that
7         you drafted, sir, it's
8         paragraph five.
9   Q. I'm quoting from the second sentence,
10    quote: I fully understood the actions
11    taken with respect to the purchase and
12    change of beneficiary for annuity contract
13    number 774944, correct?
14   A. Do you mean when the annuity -- whenever
15    the beneficiary was changed? Is that what
16    you're saying?
17   Q. Ma'am, this is your affidavit under oath
18    and penalty of perjury. You tell me what
19    that means.
20         MR. PATERSON: Object to the form.
21         MS. HUGHES: Object.
22   A. Yeah, I understood when we done it. Yeah,
23    I know what we done, yeah.

Page 98

1   Q. And as part of that --
2   A. Me and my husband both knew it. We knew
3    what we was doing when we done it, yeah.
4   Q. And as part of that, you understood that
5    Exhibit Number 12 was the contract,
6    correct?
7         MR. WALDROP: Objection.
8         MR. PATERSON: Object.
9         MS. HUGHES: Object. Asked and
10         answered.
11   Q. Is that correct?
12   A. I don't understand you keeping on about the
13    contract whenever -- and I'm looking at
14    it. I know what we took, and I know who
15    was the owner and the co-owner and I was
16    the beneficiary and a co-owner. And I
17    can't -- can't understand you keep on about
18    it when I done told you, yes, we did take
19    the contract. We transferred money out of
20    the bank into it.
21   Q. Well, what bank did you transfer it out of?
22   A. AmSouth.
23   Q. Well, what funds from AmSouth did you use

Page 99

1    for that purpose?
2   A. A CD.
3   Q. And what was the amount of that CD?
4   A. We didn't do nothing but transfer it over
5    into it, and we -- our money was on that
6    tenants of rights of survivorship in the
7    bank, and it was changed over -- we bought
8    the annuity with the CD out of the bank.
9    It just transferred out of the bank into
10    that.
11   Q. Was that CD a CD that had matured?
12   A. Yeah.
13   Q. And do you have a copy of that CD?
14   A. No, I don't, not in my presence, no. I
15    don't have --
16   Q. Well, what happened to that?
17   A. I don't even have that CD anymore. That CD
18    was gone when it went into that.
19   Q. You would agree that you and your husband
20    didn't do all of your banking at AmSouth,
21    did you?
22         MS. HUGHES: Object to the form.
23   A. Has that got anything to do with the

Page 100

1    annuity? I don't think that's relevant to
2    the case.
3   Q. Well, ma'am, just answer the --
4   A. Well, I am answering it.
5   Q. Did you bank at another place at this time;
6    that is, in 1998?
7   A. Yes, in '98.
8   Q. Where else did you bank?
9   A. At Alliant Bank in Wetumpka, Alabama.
10   Q. If you'd look at your affidavit, ma'am,
11    Exhibit 3, attached to that -- first is a
12    contract data sheet. Do you see that,
13    ma'am?
14   A. Where?
15   Q. Well, in the Exhibit A to your -- to the
16    affidavit that was prepared by AmSouth
17    Bank's attorney, there is a document that's
18    entitled contract data sheet. Do you see
19    that?
20   A. That's the same thing we're looking at over
21    there.
22   Q. Next page, ma'am.
23   A. Yeah, I'm looking at it.

Page 101

1  (Plaintiff's Exhibit 14 was marked
2  for identification.)
3  Q. Now, that's attached to the affidavit. But
4  showing you Exhibit Number 14, that
5  document is actually the letter that you
6  referred to or that was referenced during
7  your deposition by AmSouth's attorney,
8  congratulating you on the purchase the
9  annuity, isn't it?
10 A. This is from the insurance, Lincoln Life.
11 Q. And did you pick that letter up from the
12 mailbox?
13 A. Yes.
14 Q. And did you get it about May 18h?
15 A. I don't remember what day. I don't
16 particularly notice nothing like that.
17 When I get the mail, I read it.
18 Q. Now, it says -- it asks you to take a
19 moment to review and verify the information
20 on the attached single page which is called
21 the contract data page. Correct, ma'am?
22 A. Well, yeah. I did keep things when I had
23 the annuity, but I didn't have the annuity

Page 102

1  long after he passed away, so I didn't keep
2  up all of it because I didn't know I'd need
3  it.
4  Q. You threw it away?
5  A. Yeah.
6  Q. Well, but the attachment to the letter --
7  A. I got it.
8  Q. Well, it's not only part of the affidavit
9  prepared by AmSouth for you to sign, but
10 it's also the attachment to the letter
11 that's Exhibit 14, correct?
12 A. I don't think this was on the letter.
13 Q. You don't think that was attached?
14 A. I don't think it was on the letter, no. I
15 just got this letter. It was individual.
16 I didn't get this with it.
17 Q. That is, there was no attached contract
18 data sheet as the letter says?
19 A. I had one of them, but I don't remember
20 it. I don't recall it coming with that.
21 Q. Well --
22 A. It came from the bank.
23 Q. The -- You've reviewed this contract data

Page 103

1  sheet, haven't you?
2  A. Yes, I've looked at all -- everything.
3  Q. And as part of your affidavit, you
4  specifically said you understood this,
5  didn't you?
6  A. I understand it. I understand what I'm
7  looking at now.
8  Q. All right. And so you do understand the
9  distinction that we've been talking about
10 as shown in the contract data sheet between
11 an annuitant beneficiary and an owner's
12 beneficiary as noted in the contract data
13 sheet, correct, ma'am?
14 A. I understand -- I am not an attorney like
15 you are, but I do understand that my
16 husband was the owner and I was the joint
17 owner on it. I understand that.
18 Q. All right. And you understand that this
19 document provides that the annuitant's
20 beneficiary -- that is, your husband as the
21 annuitant -- his designated beneficiary was
22 as noted in the application, correct?
23     MS. HUGHES: Object.

Page 104

1  A. No. I'm not going to answer your questions
2  on that because I can't -- I can't figure
3  out what you're trying to make me say. And
4  I don't -- I'm not --
5  Q. I'm just trying to get you to tell the
6  truth, ma'am.
7  A. I'm telling the truth.
8  Q. Well, ma'am, the --
9  A. And I'm telling you how I understand this,
10 and everything I'm saying is the truth.
11 I've never told a story about any of it no
12 way.
13 Q. Well, ma'am, you understand that this
14 document, the contract data sheet attached
15 to Exhibit 14, okay, and attached to your
16 own affidavit, although prepared by the
17 bank, talks about two different types of
18 beneficiaries? You understand that,
19 correct?
20 A. Yes, it had a beneficiary. We put --
21 Q. One would be an annuitant's beneficiary and
22 the other one an owner's beneficiary. Do
23 you understand that?

Page 105

1    MR. PATERSON: Object to the form.
2  A.  Yeah.
3  Q.  And you understand also that in this case,
4     your son was the annuitant's designated
5     beneficiary, correct?
6         MS. HUGHES: Object to the form.
7         MR. PATERSON: Object to the form.
8  A.  I don't understand that. No, you won't
9     make me understand that.
10 Q.  You don't understand?
11 A.  No, I do not.
12 Q.  Well, ma'am, you said in your --
13 A.  I said --
14 Q.  You said in your affidavit --
15 A.  If I said anything in that, I didn't --
16    maybe I didn't understand it. But I said,
17    no, I will not understand what you're
18    trying to say now. I do not understand it,
19    and I'm not going to tell you I do.
20 Q.  Well, do you understand the contract data
21    sheet that's attached to both your
22    affidavit --
23 A.  You're talking about this?

Page 106

1  Q.  Yes. That's attached -- Yes, ma'am.
2  A.  I'm talking about that, but I don't --
3  Q.  Do you understand that document? Yes or
4     no.
5         MS. HUGHES: I object. Asked and
6         answered.
7  A.  No, I'm not going to -- I'm not going to
8     answer that because you're trying to tell
9     me something that I don't know -- I know is
10    not right in it, and I'm not going to
11    answer it.
12 Q.  I'm just trying to find out if you
13    understand what this document means.
14 A.  I understand the way I see it, and I will
15    see it like that, that he was the owner of
16    it and I was the co-owner. If he died, it
17    went to me; and if I died, it went to him.
18    And you can't change my mind.
19 Q.  Because that's how you understood all
20    jointly-owned property to work, correct?
21 A.  That's right. Everything we had was like
22    that, every dime of money we had. Our land
23    is like that. Everything I've got is like

Page 107

1     that, and you can't change my mind about
2     it.
3  Q.  You would also agree that the letter in
4     Exhibit Number 14 specifically advised you
5     that you would receive a statement at least
6     annually showing all activity on the
7     annuity contract?
8  A.  We did. We got it.
9  Q.  And did you receive and understand those?
10 A.  Yeah, I did.
11 Q.  And when it --
12 A.  Yeah, it was addressed to us, and I
13    understood it.
14 Q.  And you understood that when the document
15    said that there had been no activity with
16    regard to the annuity -- that is, there
17    hadn't been changes in owners or
18    beneficiaries or anything -- you understood
19    that, didn't you?
20        MR. WALDROP: Object to the form.
21 A.  I understand the beneficiary was changed
22    like I told you and how it was changed, and
23    that's the way it was. And that's what I

Page 108

1     will keep saying if you ask me all evening.
2  Q.  Well, the change that you say was made was
3     the change, as you've testified earlier,
4     that was made immediately after Ronda told
5     you of the mistake --
6  A.  Yes.
7  Q.  -- that she'd made?
8         MS. HUGHES: Object.
9  A.  We changed it and I don't know when it was,
10    but it was changed and it's still that way
11    as long as I have the annuity, and
12    that's -- that's it.
13        (Plaintiff's Exhibits 21 and 23
14        were marked for identification.)
15 Q.  Ma'am, the -- And with regard to annual
16    statements that are described in the May
17    18th letter, I'm showing you Exhibits 21
18    and 23. Those are statements that you got,
19    aren't they?
20 A.  Sure are.
21 Q.  Indicating there were no transactions with
22    regard to the annuity during those --
23    during the periods of those reports,

Page 109

1     correct?
2     A. That was just where they'd send us the
3        thing about the money, how much did -- the
4        interest and things.
5     Q. Well, it specifically says transaction
6        date, type of transaction, right?
7     A. What had already been transacted, if that's
8        what you're wanting -- what you're trying
9        to say. The beneficiary had done been
10       changed.
11    Q. Back on May the 8th of '99.
12    A. Oh, well, that ain't May the 8th. Them
13       things you giving me right there is not.
14    Q. Yeah, for period beginning May 8th, 1999 --
15    A. No, not May 8th. It wasn't. It was
16       changed April 4th, 2000.
17    Q. Well, that would be in that period of time,
18       wouldn't it, ma'am? In the period of May
19       8th of 1999 through May 8th of 2000, do you
20       see that?
21    A. 2000 is when it was changed.
22       MR. WALDROP: What is this
23       document that's stapled to the

Page 110

1        second page of the --
2        MR. MCHARD: It's the fax
3        transmission.
4        MR. WALDROP: No. It's
5        something -- Telephone Request
6        Form that's stapled to the
7        back of the Fixed Annuity
8        Contract - Annual Statement
9        for the period beginning
10       12-8-98 through 12-8-99.
11       MR. MCHARD: Ronda requested a
12       copy of that be sent to her.
13       MR. WALDROP: I don't think that
14       that goes with this, but maybe
15       it does.
16       I think you're referring
17       to the fax stuff on the -- for
18       the period 5-8-99 through
19       5-8-2000. I'm asking about
20       the form that's stapled to the
21       exhibit for the period
22       covering 12-8-98 through
23       12-8-99.

Page 111

1        MR. MCHARD: The telephone request
2        for a copy of the statement?
3        MR. WALDROP: It just says
4        telephone request. It's dated
5        12-15-99.
6        MR. MCHARD: For the annual
7        statement with an anniversary
8        date of 12-8-99, yes, sir.
9        MR. WALDROP: I don't think it
10       goes with that. That's fine.
11    Q. With Alliant Bank -- and you can look at
12       Exhibit 3 while we get the ... your
13       affidavit, ma'am.
14       MS. HUGHES: What page of Exhibit
15       3?
16       MR. PATERSON: What are you
17       looking for?
18       MR. MCHARD: You attached it to
19       her affidavit.
20       MR. PATERSON: An attachment to
21       the affidavit?
22       MR. MCHARD: Beg your pardon?
23       MR. PATERSON: I'm sorry. What

Page 112

1        were you looking for? What
2        document were you --
3     Q. Attached to your affidavit or the document
4        you signed prepared by AmSouth, there is an
5        AmSouth Investment Services, Inc.
6        confidential client information sheet --
7        confidential client profile. Do you see
8        that, ma'am?
9        (Plaintiff's Exhibit 11 was marked
10       for identification.)
11    Q. And it's also Exhibit 11 that I'm handing
12       you. Same document, correct, ma'am?
13    A. I don't know. Let me look
14       It's the same thing as far as I can
15       see.
16    Q. And, ma'am, with regard to this document,
17       this was something that Ronda Robinson
18       filled out on May the 7th of 1998 while you
19       and James were present, correct?
20    A. Yes.
21    Q. And James signed it, didn't he?
22    A. I'll have to look and see.
23    Q. The third page.

28 (Pages 109 to 112)

Page 113

1    A.  Yes.
2    Q.  That's his signature on the top line,
3         correct?
4    A.  Yes.
5    Q.  Your signature is on the second line,
6         correct?
7    A.  That's right.  That's correct.
8    Q.  And he was able to read and sign and make
9         his mark, wasn't he?
10   A.  Yeah.  He had his glasses on.  He wrote it.
11   Q.  Well, ma'am, with regard to the assets,
12        this indicates that you had a CD at AmSouth
13        for $223,000, but it shows that it, in
14        fact, didn't mature until almost three
15        months after you -- after the purchase of
16        this annuity.  Do you see that?
17   A.  We took it out.
18   Q.  You withdrew it early?
19   A.  Yes.
20   Q.  And took an interest penalty; is that
21        right?
22   A.  That's right.
23   Q.  And -- But when you took the 233,000 out --

Page 114

1         excuse me, 223,000 out, there wasn't enough
2         money to buy the $250,000 annuity, was
3         there?
4    A.  We had some more we added with it.  Do you
5         see that there?
6    Q.  Well, added what?
7    A.  We had 56 more thousand -- We had more
8         money in there and we put enough together
9         to make it.
10   Q.  So money came out of the money market
11        account?  Is that what you're saying?  Is
12        that right?  That's what I'm trying to find
13        out, ma'am.
14   A.  Yeah, we had a money market, yes, we had
15        one that you could take it out of when you
16        got ready.
17   Q.  And you're saying that that's what
18        happened?
19   A.  Yes, we took it out and added to it.  If we
20        hadn't have, we wouldn't have -- probably
21        couldn't have bought it if we hadn't have
22        put enough in --
23   Q.  Do you have any records that show that,

Page 115

1         that that's what happened?
2    A.  I've got the money right down here and I
3         bought the annuity with it, so I think that
4         would be proof enough of it.
5    Q.  Do you have a check that went to purchase
6         the annuity?
7    A.  We just got the checks -- Ronda just added
8         it to it.  She took it out of one and put
9         it into the other.
10   Q.  So no check was written to purchase the
11        annuity?  Rhonda just took it out of the
12        bank account?
13   A.  No, we fixed it like that.  I don't know
14        exactly how it happened, sir, but --
15            Now, I'm telling the truth about it,
16        and don't try to make me tell a story.
17   Q.  I'm trying to make you tell the truth,
18        ma'am --
19   A.  Well, I'm telling the truth.
20   Q.  All right.  Well, the IRA that's referenced
21        was also a separate certificate of deposit,
22        correct?
23   A.  The what?

Page 116

1    Q.  You had an IRA, individual retirement
2         account.  There was a CD for that, correct?
3    A.  IRA?  I don't remember that one.
4    Q.  Well, was that your husband's IRA?
5    A.  Well, he had to take it out at a certain
6         period and transfer it out of his -- I
7         think it was an IRA he had.  When he got 59
8         and a half, you have to move it -- no, 70,
9         I believe, move it.
10           He had something invested in one.  When
11        he got 70 years old or something, some
12        way -- you had to move it out of that into
13        something else.
14   Q.  Well, at this time, the RA was still in
15        his name, wasn't it?
16   A.  Yes.  That was his pension --
17   Q.  Well, he had a separate --
18   A.  His IRA, yes, he had one.
19   Q.  He had a separate pension for the work that
20        he had done through the State of Alabama,
21        correct?
22   A.  Yeah, he drawed a retirement check.
23   Q.  Right.  How much was his retirement check

Page 117

1    before he died?
2    A. I don't think I have to answer that.
3    Q. Well, I'm asking. I believe you do,
4    ma'am. How much was it?
5    A. Well, why? Why has that got to do anything
6    with it? Why --
7    Q. Are you refusing --
8    A. It was his retirement check. Why --
9    Q. Are you refusing to answer that, ma'am?
10   A. I don't remember exactly what it was
11   whenever he retired. I can't remember,
12   because they got raises, cost of living
13   raises and things, and I can't --
14   Q. At the time of his death, how much was it?
15   A. Oh, it must have been about close to --
16   about 2,000 a month maybe. I don't know
17   exactly.
18   Q. And did it change after his death?
19   A. Yeah, it changes -- on mine. Now, his
20   didn't because he died. What I get of it,
21   it changes if you get a little raise.
22   Q. Were you getting a separate amount before
23   he died --

Page 118

1    A. No.
2    Q. -- from his pension?
3    A. No, no, no.
4    Q. Well, how much have you been getting from
5    his pension since he died?
6    A. I draw half of it if that makes -- answers
7    your question.
8        When he died, he fixed it like that
9    when he retired, because he didn't want me
10   left out in the cold once he died and left
11   me. And he fixed it where I could draw
12   half of it the rest of my life because he
13   thought enough of me to do that, and he
14   don't think enough of somebody to try to
15   take it away from 'em either.
16   Q. Well, this document also says that -- that
17   the -- that the gross annual income for the
18   year 2000 -- or for the year 1997 had been
19   between 25 and $50,000. What were the
20   sources of that income in 1997?
21   A. Well, we had the CDs, and we never took the
22   interest off. And I drawed social
23   security. He drawed social security.

Page 119

1    Q. How much was his social security?
2    A. I don't recall. I think at the time of his
3    death, it was something around 800 a month.
4    Q. And how much was your social security?
5    A. 439.
6    Q. And did you -- Do you continue to receive
7    social security as a widow's benefit due to
8    his death?
9    A. Yes, I do.
10   Q. And how much is that?
11   A. Well, at this time, I can't -- let me see.
12   It's about ... about nine -- about 900 a
13   month.
14   Q. For the widow's award?
15   A. Yeah.
16   Q. And then you get your own separate check?
17   A. No, no, no. I don't draw on my separate
18   social security. I draw off of him.
19   Q. Because it's a larger amount?
20   A. Yes.
21   Q. Instead of getting four hundred and
22   something for your contribution --
23   A. Yeah, I got a percent of his.

Page 120

1    Q. So you're still getting about $2,000 a
2    month through his retirement?
3    A. Something in that order maybe.
4    Q. And you haven't had any financial problems,
5    have you?
6    A. Well --
7    Q. Have you, ma'am?
8    A. I don't really have financial problems, but
9    I'm like everybody else. I have to pay
10   bills, and I have to watch. I can't get
11   out and have a spending spree. I can't go
12   to the casino over in Biloxi or somewhere.
13   Q. The -- Well, when you say that, ma'am, even
14   Ronda Robinson specifically said during the
15   time that your husband was sick in January
16   and February of 2001 that you had plenty of
17   other sources of income and funds and
18   didn't need to worry about the annuity,
19   correct?
20       MS. HUGHES: Object to the form.
21       MR. WALDROP: Same objection.
22   Q. She told you that, didn't she?
23   A. I don't remember her saying that. But if

Page 121

1    we had anything, where do you think we got
2    it at? Nobody didn't give it to us.
3    Q. Well, when your husband died, there were
4    probate proceedings, and there was
5    approximately a half a million dollars of
6    assets at the time that he died, correct?
7    A. I don't remember.
8    Q. Well, there was 290,000 in connection with
9    the -- this annuity, correct, and you got
10   that, right?
11   A. Yes, I did.
12   Q. And you still had the 135 plus interest
13   from the Alliant certificate, correct?
14   A. I don't -- I don't take my interest off of
15   my money.
16   Q. Because you haven't needed it, have you?
17   A. Well, if I need it, it's there. Just like
18   I got through telling you. If I had have
19   done like most people, wasted everything
20   away, I wouldn't have had nothing. And I'm
21   saying nobody never give us nothing. And
22   we rented property and all. I don't think
23   I recall anybody -- any children coming

Page 122

1    around helping paint nor do anything, climb
2    ladders. I did and he did, so --
3    Q. Well, ma'am --
4    A. Huh-uh. (Negative response.) I don't want
5    to think about them taking my stuff, no.
6    Q. Well, ma'am, all of the assets -- the
7    checking accounts, the money market
8    accounts, the CDs both at AmSouth and
9    Alliant, your home, the IRA account of your
10   husband's -- you still have all of the
11   proceeds from those assets, don't you?
12   A. No, I don't. I've paid a lot of it out in
13   lawyer fees.
14   Q. Have you given any to your children?
15   A. No, I have not.
16   Q. So the money that you've spent has been for
17   attorney's fees; is that correct?
18   A. I don't give money to young'uns.
19   Q. Is that correct, ma'am?
20   A. Sir?
21   Q. The money that you -- The only money that
22   you have spent that you took after your
23   husband's death is that which you've spent

Page 123

1    for attorney's fees; is that correct?
2    A. Well, I have bills, too. I have to pay
3    property tax, insurance on vehicles,
4    homeowners insurance.
5    Q. But you don't have bills in excess of
6    $24,000 a year, do you?
7              MS. HUGHES: Object --
8    A. I don't know.
9              MS. HUGHES: -- to the form.
10   Q. How much are your monthly bills, ma'am?
11   A. Well, I couldn't tell you. My light bill
12   is $140 this month, and I have phone bills
13   and everything else, pay for bills and
14   groceries and all. I live like everybody
15   else. I don't live on nothing.
16   Q. The --
17   A. I'm just like you. I have bills. I'm sure
18   you do, too.
19   Q. Well, ma'am, where are your assets now?
20   A. I don't think that's -- I don't think I've
21   got to answer that.
22   Q. Are you refusing to answer that?
23   A. I don't know how much it is. I don't

Page 124

1    know. I don't remember.
2    Q. Well, where are your -- where are your bank
3    accounts and --
4    A. I don't know --
5    Q. -- certificates of deposit --
6    A. I don't have them.
7    Q. -- checking accounts?
8              You don't have any of those?
9    A. I don't keep up with them.
10   Q. You don't know where they are; is that
11   right?
12   A. (Shakes head from side to side.)
13   Q. Ma'am, at the time that you were with Ronda
14   Robinson on May the 7th of 1998, how did
15   money go from your husband to Lincoln
16   National?
17             MR. PATERSON: Object to the form
18   of that.
19             MR. GREGGS: Object to the form.
20   A. You've done asked me that.
21   Q. No. I'm trying to find out how --
22   A. Well, I told you. It was in the bank, and
23   we only just took it out of one thing and

Page 125

1    put it into another one, and that's the
2    answer.
3    Q. Well, did you receive a copy of the receipt
4       for the premium that you were paying?
5    A. Oh, yes. I know what we was doing. We
6       knew what we was doing.
7    Q. Well --
8    A. Quite aware.
9         (Plaintiff's Exhibit 13 was marked
10        for identification.)
11   Q. Showing you Plaintiff's Exhibit Number 13.
12      Is that a copy of the premium receipt that
13      you received at the time that the $250,000
14      was paid to Lincoln --
15   A. Yes.
16   Q. -- on May the 5th of 1998 -- excuse me, May
17      the 7th?
18   A. May the 7th, 1998.
19   Q. And you would agree that -- you would agree
20      that approximately a year before the
21      purchase of this annuity, James Earl had
22      given to Jim $100,000, correct?
23   A. James Earl didn't give it to him. We both

Page 126

1    gave it to him.
2    Q. Well, I thought you said that you didn't
3       believe in giving money to young'uns, to
4       quote you.
5         MS. HUGHES: I object. Badgering
6         the witness. Argumentative.
7    A. Listen, we didn't do nothing without the
8       other one's okay about it. And if I hadn't
9       have okayed for him to give it to him, he'd
10      have never got it.
11   Q. Well, ma'am, that check --
12   A. I can't help what you're talking about. I
13      know what I'm talking about. If I'd have
14      said no, he wouldn't have never got it. My
15      husband would have said no, too, if I'd
16      have said no.
17   Q. Well, ma'am, the --
18   A. His daddy didn't give it to him alone.
19        (Plaintiff's Exhibit 7 was marked
20        for identification.)
21   Q. Exhibit Number 7 is a copy of the AmSouth
22      Bank check.
23        MR. PATERSON: Let me ask you

Page 127

1    this. Was this produced to
2    us?
3    MR. MCHARD: I hasn't been
4    requested.
5    MR. PATERSON: Well, it's supposed
6    to be produced in connection
7    with the initial disclosures.
8    MR. MCHARD: We didn't have it.
9    MR. PATERSON: Well, I mean,
10   before today. Let me just
11   stay on the record.
12     Is there anything else
13   that you've got that you
14   intend to question the witness
15   about that you haven't given
16   us? This should be part of
17   the initial disclosures,
18   documents you rely upon.
19   You're obligated --
20   MR. MCHARD: I didn't have the
21   document at the time we made
22   our initial disclosures. I
23   couldn't rely on it. I didn't

Page 128

1    have the document.
2    MR. PATERSON: But you're
3    obligated to supplement that.
4    Where did this come from? I
5    mean, I don't understand. I
6    just want to prevent --
7    MR. MCHARD: Sir, I sent you --
8    and I'll put into the record a
9    copy of the objection, because
10   AmSouth hasn't provided
11   anything meaningful in
12   connection with discovery, and
13   we sent you a letter with
14   regard to that. And now
15   you're --
16   MR. PATERSON: I want to state for
17   the record that I don't know
18   where this document came
19   from. I don't object to it, but
20   I do object to just seeing it
21   for the first time now.
22     Go ahead. I've got my
23   objection on the record.

Page 129

1    MR. MCHARD: And I object, and
2        we'll continue the depositions
3        of this witness and of Ronda
4        Robinson because --
5    MR. PATERSON: We're not going to
6        voluntarily --
7    MR. MCHARD: -- because you --
8    MR. PATERSON: -- continue the
9        deposition.
10   MR. MCHARD: -- because you have
11       failed, both you and
12       Ms. Hughes, to provide
13       documents that were
14       specifically requested in
15       discovery in this case.
16   MS. HUGHES: They're irrelevant.
17   MR. PATERSON: We gave you
18       documents you're entitled to,
19       and the record will speak for
20       itself.
21   Q. Well, ma'am, this is a copy of that check,
22       isn't it?
23   A. Yes, it is. Sure is.

Page 130

1    Q. And this wasn't --
2    A. And you know who was down there and got it?
3    Q. You?
4    A. Me.
5    Q. And you would agree that this wasn't
6        something that was given to Jim after the
7        annuity was purchased, was it?
8    A. I don't -- I don't remember what date we --
9        no, it was give to him before.
10   Q. Yeah, it was given to him --
11   A. It was given to him -- if I could explain.
12       We had the CDs and he always talked about
13       he would like to have one, you know, to
14       make money on like I did. And we gave him
15       that to buy one with to start hisself one
16       to try to help him get on his feet.
17           And he said he wasn't going to leave
18       the interest on it. He was going to take
19       it out and put it in another account, and I
20       said you won't never accomplish nothing
21       like that. So I don't know what he done.
22   Q. These funds were given to him by means of
23       this check --

Page 131

1    A. Yeah.
2    Q. -- within just a few days of the time that
3        the check was obtained through Ronda
4        Robinson at AmSouth Bank, right?
5            MS. HUGHES: Objection.
6    A. What do you mean?
7    Q. You got the check that's Exhibit 7, and
8        then you and your husband made a trip
9        over --
10   A. We certainly did.
11   Q. -- and gave it to him right away?
12   A. We did. We certainly did. We went over
13       there that weekend.
14   Q. The weekend after --
15   A. Yes.
16   Q. -- the check had been picked up --
17   A. That's right.
18   Q. -- from the bank?
19   A. Sure did. Carried it over there. Handed
20       it to him. His daddy wanted to hand it to
21       him, and I got it out of my purse and give
22       it to him, handed it -- standing in his
23       kitchen.

Page 132

1    Q. Now, when you were with Ronda Robinson on
2        May the 7th, in addition to you and your
3        husband separately signing the application
4        and the confidential client profile that
5        we've been over, you also signed a fixed
6        annuity purchase authorization form, didn't
7        you?
8    A. What are you talking about?
9            (Plaintiff's Exhibit 10 was marked
10           for identification.)
11   Q. Well, showing you Exhibit Number 10. That
12       bears your signature, doesn't it?
13   A. What does that mean? What's that got to do
14       with this? Tell me.
15   Q. Well, you're the one who has testified
16       under oath that you understood everything
17       about the purchase of this annuity, and I
18       want to ask you --
19   A. Well, I did --
20           MS. HUGHES: Object.
21   A. I understood we bought an annuity. Yeah, I
22       understand that, but I don't understand you
23       trying to go into all the details of every

Page 133

1    little thing about it.
2    Q. Well, did you understand the details of
3    this annuity that was purchased?
4    A. Yes.
5    Q. And the -- Would you agree that the intent
6    was to keep the money in this annuity for
7    five to nine years?
8    A. Six years is what we took it for. And my
9    husband passed away in February before --
10   three years in May. And I took it out of
11   the annuity. I closed it out, and I had
12   the right to. I got the papers. I could
13   leave it in there in my name or take it
14   out, and that's what I did.
15   Q. Well, ma'am, with regard to this document,
16   it says that your estimated annual
17   household income was not 25 to 50, but was
18   50 to $100,000 a year, doesn't it?
19   A. Well, he could have said 50, but it was not
20   no hundred thousand. It could -- could be,
21   but it didn't say it was. Are you reading
22   that?
23   Q. No. I'm just looking at the estimated

Page 134

1    annual household income. It says 50 -- in
2    the range of 50 to $100,000.
3    A. Well, 50, but not up to a hundred. It said
4    could be. It could be from 50 to a
5    hundred. Are you explaining it right
6    there?
7    Q. Do you have a copy of your 1997 federal and
8    state income tax returns?
9    A. That's not in my possession.
10   Q. Well, will you sign an authorization so
11   that I could get that?
12   A. No.
13   Q. Well, why not, ma'am?
14        MS. HUGHES: Object. This is
15        irrelevant.
16   A. I don't think -- I don't think -- that's my
17   income thing, and what we -- I don't think
18   it's got anything -- I thought we was
19   talking about an annuity. I didn't know we
20   was trying to go back through our life
21   history.
22   Q. Well, ma'am --
23   A. What I got ain't got nothing to do with the

Page 135

1    annuity.
2    Q. Well, did you ever have a job where you
3    worked for more than minimum wage, ma' am?
4        MS. HUGHES: I object. This is
5        irrelevant.
6    A. I haven't worked in years. I haven't
7    worked since 1974 if that answers your
8    question.
9    Q. And when you worked, you worked for minimum
10   wage, didn't you, ma'am?
11   A. Well, maybe. I wasn't getting rich on
12   where I worked, no, I wasn't.
13   Q. And the 50 to hundred thousand-dollar
14   estimated annual income that James
15   explained on May the 7th of 1998 was with
16   regard to his pension and the earnings off
17   of income that was generated from property
18   that he had gained as a result of his work,
19   correct?
20        MR. GREGGS: Object to the form of
21        the question.
22   A. Yes.
23   Q. And it's also correct that the investment

Page 136

1    objective here was to save taxes, income
2    taxes, correct?
3    A. Well, that was put in for income things,
4    yes.
5    Q. And, also, that you had no investment
6    experience, you and Jim, right?
7    A. What?
8    Q. That you had no investment experience.
9    A. Well, we'd done CDs and IRAs and things
10   like that. That's all we'd ever done until
11   we went into the annuity.
12        But, now, I think -- I think anybody
13   with common sense, if you want to try to
14   save a little or deduct something -- why
15   does people put all that on their tax
16   deduction every year down -- to try to keep
17   from paying? Yeah.
18   Q. And this document specifically says that
19   the -- that the fixed annuity that was
20   being purchased was not a deposit account
21   and was not an obligation of AmSouth Bank
22   where you purchased it and was not
23   guaranteed by AmSouth Bank or by any of its

34 (Pages 133 to 136)

Page 137

1       affiliates, correct?
2   A.  What are you saying, now?
3           MS. HUGHES: Objection.
4   A.  I don't understand what you're saying.
5   Q.  You would agree that you understood that
6       the fixed annuity -- the Lincoln National
7       fixed annuity that was being purchased on
8       May the 7th of 1998 was not a deposit
9       account at the bank, was not an obligation
10      of the bank and was not guaranteed by
11      AmSouth Bank or any of its affiliates,
12      correct?
13  A.  What do you mean? Insured? Is that what
14      you're trying to say, it wasn't insured?
15      Is that what you're saying?
16  Q.  Or guaranteed in any way by the bank,
17      right?
18  A.  I don't know whether it was guaranteed by
19      the bank or not.
20  Q.  Well, did you read and understand that?
21  A.  It wasn't insured through the annuity
22      company. We knew that.
23  Q.  But you didn't know whether the bank

Page 138

1       insured it or not?
2   A.  Well, we had the money -- we had -- The
3       money was insured for so much at the bank.
4   Q.  That annuity money?
5   A.  No, the money that we had in the bank.
6   Q.  Well, was the annuity money guaranteed or
7       insured by the bank?
8   A.  I'm telling you that after we invested in
9       the annuity, that the -- that we had no --
10      it wasn't insured. We knew that, that it
11      wasn't insured with the insurance company.
12      That was explained to us.
13          MR. PATERSON: When we're at a
14          point where we might take a
15          break -- are you nearly done?
16          MR. MCHARD: We can take a break.
17          (Lunch recess was taken.)
18  Q.  Ma'am, when we broke, I had been asking you
19      about Exhibit Number 10 and the issues
20      about whether the Lincoln National life
21      insurance annuity that is the subject of
22      this lawsuit was insured or not by AmSouth
23      Bank. Do you remember that?

Page 139

1   A.  Yes, I remember that.
2   Q.  And did you and your husband ever have
3       concerns about whether or not the Lincoln
4       National annuity was a safe investment?
5   A.  Well, it's not safe anywhere. The bank can
6       go under and you can't get all your money
7       out neither unless -- it's insured for so
8       much. We was aware of that, too.
9   Q.  That it was only insured for so much?
10  A.  That's right.
11  Q.  That is, the annuity?
12  A.  No, the bank -- your money in the bank.
13  Q.  Did you ever ask Ronda Robinson after
14      you -- after the annuity was purchased --
15  A.  We knew it wasn't -- We knew it wasn't
16      insured.
17  Q.  That it was not?
18  A.  (Witness nods head up and down.)
19  Q.  Did you ever ask her after the purchase of
20      the annuity --
21  A.  She told us that it wouldn't be.
22  Q.  Did you ever ask her after the purchase of
23      the annuity about the safety of that

Page 140

1       investment?
2   A.  Well, it was explained when we did it.
3   Q.  Just answer my question. Did you ever talk
4       to Ronda after --
5   A.  No, I didn't talk to her no more about it,
6       no, not what -- not about the insurance on
7       it, no, because she explained it to us and
8       I was aware of the fact.
9   Q.  That is, she had explained it to you when
10      you were there when it was purchased May
11      the 7th of '98 that this was not an insured
12      investment, correct?
13  A.  Yes. Correct.
14  Q.  And you didn't talk to her any more about
15      the safety --
16  A.  I don't recall.
17  Q.  -- of the investment --
18  A.  I don't recall if we did.
19  Q.  Did she ever tell you that the annuity was
20      insured by Lincoln?
21  A.  I don't remember that.
22  Q.  She may have?
23  A.  I said I don't remember.

35 (Pages 137 to 140)

Page 141

1  Q. You just don't know one way or another?
2  A. She had told me it wasn't, and I don't
3     remember any other time of it being brought
4     up. If it was, I don't remember.
5  Q. She had told you that it was not insured?
6         MS. HUGHES: I object.
7  A. Yes.
8         MS. HUGHES: Asked and answered.
9  Q. In light of your testimony earlier that
10    Ronda Robinson told you immediately after
11    the contract was issued that there was a
12    mistake, why -- why did two years go by
13    before anything was done regarding that?
14 A. Well, I don't know exactly. I think
15    maybe -- My husband liked seeing the
16    things. He'd want -- When we'd go to the
17    bank, he wanted to check things and see,
18    keep up with everything on track.
19        And one day we was down there for some
20    reason, and he talked to her about the
21    annuity. And he wanted to be sure
22    everything was going right because he said
23    if he passed away, he wanted to be sure

Page 142

1     that everything was right, that I would get
2     it if he -- if he passed on. He bothered
3     them about looking at everything.
4  Q. He wanted to look at it to see --
5  A. He wanted to see. He wanted to see if it
6     was secured right.
7  Q. And it was important to him that he be able
8     to see those documents to see that they
9     contained what he intended?
10 A. It was important. They can tell you. He'd
11    be right there at the last minute to see.
12 Q. Do you recall in February of 2002 talking
13    with Ronda Robinson just before your
14    husband died telling --
15 A. 2002?
16 Q. -- excuse me, 2001, just before your
17    husband died of being worried about
18    expenses if your husband needed extended
19    care?
20 A. That's right. I've talked about that to a
21    lot of people. And he was going to have
22    to -- when he had brain surgery, his doctor
23    recommended him -- I think this is where

Page 143

1     some of that come up about him being --
2        He was going to have to go to a rehab
3     after he had the brain surgery for a while,
4     and I think that's where some of this stuff
5     got confused at, about me thinking he was
6     incompetent and all like that. I think
7     somebody has got things mixed.
8  Q. Well, you would agree he wasn't incompetent
9     until the time --
10 A. He wasn't -- he had -- When he had brain
11    surgery, the surgeon told me that when he
12    left that hospital, he'd have to put him in
13    a rehab for so long till his mind could get
14    well.
15 Q. But he wasn't --
16 A. He never did come out of the hospital. He
17    died in the hospital.
18 Q. But he wasn't incompetent until he went
19    into the hospital that --
20 A. No. No, no, no. In January before -- the
21    last of January, the first of February --
22    He began getting a little forgetful the
23    last of January. Sometimes you could ask

Page 144

1     him something, and he seemed like he
2     couldn't give you the right answer.
3        But when he -- He stayed in the
4     hospital one week to the day after he had
5     the surgery till he passed on.
6        And I'd certainly like for him to be
7     here today where he could straighten
8     everything out in five minutes.
9  Q. Me, too, ma'am.
10       You understood that Ronda Robinson was
11    an employee of AmSouth Bank, correct?
12 A. Oh, yes, I understood that.
13 Q. And --
14 A. I dealt with her long enough till I thought
15    she might be. She stayed there.
16 Q. Well, she had been there since 1986, hadn't
17    she?
18 A. Uh-huh. (Positive response.)
19 Q. Yes, ma'am?
20 A. I don't know what day she came there. I
21    can't say that. I don't know.
22 Q. Well, how long had you been --
23 A. I started with that bank in '87.

Page 145

1   Q.  And she was there then?
2   A.  No, she was not.
3   Q.  Well, do you recall when she started to
4       work at that bank --
5   A.  No, I do not. No, I --
6   Q.  -- as an employee of that bank?
7   A.  I don't remember things like that. Things
8       like that -- If you walk in a bank and see
9       a new -- somebody there working, that don't
10      dawn on you what day it is or nothing
11      because you could care less about it.
12  Q.  Now, with regard to whenever it was, now,
13      that you claim that the change of
14      beneficiary was done, you understood that
15      the change of beneficiary could only be
16      done in accordance with the provisions of
17      the contract, correct?
18  A.  You couldn't change a beneficiary you're
19      saying? What are you saying?
20  Q.  That any changes could be done only in
21      accordance with the terms and provisions of
22      the annuity contract. You knew that,
23      didn't you?

Page 146

1   A.  I knew we could change the beneficiary if
2       we wanted to. I knew that. You can always
3       do that.
4   Q.  Well, that's what you assumed from your
5       past dealings before you purchased this
6       annuity, correct?
7   A.  I'm under the impression you can change a
8       will or a beneficiary on anything if you
9       get ready. You're not tied to no --
10      nothing.
11          Are you trying to tell me that we
12      didn't -- I didn't have the right to change
13      it, we -- me and James Crouch didn't have
14      the right to change the beneficiary? Is
15      that what you're trying to say to me?
16  Q.  Well, if you're asking me a question -- I
17      think we'll get to that in a moment, ma'am.
18          (Plaintiff's Exhibit 22 was marked
19          for identification.)
20  Q.  Showing you Exhibit Number 22. That's a
21      document that you signed --
22  A.  It certainly is.
23  Q.  -- isn't it?

Page 147

1   A.  I signed that.
2   Q.  And you would agree that it specifically
3       says that in order for a beneficiary change
4       to occur, under Section A at the top of the
5       document, the document had to be changed in
6       accordance with the provisions of the
7       contract, correct?
8   A.  I don't understand.
9   Q.  Well, that's what it says. The first
10      paragraph --
11  A.  I see it.
12  Q.  -- of Section A:  In accordance with the
13      provisions of this contract, correct? See
14      that, ma'am?
15  A.  Yeah, I see that.
16  Q.  You agree that that would have to be done,
17      right?
18  A.  Well, we could change it. I understand
19      that.
20  Q.  Well, but it specifically -- it indicates
21      right above that that the institution or
22      agency that was handling this annuity
23      service request was AmSouth Bank, doesn't

Page 148

1       it?
2   A.  Yeah, AmSouth Bank was the agency where I
3       had got the money out of, yes.
4   Q.  And they were -- they were listed as the
5       institution slash agency that was handling
6       this annuity service request, correct?
7   A.  That's right.
8   Q.  And all the handwriting on this form other
9       than the signature for owner and joint
10      owner is that of Ronda Robinson, isn't it?
11  A.  Yes.
12  Q.  And you would agree that she also placed
13      the X's in the boxes, correct?
14  A.  Yes, she did.
15  Q.  And in accordance with the provisions of
16      the contract, as we talked about earlier,
17      there was to be made a change in the
18      annuitant's beneficiary, correct?
19  A.  Right.
20  Q.  Not the owner's beneficiary, correct?
21  A.  The owner and the --
22  Q.  No. The only box that's checked is the
23      annuitant's beneficiary, correct?

Page 149

1   A.  Yeah, I see that.
2   Q.  And you would agree that as we looked
3       earlier at the application, Exhibit 12,
4       which you said was the contract, there was
5       only an annuitant beneficiary that was
6       designated, and that was your son, Jim,
7       correct?
8           MR. WALDROP: Object to the form.
9           MR. PATERSON: Object to the form.
10  Q.  Is that correct, ma'am?
11  A.  He was the beneficiary on it, yes.
12  Q.  And he was listed as the annuitant's
13      beneficiary, correct?
14  A.  I'm going by this one, the contingency --
15  Q.  No.
16  A.  I know --
17  Q.  The contract specifically shows --
18  A.  I know what you're saying.
19  Q.  -- that he was the annuitant's beneficiary,
20      correct?
21  A.  That was before it was changed.
22  Q.  You agree that that was before it was
23      changed; is that correct? That he was the

Page 150

1       annuitant beneficiary before it was
2       changed?
3   A.  He was just a beneficiary. I don't know
4       what you want to call it, but he was just a
5       beneficiary on it.
6   Q.  And you'll agree that there was no owner's
7       beneficiary in connection with this
8       contract; is that right?
9   A.  Owner's beneficiary? I thought me and
10      James -- James Earl Crouch was the owners
11      of that. I didn't know James Edward was
12      the owner.
13  Q.  Now, looking at the contract, Exhibit 12 --
14  A.  Yeah, I see that.
15  Q.  -- do you see that there's no --
16  A.  I see what you're trying to say.
17  Q.  -- there's no designation for an owner
18      beneficiary, is there?
19      MR. GREGGS: Object to the form.
20  Q.  Is there, ma'am?
21  A.  No.
22  Q.  Thank you. And there's no --
23  A.  But why does there have --

Page 151

1   Q.  There's no check --
2   A.  -- to be one?
3   Q.  There's no checkmark in the annuity service
4       request for a change of an owner's
5       beneficiary, is there?
6           MS. HUGHES: Which is where?
7           THE WITNESS: He's talking about
8           right there.
9           MR. MCHARD: No.
10          THE WITNESS: Yes, he is.
11  Q.  I'm talking --
12  A.  Yeah, you are. You're talking about this
13      right here on here.
14  Q.  Talking about Exhibit Number 22 that's in
15      front of you, ma'am.
16  A.  I've got this.
17  Q.  There's no checkmark here to indicate
18      there's to be a change in any owner's
19      beneficiary, is there?
20  A.  22. Yeah, I know ... yeah ...
21          (Brief interruption.)
22  A.  I don't -- I don't understand all of that.
23      I think that's just irrelevant to that

Page 152

1       because we've done got this down here, and
2       I have went over it and over it with you.
3       And I just don't think that -- You're
4       asking me the same question, the same
5       question, and I done told you and told you
6       how it is.
7   Q.  James's signature is not on this document,
8       is it?
9           MR. GREGGS: Object to the form.
10          MS. HUGHES: Object to the form.
11  A.  Which James?
12  Q.  James Earl Crouch's. You signed -- You
13      signed his name after owner, didn't you?
14  A.  I signed it, yes, I did.
15  Q.  Well, you signed it as joint owner and you
16      signed it as owner, didn't you?
17  A.  I signed his name at his request in front
18      of Ronda Robinson because --
19  Q.  Well, whose name did you sign first?
20  A.  His name where she -- she told me to sign.
21      That's where she told him to sign and told
22      me to sign under it. And he couldn't see
23      it, and he gave me the paper like this.

Page 153

1    Sign my name, honey. I said, I can't. I
2    don't -- he said -- I said, I'll have to go
3    back to the house and get your glasses.
4    And she said, no, you won't, Ms. Crouch. I
5    heard him to give you permission to sign
6    his name and I'm a notary and I will
7    witness it, and that's the way it was. He
8    was sitting right here, and I was sitting
9    right there.
10   Q. How far away is your home from the bank?
11   A. Oh, about five minutes.
12   Q. Right. So a man that wanted to see all
13      these important bank documents and would go
14      to the bank to see documents that he was
15      interested with, you wouldn't wait ten
16      minutes so that he could see a change with
17      regard to a document involving $290,000?
18         MR. PATERSON: Object to the form.
19   Q. Is that right, ma'am?
20         MS. HUGHES: Object.
21         MR. WALDROP: Same objection.
22   Q. Is that right?
23   A. No, I'm not answering that like that. No.

Page 154

1    I was going back home to get the things and
2    she said I didn't have to, that it was
3    legal for me to sign it under his request,
4    and I did it.
5    Q. As an owner, as a joint owner, correct?
6         MR. GREGGS: Object to the form.
7         MS. HUGHES: Object to the form.
8    Q. Is that right, ma'am? As a joint owner --
9    A. I signed his name right here, sir, and
10      that's all I can tell you. And I signed it
11      with his permission and in his presence.
12      And she told me to sign it where -- there
13      where his name was going to be, and I did.
14      And I done it, and I don't deny signing
15      it in her presence with his signature --
16      telling me to do it. He gave me
17      permission, and I signed it.
18   Q. Well, are you --
19   A. And that is the truth, and I don't -- you
20      can't make nothing else out of it.
21   Q. Well, ma'am, are you aware of
22      representations that were made to the court
23      that Ronda Robinson specifically

Page 155

1    witnessed --
2         MR. PATERSON: Objection to the
3         form.
4         MS. HUGHES: Object to the form.
5    Q. -- James Earl Crouch signing his name --
6         MR. PATERSON: Objection to the
7         form.
8    Q. -- on the line that says owner?
9         MS. HUGHES: Same objection.
10        MR. PATERSON: Same objection.
11   A. No. No, I ain't aware of that. No, no,
12      no.
13   Q. If that was true, if that statement was, in
14      fact, made, that would be untrue, wouldn't
15      it?
16        MR. PATERSON: Object.
17        MR. WALDROP: Objection.
18        MS. HUGHES: Objection.
19   Q. Wouldn't it, ma'am?
20   A. Now, what did you say?
21   Q. If someone represented to the court that
22      James Earl Crouch specifically in his hand
23      signed his own name on the owner's line of

Page 156

1    Exhibit 22, the annuity service request of
2    April 4 of 2000, that would be an untruth,
3    wouldn't it?
4         MS. HUGHES: Objection.
5         MR. PATERSON: Objection.
6         MR. WALDROP: Objection.
7    A. Yes. He did not sign it. I signed it.
8    Q. After you signed it, what did you -- After
9       you signed it for him and for you, what did
10      you do with it?
11   A. Well, I got -- I had a copy of it. I
12      carried it home with me. I still have --
13   Q. Well, did Ronda sign it before she gave
14      it --
15   A. Ronda signed it -- yes, she --
16   Q. Did she --
17   A. Ronda signed it right there.
18   Q. Did she sign it before --
19   A. She signed it right there in our presence.
20   Q. Well, did she sign it before she gave it to
21      you or after she gave it to you or what?
22   A. She signed it before she gave it to me.
23        MR. WALDROP: Let me just be

Page 157

1    clear. You're saying before
2    she gave it to you, are you
3    talking about before she gave
4    you the copy?
5    THE WITNESS: The copy.
6    MR. WALDROP: Okay. Your question
7    was unclear as to whether she
8    signed it before she gave
9    it --
10    MR. MCHARD: I don't think it was
11    unclear at all.
12    MS. HUGHES: It was ambiguous.
13    MR. WALDROP: Well, it's not now.
14    MR. MCHARD: Not after you've
15    gotten her to change her
16    story --
17    A. When she got through with all the
18    paperwork --
19    MR. WALDROP: Sam, Sam --
20    A. -- she gave me a copy.
21    MR. WALDROP: -- that is
22    unprofessional and uncalled
23    for. I did not get her to

Page 158

1    change her story at the end.
2    I didn't get her to change her
3    story at all.
4    MR. MCHARD: You'll have an
5    opportunity --
6    MR. WALDROP: Let me finish.
7    I'm not making any snide
8    comments toward you, but
9    you -- you don't have to make
10    those toward me. I was trying
11    to get a clarification of your
12    question because it was in my
13    mind unclear. She answered
14    it. I didn't suggest how she
15    answer it. She just answered.
16    Move on.
17    MR. MCHARD: I think your right to
18    ask questions comes after I'm
19    do.
20    MR. PATERSON: Well, let's move
21    on.
22    MR. WALDROP: Ask good ones,
23    please.

Page 159

1    MR. PATERSON: Let's please move
2    on.
3    MR. MCHARD: Well, then, don't
4    interrupt.
5    MR. WALDROP: Then ask good ones
6    and I won't.
7    Q. Ma'am, this document that Ronda told you to
8    go ahead, you sign his name, don't go home
9    and pick up the glasses so he can read it,
10    this document, Ronda signed it before she
11    gave it to you, didn't she --
12    MR. WALDROP: Objection.
13    MS. HUGHES: Objection.
14    Q. -- before she gave it to you to sign?
15    A. No, I signed it first, and then Ronda
16    witnessed it and signed it next. She --
17    Q. Signed both -- signed both lines as witness
18    while you were there?
19    A. Yes.
20    Q. Didn't sign on the lines correctly, did
21    she?
22    MR. WALDROP: Object.
23    A. What do you mean sign on the line? She

Page 160

1    signed on the lines, yeah.
2    Q. Well, do you still have your copy of what
3    you --
4    A. I certainly do.
5    Q. Well, can you show that to me, ma'am?
6    A. I've got my copy. It's at home, but I can
7    show it to you.
8    Q. Well, you brought a number of documents
9    with you here today, didn't you?
10    A. It wasn't that.
11    Q. Well, I want you to tell me what documents
12    you brought here that your attorney is
13    shaking her head no to --
14    A. I don't have --
15    Q. -- that you brought to this deposition
16    today, ma'am.
17    A. I just brought my -- I just brought a few
18    things that I wanted to go over with, some
19    questions that she had gave me from y'all
20    for me to look over. And I was looking
21    over them this morning, and I got them in a
22    bag. I was sitting out there looking over
23    them in the car.

Page 161

1    Q. Well, I'd like to see what's in the bag,
2       ma'am.
3              MS. HUGHES: Object.
4              MR. PATERSON: Object to this line
5                 of questioning.
6    A. No, I don't think you're going to look at
7       what's in my bag.
8    Q. Well, what's contained in the bag that you
9       brought with you?
10   A. I told you what was in there, y'all's
11      little questions you sent over there for me
12      to answer, your little interrogatory or
13      whatever you want to call them.
14   Q. Well, did you answer them under oath?
15   A. I read them.
16   Q. Well, did you -- did you provide answers?
17   A. It was something y'all sent that I've been
18      studying.
19   Q. Well, did you -- did you write out answers
20      to them?
21   A. I didn't write down under no oath.
22   Q. You never signed your name to swear that
23      the answers were true; is that correct?

Page 162

1    A. You didn't have no --
2              MS. HUGHES: I object to
3                 harassment.
4    A. You didn't have no answers on them. You
5       just wanted to send them over there for me
6       to go over.
7    Q. And you haven't answered those yet, have
8       you?
9              MR. PATERSON: Are you talking
10                about her interrogatories?
11             THE WITNESS: Yeah.
12   Q. And you haven't answered those, have you?
13   A. No.
14             MS. HUGHES: Yes, you have.
15   A. Yeah, I did answer them. I have answered
16      them.
17   Q. Well, your attorney has now said, yes, you
18      have.
19   A. Well, all this was done--
20   Q. You were just reading over the questions?
21      You haven't written out any answers or
22      provided --
23   A. Yeah, I've written -- I put some answers.

Page 163

1       We had answers on them. We've been over
2       them.
3    Q. Well, did you -- Are you now changing your
4       answer to say there you signed answers
5       under oath with regard to interrogatories?
6              MS. HUGHES: Harassment.
7              MR. WALDROP: Objection.
8              MS. HUGHES: I object.
9    A. Listen, I'm not going to keep repeating,
10      answering all that stuff you ask me a
11      hundred times. I've read over the
12      questions, and we -- and me and my lawyer
13      went over them, and I think that's
14      sufficient.
15   Q. But you --
16   A. And I don't want you to keep hounding me
17      about did you do -- yes, I did. I went
18      over them with my attorney, and I think she
19      advised me right on them.
20   Q. Did you sign them -- your answers under
21      oath, then?
22   A. Why?
23   Q. Well, did you or didn't you sign --

Page 164

1    A. No.
2    Q. All right. No.
3    A. I signed -- Yeah, we signed them. Sure
4       did. I signed them with her.
5    Q. Signed your document and then you say --
6       you change your answer and you --
7              MS. HUGHES: I object.
8              MR. PATERSON: I object to this
9                 line of questioning. It's
10                badgering the witness and --
11             MR. MCHARD: No.
12             MR. PATERSON: -- you're
13                intentionally trying to
14                confuse her, which is --
15             MR. MCHARD: No, I'm not. I'm
16                just trying to get the truth,
17                and it changes every time
18                somebody interrupts.
19   A. No. I done told you this morning I don't
20      tell stories about things, sir. What I say
21      about this is true.
22   Q. Well, ma'am --
23   A. Whether you believe it or not is immaterial

Page 165

1    to me.
2    Q.  In terms of stories, are you aware that the
3         lawsuit regarding this annuity had been on
4         file for --
5    A.  I know when he put the -- I saw -- I know
6         when he put the little court thing in.
7         September the 25th, 2002.
8    Q.  And that you weren't part of that lawsuit
9         then, were you?
10   A.  He didn't never bring it out then, but
11        that's when he filed.  I was in a lawsuit
12        with his little half brothers and sisters,
13        but his was filed September the 25th, 2002.
14   Q.  Only against the bank, AmSouth, correct?
15   A.  Yeah, when it started.
16   Q.  And you're aware that AmSouth Bank
17        specifically said that they would provide
18        no information regarding this annuity
19        unless you either consented to give a copy
20        of the contract or you were named as an
21        additional defendant in the lawsuit,
22        correct?
23             MR. PATERSON:  Object to the form

Page 166

1         of that.
2             MS. HUGHES:  Object to the form.
3    Q.  You understand that, right?
4             MR. PATERSON:  Object to the form
5             of that.  This witness has no
6             idea what AmSouth represented
7             to anyone.
8    A.  No, I don't know nothing about that.
9    Q.  Well, your attorneys haven't shown you the
10        copies of the pleadings that were filed by
11        Balch & Bingham and Paul DelCambre, in
12        particular, specifically stating that
13        that's what happened?
14   A.  I knew -- I knew -- I knew whenever I got
15        involved, when they put me in it, then I
16        started knowing.  Yeah, I knew he was on
17        AmSouth Bank.  I knew that.
18   Q.  Well, did you talk to Mr. DelCambre?
19   A.  No, I've never talked to him.
20   Q.  Did you talk to some attorneys at Balch &
21        Bingham other than the attorneys in this
22        office?
23   A.  No.  Talked to my attorney.

Page 167

1    Q.  Didn't provide any declarations to them or
2         any statements?
3    A.  I talked with my attorney.
4    Q.  And the only attorney that you've talked to
5         in this case other than in connection with
6         the discussion you had about three weeks
7         ago in this office --
8    A.  That's right.  That's right.  I know what
9         you're going into.
10   Q.  -- was Glenda; is that correct?
11   A.  That's right.
12   Q.  So you never talked with any attorneys in
13        Mississippi at all?
14   A.  Oh, yes.  I had an attorney in Mississippi.
15   Q.  Oh, did you talk with her?
16   A.  I have talked to her a long time ago.
17   Q.  Well, with regard to Mr. DelCambre, are you
18        specifically aware that he represented to
19        the court, and I quote, in the motion to
20        transfer --
21             MR. PATERSON:  Objection.  This is
22             highly improper.
23   Q.  -- transfer pursuant to 28 USC Section

Page 168

1    1404(a), paragraph three, I'm quoting:
2         When the discovery action was filed,
3         copies of the documents being sought by the
4         original complaint, while not generated by
5         AmSouth, were in the possession of
6         AmSouth.  These documents related to an
7         annuity contract.
8             MR. PATERSON:  Let me say for the
9             record --
10            MR. MCHARD:  Im not finished,
11            sir.
12   Q.  Ina Sue Crouch was not named as a party in
13        the original complaint filed in the
14        discovery action.  Under the
15        Gramm-Leach-Bliley Financial Services
16        Modernization Act of 1999, the documents
17        being sought by James Edward Crouch were
18        considered confidential and were not
19        subject to disclosure when AmSouth's
20        customer was not a party to the proceeding
21        in which they were sought.
22             As a result, AmSouth refused to release
23        the documents without authorization from or

Page 169

1   notice to Mrs. Crouch in compliance with
2   the Gramm-Leach-Bliley Act.
3       Were you aware of that?
4           MR. PATERSON: Excuse me one
5           second. Let me put something
6           on the record before she
7           answers.
8           MR. MCHARD: Well, no. We can put
9           it on after she answers.
10          MR. PATERSON: No, I can put it on
11          anytime I want to put
12          something on the record, and
13          I --
14          MR. MCHARD: Well, if it's an
15          objection, not a speaking
16          objection. You can object as
17          to the form.
18          MR. PATERSON: I would like to put
19          on the record that these
20          documents that have been
21          produced by AmSouth are the
22          same documents that are
23          related to the purchase of

Page 170

1           this annuity that AmSouth has
2           had and has always had.
3           AmSouth has produced every
4           scrap of paper it has
5           regarding this annuity.
6           Thank you.
7   Q.  You're aware of this information I just
8       read word-for-word out of AmSouth's
9       pleading filed in the court, correct?
10  A.  He told you about that. What he said ...
11  Q.  And the reason, then, that you were sued
12      was because AmSouth wouldn't do it without
13      your consent, and you refused to consent to
14      provide copies of the documents to show and
15      explain to your son; is that correct?
16          MR. PATERSON: Objection to the
17          form.
18  A.  No.
19  Q.  What did you have to hide?
20  A.  I didn't have nothing to hide.
21  Q.  Then why didn't you provide him the
22      documents, ma'am?
23  A.  He didn't have any business with them. My

Page 171

1   son is telling a story. And I'll say it in
2   front of him or you and anybody else. He's
3   misrepresenting y'all about the money. His
4   daddy ain't never told him no such of a
5   thing that he sat up here and told this
6   morning.
7   Q.  You still love your -- your husband, don't
8       you?
9   A.  My husband?
10  Q.  Yes.
11  A.  I surely do, and I wouldn't --
12  Q.  And you still love your son, don't you?
13  A.  Well, I can't say that. He don't love me.
14      He walked away from the cemetery five and a
15      half years ago and hasn't been back to see
16      me, so I wouldn't consider him being too
17      much of a son.
18  Q.  The -- In terms of the discussions that you
19      now claim that you had with your attorney
20      in Mississippi ...
21          Did you ever represent in connection
22      with these proceedings that you were unable
23      to drive beyond a mile or two from your

Page 172

1   home?
2   A.  Do what?
3   Q.  Have you ever represented or stated, told
4       people that you were unable to drive more
5       than a mile or two from your home?
6   A.  That I was unable to drive more than a mile
7       from my home?
8   Q.  Right.
9   A.  Well, no, I've never thought of such a
10      thing. I drive in -- I drive to town and
11      go to the grocery store and go visit my son
12      and all that. I ain't never told nobody
13      that. Where did that come from?
14  Q.  Where does your son live that you go to
15      visit?
16  A.  He lives in Alexander City.
17  Q.  And which son is that?
18  A.  My oldest.
19  Q.  David?
20  A.  No, Jerry.
21  Q.  Jerry.
22  A.  I've got a son in Nashville, but I don't
23      drive to Nashville.

Page 173

1  Q. So if somebody represented that it had been
2     years --
3        When was the last time that you drove
4     out of town to visit Jerry?
5  A. Oh, about a week ago.
6  Q. And has that been a regular thing that
7     you've done?
8  A. I don't understand what you're getting at
9     about no two miles from. Where did that
10    come from? I want -- Tell me.
11 Q. Your attorney. Your attorney.
12 A. I don't drive no two miles. I can go more
13    than two miles.
14 Q. How far is it to your son's house?
15        MS. HUGHES: I object.
16 Q. How far is it to your son's house?
17 A. Oh, about 20 miles.
18 Q. You can drive anywhere you want whenever
19    you want, right?
20 A. I'm sure I could.
21 Q. And --
22 A. But I don't understand why that's got
23    anything to do with this, where I drive.

Page 174

1  Q. Well --
2  A. Some of these questions ain't making sense
3     to me.
4  Q. Well --
5  A. Now, at first, I couldn't drive right after
6     my husband died. I wasn't able. I was --
7     I had waited on him about two or three
8     months in the bed with diapers on and all,
9     and I was -- lost 20 pounds and I was about
10    dead, and I didn't have nobody to come and
11    help me neither.
12 Q. Do you need a break, ma'am?
13 A. No.
14 Q. Now --
15 A. I done it all by myself.
16 Q. Well, did you -- That period of time only
17    lasted a couple of months, didn't it?
18        MS. HUGHES: I object.
19 Q. You got your strength back and --
20        MS. HUGHES: Object to form.
21 A. I don't know exactly.
22 Q. Well, ma'am --
23 A. I've been through too much in five and a

Page 175

1     half years.
2  Q. Well, in June of -- May and June of 2005,
3     did you -- were you unable to drive because
4     you were having passing-out spells?
5  A. I don't remember that. At one time I did
6     have one, but that was -- it's been a year
7     or so ago. I had -- I fainted and fell out
8     one day.
9  Q. Only one time?
10    Yes?
11 A. Yeah. I had to go have a bunch of heart
12    procedures done.
13 Q. But those checked out to be fine, didn't
14    they?
15 A. Yeah, they was pretty well.
16 Q. And you've never been advised by a doctor
17    not to give your deposition in connection
18    with this case, have you?
19 A. No, I sure haven't. I've never been
20    incompetent to do it. I've been able to do
21    it, and I thank the Lord I am.
22 Q. So to the extent that your attorney
23    specifically represented all of these

Page 176

1     things that you weren't capable of doing
2     it --
3        MS. HUGHES: I object.
4  Q. -- and weren't capable of driving --
5        MS. HUGHES: Her attorney
6        objected -- represented what?
7        MR. MCHARD: All of these things
8        that I just read.
9        MS. HUGHES: When did I say that
10       she was unable to drive and
11       all this kind of stuff?
12       MR. MCHARD: Well, ma'am, Carol
13       Ann Bustin represented it as
14       an officer of the court June
15       9th, 2005.
16       MR. PATERSON: Do you want to go
17       on to something that's
18       relevant to the annuity?
19       MR. MCHARD: Well, I think --
20       I think all of this is.
21       THE WITNESS: I don't see it.
22 Q. Now, in connection with representations
23    made to this court -- to the court in this

Page 177

1   matter, are you aware that it's been
2   represented that all of the banking and
3   financial records of you and your deceased
4   husband are maintained in Wetumpka,
5   Alabama?
6          MR. PATERSON: Object to the form
7             of that.
8   A. Yes.
9   Q. And that's true, isn't it?
10  A. Yes.
11         MR. PATERSON: You're asking her
12            if she knows where
13            AmSouth's records are
14            maintained? Is that what --
15         MR. MCHARD: It's one of the other
16            representations you made, just
17            like the affidavit that you
18            had her fill out. So if it
19            isn't true, then it's a
20            misrepresentation of Balch &
21            Bingham. That's all I can
22            tell you.
23         MR. PATERSON: Did you name us

Page 178

1             as --
2          MR. MCHARD: Well, I am going to
3             be naming Paul DelCambre as a
4             witness, but not -- not as a
5             defendant.
6   Q. Did you ever tell Mr. DelCambre that --
7          MR. PATERSON: I object to the
8             form of this. She stated that
9             she's never had a conversation
10            with Mr. DelCambre.
11  Q. -- that in June of 2005, you had a serious
12     illness, were in a weakened condition and
13     unable to travel to Mississippi? Did you
14     ever tell him that?
15  A. I didn't never talk to him. How did I tell
16     him?
17  Q. You never told anybody that, did you?
18  A. I didn't say I wasn't able to come over
19     there, but it wasn't -- it didn't supposed
20     to be in Mississippi. It happened in
21     Alabama, and it needed to be in Alabama.
22     I'm that smart. I'm not an attorney, but
23     I'm smart enough to know that.

Page 179

1          We had papers where he said he wasn't
2       able to come to Montgomery, too.
3   Q. Well, you're aware that he has a back
4       disability, correct?
5   A. What?
6   Q. You're aware that your son does have a back
7       disability, correct?
8   A. Oh, he's had a back problem for years,
9       so -- everybody has problems. I do, too.
10      I'll soon be 83 years old. I have
11      problems, too. If I live to October, I'll
12      turn 83.
13  Q. Well, congratulations, ma'am.
14         Now, your attorney passed over to you
15      during my questioning of you for you to
16      look at after you had given certain answers
17      the -- some answers to interrogatories. Do
18      you remember that, ma'am?
19         Do you remember just seeing that? Your
20      attorney has got it right on top of her
21      stack of papers. You've got that document
22      in front of you again, ma'am?
23  A. Yes.

Page 180

1          MR. PATERSON: Are these the
2             interrogatories that were
3             served on all the parties in
4             the case, Sam? Is that what
5             you --
6          MR. MCHARD: I hope so.
7          MR. PATERSON: Is that what --
8          MS. HUGHES: Her answers.
9          MR. PATERSON: Her answers, okay,
10            that were served on everybody.
11  Q. Showing you the -- the pages are unnumbered
12      for some reason, but on the seventh page,
13      is that your signature?
14  A. Yes, it is.
15  Q. And did Attorney Hughes mail you this
16      document, have you sign it and send it back
17      to her?
18  A. No. I signed it down in her office.
19  Q. Did you drive to her office?
20  A. Yes.
21  Q. And were these answers prepared while you
22      were waiting there the first time you
23      answered it? Is that what happened?

Page 181

1    A.  I think she had it -- she had it all ready.
2    Q.  Oh, she had it all ready for you with
3         answers before you talked to her about it?
4    A.  No, no, no.  She just had me to come and
5         sign.
6    Q.  Well, had you talked with her about them
7         before?
8              MS. HUGHES:  Attorney-client
9              privilege.
10             MR. MCHARD:  No, it isn't.
11             MS. HUGHES:  Yes, it is.
12             MR. MCHARD:  No, it doesn't go to
13             the substance of the
14             conversations.
15    Q.  Had you talked with her about answers
16         before you went there to sign these?
17             MR. WALDROP:  Objection.
18    A.  I'll tell you.  I've had so much harassment
19         with these here lawyers about all this
20         junk.  I've got a whole sackful of mess
21         that I've had.  How do you expect me to
22         keep up with all this stuff?  I'm not no
23         teenager, and it's good that I can even

Page 182

1         keep up with any of it.
2    Q.  But you do, don't you?
3    A.  Yes, I do.  And y'all are thinking I'm a
4         teenager I guess.  When you get my age, you
5         probably won't be keeping up with much
6         either.
7    Q.  Now, in your sworn answer to interrogatory
8         number one, you state as your answer --
9    A.  What's the page?
10    Q.  It's on the first page.  It's called
11         interrogatory number one.
12              In your answer to my question asking
13         you to identify every person known by you
14         who has knowledge of any discoverable
15         information and identifying substance --
16         subjects and substance of the information,
17         you say see the initial disclosures,
18         correct?
19    A.  Yes.
20    Q.  And do you know what that means, ma'am?  Do
21         you know what the initial disclosures were?
22    A.  This is where we done put the things down
23         there for you to see.

Page 183

1    Q.  Well, what initial disclosures are you
2         talking about, ma'am?
3    A.  Well, there wasn't nobody that know -- know
4         nothing about it, information known by each
5         respectable --
6    Q.  What initial disclosures are you
7         referencing, ma'am?
8              MS. HUGHES:  I object.
9    Q.  Your initial disclosures?
10             MS. HUGHES:  Asked and answered.
11             MR. MCHARD:  No.
12    Q.  Are you referring to your initial
13         disclosures in this case, ma'am?
14    A.  What are you talking about, initial
15         disclosures?
16    Q.  Well, I'm asking about your sworn answers.
17    A.  Well, I don't know what you're talking
18         about.
19             MS. HUGHES:  Object.  Harassment.
20    A.  I don't know what you're talking about.
21    Q.  Well, when you --
22    A.  I just -- I just -- Huh-uh.  (Negative
23         response.)

Page 184

1    Q.  When you stated --
2    A.  I don't understand it, and I'm not going to
3         answer it.
4              MR. PATERSON:  Why don't you show
5              her the initial disclosures.
6              Be fair to her and show her
7              the initial disclosures and
8              ask her if that's who the
9              witnesses are.
10    A.  I don't know nothing about nobody -- no
11         subjects, I mean --
12    Q.  Well, whose --
13    A.  Every person I --
14    Q.  Whose initial disclosures are you referring
15         to, ma'am?
16    A.  Every person known by you that has any
17         claims.  I don't know nobody that's got no
18         claims to nothing but me.
19    Q.  In your answer, whose initial
20         disclosures --
21    A.  I don't know.
22    Q.  -- are you talking about?  Yours?
23    A.  It's mine if you want me to tell you that

Page 185

1    ain't nobody else knows nothing about it
2    and got nothing to do with it but me that
3    can answer it, that's right. Don't be
4    trying to trip me up into something.
5    Q.  Well, you didn't file initial disclosures
6    in this case, did you?
7         MS. HUGHES: Argumentative.
8         Object.
9    Q.  Did you?
10   A.  Are you telling me that some -- that
11       somebody else is -- got somebody else
12       involved in it and you want to know who it
13       is or something? Is that what you trying
14       to say? You ain't making yourself clear to
15       me about that. And you think I'm an
16       attorney, too? I'm not.
17        MS. HUGHES: I object. This is
18             the attorney's work. I put
19             the answer with her request.
20        MR. MCHARD: Well, ma'am, it's
21             verified by -- by her as being
22             read and being truthful.
23        MS. HUGHES: That's right.

Page 186

1         MR. MCHARD: It's not.
2         MS. HUGHES: Okay. You tell us
3             the true answer, then.
4    Q.  And you reviewed the -- certain documents
5        in answer to interrogatory number three and
6        said that those were all the known
7        documents; is that correct, ma'am?
8        I asked you to identify all the
9        documents which evidence communications
10       between five different groups of folks. Do
11       you see that, ma'am, in interrogatory
12       three?
13   A.  Yeah, I see it.
14   Q.  And you state that all known documents will
15       be produced in the request for production,
16       correct?
17   A.  Yes.
18   Q.  Did you review documents then that were
19       produced in connection with this answer to
20       interrogatory? Did you look at them?
21   A.  I've read these, yes.
22   Q.  And were those all the documents that
23       related to --

Page 187

1    A.  The annuity.
2    Q.  -- to the annuity and the questions that
3        were posed in the interrogatory? Is that
4        it?
5    A.  I'm reading.
6        That's all I know.
7    Q.  What's all you know?
8    A.  All the documents.
9    Q.  All what documents? What are you referring
10       to?
11   A.  Just what you got through asking.
12       Communications between me and James Earl
13       Crouch and AmSouth Bank, between Ina Sue
14       Crouch, James Earl Crouch and Lincoln
15       National Insurance, between Ina Sue Crouch
16       and James Earl Crouch and Ronda Robinson,
17       between AmSouth and Lincoln National
18       Insurance related to the annuity, and
19       between AmSouth and Ronda Robinson.
20   Q.  And you're saying that you attached in the
21       answers to interrogatories every document
22       that existed with regard to that, correct?
23        MS. HUGHES: I object --

Page 188

1    Q.  Is that correct, ma'am?
2         MR. WALDROP: Same objection.
3         MR. HUGHES: -- to the form.
4    Q.  Is that what you're saying?
5         MR. PATERSON: Is the question,
6             has she produced all the
7             documents she has? Is that
8             your question to her?
9         MR. MCHARD: No.
10        THE WITNESS: Yes.
11        MR. MCHARD: No. And if you -- if
12            you took the opportunity to
13            read --
14        THE WITNESS: That's all I know.
15        MR. MCHARD: -- the objection
16            letter that I forwarded to you
17            and Ms. Hughes in advance of
18            this deposition, you would
19            understand that's not what I'm
20            asking. And I object to your
21            speaking objection.
22   A.  Well, that's all I know anything about what
23       we done with it. The annuity and the

Page 189

1    people that was involved and all this other
2    stuff you're saying is irrelevant to me.
3    Q.  Ma'am, you don't know of any document that
4       your husband signed between January 1 of
5       1997 and the date that he died, do you?
6    A.  I don't know if he signed any. If he did,
7       it's unbeknowings to me and I ain't seen
8       nothing about it.
9    Q.  And that's --
10   A.  Me and my husband done nothing -- hiding
11      from one another. If we done any kind of
12      banking business, we was both there.
13   Q.  And that's why you answered interrogatory
14      number six that you were unaware of any
15      such documents, correct?
16         Is that right, ma'am?
17   A.  What you trying to say? Executed by him.
18      That's unknown. I don't know nothing about
19      if he signed anything. I can't tell you.
20      That's unknown.
21   Q.  You were also specifically asked in the
22      request to produce -- number six, to
23      produce all the documents which related to

Page 190

1    the activities of you and James Earl,
2    AmSouth Bank and AmSouth Investment and
3    Lincoln National in connection with the
4    annuity. But, again --
5    A.  Number six?
6    Q.  -- the only documents that you know
7       anything about are the ones that you
8       attached; is that right?
9    A.  That's right.
10   Q.  And, ma'am, the -- we asked for canceled
11      checks drawn on AmSouth Bank who, according
12      to the representations that they filed with
13      the court, had those documents --
14         MR. PATERSON:  Object to the form.
15   Q.  -- from January 1, 1997 until March 2001 on
16      any account that your husband had an
17      interest.
18         Do you see that in request number five?
19   A.  Yeah, I see it.
20   Q.  And are you willing to sign an
21      authorization for the bank to give us those
22      documents?
23   A.  I don't have those documents, all that

Page 191

1    stuff. I don't keep it. And I ain't
2    signing nothing for no bank to give
3    nothing.
4    Q.  Why is that, ma'am?
5    A.  Because that's not necessary. It's
6       irrelevant to the case. You're trying to
7       make a big issue out of nothing. I'm
8       talking about the annuity. What has
9       that -- my bank records got to do with it?
10      You make me understand that, please. I'd
11      like to know.
12   Q.  So you're refusing --
13   A.  We're talking about the annuity.
14   Q.  You're refusing to authorize that; is that
15      correct, ma'am?
16   A.  Why have I got to authorize it?
17   Q.  Are you refusing?
18   A.  I don't -- I don't have those things. I
19      don't have all those blank checks and
20      things.
21   Q.  Well, you control it. You can simply
22      execute an authorization to have them give
23      us the records, can't you, ma'am?

Page 192

1    A.  I might could if I wanted to.
2    Q.  Will you do that, ma'am?
3         MS. HUGHES:  Think about it.
4    Q.  Your attorney is saying think about it.
5       Are you willing to do that as I asked you
6       on the record?
7         MR. WALDROP:  Objection.
8         MS. HUGHES:  Objection.
9    Q.  Well, you can still go ahead and answer.
10   A.  I don't think there's nothing that I need
11      to do. I don't think it's concerning
12      this. That's why I don't want to do it
13      because I don't think it pertains to it.
14      It's something that's no good to me.
15   Q.  Well --
16   A.  You ain't down to basics with the annuity.
17      You're trying to come back to something way
18      back in time. That's -- that's not -- It's
19      irrelevant to it, what you're trying to ask
20      me.
21   Q.  Ma'am, if you would look at Exhibit Number
22      12 which you have right over there. See
23      that document?

Page 193

1  A. Yeah, I see it.
2  Q. You would agree that that document is clear
3     and unambiguous with regard to --
4         MS. HUGHES: Object to the form.
5         MR. PATERSON: Object to the
6         form. Calls for a legal
7         conclusion.
8         MR. GREGGS: Object to the form.
9  A. I don't want to go over that no more with
10    you. I've done been over it.
11        COURT REPORTER: I'm sorry?
12        THE WITNESS: I told her I've done
13        been over that with him.
14 Q. You understand that document, don't you?
15 A. I understand the writing, yeah.
16 Q. And you understand that document to be
17    clear --
18 A. And you've never made me understand what
19    you're talking about. No, you haven't.
20    You haven't --
21 Q. No. You understand that -- the words of
22    that document --
23 A. I understand --

Page 194

1  Q. -- to be clear; is that correct?
2  A. I understand our names and our social
3     security numbers and where he was the owner
4     and I was the co-owner and all that, I
5     understand that, but that's all I
6     understand about it, and that's the right
7     thing to be. What I'm saying is right. I
8     was there and nobody else was, and I happen
9     to know.
10 Q. Well, ma'am, in connection with the letter
11    that you got from Lincoln National dated
12    May the 18th of 1998, Exhibit 14 in front
13    of you, ma'am. Right there.
14 A. Oh, yes. I've seen that a while ago. You
15    showed it to me.
16 Q. Right. You've seen that letter.
17 A. Oh, yes, I've seen it.
18 Q. And you know that --
19 A. I have a copy of it at my house. I've seen
20    it.
21 Q. What other documents do you have at your
22    house regarding this annuity?
23        MS. HUGHES: Object. Asked and

Page 195

1         answered.
2  A. I've got this letter. That's all I'm
3     saying.
4  Q. Well, but you have other documents about
5     the annuity --
6  A. No.
7  Q. -- that you're not telling me about,
8     correct?
9  A. I got the annuity where I took it out.
10    Yes, I'm aware of that. I'm smart
11    enough --
12 Q. You mean the pink copy?
13 A. Well, it's the same thing. It just
14    happened to be on a pink paper.
15 Q. And you would agree that Lincoln National
16    specifically invited your husband if there
17    were any corrections or changes that needed
18    to be made on the application, that you
19    should immediately fill out an amendment --
20 A. Oh, yes.
21 Q. -- which he would have to sign?
22 A. Uh-huh. (Positive response.) He did.
23 Q. And he never did that, did he?

Page 196

1         MR. GREGGS: Object to the form.
2         MS. HUGHES: Object to the form.
3  A. Yes. We signed it whenever we changed the
4     beneficiary on it, yeah, we did. That was
5     the -- That was our change right there, and
6     that was the only change was made.
7  Q. When you signed it two years later, when
8     you personally did, correct?
9  A. At his request I signed it. I don't deny
10    signing his name and never have.
11 Q. The --
12 A. But my understanding the way that -- some
13    of the papers I got, I did it without his
14    consent, which is very, very untrue. He
15    was sitting in a chair right there.
16 Q. Now, prior to your husband's death, did you
17    or James Earl have any disagreements or
18    quarrels with your son, Jim?
19 A. I don't recall any.
20 Q. Did you and your husband file joint tax
21    returns for the years 1997 through the date
22    of his death?
23 A. We filed them every year as long as we

Page 197

1    lived together.
2    Q. Do you still have those, ma'am?
3    A. I don't know where I have them or not. I'd
4       have to -- I don't think so.
5    Q. You may; is that right?
6    A. I don't know. I'd have to look. I doubt
7       it.
8    Q. Have you ever looked?
9    A. No. I couldn't see where it would be
10      important for us to have them, so I never
11      bothered about it.
12   Q. What discussions did you and James have
13      after your husband's death about the
14      annuity?
15   A. With James Edward? You're talking about my
16      son?
17   Q. Yes.
18   A. He called -- His father passed away and was
19      buried the 17th of February. He called me
20      in July after then and wanted a copy of the
21      annuity. And I told him I had already took
22      it out. I didn't own it anymore. And he
23      said, well, I can still have a copy of the

Page 198

1    papers, can't I? I said, you have no
2    business with them because I don't even own
3    the annuity anymore. I had canceled it
4    out.
5    Q. Well, did you have discussions about the
6       will and about the annuity?
7    A. Nothing was discussed about no annuity. I
8       think you're getting a little false
9       information from some people.
10   Q. Well, did you have any discussions on --
11   A. No.
12   Q. -- on Friday after your husband's death,
13      Friday the 16th?
14   A. No.
15   Q. No discussions with any of your children
16      about that?
17   A. No.
18   Q. Not about the annuity and not about the
19      will, no discussions; is that right?
20   A. How could I discuss the will when it came
21      up missing?
22   Q. Well, wasn't -- wasn't the will to be read
23      at your house on the 17th -- on the 16th,

Page 199

1    the day before the funeral?
2    A. No, that was never mentioned. Never
3       mentioned. I'm telling you, you've got
4       some false information.
5    Q. None of your children ever talked about
6       doing that?
7    A. I was informed by his -- his little Brenda,
8       the one that -- the night he laid a
9       corpse --
10      To show you what kind of people, they
11      started on me the night he laid a corpse
12      about the will, and I didn't know it was
13      missing till after he was put in the
14      grave. It came up missing out of my house,
15      and I don't know to this day no more than
16      you do where it's at.
17   Q. But it had been in your house in a
18      briefcase?
19   A. That's right, behind a door where he wanted
20      it kept.
21   Q. Until immediately after he died?
22   A. That's right. When I was looking through
23      for some cemetery papers and insurance,

Page 200

1    found it gone. And I've tried to tell all
2    these attorneys that. And if they don't
3    believe it, I'm sorry.
4       (Plaintiff's Exhibit 25 was marked
5       for identification.)
6    Q. Ma'am, with regard to your husband's death,
7       did you ever review the death certificate?
8    A. The death certificate?
9    Q. Yes, ma'am.
10   A. Yes, sir, I did. I had to send Lincoln
11      Life one original whenever I got the
12      annuity out.
13   Q. And did you understand the -- Did you
14      understand or know who the doctor was that
15      prepared the death certificate?
16   A. I don't remember the name that was on it.
17   Q. Well, was it Dr. Chen?
18   A. No, I don't think so.
19   Q. Well --
20   A. It might have been him. I don't know.
21      There was so many doctors there the day he
22      died, I don't know. I don't know.
23      I'm telling you. I was sick, and I

Page 201

1    wasn't able to remember all that stuff. I
2    was barely able to go to the hospital.
3    Q.  Well, there was some concern about --
4    A.  And I thought a death certificate was a
5        death certificate, regardless of what
6        doctor signed it. I didn't know it had to
7        be no special one.
8    Q.  There was some concern as to the cause of
9        some of the brain injury, wasn't there?
10   A.  The brain injury?
11   Q.  Yes.
12   A.  What do you mean concern of it? Doubting
13       it? Is that what you -- somebody trying to
14       doubt something about it?
15   Q.  As to how it was caused.
16   A.  His brain deteriorated and drowned in
17       fluid. It's called encephalitis or
18       something like that. I don't know exactly
19       the word, but it was something another to
20       that.
21          But anyway, his brain deteriorated, so
22       the doctors told me -- I'm going by the
23       doctors -- and drowned in fluid. It caused

Page 202

1        his -- to be like that.
2    Q.  What doctors told you that?
3    A.  Dr. Rigsby, the brain surgeon, and the head
4        doctor that does the things to check them,
5        whatever you call it.
6    Q.  And did he tell you that after the brain
7        surgery?
8    A.  No, he told me before. That's why they
9        done it. They said he was going to die if
10       I didn't let him have the surgery.
11   Q.  And your children had requested that there
12       be an autopsy performed, hadn't they?
13   A.  I never heard of it.
14          MR. PATERSON:  Object to this line
15       of questioning.
16   A.  That's not true.
17          MR. PATERSON:  Excuse me a
18       second.
19          For the record, that has
20       nothing to do with the case
21       involving --
22   A.  I wish somebody would quit telling things.
23          MR. PATERSON:  Object to the

Page 203

1        line -- this line of
2        questioning.
3    Q.  Are you aware of --
4    A.  I'm not aware if somebody done that.
5        That's unbeknowings to me.
6    Q.  Well, did you know what MPH was?
7    A.  That's what he had they claimed, that
8        encephalos stuff. That's what -- That's
9        what they claimed he had, MPH or something
10       another. I don't know doctor terms. I'm
11       not a doctor either.
12   Q.  Did you ever talk to any of your children
13       about performing an autopsy with regard
14       to --
15   A.  No. No, no, no, no. It was never brought
16       up, and I wouldn't have had one if they did
17       because he had been through enough cutting
18       and pain and stuff, and I wouldn't have had
19       one if they would have brought it up.
20   Q.  And did you, in fact, tell them that, that
21       he had already had enough cutting and you
22       didn't want an autopsy?
23   A.  They didn't ask me about it.

Page 204

1    Q.  Well, did you tell them that?
2    A.  No, I didn't tell them. I would have told
3        them if they'd have brought it up. I was
4        his wife. I had a right to do it.
5           MR. MCHARD:  I'm going to recess
6        this deposition at this time
7        until we have gotten
8        compliance with the discovery
9        that we requested to which
10       objections were filed and
11       improper and incomplete
12       answers served. An objection
13       letter was promptly sent by me
14       and no updates provided.
15          So at this time, we're
16       going to recess the deposition
17       on behalf of the plaintiff.
18       MS. HUGHES:  We have given you
19       everything that we have.
20       THE WITNESS:  That's all -- You've
21       got everything we've got.
22       MR. PATERSON:  Let me say on
23       behalf of AmSouth, you've got

## Page 205

1  all of our documentation
2  and --
3  THE WITNESS: You've got all of
4  mine, too.
5  MR. PATERSON: And our objections
6  to the discovery you
7  propounded to the AmSouth
8  defendants is a matter of
9  record, and we'll take that up
10  with the magistrate, the
11  discovery dispute for
12  resolution.
13      And as far as we're
14  concerned, this deposition is
15  over. We don't agree to
16  continue it. And that will
17  have to -- that will have to
18  be determined by the court as
19  well.
20  MR. MCHARD: For the record, your
21  firm has specifically
22  represented to the United
23  States District Court that you

## Page 206

1  had all of the records, and
2  I've read that provision, and
3  the initial disclosure
4  specifically says that you had
5  all those records with regard
6  to the bank accounts.
7      Not one of them has been
8  provided despite my
9  objections, and I've been told
10  today that I still don't have
11  the annuity contract for which
12  this lawsuit was filed
13  initially back in September of
14  2002, some four years ago.
15  MR. WALDROP: On behalf of
16  Lincoln, we object to the
17  deposition being continued.
18  We view it, as does counsel
19  for AmSouth, as being over.
20      I think Lincoln has
21  complied in good faith with
22  producing its initial
23  disclosures. And I have

## Page 207

1  obtained what I believe to be
2  a sample form annuity contract
3  which would -- and I'll give
4  you a copy right now because I
5  don't want to deny you the
6  opportunity if you want to ask
7  some questions about it in
8  this deposition, and I don't
9  want to have any excuse for
10  this thing being continued.
11      From our standpoint -- I
12  went to great lengths to get
13  this sample contract during
14  the course of this
15  deposition. I've had it
16  e-mailed down here and we'd
17  offer --
18  MR. MCHARD: Well, this has never
19  been produced in discovery or
20  in the initial disclosures.
21  MR. WALDROP: There's not any
22  pending discovery to Lincoln.
23  We are in this case for

## Page 208

1  literally about two months.
2      We view -- We're saying
3  that this application form or
4  something like that was the
5  contract, quote, unquote, to
6  use your phrases. So I said,
7  well, if there actually is a
8  greater part of the
9  contract -- this is what I
10  believe is on file with the
11  Department of Insurance, but
12  this is a sample form of the
13  Investor's Choice annuity
14  contract.
15      And, of course, once an
16  annuity is surrendered, as
17  this one was, normally those
18  things are no longer
19  retained. That's the normal
20  practice when an annuity or CD
21  or something else is
22  surrendered. Most banks and
23  insurance companies don't

Page 209

1    retain those.
2        But this is a sample
3    annuity contract for
4    Investor's Choice as I
5    understand it. Just to
6    identify it for the record, it
7    has some numbers on it, LN028
8    through LN041. It also has
9    some numbers on this at the
10   bottom, A-31 through A-44.
11   MS. HUGHES: We also object to a
12   continuance.
13       I can provide you with
14   first names of doctors, if
15   this will help you, of those
16   that are still in practice.
17   Other than that, I don't know
18   of anything else we can
19   provide you.
20   THE WITNESS: I told him Kumar was
21   his medical doctor. Dr. Peden
22   is retired and gone.
23   MR. PATERSON: We have no

Page 210

1    questions of this witness.
2    THE WITNESS: I've given the names
3    of the doctors over there that
4    done the surgery and all.
5    That's all I know.
6    MR. PATERSON: Sam, do you have
7    any more questions of this
8    witness?
9    MR. MCHARD: I can't read -- I
10   can't read this -- a legal
11   document such as this and be
12   able --
13   MS. HUGHES: Well, Ms. Crouch
14   would have no knowledge of the
15   contract except what is
16   written there.
17   THE WITNESS: That's right.
18   MS. HUGHES: So it would be
19   useless to question her about
20   the contract.
21   MR. MCHARD: Let me reserve my
22   questioning until I've had an
23   opportunity to review the

Page 211

1    document.
2        EXAMINATION
3    BY MS. HUGHES:
4    Q.  Ms. Crouch, have you told the truth to the
5        best of your knowledge on every question
6        asked here today?
7    A.  Yes, I have.
8    Q.  Did you and Mr. Crouch to the best of your
9        knowledge handle all of your personal
10       matters together?
11   A.  Yes, ma'am.
12   Q.  Did you handle your money matters together?
13   A.  Yes, we did.
14       MR. MCHARD: I'm going to object
15       to the leading nature of these
16       questions by the witness's own
17       counsel.
18       MR. PATERSON: Objection noted.
19       Go ahead.
20       MR. MCHARD: Object as to form of
21       all of these leading
22       questions. Ask that they be
23       stricken.

Page 212

1    Q.  Have you presented every document that you
2        had in your possession to your knowledge?
3    A.  Yes, I have.
4        MR. MCHARD: Just show a standing
5        objection to all the questions
6        counsel is asking because
7        they're leading and an
8        improper form.
9        MS. HUGHES: Well, all of yours
10       were improper form also.
11       Couldn't even understand half
12       of them.
13       That's all I have. Thank
14       you.
15       MR. PATERSON: We have no
16       questions of this witness.
17       MR. GREGGS: No questions.
18
19
20       * * * * * * * * * * * *
21       FURTHER DEPONENT SAITH NOT
22       * * * * * * * * * * * *
23

Page 213

1    REPORTER'S CERTIFICATE
2    STATE OF ALABAMA:
3    MONTGOMERY COUNTY:
4        I, Lisa J. Nix, Registered Professional
5    Reporter and Commissioner for the State of Alabama
6    at Large, do hereby certify that I reported the
7    deposition of:
8            INA SUE CROUCH
9    who was first duly sworn by me to speak the truth,
10    the whole truth and nothing but the truth, in the
11    matter of:
12        JAMES E. CROUCH,
13        Plaintiff,
14        Vs.
15        AMSOUTH BANK, INA SUE CROUCH and JOHN
16        and JANE DOES 1-10,
17        Defendants.
18        In The U.S. District Court
19        For the Middle District of Alabama
20 ·    Northern Division
21        Case Number 2:06-CV-00111-MEF
22    on Wednesday, August 23, 2006.
23        The foregoing 212 computer printed pages

Page 214

1    contain a true and correct transcript of the
2    examination of said witness by counsel for the
3    parties set out herein.  The reading and signing of
4    same is hereby waived.
5        I further certify that I am neither of kin
6    nor of counsel to the parties to said cause nor in
7    any manner interested in the results thereof.
8        This 11th day of September 2006.
9
10
11        _____
            Lisa J. Nix, Registered
12          Professional Reporter and
            Commissioner for the State
13          of Alabama at Large
14
15
16
17
18
19
20
21
22
23