# EXHIBIT 4

# VIDEOTAPED DEPOSITION OF
# JAMES CROUCH

## August 23, 2006

## Pages 1 through 113

# CONDENSED TRANSCRIPT AND CONCORDANCE
# PREPARED BY:

**Haislip, Ragan, Green, Starkie & Watson, P.C.**
**566 South Perry Street**
**Post Office Box 62**
**Montgomery, AL  36104**
**Phone: (334) 263-4455**
**Fax: (334) 263-9167**
**E-mail: haislipragan@charter.net**

**Page 1**

1    IN THE UNITED STATES DISTRICT COURT
2    FOR THE MIDDLE DISTRICT OF ALABAMA
3    NORTHERN DIVISION
4
5    JAMES E. CROUCH,
6        Plaintiff,
7    Vs.                        CIVIL ACTION NO.
                                2:06-CV-00111-MEF
8    AMSOUTH BANK, INA SUE
     CROUCH and JOHN and
9    JANE DOES 1-10,
10       Defendants.
11
12    * * * * * * * * * * * *
13
14       VIDEOTAPED DEPOSITION OF JAMES CROUCH,
15    taken pursuant to stipulation and agreement before
16    Lisa J. Nix, Registered Professional Reporter and
17    Commissioner for the State of Alabama at Large, in
18    the Law Offices of Balch & Bingham, Suite 200, 105
19    Tallapoosa Street, Montgomery, Alabama on
20    Wednesday, August 23, 2006, commencing at
21    approximately 9:04 a.m.
22
23    * * * * * * * * * * * *

**Page 2**

1        APPEARANCES
2
3    FOR THE PLAINTIFF:
4    Mr. Samuel S. McHard
     BRYAN NELSON P.A.
5    Attorneys at Law
     6524 U.S. Highway 98
6    Post Office Drawer 18109
     Hattiesburg, MS 39404-8109
7
8    FOR THE DEFENDANT AMSOUTH:
9    Mr. Charles B. Paterson
     BALCH & BINGHAM
10   Attorneys at Law
     Suite 200
11   105 Tallapoosa Street
     Montgomery, Alabama 36104
12
13   FOR THE DEFENDANT INA SUE CROUCH:
14   Ms. Glenda W. Hughes
     Attorney at Law
15   103-B Commerce Street
     Wetumpka, AL 36092
16
17   ON BEHALF OF LINCOLN NATIONAL:
18   Mr. E. Glenn Waldrop, Jr.
     Mr. Mitchell D. Greggs
19   LIGHTFOOT, FRANKLIN & WHITE
     Attorneys at Law
20   400 20th Street North
     Birmingham, AL 35203
21
22   ALSO PRESENT:
23   Jeff Baker, Videographer

**Page 3**

1
2            EXAMINATION INDEX
2
3    JAMES CROUCH
        BY MR. PATERSON . . . . . . . . . . 5
4       BY MS. HUGHES . . . . . . . . . . 72
        BY MR. WALDROP . . . . . . . . . 84
5
6
7            EXHIBIT INDEX
8                        MAR
     DEFENDANT'S EXHIBIT
9    1   Affidavit of James Edward Crouch        55
10   2   Undated letter to Ron Sylvanden from    55
         James Edward Crouch
11
     3   9/8/01 letter to James Edward Crouch    55
12       from Ronald Sylvander, Annuity Claims
         Supervisor, Lincoln Financial Group
13
     4   Complaint for Discovery            55
14
     5   Motion for Leave to Amend Complaint     55
15
     6   Amended Complaint            55
16
     7   Second Amended Complaint        55
17
     8   5/16/00 letter to James E. Crouch and   55
18       Sue Crouch from Lincoln Financial Group
19   9   Annuity Service Request (Beneficiary    94
         Changes)
20
     10  5/17/02 handwritten letter to Mr. Burch   101
21       and Ron Sylvander from Brenda Mae Crouch
         Cobb
22
23

**Page 4**

1            STIPULATION
2        It is hereby stipulated and agreed by and
3    between counsel representing the parties that the
4    deposition of JAMES CROUCH is taken pursuant to the
5    Federal Rules of Civil Procedure and that said
6    deposition may be taken before Lisa J. Nix,
7    Registered Professional Reporter and Commissioner
8    for the State of Alabama at Large, without the
9    formality of a commission, that objections to
10   questions other than objections as to the form of
11   the question need not be made at this time but may
12   be reserved for a ruling at such time as the said
13   deposition may be offered in evidence or used for
14   any other purpose by either party provided for by
15   the Statute.
16       It is further stipulated and agreed by and
17   between counsel representing the parties in this
18   case that the filing of said deposition is hereby
19   waived and may be introduced at the trial of this
20   case or used in any other manner by either party
21   hereto provided for by the Statute regardless of
22   the waiving of the filing of the same.
23       It is further stipulated and agreed by and

Page 5

1    between the parties hereto and the witness that the
2    signature of the witness to this deposition is
3    hereby waived.
4
5         * * * * * * * * * * * *
6
7         JAMES CROUCH
8    The witness, after having first been duly
9    sworn to speak the truth, the whole truth and
10    nothing but the truth testified as follows:
11         EXAMINATION
12    BY MR. PATERSON:
13    Q.  Mr. Crouch, what does -- What does James E.
14        Crouch stand for?
15    A.  James Edward Crouch.
16    Q.  And do you go by Edward or something other
17        than James E. Crouch?
18    A.  I go by Jim.
19    Q.  Jim?
20    A.  Yes, sir.
21    Q.  For the record, would you state your name
22        and -- your whole name and your current
23        address.

Page 6

1    A.  James Edward Crouch. 74 Bob Graham Road,
2        Sumrall, Mississippi 39482.
3    Q.  And what is your date of birth?
4    A.  8 March '57.
5    Q.  What do you do for a living?
6    A.  I'm retired from the Army. I have my own
7        business. I grow produce and cut flowers.
8    Q.  When did you retire from the Army?
9    A.  1995.
10    Q.  And at what rank did you retire?
11    A.  Sergeant first class.
12    Q.  How long did you serve?
13    A.  Over 20.
14    Q.  And were you honorably discharged?
15    A.  Yes, I was.
16    Q.  What is -- Just briefly, what is your
17        educational background?
18    A.  I have an associate's degree.
19    Q.  From where?
20    A.  Central Texas College.
21    Q.  Okay. And am I correct in understanding
22        you are the son of the defendant, Ina Sue
23        Crouch, that's here today? This is your

Page 7

1    mother here today?
2    A.  Yes.
3    Q.  Okay. Do you have any brothers or sisters?
4    A.  No full-blooded brothers and sisters.
5    Q.  So you are the only child of Mrs. Ina Sue
6        Crouch that's here today and James Crouch
7        that's deceased?
8    A.  Yes.
9    Q.  And am I correct your father passed away on
10        February 14th, 2001?
11    A.  Yes, sir.
12    Q.  And do you know how long your moher and
13        father were married prior to your father's
14        death?
15    A.  Not -- I can't remember, sir.
16    Q.  It was more than 40 years, wasn't it?
17    A.  I can't remember, sir.
18    Q.  Okay. Am I correct in understanding, you
19        were -- once you were born to Mr. and
20        Ms. Crouch, you were raised by Mr. and
21        Ms. Crouch there in their house, and you
22        lived there through your high school years?
23    A.  Yes, sir.

Page 8

1    Q.  Where did you grow up?
2    A.  In Montgomery.
3    Q.  Where did y'all live in Montgomery?
4    A.  We lived at Red Eagle Honor Farm on Lower
5        Wetumpka Road.
6    Q.  So you were raised by your mother and
7        father here in Montgomery and went to high
8        school here in Montgomery?
9    A.  Yes, sir.
10    Q.  Where did you go to high school?
11    A.  Robert E. Lee.
12    Q.  And following Lee High School, did you go
13        on to college at that time or did you go in
14        the Army at that time?
15    A.  No, sir. I went straight into the Army.
16    Q.  And from the time you were a small child
17        until the time you went off to the Army,
18        were you essentially raised by your mother
19        and father there at home?
20    A.  Yes.
21    Q.  Am I right that you last lived at home with
22        your mother and father when you went off to
23        the Army?

Page 9

1  A.  Yes, sir.
2  Q.  Did you go to college while you were on
3      active duty or after you got off active
4      duty?
5  A.  No, sir. While I was on active duty, I
6      would go to the class on weekends and
7      off-duty hours.
8  Q.  Did you use the GI Bill to help you with
9      that?
10 A.  There was some other program for active
11     duty personnel where they paid a portion
12     and I paid a portion.
13 Q.  Did your mother and father help in any way
14     pay for your education?
15 A.  No, sir.
16 Q.  Have you ever held any written power of
17     attorney from either your mother or your
18     father? Have they ever given you a power
19     of attorney to manage their affairs in the
20     event they couldn't?
21 A.  Not that I can recall.
22 Q.  Do you know what a power of attorney is?
23 A.  Yes, sir.

Page 10

1  Q.  What kind of business was your father in
2      when you were growing up there in high
3      school? What was his occupation?
4  A.  I believe his title was farm
5      superintendent.
6  Q.  Who did he work for?
7  A.  State of Alabama.
8  Q.  At the Red Eagle Honor Farm?
9  A.  Yes, sir.
10 Q.  Worked for the Department of Corrections?
11 A.  Yes, sir.
12 Q.  And did your mother work when you were in
13     high school?
14 A.  No, sir.
15 Q.  Was she a housewife?
16 A.  Yes.
17 Q.  Were your mother and father ever involved
18     in any side business other than him working
19     for the State and your mother being a
20     housewife?
21 A.  I think that -- Well, I know they had a
22     house. I think they had it rented.
23 Q.  Had a rental house?

Page 11

1  A.  They -- I don't know what their arrangement
2      was. I know we owned a house -- or they
3      owned a house in Highland Gardens.
4  Q.  And did they collect rents from that house?
5  A.  That I do not know, sir.
6  Q.  Did they own that house when you went off
7      to the Army?
8  A.  I don't know, sir.
9  Q.  You don't know -- You don't know whether it
10     was bought while you were still in high
11     school or after high school?
12 A.  I don't know what their mortgage
13     arrangements were or what they did in
14     regards to that.
15 Q.  What I was trying to figure out is when
16     they acquired it. Did they buy it before
17     you went off to the Army or after you --
18 A.  Oh, yes, sir. Yes, sir. It was -- The
19     home in Highland Gardens was purchased
20     before I went into the Army.
21 Q.  Okay. Do you know whether or not they
22     bought older houses and fixed them up and
23     sold them and rented them? Was that kind

Page 12

1      of a side business they had at one time?
2  A.  I don't know of that, sir.
3  Q.  You weren't involved in it?
4  A.  No, sir.
5  Q.  Okay. Were you ever at any time -- from
6      the time you were in high school until the
7      present ever on any checking account or
8      savings account with your mother and
9      father?
10 A.  None that I can recall, sir.
11 Q.  Did you have any kind of -- ever have any
12     kind of joint certificate of deposit or any
13     kind of security, like a stock or a bond,
14     jointly with your parents?
15 A.  None that I can recall right now, sir.
16 Q.  Is it fair to say that Mr. and Ms. Crouch
17     tended to their own business affairs
18     independent of you?
19 A.  Yes, sir.
20 Q.  Now, after you went off to the Army and
21     made a career of the Army, how often would
22     you visit back here in the area and visit
23     your parents?

Page 13

1  A.  Sir, that depended on where I was assigned
2      at the time. When I was assigned to Ft.
3      Rucker, I went quite often. When I was
4      assigned to Redstone Arsenal, a little less
5      because of the drive. When I was in
6      Germany, I just did my whole tour there.
7      When I was in South Carolina, we would come
8      maybe once a year.
9  Q.  Did you ever have occasion to assist your
10     mother and father at any time with writing
11     checks or paying monthly bills or family
12     bills that they had?
13 A.  Not that I can recall.
14 Q.  Do you know as between your mother and
15     father which one of them tended to the
16     chores of writing bills at the end of the
17     month, writing checks for bills and payment
18     of the routine monthly bills?
19 A.  That I don't know, sir.
20 Q.  To your knowledge, did Mr. and Ms. Crouch
21     always have joint checking accounts and
22     joint savings accounts?
23 A.  I have no idea, sir.

Page 14

1  Q.  At some point in time, within several years
2      of prior to the time your father died, am I
3      right in understanding that your mother and
4      father -- your mother and father made a
5      gift to you of $100,000?
6  A.  My father did, sir.
7  Q.  Okay. When was that?
8  A.  That was in '97.
9  Q.  1997?
10 A.  Yes, sir, I think '97.
11 Q.  And did your mother and father drive over
12     to Mississippi and bring you a check?
13 A.  Yes, sir.
14 Q.  Who signed that check?
15 A.  I think it was Ronda Robinson.
16 Q.  Was it a cashier's check from a bank?
17 A.  I think so, sir.
18 Q.  Ronda Robinson --
19 A.  I'm really not sure what a cashier's check
20     is, but I think that Ronda Robinson's name
21     appeared on it.
22 Q.  And Ronda Robinson you knew was an
23     AmSouth -- an employee of AmSouth that

Page 15

1      assisted them with banking and other
2      things?
3  A.  I did not know who she was.
4  Q.  But you remember your mother and father
5      driving to Mississippi in 1997 and bringing
6      you a $100,000 check, and it had -- you
7      remember it had Ronda Robinson's name on
8      it?
9  A.  Yes, sir, I believe she had -- had Ronda
10     Robinson's name, as best I can recall.
11 Q.  And was that check payable to you
12     personally?
13 A.  Yes, sir.
14 Q.  Do you know the source of the funds of that
15     check? Where did the money come from?
16 A.  I don't know, sir.
17 Q.  Do you think it came out of a joint account
18     of your mother and father?
19         MR. MCHARD: Im going to object
20         to the form of that. It's
21         been asked and answered.
22 Q.  You may answer if you know.
23 A.  Would you repeat the question.

Page 16

1  Q.  Do you know if it came out of a joint
2      account, your mom and dad's account?
3  A.  I don't know, sir.
4  Q.  What was the purpose of this -- giving you
5      this money?
6  A.  There was never anything stipulated, sir.
7  Q.  It wasn't a loan or anything like that?
8  A.  No, sir.
9  Q.  Did you ask your parents for the money or
10     did they just out of the blue drop in one
11     day and bring you $100,000?
12 A.  No, sir, I didn't ask for anything.
13 Q.  Was it a surprise to you that they brought
14     you that?
15 A.  Yes, I would have to say it was a surprise.
16 Q.  I'm sorry. Are you married?
17 A.  Yes, sir.
18 Q.  Were you married at the time in '97?
19 A.  Yes, sir.
20 Q.  Was the check made payable to you or you
21     and your wife?
22 A.  As best as I can remember, sir, it was made
23     payable to me.

Page 17

1  Q. And I'm not asking you to account for every
2     dime of it, but basically what did you do
3     with the money?
4  A. Well, I mingled it with my funds.
5     Initially, I purchased a CD and then
6     moved -- when the interest rates went low,
7     I went and put it in a mutual fund. And
8     then later on, I paid off all my bills and
9     paid off my land and purchased a mobile
10    home.
11 Q. Did you have discussions with your mother
12    and father when they came over to bring
13    that check where you thanked them for the
14    check?
15 A. Could you repeat the question, sir?
16 Q. Did you have occasion to thank them for the
17    money they brought you when they came over
18    to Mississippi and brought you that check?
19 A. Certainly. They stayed the night.
20 Q. Your mom and dad spent the night with you?
21 A. Yes. They may have spent more than just
22    one day. I'm really not sure. That was a
23    long time ago.

Page 18

1  Q. In 1997, were you getting along fine with
2     your mother and father?
3  A. Yes, sir.
4  Q. Did there come a time at some time after
5     1997 where you had a falling out with
6     either your mother or your father?
7  A. No, sir.
8  Q. Do you have -- Have you had a falling out
9     with your mother since 1997?
10 A. In regards to this matter?
11 Q. Yes, sir, any matter.
12 A. When my father -- Before my father passed
13    away, there was no ill will between us.
14 Q. Did you have any kind of spats or anything
15    like that?
16 A. Not that I can remember, sir, at this time.
17 Q. What about with your mom? Did you have --
18    and I'm not talking -- I'm talking other
19    than this lawsuit and the matters relating
20    to this lawsuit. Have you had any kind of
21    unhappiness or spat or however you want to
22    characterize it with your mother?
23 A. Sir, are you speaking about my entire life

Page 19

1     or --
2  Q. No, I'm talking about since 1997 after they
3     brought you that check.
4  A. None that I can remember, sir.
5  Q. When did you first find out that your
6     mother and father purchased an annuity from
7     Lincoln -- or purchased -- I'm sorry, let
8     me back up, purchased a Lincoln annuity
9     from AmSouth Investment Services?
10 A. It was in May or June of '98. My mother,
11    Ina Sue Crouch, called me on the phone.
12    She said, your daddy wants to talk to you.
13       And my father got on the line. He told
14    me that he had purchased an annuity at
15    AmSouth Bank through Lincoln National
16    for -- in the amount of $250,000, and I was
17    to get the proceeds upon his death.
18 Q. Did he tell you anything else?
19 A. That's all I can remember, sir.
20 Q. Did he tell you where the $250,000 came
21    from?
22 A. No, sir.
23 Q. Did he ever have occasion to tell you it

Page 20

1     came out of a joint account with your --
2     with his mother -- with your mother?
3  A. I don't recall that, sir.
4  Q. Did he ever tell you anything like that the
5     money was to be used to -- for the survivor
6     of your mother and father, and then if --
7     whatever was left would go to you? Did he
8     ever tell you anything like that?
9  A. No, sir.
10 Q. Other than what you just related, do you
11    recall anything else that he told you?
12 A. Nothing that I can remember, no.
13 Q. Did you ever have any other discussion with
14    your mother or father about the annuity at
15    any time after that?
16 A. When my father died, I asked my mother
17    about the annuity.
18 Q. What did you ask her and what did she say?
19 A. I asked her when will, you know, I get the
20    proceeds from the annuity, and she said
21    that it was hers.
22 Q. Did you say --
23 A. And I'm paraphrasing. I'm not quoting.

Page 21

1   Q. Sure. Just give me your best
2      recollection.
3         Did she say anything else to you or you
4      say anything else to her about that issue?
5   A. Not that I can recollect at present.
6   Q. Was there any witness to the conversation
7      that you related -- conversation between
8      you and your father on the telephone, any
9      witness to that?
10  A. None on my end, sir.
11  Q. But your mother called and said, hold on a
12     minute, speak to your father, correct?
13  A. Yes, sir.
14  Q. Did your mother ever tell you that it was a
15     jointly-owned annuity, that it was
16     something that she and your father owned
17     jointly?
18  A. She never discussed the annuity with me.
19  Q. Did you ever see any paperwork related to
20     the annuity prior to this lawsuit?
21  A. No, sir.
22  Q. Did your mother ever tell you that the
23     annuity was bought with the joint funds of

Page 22

1      Mr. and Ms. Crouch, your mother and dad?
2         MR. MCHARD: I'm going to object.
3         It's been asked and answered.
4   A. Could you repeat the question.
5         THE WITNESS: Should I answer?
6   Q. Did your mother ever tell you that the
7      annuity was purchased -- initially
8      purchased with the joint funds from joint
9      accounts owned by Mr. and Ms. Crouch, your
10     mom and dad?
11  A. I don't recall.
12  Q. Do you have any knowledge of where the
13     money came from to buy the annuity?
14        MR. MCHARD: Object. Asked and
15        answered.
16  Q. You can answer if you know.
17  A. I don't recall.
18  Q. Okay. Now, in 1997 when your mom and dad
19     made that trip over to Mississippi to bring
20     you the check, was he retired from the
21     State by then?
22  A. Yes, sir.
23  Q. And was your mom working at the time?

Page 23

1   A. No, sir, I don't believe so.
2   Q. And to your knowledge, what did they live
3      off of? What was their means of support?
4   A. I can only speculate that it was his
5      pension, sir, but, again, that's only
6      speculation.
7   Q. State retirement?
8   A. Yes, sir. That's only speculation.
9   Q. Do you know whether or not they had any
10     real estate that they get rents from that
11     they used to live off of?
12  A. That I do not know, sir.
13  Q. Do you know whether or not they had any CDs
14     or anything like that that they lived off
15     that -- helped live off that interest off
16     CDs?
17  A. My father had said they had CDs, but I
18     didn't know what he did with them.
19  Q. Did you have any discussion with your
20     father about whether or not they were joint
21     CDs with your mother?
22  A. No, sir. It wasn't so much discussions.
23     He would just -- He just said he had CDs.

Page 24

1   Q. So you knew that your mother and father had
2      some CDs that they were using that interest
3      to live off of, didn't you?
4   A. No, sir, I didn't know they were using the
5      interest to live off of.
6   Q. Did you ever have occasion to see a tax
7      return of your parents'?
8   A. Not that I can remember, sir.
9   Q. Do you know whether they filed a joint or a
10     separate tax return?
11  A. That I don't know, sir.
12  Q. Do you know how any of their real estate
13     was held, whether it was joint or was it
14     individually, or how it was held?
15  A. Not that -- I think some documents were
16     produced during the course of this lawsuit,
17     but I don't remember exactly how they were
18     worded.
19  Q. Did either your mother or your father ever
20     tell you anything to the effect that they
21     intended for the survivor to get anything
22     they had -- survivor of them to get
23     anything they had, and that upon the death

Page 25

1  of the last to pass away that you would be
2  the beneficiary of anything that they had?
3      MR. MCHARD: I'm going to object
4      as to the form of that. It's
5      compounded and confusing.
6      MR. PATERSON: It wasn't a very
7      good question. I'll withdraw
8      that.
9  Q. I want to know about any discussion you had
10     with your parents regarding you being any
11     type of beneficiary under their will or
12     under the annuity or under any CD or
13     anything.
14     MR. MCHARD: When you say with the
15         parents, do you mean with both
16         of them or --
17     MR. PATERSON: Either-or.
18     MR. MCHARD: -- either one --
19     MR. PATERSON: Either-or.
20         Either-or.
21 A. In regards to the will, sir, he always said
22     that half would go to me, half would go to
23     my mother, and he was leaving a dollar to

Page 26

1  the others.
2  Q. He had some children by a prior marriage?
3  A. Yes, sir.
4  Q. And that's who he told you he was leaving a
5     dollar to?
6  A. That's who I assume, sir.
7  Q. Did your father ever tell you anything like
8     that under his will and your mother's will,
9     that he was leaving everything to the
10    mother and the mother was leaving
11    everything to the father, and then upon the
12    death of the last one, you would get what's
13    left?
14    MR. MCHARD: I'm going object.
15        This has been asked and
16        answered.
17 Q. Go ahead, please.
18 A. Could you repeat the question.
19    MR. PATERSON: Read it back, Lisa.
20    (The following was read:
21    Question: Did your father ever
22        tell you anything like that
23        under his will and your

Page 27

1  mother's will, that he was
2      leaving everything to the
3      mother and the mother was
4      leaving everything to the
5      father, and then upon the
6      death of the last one, you
7      would get what's left?)
8  A. I don't recall him ever saying that.
9  Q. Anything like that?
10 A. No, sir.
11 Q. Do you know whether or not your mother and
12    father made some money by buying and fixing
13    up and selling houses?
14    MR. MCHARD: Object. Asked and
15        answered.
16 A. I don't know that, sir.
17 Q. You don't know one way or another?
18 A. No, sir.
19 Q. What real estate -- What was your
20    impression of what real estate your parents
21    owned at the time of your father's death?
22 A. Just where they lived, sir.
23 Q. You didn't think they owned any other real

Page 28

1  estate?
2  A. As best -- And this is just the best of my
3     recollection.
4  Q. Okay.
5  A. I think the only thing they had was the
6     acreage they were on.
7  Q. Now, in addition to your parents giving you
8     $100,000 that we talked about, did they
9     also have occasion to pay off a car note
10    for you in the amount of about $6,000?
11 A. My father did, yes, sir.
12 Q. When was that?
13 A. I don't remember the exact year, sir.
14 Q. Was it before or after the $100,000 gift?
15 A. That would be before, sir.
16 Q. Did that come out of the joint funds of
17    your mother and father?
18 A. No, my father gave it to me, so I don't
19    know where it came from, sir.
20 Q. Did you ask your father for the money?
21 A. No, sir.
22 Q. Did you thank your father for that?
23 A. Yes, sir.

Page 29

1  Q. Did you thank your mother for that?
2  A. Yes.
3  Q. Now, you gave a -- You signed an affidavit
4     in this case. I've got some questions I
5     want to ask you about it.
6        MR. PATERSON: Have you got a
7        copy?
8  Q. I've placed before you -- It says affidavit
9     of James Edward Crouch, and this is an
10    affidavit that's been filed in this case.
11       MR. PATERSON: Counsel, I don't
12       see any -- I don't see any
13       need to make this an exhibit
14       since it's part of the court
15       file anyway. If y'all would
16       prefer, I'll be glad to make
17       it an exhibit. Do y'all have
18       a preference? Anybody?
19       MR. WALDROP: I don't care.
20       MS. HUGHES: I don't either.
21       MR. PATERSON: Sam, do you care?
22       MR. MCHARD: I have no preference.
23 Q. Okay. All right. The first thing I want

Page 30

1     to do is I want to -- turn to page five and
2     just tell me, is that your signature?
3  A. Yes, sir, that is my signature.
4  Q. Now, the exhibits to this deposition -- I'm
5     sorry. The exhibits to this affidavit,
6     it's shown -- there's a document shown as
7     Exhibit 1, Exhibit 2, Exhibit 3. If you'd
8     turn back and take a look at those.
9     Actually, Exhibits 1 and 2, if you'd take a
10    look at.
11       Am I correct in understanding you first
12    saw these documents and obtained copies of
13    these documents by virtue of this
14    litigation?
15       MR. MCHARD: Exhibits 1 and 2?
16       MR. PATERSON: Yes, sir, 1 and
17       2.
18 A. Yes.
19 Q. Now, do you know what funds or what source
20    of income your mother was supposed to live
21    off of if your father died?
22 A. No one discussed that with me, so ...
23 Q. Nobody discussed that with you?

Page 31

1  A. No, sir.
2  Q. When your father passed away, were you
3     concerned that your mother -- regarding
4     whether or not your mother had enough to
5     live off of?
6  A. I assumed she had his pension, sir.
7  Q. What's your basis of that?
8  A. That's just an assumption, sir, on my part.
9  Q. Did you ever have any discussion with your
10    mother about, hey, Mom, do you have enough
11    to live off of, anything like that?
12 A. No.
13 Q. Did you care if your mother had enough to
14    live off of?
15 A. Yes.
16 Q. But you never inquired of her, correct?
17 A. No, sir, I didn't inquire.
18 Q. There's an Exhibit 3 to your affidavit.
19       MR. PATERSON: Just for the
20       record, this affidavit is
21       dated March 22nd, 2006.
22 Q. And this appears to be a petition filed
23    with the probate court up in Elmore

Page 32

1     County. Did you join with other relatives
2     in filing this petition for letters of
3     administration?
4  A. I never went there, sir, but they told me
5     that I was part of it.
6  Q. Okay. Did you expect to -- Did you expect
7     to receive something upon your father's
8     death, some kind of benefit or some kind of
9     money or property or anything?
10       MR. MCHARD: You mean other than
11       the annuity he's already told
12       you?
13       MR. PATERSON: Yeah. That would
14       be fair.
15 Q. I know you said you expected to receive the
16    benefits of the annuity. Did you expect to
17    receive something else upon your father's
18    death?
19 A. Basically what he had already said in the
20    will, half of the property.
21 Q. What property were you expecting to
22    receive?
23 A. I didn't know --I knew they had some land,

Page 33

1  but I did not know what they had as well --
2  as far as money was concerned.
3  Q. Did you know whether or not the land was
4  held in joint survivorship -- the title to
5  it was held in joint survivorship with your
6  mother?
7      MR. MCHARD: Asked and answered.
8      Object.
9  A. I only saw the documents -- I saw a
10  document at -- once these were produced.
11  But at that time, I don't believe I had any
12  idea.
13  Q. And let me be clear on something. I may
14  have misunderstood you. Earlier, I thought
15  you said you weren't sure whether or not
16  they owned any land other than the house at
17  the time of his passing away.
18  A. That's what I was speaking of, sir.
19  Q. All right. Let me be clear on this, then
20  I know they owned the home that they lived
21  in at the time -- they owned that jointly
22  at the time of his passing away, correct?
23  A. Yes.

Page 34

1  Q. All right. Did they own any other real
2  estate, land of any type?
3      MR. MCHARD: Excuse me. I think
4      he's trying to make it clear
5      to you that there was an
6      acreage on which the home sat.
7      MR. PATERSON: Well, that's what I
8      want him to tell me.
9  Q. If you would, make it clear. What did they
10  own? What real estate did they own?
11  Describe it for me.
12  A. They had ... I don't know how many acres.
13  I could only guess the size.
14  Q. Give me your best judgment how many acres.
15  A. Maybe -- Maybe six, and this is just a
16  guess.
17  Q. Okay. A house and six acres?
18  A. Yes, sir. That's the real estate I'm
19  speaking of.
20  Q. And do you know how the title to that was
21  held?
22  A. No, sir.
23  Q. Do you know today how the title to it was

Page 35

1  held?
2  A. Beg your pardon, sir?
3  Q. Do you know today, sitting here today, how
4  the title was held?
5  A. I don't -- I don't believe that I can
6  recall that --
7  Q. I mean, wasn't it joint survivorship and it
8  passed to your mother upon your father
9  passing away?
10  A. I'm not sure, sir.
11  Q. It didn't go to you, though, did it?
12  A. I don't know, sir.
13  Q. Well, do you--
14  A. I don't have it now.
15  Q. Okay. You don't have it.
16      So what did you expect to get upon --
17  Other than the annuity you've testified to,
18  what did you expect to get upon your father
19  passing away?
20  A. I have no idea, sir. I figured it would be
21  in the will.
22  Q. Do you know whether or not your father's
23  will was ever found?

Page 36

1  A. I don't know, sir.
2  Q. You don't know one way or another or do
3  you --
4  A. I don't know if it was found.
5  Q. Okay. Have you ever seen your father's
6  will?
7  A. No, sir.
8  Q. Do you know whether or not your father's
9  will was ever probated?
10  A. Sir, there was an attempt to probate
11  something. I wasn't clear on exactly
12  what -- what transpired.
13  Q. Okay. Take a look at your affidavit,
14  please. Let me focus you on paragraph
15  six. Read what you said there in number
16  six.
17  A. In early January 2000 --
18  Q. Don't read it to me. Read it to yourself.
19  A. Oh, I'm sorry.
20  Q. Do you stand by that statement here today?
21  Is that correct?
22  A. Yes.
23  Q. Now, in January of 2001, did you feel he

Page 37

1       was mentally competent at the time?
2    A.  Yes.
3    Q.  He had been in ill health, but his mind was
4       sound, correct?
5    A.  In my estimation, sir, yes.
6    Q.  And am I right that your mother was caring
7       for him at that time?
8    A.  She was living there with him, yes, sir.
9    Q.  Well, was there any nurse or any kind of
10      other sitter service or nurse or anybody
11      else there to tend to him in his illness
12      other than your mother?
13   A.  Not that I know of, sir.
14   Q.  You're not aware of any other caretakers he
15      ever had other than your mother, are you?
16   A.  I'm not aware of it, no, sir.
17   Q.  Do you know at the time in January of 2001
18      who was writing the checks, the family
19      checks, like the power bill and things that
20      would come to the house on a monthly basis?
21   A.  No, sir.
22   Q.  Do you know whether he was helping do that?
23   A.  I don't know -- I didn't know, sir.

Page 38

1    Q.  When you came for this visit in January of
2       2001, did you stay there at the house with
3       your mom and dad?
4    A.  Yes, sir.
5    Q.  Who else was with you?
6    A.  My wife, Teresa.
7    Q.  Do y'all have any children?
8    A.  Yes, sir.
9    Q.  What are their ages?
10   A.  My oldest is 23, and my youngest is 19.
11   Q.  Was it just the two of you, you and your
12      wife, that stayed there in January of '01
13      at the house?
14   A.  Sir, the best of my recollection, it was
15      me, my wife, and my children.
16   Q.  So there were -- your family staying with
17      your mother and daddy?
18   A.  As best as I can recall, sir.
19   Q.  In January of 2001, did you know that the
20      assets of your mother and father -- all the
21      assets of your mother and father were held
22      jointly? Did you know that?
23   A.  I did not know anything about their assets,

Page 39

1       sir.
2    Q.  You didn't know one way or another how they
3       were held, correct?
4    A.  No, sir.
5    Q.  So in January of 2001, based on paragraph
6       number six, am I correct in understanding
7       that all you thought you would get was the
8       annuity?
9           MR. MCHARD: I'm going to object.
10   Q.  Do you see number six?
11          MR. MCHARD: I'm going to object
12             as to the form of that
13             question.
14          Paragraph six speaks for
15             itself. If you want him to
16             read it into the record as he
17             began to do, that's fine.
18          MR. PATERSON: Your objection is
19             on the record.
20   Q.  Go ahead and answer if you can.
21   A.  Could you repeat the question?
22   Q.  In January of 2001 -- and I'm referencing
23      this statement referenced in paragraph six

Page 40

1       of your affidavit -- did you think that you
2       would get anything else from your father
3       passing away other than the annuity?
4    A.  Sir, I assumed that that would have been
5       spelled out in the will.
6    Q.  And in January of 2001, he didn't talk to
7       you anything about a will, did he?
8    A.  Yes, sir, he did.
9    Q.  And you just -- you didn't -- You didn't
10      put that in the affidavit?
11          MR. MCHARD: Do you mean put in
12             the discussions that he had
13             with his father about the
14             will?
15          MR. PATERSON: Yes, sir.
16   Q.  That's not referenced --
17   A.  No.
18   Q.  -- in the affidavit, is it?
19   A.  He did speak of the will at that time, sir.
20   Q.  And what did he say about the will at that
21      time?
22   A.  He stated that my mother, Ina Sue Crouch,
23      had went to see an attorney to have him

Page 41

1    come and do another will, and he stated
2    that that was --
3         That's about the best I can recall
4    that. He said that there was going to be
5    an attorney come to do -- she was getting
6    an attorney to do a new will.
7         And he followed up when she left the
8    room with he didn't care what she did; the
9    annuity -- we would get the annuity at
10   AmSouth.
11   Q.  And were there any witnesses to that
12       statement?
13   A.  My wife, Teresa Crouch.
14   Q.  As far as you know, you didn't inherit
15       anything from your father's passing
16       correct?
17   A.  As far as I know?
18   Q.  Yes, sir.
19   A.  My mother gave me his ring.
20   Q.  Anything else?
21   A.  No, sir.
22   Q.  Do you know whether or not any of the
23       children by your father's first marriage

Page 42

1    inherited anything from your father?
2    A.  That I do not know, sir.
3    Q.  Turn your affidavit over to paragraph 10.
4        Just take a quick look at that, if you
5        would.
6         Just tell me, who is Barbara Middleton?
7    A.  Barbara Middleton is one of my father's
8        children from another marriage.
9    Q.  Have you ever had any discussions with her
10       regarding what she expected to inherit from
11       your father?
12   A.  Not that I can recall now, sir.
13   Q.  Do you know whether she had any
14       expectations of inheriting anything?
15   A.  That -- I don't know what her expectations
16       were, sir.
17   Q.  Now, in paragraph number 12, you make
18       reference to a deposition, and that
19       deposition was taken in a probate
20       proceeding, correct?
21   A.  The deposition of Ina Sue Crouch?
22   Q.  Yes, sir.
23   A.  Yes, sir. That's my understanding.

Page 43

1    Q.  Okay. What happened to that probate
2        proceeding?
3    A.  That I don't know, sir.
4    Q.  Wasn't it dismissed?
5    A.  That I -- I don't know, sir.
6    Q.  Okay.
7    A.  I don't recall.
8    Q.  Now, look at paragraph number 13. Did
9        Ronda Robinson make that -- Look at the
10       first sentence of that in paragraph number
11       13.
12        Did Ronda Robinson -- Did you ever have
13       any conversation at all with Ronda
14       Robinson?
15   A.  Yes, sir.
16   Q.  All right. Did she tell you what -- What
17       did she tell you about this change in
18       beneficiary form?
19        And let me be clear with you. What Im
20       asking is, I want to find out the basis of
21       your knowledge, the first sentence of
22       paragraph 13.
23   A.  That was information that was given to me

Page 44

1    by my attorney, sir.
2    Q.  So you don't have any firsthand knowledge
3        of what Ronda Robinson represented to you?
4        Ronda Robinson never represented anything
5        to you, did she?
6    A.  I spoke to her, sir.
7    Q.  Did she tell you -- Did she give you the
8        information set forth in paragraph one
9        of -- I mean the sentence -- the first
10       sentence of paragraph 13?
11   A.  The information was sent to me through my
12       attorney.
13   Q.  So Ronda did not make that representation
14       directly to you, did she?
15   A.  No, sir.
16   Q.  Ronda never told you that she handled
17       change of beneficiary forms, correct?
18   A.  No, sir, that was not the conversation I
19       had.
20   Q.  Now, let's look at the second sentence. It
21       says: Ronda Robinson represented to Paul
22       DelCambre. Do you see that sentence?
23   A.  Yes, sir.

Page 45

1  Q. Is that also something that was told to you
2     through your attorney?
3  A. Yes.
4  Q. You have no firsthand knowledge of that
5     whatsoever?
6  A. No, sir. I've never talked to
7     Mr. DelCambre.
8  Q. Now, are you aware that -- were you aware
9     at any time, even now, have you ever been
10    aware that your mother and father were the
11    joint owners of this annuity?
12 A. Am I aware now, sir?
13 Q. At any time.
14 A. I am aware now, sir.
15 Q. How did you become aware of that?
16 A. Through my attorney, sir.
17 Q. Okay. Through the course of this
18    litigation?
19 A. Yes.
20 Q. Now, if, in fact, they were joint owners of
21    the annuity, do you think they had the
22    right to make any changes they wanted to
23    make in the annuity?

Page 47

1              what they're asking.
2  Q. Well, you weren't --
3  A. I'm sorry.
4  Q. You weren't a joint owner of the annuity,
5     were you?
6  A. No, sir, I wasn't.
7  Q. Have you got any life insurance on your
8     life?
9  A. Yes, sir.
10 Q. Have you got a policy?
11 A. Not with me, sir.
12 Q. No, no, no. I mean, do you have one?
13 A. Yes, sir.
14 Q. And your wife and your family are the
15    beneficiaries of it?
16 A. My wife is beneficiary, sir.
17 Q. And you own that policy, don't you?
18 A. Yes, the best I know, sir.
19 Q. And you can change the beneficiary of that
20    anytime you get ready, can't you?
21 A. Yes, I can, sir.
22 Q. Because you're the owner, right?
23 A. Yes, sir, but I have to actively do it. No

Page 46

1              MR. MCHARD: I'm going to object
2          to the form of that. Calls
3          for legal conclusions.
4              And the Investor's Choice
5          Lincoln National Life
6          Insurance form which is
7          attached as Exhibit 1 to the
8          affidavit that you've asked
9          him to review gives the answer
10         to those legal conclusions.
11 Q. Go ahead.
12 A. Could you repeat the question?
13         MR. PATERSON: Read it back.
14         (The following was read:
15         Question: Now, if, in fact, they
16         were joint owners of the
17         annuity, do you think they had
18         the right to make any changes
19         they wanted to make in the
20         annuity?)
21         MR. MCHARD: Do you understand
22         what he's asking?
23         THE WITNESS: I'm not real clear

Page 48

1  one else can do it for me.
2  Q. Now, Ronda Robinson has filed an affidavit
3     in this case indicating that your mother
4     signed your father's name at his request
5     and in the presence of Ronda Robinson.
6     Have you seen that affidavit?
7              MR. MCHARD: I'm going to object.
8          If you're going to ask him
9          about a document, I'm going to
10         demand that you show it to
11         him.
12 A. No, sir, I don't think I've seen that.
13 Q. Haven't seen that?
14     Have you ever heard -- Have you ever
15     heard anything about Ronda Robinson --
16     about your mother signing your father's
17     name in the presence of Ronda Robinson on
18     the change of beneficiary form?
19 A. Only through my attorney, sir.
20 Q. Well, what have you heard?
21         MR. MCHARD: Well, I'm going to
22         object as to attorney-client
23         privilege. Instruct him not

Page 49

1    to answer.
2    Q. Are you contending that the change of
3    beneficiary form -- What are you contending
4    about the change of beneficiary form in
5    this case?
6    A. That it was signed without my father's
7    knowledge or consent.
8    Q. Has anybody ever told you that it was
9    signed by your mother at your father's
10   request and in the presence of Ronda
11   Robinson? Anybody ever told you that?
12              MR. MCHARD: I'm going to object
13              to the extent that it calls
14              for any privileged
15              attorney-client
16              communications. I'm going to
17              instruct him not to answer to
18              that extent.
19   Q. Have you ever heard that from anybody other
20   than your lawyer?
21   A. Would you repeat the question, sir?
22   Q. Have you -- Are you aware of the fact that
23   your mother signed your father's name to

Page 50

1    the change of beneficiary form?
2              MR. MCHARD: Well, I'm going to
3              object to the form of that.
4              MR. PATERSON: Well, I'll tell you
5              what let's do. I'll tell you
6              what. I'm going to get to
7              that when we go through these
8              other exhibits. I'll come
9              back to that.
10             MR. MCHARD: All right.
11             MR. PATERSON: Well leave it
12             alone.
13   Q. So your contention is that your mother
14   signed your father's name without his
15   knowledge and consent?
16   A. Yes.
17   Q. And what's the basis of that contention?
18   What evidence do you have that leads you to
19   that conclusion?
20   A. Sir, his signature is not affixed to the
21   document. He stated in early January that
22   the annuity was mine.
23   Q. Okay. Do you have any other evidence other

Page 51

1    than what you just told me?
2    A. Nothing that I can remember right now.
3    Q. All right. Do you know who signed his name
4    to the change of beneficiary form?
5    A. Do I know beyond a shadow of a doubt? No,
6    sir.
7    Q. What do you believe? What's your belief?
8    A. My belief is that it was my mother, Ina Sue
9    Crouch.
10   Q. Do you have any belief as to whether or not
11   anybody was present when it was done?
12   A. Sir, I have no way to know that.
13   Q. Now, would you agree with me that if this
14   change of beneficiary form is legal and
15   binding, that you have absolutely no
16   interest in this annuity --
17             MR. MCHARD: Object.
18   Q. -- at all?
19             MR. MCHARD: I'm going to object
20             as to the form of that
21             question.
22   Q. Go ahead.
23   A. Would I agree to what, sir?

Page 52

1    Q. That if the change of beneficiary form is
2    legal and binding, that you have no
3    interest in this annuity.
4    A. In that I do not believe that it's legal
5    and binding?
6    Q. I said if it is. If it turns out as a
7    matter of law --
8              MR. MCHARD: He's answered. He
9              answered your question.
10             MR. PATERSON: You won't let him
11             answer. Let him answer.
12             MR. MCHARD: No, he did. He said
13             he doesn't believe --
14   A. I don't believe it is, so I can't speculate
15   about anything else. I don't believe it's
16   legal and binding. So in regards to this
17   annuity or this particular piece of paper,
18   no, I don't think it is.
19   Q. Your father died on February 14, 2001.
20   When did you ask your mother about the
21   annuity?
22   A. I don't remember the exact date, sir.
23   Q. Well, didn't you leave town on that same

Page 53

1    day that he passed away, or did you stay a
2    few days?
3    A.   The date he passed away, sir, I was in
4        Mississippi.
5    Q.   All right. And you came here, and you
6        attended the funeral, I assume?
7    A.   Yes.
8    Q.   When did you have the discussion -- any
9        discussion at all with your mother about
10       the annuity?
11   A.   Oh, sir, that was the day before the
12       funeral.
13   Q.   And so your mother told you the day before
14       the funeral that you would not get any
15       benefits under the annuity?
16   A.   Yes.
17   Q.   When did you decide to sue your mother?
18   A.   When I tried to get information about it
19       and I hit a brick wall everywhere I went,
20       and I felt that if it was really valid and
21       what she was saying was true, people would
22       be more forthcoming. Since everyone
23       stonewalled me, then I figured I needed to

Page 54

1    look into it further, but the exact date I
2    don't remember.
3    Q.   So your mother told you you had no interest
4        in it, and you didn't believe your mother,
5        correct?
6    A.   No, sir, I did not.
7    Q.   Do you think -- Do you think your mother is
8        just telling you a lie?
9    A.   In regards to this, yes, sir.
10   Q.   And can you -- In your lifetime, has your
11       mother ever lied to you before?
12   A.   I really have never gotten into a lot of
13       conversations where I had to check up the
14       facts behind what she said.
15   Q.   Sitting here today, can you ever think of a
16       situation where your mother has lied to
17       you?
18   A.   Again, sir, I've never checked up to --
19       followed up to see if she was telling me a
20       lie or the truth.
21   Q.   So you don't know of any, correct?
22   A.   I don't know of anything other than
23       she's -- we were doing a family tree, and

Page 55

1    she said that they were married in 1950
2    something. And after Daddy died, I found
3    out that that wasn't true.
4    Q.   When were they married?
5    A.   '66 -- excuse me. '66, I believe.
6            MR. PATERSON: I'll tell you what
7        I'm going to do. The
8        affidavit that we've talked
9        about, I'm going to go ahead
10       and mark that as
11       Defendant's -- Defendant
12       AmSouth Exhibit 1.
13           And I'm going to hand you
14       a stack of documents that are
15       going to be marked AmSouth
16       Exhibits 1 through 8, and I'm
17       going to ask you some
18       questions about them.
19       (Defendant's Exhibits 1 through 8
20       were marked for identification.)
21           MR. PATERSON: Let's go off the
22       record one quick second.
23       (Off-the-record discussion.)

Page 56

1    Q.   Just so the record is straight, you've got
2        a stack of documents in front of you, and
3        they've got tab numbers on them. Do you
4        see tab number one?
5    A.   Yes.
6    Q.   That's going to be marked as Defendant's
7        Exhibit Number 1.
8            MR. MCHARD: It has an Exhibit A
9        on it.
10           MR. PATERSON: That came off the
11       summary judgment filings.
12   Q.   Tab one we will mark as Defendant's Exhibit
13       1. Behind tab one, which is Defendant's
14       Exhibit 1, that's the affidavit -- that's
15       your affidavit that you previously
16       identified, correct, that we talked about
17       earlier?
18   A.   Yes, sir, it looks like it.
19   Q.   Now, if you would, turn to tab two, which
20       is going to be marked Defendant's Exhibit
21       Number 2. Is that your signature there?
22   A.   Yes, sir, that is.
23   Q.   And is this a copy of a letter that you

Page 57

1   wrote to Lincoln National following your
2   father's death?
3   A. Yes, sir, it is.
4   Q. All right. And did you write Lincoln
5   National trying to find out if you had any
6   interest in the annuity?
7   A. Yes, sir, I did.
8   Q. And that's what this is, Defendant's
9   Exhibit 2?
10  A. That's what the letter is, sir.
11  Q. Okay. Now, I want to ask you about some of
12  your statements in this letter.
13      Seven lines down kind of in the middle
14  of the thing, it says -- and I want to call
15  your attention to this language. You tell
16  Lincoln National that: I have now received
17  a call telling me that I was the original
18  beneficiary, and it had been changed
19  without my father's knowledge.
20      Do you see that language?
21  A. Yes.
22  Q. Okay. Now, who called you?
23  A. Brenda Cobb.

Page 58

1   Q. All right. Who is Brenda Cobb?
2   A. She is the daughter of my father from his
3   first marriage.
4   Q. Is it C-O-B-B or C-O-B-B-S?
5   A. I think it's B-B, sir. I'm not sure.
6   Q. And where does Brenda Cobb live?
7   A. Montgomery I believe, sir,
8   Q. And when did Brenda call you?
9   A. It was sometime when they started doing
10  things to probate the estate, sir.
11  Q. Okay.
12  A. I'm not sure of the exact time.
13  Q. And what did Brenda tell you -- Let me back
14  up.
15      Did you have a telephone conversation
16  with her or did she tell you in person or
17  what?
18  A. It was on the telephone.
19  Q. And did you call her or did she call you?
20  A. She called me, sir.
21  Q. And what did she say to you other than
22  what's in here?
23  A. Basically, that's all she said, sir.

Page 59

1   Q. How long did y'all talk?
2   A. That I don't remember. It was a longtime
3   ago, sir.
4   Q. Did she tell you the basis of her
5   information, where she learned this?
6   A. No, sir.
7   Q. Did she tell you the basis of her statement
8   that it was changed without your father's
9   knowledge?
10  A. No, sir, she didn't say.
11  Q. Do you have any evidence that this was true
12  what she told you?
13      MR. MCHARD: Other than what he's
14      already told you.
15  Q. Other than what you've testified to today,
16  do you have any evidence this is true?
17  A. In what time frame, sir? Now or --
18  Q. Sitting here today.
19  A. I really don't understand the question.
20  Q. All right. We know today that you were --
21  Correct? You know today that you were
22  listed originally as a beneficiary on this?
23  A. Yes, sir.

Page 60

1   Q. And you know that was changed?
2   A. Yes, sir.
3   Q. Now, when is the first time that you ever
4   heard it was changed without your father's
5   knowledge?
6   A. Brenda Cobb, she made that statement.
7   Q. Okay. Have you had any discussions with
8   Brenda Cobb since then?
9   A. She called me, sir, sometimes during the
10  time that probate was going on just to keep
11  me up to date with what was going on.
12  Q. When is the last time you've talked to
13  Brenda Cobb?
14  A. I'd say from the probate ended, sir.
15  Q. And how long has that been?
16  A. I'm not sure how many years, sir.
17  Q. More than a year?
18  A. Oh, yes, sir.
19  Q. Is Brenda Cobb aware -- Have you made
20  Brenda Cobb aware of the lawsuit that we're
21  here on today?
22  A. I haven't spoken to her, sir.
23  Q. Now, look at tab three. It's marked as

Page 61

1    Defendant's Exhibit Number 3. Is this the
2    response you got from Lincoln?
3    A. Yes, sir, it looks like it.
4    Q. Now, Number Four, tab four is Defendant's
5    Exhibit Number 4. It's a copy of a
6    complaint filed in state court in
7    Mississippi by a lawyer named Glenn White.
8        Is this the -- your initial lawsuit
9    where James E. Crouch sued AmSouth Bank
10   seeking documents about the annuity?
11   A. I would assume, sir, that it was the
12   initial, but there was so much paper
13   generated, I just couldn't tell you --
14   Q. I mean, you employed Mr. White first to do
15   this for you?
16   A. Yes. Mr. White was the first attorney.
17   Q. And to your knowledge, this was the first
18   pleading that was filed in a court on your
19   behalf?
20   A. Again, sir, I couldn't tell you. I
21   would -- I would say yes, but I'm not real
22   sure.
23   Q. Turn to tab five which has been marked as

Page 62

1    Defendant's Exhibit Number 5, and this is
2    a -- court papers filed, and it's got an
3    amended complaint. And still, Mr. White is
4    representing you at the time this was filed
5    in October of '04, correct?
6    A. Yes, sir, I would assume.
7    Q. All right. Do you know why you amended
8    your complaint?
9    A. No, sir. Mr. White was handling
10   everything.
11           MR. MCHARD: Excuse me. Excuse
12       me. But you represent
13       AmSouth, and you know that the
14       complaint had to be amended at
15       the demand of AmSouth to bring
16       in -- to bring in Ina Sue
17       Crouch. I mean, you know that
18       that's what the pleadings are.
19           MR. PATERSON: Do you want to say
20       anything else on the record?
21           MR. MCHARD: Well, I mean, I just
22       don't --
23           MR. PATERSON: If you've got an

Page 63

1        objection, please state it.
2        If you don't have an
3        objection --
4            MR. MCHARD: Well, I just -- I
5        don't think that that question
6        is in good candor because you
7        know that that's the truth.
8        AmSouth forced him to sue his
9        mother.
10           MR. PATERSON: Are you through
11       testifying? I mean, if you
12       have an objection, please make
13       it; otherwise, let the witness
14       answer.
15           MR. MCHARD: Well, I object
16       because this is lack of good
17       candor because you know what
18       AmSouth did and why the
19       amended complaint was filed,
20       because your law firm through
21       Paul DelCambre filed those
22       pleadings with the court
23       demanding that that be done.

Page 64

1            MR. PATERSON: Are you done?
2            MR. MCHARD: Yes.
3    Q. Okay. Let me show you tab number six and
4    ask you. This is an amended complaint
5    dated January 13th, '05. And in this
6    amended complaint, Mr. White is still
7    representing you. And at this point in
8    time, you add your mother, Ina Sue Crouch,
9    as a defendant in the case. Do you see
10   that in tab -- in Exhibit 6?
11   A. I'm sorry. I'm just not real good at
12   reading these. I don't know what it --
13   what it says.
14   Q. Well, let's take a look at it. Look at tab
15   number six.
16           MR. MCHARD: Well, why don't we
17       take a break and let him read
18       the document then.
19           MR. PATERSON: If you want to take
20       a break, we'll be glad to take
21       a break. I was just going to
22       show him a sentence in it and
23       ask him a question. If we

Page 65

1     need a break, fine.
2          (Brief recess was taken.)
3     Q. When we broke, sir, what I was asking you
4        about, Exhibit Number 7. It is an amended
5        complaint filed January 13th, 2005.
6        I'll represent to you based on
7        paragraph three that this is the first time
8        that the complaint was amended to sue your
9        mother. Okay?
10    A. Yes, sir.
11    Q. Why did you decide to sue your mother
12       January 13th of 2005?
13    A. It's my understanding, sir, that she
14       refused to allow AmSouth Bank to turn over
15       the documents. This is just what I was
16       told, sir.
17    Q. Now, let's look at -- Before I do that, let
18       me ask you this. Have you ever had any
19       bank account at AmSouth?
20    A. Yes, sir, I have.
21    Q. Have you got one now?
22    A. No, sir.
23    Q. When is the last time you had a bank

Page 66

1     account there?
2     A. I'd have -- I'd just be guessing, sir.
3        Maybe -- Maybe ten years ago, sir, but
4        that's just a guess.
5     Q. In Mississippi?
6     A. No, sir. It would have been in Wetumpka.
7     Q. And what occasioned you to have a bank
8        account in Wetumpka if you didn't live
9        there, or did you live there?
10    A. I'm going to tell you, sir. I'm a little
11       confused because it was so long ago. I
12       believe that I had an account in Wetumpka
13       because we had to have somewhere to put
14       direct deposit of my check.
15       The military doesn't pay you cash or a
16       check. We -- And it's my best recollection
17       that we used AmSouth Bank. And that was so
18       long ago -- I think it was at AmSouth Bank.
19    Q. Okay. You haven't had an account at
20       AmSouth Bank in the last ten years, though,
21       right?
22    A. I don't think so, sir. Again, I'm not real
23       sure of the time frame.

Page 67

1     Q. All right. Have you ever done any business
2        with AmSouth Investment Services?
3     A. Not to my knowledge, sir.
4     Q. Let me show you what's been marked as
5        Defendant's Exhibit Number 7. It's behind
6        tab seven. And I'll represent to you that
7        this is a second amended complaint filed by
8        Mr. McHard, your current lawyer, on June
9        23rd, 2006. Have you seen this before?
10    A. I would have to read it, sir, to --
11    Q. Just take a look at it and just tell me if
12       you've ever seen it.
13            MR. MCHARD: What he's saying,
14            he'd have to read it. If you
15            want him to read the whole
16            thing, he can read the
17            whole --
18    Q. Just take -- you can take a look -- as good
19       a look at it as you've ever -- you need to
20       take and just answer in simple words, have
21       you ever seen it before today?
22    A. Yes, sir, I think I have.
23    Q. Look at paragraph number 30 on page six of

Page 68

1        Exhibit Number 7. Is this something -- The
2        allegations in paragraph 30, is that
3        something that you relied on your lawyer
4        for?
5     A. Sir, I'm sure I would understand this
6        statement if it were broken down in a
7        simpler form.
8     Q. But your lawyer drafted this for you,
9        right?
10    A. Yes, sir.
11    Q. Have you ever purchased an annuity from
12       AmSouth Investment Services?
13    A. Not to the best of my recollection, sir.
14    Q. Am I correct in understanding as a result
15       of your pleadings filed in this case,
16       you're asking to be paid the $250,000
17       annuity that went to your mother --
18    A. Yes, sir.
19    Q. -- and some other damages that are set out
20       in the complaint?
21    A. Yes, sir.
22    Q. And you're also asking the court to find
23       that the change of beneficiary form is null

Page 69

1    and void and of no effect, right?
2    A. I believe that's what it says, sir. I'm
3    not exactly sure.
4    Q. Okay. Are you aware that the change of
5    beneficiary form made you a contingent
6    beneficiary, that if -- in the event your
7    mother and father both passed away, you'd
8    get the proceeds?
9         MR. MCHARD: Well, I'm going to
10        object as to the form.
11        MR. PATERSON: Okay.
12        MR. MCHARD: And it's compound.
13        MR. PATERSON: Objection noted.
14   Q. Go ahead.
15   A. I saw how the -- how the document was
16   filled out, that I was selected the
17   contingent beneficiary. Was the document
18   valid?
19   Q. Now, in your lawsuit, you're claiming from
20   the defendants punitive damages. What do
21   you want -- Do you want to punish AmSouth
22   or AmSouth Investment Services for
23   something? Have they done something to you

Page 70

1    that you think deserves -- that they
2    deserve to be punished for?
3    A. Sir, I would believe that they were
4    unprofessional when they did this and it
5    caused a lot of hardship for my family.
6    Q. What did they do that was unprofessional?
7    A. They changed a document without my father's
8    knowledge or consent, sir.
9    Q. All right. And other than what you've
10   testified to today, you don't have any
11   basis of that other than what you've
12   testified to today, correct?
13   A. I'm sorry. I don't ...
14   Q. You don't have any evidence or basis for
15   that belief other than what you've
16   testified to today? You don't have
17   anything to add that supports your belief
18   that it was changed without his knowledge
19   and consent?
20   A. Nothing I can remember right now, sir.
21   Q. You also claim punitive damages against
22   your mother. Do you want to punish your
23   mother in this case as well?

Page 71

1    A. Sir, again, this was something that didn't
2    have to happen. I think that if you were
3    involved in it, you should have to pay a
4    penalty.
5    Q. You think your mother took something that
6    belonged to you?
7    A. Yes, sir, I do.
8    Q. Would it change your feeling on that if you
9    knew that the annuity was bought with joint
10   funds of your mother and father?
11        MR. MCHARD: I'm going to object
12        to the form of that.
13   A. No, sir.
14   Q. Let's look at Defendant's Exhibit Number
15   8. It's behind tab eight. Please take all
16   the time you need to look at it.
17        My question to you is, have you ever
18   seen this letter before? It's a letter
19   dated May 16, 2000 to James E. Crouch and
20   Sue Crouch in Wetumpka, Alabama.
21   A. I believe this is one of the documents that
22   was provided by me -- by my attorney, sir.
23        MR. PATERSON: I don't have any

Page 72

1         further questions at this
2         time. Thank you.
3             Some of these other
4         lawyers may have questions of
5         you.
6         (Brief interruption.)
7         (Off-the-record discussion.)
8             EXAMINATION
9    BY MS. HUGHES:
10   Q. Mr. Crouch, you stated that you made visits
11   to your parents'. About how many times did
12   you visit your parents there at the last?
13   A. At the --
14        MR. MCHARD: I'm going to -- at
15        the last. If you would be
16        kind enough --
17   Q. Within the last six months --
18        MR. MCHARD: I'm going to object
19        to the form.
20   Q. -- prior to his death.
21   A. I would have to say we were there -- and
22   this is just a guess -- several times.
23   Q. How many are several?

Page 73

1   A. Again, ma'am, I'm just guesstimating.
2   Q. Do you have a written document showing that
3      your dad wanted you to have the $250 --
4      $250,000?
5   A. Do I in my possession have ...
6   Q. Yes, or your attorney.
7   A. We have the documents that were produced.
8      We have the change of beneficiary which in
9      my estimation is null and void.
10  Q. Which you think is null and void?
11  A. Yes, ma'am, because it doesn't -- it
12     doesn't have my father's signature on it.
13  Q. Other than the discussion that you had with
14     your father, why do you think you deserve
15     the annuity?
16  A. Ma'am, you're asking me to justify my
17     relationship with my father and what I
18     deserve. I don't know. My father was an
19     independent thinker. He had -- He made up
20     his own mind. I'm sure he had reason.
21  Q. Did you often go help your parents do
22     things at their house?
23  A. Qualify things, ma'am.

Page 74

1   Q. Did you cut the grass?
2   A. No. I think my father paid someone to cut
3      the grass.
4   Q. Did you go with them and do things with
5      them? Go to the lake, go fishing?
6          MR. MCHARD: At what point in
7              time?
8   Q. Within the last year prior to his death.
9   A. I would go there, and he would be in the
10     garden or -- as far as leaving his
11     homestead, not a lot, sir -- or excuse me,
12     ma'am.
13  Q. Did you help him with his garden?
14  A. No, ma'am, I did not.
15  Q. Did you help him mend a fence?
16  A. I wasn't aware of any fence he had that
17     needed mending, ma'am.
18  Q. So you didn't help your parents do anything
19     that needed mending around the house?
20  A. No, ma'am. I lived in Mississippi.
21  Q. When you went, how long did you stay?
22          MR. MCHARD: At what point in
23              time?

Page 75

1   Q. Within the last year.
2          MR. MCHARD: All these questions
3              are within the last year; is
4              . that correct?
5          MS. HUGHES: So far.
6   A. It would usually be just a couple of days.
7      I had kids in school.
8   Q. Upon your father's death, when did you
9      arrive at your mom's house?
10  A. I can't give you an exact time.
11  Q. How long did you stay after the funeral?
12  A. We had to get back. After the funeral, we
13     left and went back to Mississippi.
14  Q. So you only stayed a short time?
15  A. Yes, ma'am.
16  Q. Did you console your mother during the
17     funeral?
18  A. Yes, ma'am.
19  Q. Did you tell her that you loved her?
20  A. Yes, ma'am.
21  Q. Did you ask her did she need any help
22     during that time?
23  A. She lives in a mobile home. She had all

Page 76

1      her other kids there. And like I say, we
2      had kids in school. We just went to the
3      funeral and went back home.
4   Q. How many times have you called your mother
5      since the funeral of your dad?
6   A. None that I can -- I can't remember. That
7      may not be correct. It's just -- it's been
8      a long time.
9   Q. Why have you not called your mother?
10  A. Most of the reason, we've been involved in
11     this legal dispute.
12  Q. When did this legal dispute start?
13  A. I don't know right off the top of my head,
14     ma'am.
15  Q. If your mother didn't have the annuity and
16     you got it, what do you think she'd live
17     off of?
18          MR. MCHARD: Object. Asked and
19              answered.
20  A. I assume my father's pension.
21  Q. Do you even have any idea how much the
22     pension is worth?
23  A. No, ma'am, I do not.

## Page 77

1  Q. How much were you involved in the probate
2      case in which your two half sisters were
3      suing?
4  A. I didn't go there. They talked to me about
5      it over the telephone.
6  Q. Did you ask that they get involved in that
7      case?
8  A. No, ma'am, I did not.
9  Q. Did you provide money for an attorney
10      during that case?
11  A. No, ma'am.
12  Q. What's your dad's date of birth?
13  A. I can't remember, ma'am.
14  Q. Do you know your mother's date of birth?
15  A. No, ma'am.
16  Q. Do you ever call her and wish her a happy
17      birthday?
18  A. We've been involved in a legal dispute,
19      ma'am. Under advice of my counsel, I was
20      told not to contact or talk to anyone
21      involved in this.
22  Q. What's your mother's maiden name?
23  A. Parrett.

## Page 78

1  Q. How many brothers and sisters does she
2      have?
3  A. I don't know, ma'am.
4  Q. How close were you to your dad?
5  A. Very close.
6  Q. Why do you think that you were that close
7      to your father?
8  A. It's just a feeling I had, ma'am.
9  Q. Did both of your parents give you the
10      $100,000?
11          MR. MCHARD: Object. Asked and
12          answered.
13  A. My father gave it to me, ma'am.
14  Q. Did your mother go there with you -- with
15      him to give you the $100,000?
16  A. She was present, yes, ma'am.
17  Q. Did you thank both of your parents for the
18      money?
19  A. I thanked -- Yes, I thanked both. It was
20      only common courtesy.
21  Q. So you thanked your mother even though you
22      say that your dad gave you the money.
23  A. She was present.

## Page 79

1  Q. So why do you think only your dad gave you
2      the 100,000?
3  A. My father presented it to me as a gift to
4      me.
5  Q. The question has been asked about what
6      point in time did you know about the
7      annuity. When after your father's death
8      did you mention to your mother about the
9      annuity?
10          MR. MCHARD: Object. This has
11          been asked and answered as the
12          question even prefaces.
13          Object as to the form.
14  A. We talked about the -- Maybe you should ask
15      the question once more so I understand.
16  Q. Did you call your mother about the annuity
17      after your father's death?
18  A. Did I call her about the annuity?
19  Q. Yes.
20  A. No, ma'am, not that I can remember.
21  Q. Did she call you about the annuity?
22  A. She called and -- She called right after we
23      got back, and the subject of the annuity

## Page 80

1      did come up.
2  Q. Did you ask her to see the paperwork
3      regarding the annuity?
4  A. Yes, ma'am.
5  Q. And what did she tell you?
6  A. She didn't volunteer.
7  Q. Did it concern you at all when you joined
8      your mother as a defendant?
9  A. Pardon me, ma'am?
10  Q. Did it bother you, did it concern you at
11      all when you joined your mother as a
12      defendant?
13          MR. MCHARD: Do you know what
14          she's asking? Do you know
15          what that means?
16  A. I believe .. I'm really not -- I'm not
17      really clear.
18  Q. Are you troubled at all that your mother is
19      a defendant?
20  A. She refused to turn over the paperwork to
21      AmSouth. AmSouth said without listing her,
22      they couldn't give the paperwork. There
23      was no way around it.

Page 81

1  Q. Do you care at all how your mother lives?
2  A. Yes.
3  Q. If she doesn't have the 250,000, do you
4     think she could live off of a small
5     pension?
6         MR. MCHARD: Well, I'm going to
7             object. Assumes facts not in
8             evidence. Object as to form.
9  Q. So you're not too concerned about your
10     mother's welfare?
11 A. I don't understand your question. Are you
12     asking for an opinion or something?
13 Q. I'm asking you, how will your mother live
14     if she didn't have the $250,000.
15         MR. MCHARD: I'm going to object.
16             If you'll provide us with the
17             documents that we've requested
18             and that you've so far
19             objected to providing to us so
20             that we can review those to
21             determine what the assets and
22             sources of income are, then
23             he'll be glad to answer the

Page 82

1             question.
2         MS. HUGHES: Does that have
3             anything to do with whether he
4             has the 250,000 or not? I
5             can't see that that's relevant
6             for him to decide whether she
7             has the 250,000 or not.
8             That's not relevant.
9         MR. MCHARD: Well ...
10        MS. HUGHES: If she has two
11            million, then he thinks he
12            should get the 250, and if she
13            only gets 600 a month
14            anyway -- I can't see that it
15            makes any difference.
16        MR. MCHARD: Excuse me, ma'am, but
17            if you would be kind enough to
18            simply provide the documents
19            that were properly --
20        MS. HUGHES: If you want them, you
21            find them.
22        MR. MCHARD: -- that were properly
23            requested in discovery and

Page 83

1             that were again requested to
2             be provided prior to this
3             deposition in the letter that
4             we wrote you outlining the
5             problems and the improper
6             objections which you raised in
7             connection with the discovery
8             that have been served on you,
9             he will at that point answer
10            your question. Until then,
11            you know, that's not an
12            appropriate question.
13        MS. HUGHES: He doesn't care
14            whether she has money or not.
15            It doesn't matter.
16 Q. Are you trying to punish your mother for
17     something?
18 A. No, ma'am.
19 Q. Well, in your lawsuit, you're wanting
20     punitive damages. Do you know what
21     punitive means?
22 A. Yes, ma'am, I do.
23 Q. What does that mean?

Page 84

1  A. That means that whoever did it will not do
2     it again.
3  Q. So you're afraid that your mother just
4     might do something to you again?
5  A. I think that the punitive damages were
6     asked for by my attorneys. Under their
7     best advice, they said this is what -- we
8     need to sue, and I followed their advice.
9  Q. You do not love your mother at all, do you?
10 A. You're asking a question that is so
11     subjective ...
12 Q. Yes or no?
13 A. Yes, I do.
14        MS. HUGHES: Thank you. That's
15            all I have.
16        (Brief interruption.)
17        EXAMINATION
18 BY MR. WALDROP:
19 Q. Mr. Crouch, my name is Glenn Waldrop. I
20     represent Lincoln National in this case.
21     You and I have never met before today,
22     have we?
23 A. No, sir.

Page 85

1    Q.  I'll try not to replow old ground and I'll
2         try to be fairly brief, but I do need to
3         ask you some questions since you have added
4         my client, Lincoln National Life Insurance
5         Company, as a defendant to this lawsuit.
6         Do you understand that?
7    A.  Yes, sir.
8    Q.  All right.  Let me just ask you generally,
9         do you agree that an owner of an annuity or
10        life insurance policy should be entitled to
11        change the beneficiary when that owner
12        decides they want to do that?
13              MR. MCHARD: Im going to object
14                as to the form of that
15                question and would refer you
16                to the contract itself which
17                you say -- which you contend
18                speaks for itself.
19    Q.  You can answer the question.
20    A.  Could you repeat the question.
21              MR. WALDROP: Will you read it
22                back, please, and just note
23                that there was an objection.

Page 86

1              (The following was read:
2              Question: Let me just ask you
3                generally, do you agree that
4                an owner of an annuity or life
5                insurance policy should be
6                entitled to change the
7                beneficiary when that owner
8                decides they want to do that?)
9    A.  Sir, I think that is -- as my father was
10        the annuitant and the owner and his
11        signature wasn't on the change of
12        beneficiary, then he did -- he did not
13        change it.
14    Q.  That's not my question, and I'm going to
15        try to do a better job of asking it
16        because, apparently, I didn't convey it.
17        Let me try one more time.
18    A.  Yes, sir.
19    Q.  Do you agree generally that an owner of an
20        annuity or a life insurance product ought
21        to be able to change the beneficiary if
22        they choose to do so?
23              MR. MCHARD: Same objection.

Page 87

1    A.  If it is the owner that's doing so, yes.
2    Q.  You understand that in this case that your
3         mother was a joint owner of this annuity
4         together with your father, right?
5    A.  Yes, sir.  That's what was on the paperwork
6         that I saw.
7              (Brief interruption.)
8    A.  I said, yes, sir, that was on the paperwork
9         that I saw.
10             THE WITNESS: Could I get a glass
11               of water or something?
12    Q.  You mentioned that you saw your father --
13             MR. MCHARD: He stated that he
14               needed a glass of water.
15             MR. WALDROP: All right.  Well,
16               let's take a break and let him
17               get it.
18             (Brief interruption.)
19             MR. WALDROP: Anytime you need a
20               break, Mr. Crouch, just tell
21               us and we'll let you have one,
22               and I apologize.  I didn't
23               hear you asking for the

Page 88

1              water.
2                Are you okay to proceed
3                now?
4              THE WITNESS: Yes, sir.
5              MR. WALDROP: Good enough.
6    Q.  You mentioned that you came over to visit
7         with your parents, I think you said,
8         several times during the last year, of your
9         father's life.
10    A.  Yes, sir.
11    Q.  Let me ask you this question.  When was the
12        last time you ever saw your father sign his
13        name to any piece of paper?  Do you
14        remember?
15    A.  The last time, sir?
16    Q.  Yes, sir.
17    A.  Actually see him affix his signature, not
18        him sign something and give to me that I
19        didn't see him sign?
20    Q.  Right.  When did you actually see him sign
21        his name to a piece of paper, the last time
22        you recall seeing that?
23    A.  I don't -- I can't recall anything right

Page 89

1    this very moment.
2    Q. You don't recall him signing his name in
3    your presence during the last year of his
4    life, do you?
5    A. Nothing I can think of now, sir.
6    Q. Can you think of anything -- any piece of
7    paper he signed in your presence during the
8    last five years of his life?
9    A. Signing his name, I can't remember any
10    specific time -- any specific time right
11    now.
12    Q. Okay. Can you recall any specific time
13    ever seeing your father sign his name to a
14    piece of paper?
15    A. Ever?
16    Q. Yes, sir.
17    A. Yes.
18    Q. In your presence.
19    A. Yes, sir.
20    Q. My father used to sign my report cards when
21    I brought them home.
22    A. Yes, sir.
23    Q. Your mom or dad may have done that for

Page 90

1    you. What else do you recall your
2    parents -- not your parents. What else do
3    you recall your father signing where he
4    signed his name in your presence?
5    A. If memory serves me correctly, I saw him
6    sign the -- he sold me a car, and he gave
7    me a bill of sale.
8    Q. Okay. Anything else you can recall at this
9    time?
10    A. Nothing else I can recall at this time,
11    sir.
12    Q. When did he sell you that car? How old
13    were you?
14    A. It was sometime in the late eighties, sir
15    Q. 1980's?
16    A. Yes, sir.
17    Q. Were you still in the military at that
18    time?
19    A. Yes, sir.
20    Q. All right. You may have said this before.
21    If you did, I didn't hear it, so I don't
22    mean to replow old ground, but when did you
23    retire from the military? What year?

Page 91

1    A. 1995, sir.
2    Q. Now, you were shown some exhibits earlier.
3    I'm going to ask you some questions. I
4    don't want to re-mark all of these.
5    Exhibit 8 is a May 16, 2000 letter.
6    Exhibit 8, if you'll look at it. It's a
7    May 16, 2000 letter from Lincoln National
8    to James E. Crouch and Sue Crouch. Do you
9    see that?
10    A. Yes, sir.
11    Q. That would have been a letter that would
12    have been sent to your father and your
13    mother, right?
14    A. I assume, sir.
15    Q. That's who it's addressed to, isn't it?
16    A. Yes, sir, that's what I -- I assume.
17    Q. The address 360 Old 231 North, Wetumpka,
18    Alabama 36092, was that the address where
19    your mom and dad lived?
20    A. I would assume so, sir. I don't remember
21    it right off the top of my head.
22    Q. You don't have any reason to believe that's
23    not the correct address, do you, for your

Page 92

1    mom and dad?
2    A. No, sir, I don't.
3    Q. And this letter is dated May 16, 2000.
4    That would have been about eight or nine
5    months before your father passed away?
6    A. Yes, sir, I guess.
7    Q. The math would be what it is, but this is
8    dated May 16, 2000. Your father passed
9    away February 14 of 2001.
10    A. Yes.
11    Q. The letter salutation says: Dear James E.
12    Crouch. That would be your dad, right?
13    A. Yes, sir, I assume.
14    Q. Do you know whether your father got this
15    letter?
16    A. I would have no way of knowing, sir.
17    Q. One way or the other?
18    A. No, sir, I didn't -- I don't know.
19    Q. Was your father able to read and write?
20    A. Yes, sir.
21    Q. And could he understand, you know, written
22    documents such as a letter?
23    A. Yes, sir.

Page 93

1  Q. The second paragraph of this letter says:
2     Dear James E. Crouch, we have updated our
3     records to reflect your new beneficiary
4     designations as shown on the enclosed copy
5     of your request.
6        Do you know whether your father got
7     this letter from Lincoln at any time saying
8     the beneficiary on the annuity has been
9     changed?
10 A. No, sir. I'd have no way of knowing
11    exactly.
12 Q. You don't know one way or the other?
13 A. No, sir.
14 Q. Are you aware of any action that your
15    father took after receiving this letter,
16    assuming he did?
17        MR. MCHARD: I'm going to object
18        to the form of that.
19 Q. Well, let's assume he did. Are you aware
20    of any action your father took in response
21    to this letter from Lincoln telling him
22    that the beneficiary had been changed per
23    your request?

Page 94

1  A. I didn't even know the letter existed, sir.
2  Q. So you're not aware of any action he took;
3     is that fair?
4  A. No, sir.
5  Q. That's not fair?
6  A. No, sir. I'm saying I didn't know whether
7     he received the letter. I didn't know the
8     letter was even in existence.
9  Q. And you're not aware of any action he might
10    have taken in response to this letter, are
11    you?
12 A. No, sir.
13 Q. If this has been marked previously, I
14    apologize, but I'm going to show you what
15    I'm going to mark as -- I think it's
16    Exhibit Number 9.
17        (Brief interruption.)
18        (Defendant's Exhibit 9 was marked
19        for identification.)
20 Q. Exhibit Number 9 to your deposition, which
21    is the annuity service request or the
22    change in beneficiary form, I realize
23    you've seen that in the course of this

Page 95

1     lawsuit, have you not?
2  A. Yes, sir.
3  Q. And that's the piece of paper that you
4     dispute whether it's effective or not,
5     right?
6  A. Yes, sir.
7  Q. It's dated, what? What date? April 4,
8     2000?
9  A. Yes.
10 Q. All right. That would be roughly a month
11    before this letter, Exhibit 8, that we just
12    looked at, the May 16, 2000 letter, right?
13 A. Yes, sir. This would have been prior to
14    the letter.
15 Q. Right. Were you present on April 4, 2000
16    when this document was filled out?
17 A. No, sir.
18 Q. You weren't -- You weren't there at the
19    bank when Ronda Robinson signed her name to
20    this?
21 A. No, sir.
22 Q. Do you know whether your mother and father
23    were both there at that time?

Page 96

1  A. No, sir, I don't.
2  Q. You don't know -- You don't have any way of
3     knowing what was said or who was present or
4     what happened on that date, do you?
5  A. No.
6  Q. Because you weren't there, right?
7  A. No, sir.
8  Q. Okay. I need to ask you this. Can you
9     tell me -- there's some letters in the file
10    where -- You got a letter back from Lincoln
11    National Life Insurance Company after you
12    wrote them your letter that Mr. Paterson
13    asked you about. You saw their responsive
14    letter, right?
15 A. Yes, sir.
16 Q. Other than that letter you got back from
17    Lincoln National Life Insurance Company
18    which was marked as, I believe, Exhibit
19    Number 3, have you had any other
20    communications -- verbal, written or
21    otherwise -- with Lincoln at any time?
22 A. Yes, sir. I called them ... I want to say
23    twice, but that's just guessing. It may

Page 97

1    have been more. It may be more than once,
2    but I --
3    Q. You -- Go ahead. I'm sorry.
4    A. But I called them and talked to them about
5       it, but the times and the dates and
6       everything I don't remember.
7    Q. Do you have any written record of those
8       conversations, any notes or notations or
9       anything like that?
10   A. No, sir.
11   Q. Do you have any recordings of those
12      conversations?
13   A. No, sir.
14   Q. You didn't record those telephone calls?
15   A. No, sir.
16   Q. Do you remember the name or names of the
17      persons that you spoke to at Lincoln?
18   A. No, sir, I sure don't.
19   Q. Do you know whether it was a man or a woman
20      or both or what?
21   A. Both.
22   Q. Let's focus on the woman you spoke to. How
23      many times did you speak to the woman when

Page 98

1    you called Lincoln?
2    A. I'm just guessing, sir. I'll say one time.
3    Q. Tell me what you remember about that phone
4       call.
5    A. If I remember correctly, I called. And the
6       first time, I believe, someone -- I talked
7       to someone. I don't know which it was, the
8       male or the female, but they told me that I
9       was the beneficiary. But they couldn't
10      provide me any information other than that
11      and it had been changed.
12          And I believe I talked -- after Lincoln
13      sent me a letter, the letter that they sent
14      as a response saying I wasn't the primary
15      beneficiary, there was -- at the end of the
16      letter, it said call if you have any
17      questions or whatever.
18          I can't remember the gentleman's name,
19      but I called to talk to him about it. And
20      he basically just told me that he had told
21      me everything that he possibly could.
22          That's the only conversations that I
23      can remember at this time, sir.

Page 99

1    Q. Would it be fair to say that what you
2       remember about the phone conversations that
3       you've had with somebody at Lincoln,
4       whether it was the man or the woman, were
5       to the effect of you asked them questions
6       about the annuity, they told you that you
7       had been the beneficiary of the annuity,
8       but that the beneficiary designation had
9       been changed?
10   A. Yes, sir. They -- I can't remember exactly
11      what they said. They were very veil in the
12      information, and they were very close to
13      the vest with what they told me. But they
14      gave me indications that I needed -- if I
15      wanted this information, I needed to write
16      a letter. They can't tell me anything over
17      the telephone.
18          But I did pick some -- some veil type
19      information up that made me write the
20      letter and get this -- the answer.
21   Q. When you say -- What you remember about it
22      is they told you ultimately or during the
23      course of these conversations that you had

Page 100

1    been the original beneficiary, but that
2    their records showed that that had been
3    changed?
4    A. Yes, sir, that's what I -- that's the best
5       I can remember that.
6    Q. Is there anything else you can remember
7       about these phone calls that you had with
8       this man and this woman at Lincoln
9       National?
10   A. No, sir. There's nothing else I remember
11      right now.
12   Q. All right. Other than the two letters, the
13      one you wrote to Lincoln National which was
14      marked as an exhibit and the one that they
15      sent you back which was also marked as an
16      exhibit, and other than these phone calls,
17      have you had any other communications at
18      any time with anybody representing Lincoln
19      National?
20   A. Nothing that I can remember, sir.
21   Q. Has your wife ever called or spoken to
22      anybody at Lincoln National or had any
23      written communications with them to your

Page 101

1   knowledge?
2   A. Not to my knowledge, sir.
3       (Defendant's Exhibit 10 was marked
4       for identification.)
5   Q. I'm going show you what has been marked as
6       Defendant's Exhibit Number 10, just staying
7       in the sequence. This appears to be a --
8       Lincoln has produced a copy of this to you
9       and your counsel and to the other lawyers
10      in this case. This is a handwritten letter
11      dated May 17, 2002 from Brenda Cobb to
12      Lincoln.
13          Have you seen this before?
14  A. It was part of the information my attorney
15      showed me.
16  Q. All right. This was your sister who --
17      actually, your half sister, right?
18  A. Yes.
19  Q. She was the daughter of your father by a
20      prior marriage?
21  A. Yes.
22  Q. And this is the lady -- Brenda Cobb -- who
23      you say called you and told you that there

Page 102

1   had been a change in the beneficiary?
2   A. Yes.
3   Q. And you see that Brenda Cobb was writing to
4       Lincoln, trying to find out whether she had
5       some interest in this annuity?
6   A. Yes, sir, it seems that's what it is.
7   Q. Has she ever had any discussion with you
8       about whether or not she ought to have some
9       interest in this $250,000 annuity?
10  A. She had talked about if she got it and
11      probated it, she wanted me to pay money --
12      because I paid nothing for the probate or
13      whatever. She expected me to pay ... I
14      cannot remember any -- we didn't come to
15      any figures, I don't believe, but it was
16      that if I received this, then she was going
17      to get a portion of it because she was
18      footing the bill for the probate.
19  Q. So she said -- she told you, in essence --
20      and I just want to make sure I
21      understand -- that if she were successful
22      in this probate lawsuit that she filed in
23      getting that annuity and it benefited you

Page 103

1   financially, that she expected you to pay
2   her something to cover her expenses or --
3   A. Yes, sir.
4   Q. -- compensate her?
5   A. Yes, sir.
6   Q. Okay. And you understood at the time that
7   you had that conversation with Brenda Cobb
8   that the annuity had been paid out to your
9   mother at that time?
10  A. Sir, I don't remember at that time.
11  Q. You know at some time that annuity was paid
12  out to your mother, right?
13  A. Yes, sir. I found out later on through my
14  attorneys.
15  Q. Yes, sir. You had attorneys at the time,
16  did you not, that Brenda Cobb wrote this
17  letter on May 17, 2002 to Lincoln? You had
18  your own attorneys at that time?
19  A. I don't -- My best recollection, sir, is I
20  don't think I did.
21  Q. Let's take a look at these exhibits. If
22  you'll let me just -- I'm not trying to
23  trick you. I just want to refresh your

Page 104

1   recollection. And I could be wrong about
2   this.
3       Exhibit Number 4 is the complaint for
4   discovery that Mr. White filed on your
5   behalf, and it's dated September of 2002.
6   You hired him sometime on or before
7   September of 2002 to get him to file that
8   complaint for discovery, right?
9   A. Yes, sir, I would assume so.
10  Q. And Brenda Cobb -- your half sister's
11  letter is written May 17, 2002, right?
12  A. Yes, sir.
13  Q. All right.
14          MR. MCHARD: Four months earlier.
15  Q. Four months in terms of the dates of the
16  documents.
17      Do you recall when it was that you
18  hired Mr. White? It was obviously before
19  he filed that complaint, but do you recall
20  when it was?
21  A. Not the exact date, sir.
22  Q. Now, how did you find out your father had
23  passed away?

Page 105

1    A.  It was -- I'm kind of nervous here. I'm
2         having trouble remembering names. It was
3         my half brother, Wayne's wife, she called.
4         Her name escapes me right now.
5    Q.  You received a phone call from the wife of
6         your half brother. Was that on the same
7         day that your father died that you got that
8         call?
9    A.  I believe it was, sir.
10   Q.  And you came over, you said, for the
11        funeral. How many days after your father
12        passed away was the funeral? Was it one
13        day later? Two days later?
14   A.  I really don't remember, sir.
15   Q.  Was it within a couple of days?
16   A.  I would think so.
17   Q.  And did you come over the day before the
18        funeral or did you come over the day of the
19        funeral?
20   A.  The day before the funeral, sir.
21   Q.  Did you see your mama the day you came
22        over?
23   A.  Yes, sir.

Page 106

1    Q.  And did you see her the day of the funeral
2         as well?
3    A.  Yes, sir.
4    Q.  And then after the funeral, you drove back
5         to Mississippi?
6    A.  Yes.
7    Q.  Now, when you came over to Alabama
8         following your father's death, did you ask
9         your mother about the annuity?
10   A.  Yes.
11   Q.  So you brought it up with her on that
12        occasion; is that right?
13   A.  I don't know how the conversation got
14        started, sir, but people were talking about
15        the will. And I just thought it would be
16        part of the conversation since they were
17        talking about the will to bring that up as
18        well, sir.
19   Q.  So you brought up the subject of the
20        annuity with your mother on that
21        occasion --
22   A.  Yes.
23   Q.  -- when you came over following your

Page 107

1         father's death?
2    A.  Yes.
3    Q.  Who all was present when you had that
4         conversation with your mother?
5    A.  I can't recall, sir.
6    Q.  Do you recall anybody else being present?
7    A.  I'm sure my wife was present, sir.
8    Q.  Teresa, right?
9    A.  Yes.
10   Q.  Other than you and Teresa and your mother,
11        can you recall anybody else being there
12        when you brought up the subject of the
13        annuity when you came over for your
14        father's funeral?
15   A.  I think it was just me and my wife, sir.
16   Q.  Where were y'all when you had this
17        conversation?
18   A.  At my father's home.
19   Q.  And your mother's home?
20   A.  Yeah.
21   Q.  So you were there at her house?
22   A.  Yes.
23   Q.  And you brought up the subject of the

Page 108

1         annuity?
2    A.  Yes, sir, talking about the will, and I
3         thought I'd bring that up as well.
4    Q.  Now, you were asked some questions about
5         whether you were concerned about your
6         mother being sued as a defendant in this
7         lawsuit. And what I wrote down was you
8         said, well, she wouldn't turn over the
9         annuity records, so I thought she had to be
10        added as a defendant. Do you recall that
11        testimony generally?
12            MR. MCHARD: Im going to object
13            to the form.
14   A.  That was what my attorneys told me had to
15        be done, sir.
16   Q.  Yes, sir. Well, the annuity records have
17        now all been produced, and you're still
18        suing your mother, aren't you?
19   A.  I'm following the advice of my counsel,
20        sir.
21   Q.  Which is suing your mother, right?
22   A.  If that's the case, then, yes, sir.
23   Q.  Well, you know it is. You know you're

Page 109

1    suing your mother sitting right here to my
2    left, don't you?
3    A. Yes, sir.
4    Q. I'm not going to mark this as an exhibit,
5    but there is -- I had a question about a
6    document that was filed in this case by
7    your lawyers. It's called Plaintiff's
8    Preliminary Combined Response to AmSouth
9    Bank's Motion for Summary Judgment and
10    Memorandum of Law. It looks like it was
11    filed in March of 2006.
12            MR. WALDROP: If somebody wants to
13            make it an exhibit, they can,
14            but ... I don't think there's
15            any dispute that this is what
16            we've got there.
17    Q. I want you to look at paragraph number
18    seven of this pleading that your lawyers
19    filed, and it refers to a settlement
20    agreement. Just take a look at that for a
21    minute and when you've read that paragraph,
22    let me know. I've just got a few
23    questions, and we'll be done.

Page 110

1            Do you know what settlement agreement
2    is being referred to in paragraph number
3    seven of this pleading?
4    A. Honestly, sir, I'm confused about this
5    legal paperwork. So my answer to you would
6    be I'd have to talk to my attorney so he
7    could explain it to me.
8    Q. It talks about a suit to enforce some
9    settlement agreement among other things.
10            Are you aware of any settlement that
11    has allegedly been breached or that needs
12    to be enforced, any settlement agreement?
13    A. I would have to confer with my attorney,
14    sir. I don't know anything off the top of
15    my head.
16    Q. You don't know?
17            MR. MCHARD: Well, it's asked and
18            answered.
19    Q. I just want to be clear. Without talking
20    to your lawyers, you can't answer the
21    question about what settlement agreement
22    because you just don't know right now
23    sitting here today?

Page 111

1    A. It's complicated, sir. I can't answer
2    right now. I don't understand it.
3    Q. Let me ask these questions and I think
4    we'll be done.
5            This annuity that was purchased through
6    AmSouth Investment Services and was issued
7    by Lincoln National Life Insurance Company,
8    did you pay any of the premiums or the
9    dollars that went into the purchase of that
10    annuity?
11    A. No, sir.
12    Q. Not one penny?
13    A. No, sir.
14            MR. WALDROP: I think that's it.
15            MR. PATERSON: I don't have any
16            further questions.
17            MS. HUGHES: I don't have any.


18

19

20            * * * * * * * * * * * * *
21            FURTHER DEPONENT SAITH NOT
22            * * * * * * * * * * * * *
23

Page 112

1            REPORTER'S CERTIFICATE
2    STATE OF ALABAMA:
3    MONTGOMERY COUNTY:
4            I, Lisa J. Nix, Registered Professional
5    Reporter and Commissioner for the State of Alabama
6    at Large, do hereby certify that I reported the
7    deposition of:
8            JAMES CROUCH
9    who was first duly sworn by me to speak the truth,
10    the whole truth and nothing but the truth, in the
11    matter of:
12            JAMES E. CROUCH,
13            Plaintiff,
14            Vs.
15            AMSOUTH BANK, INA SUE CROUCH and JOHN
16            and JANE DOES 1-10,
17            Defendants.
18            In The U.S. District Court
19            For the Middle District of Alabama
20            Northern Division
21            Case Number 2:06-CV-00111-MEF
22    on Wednesday, August 23, 2006.
23            The foregoing 111 computer printed pages

Page 113

1    contain a true and correct transcript of the
2    examination of said witness by counsel for the
3    parties set out herein. The reading and signing of
4    same is hereby waived.
5         I further certify that I am neither of kin
6    nor of counsel to the parties to said cause nor in
7    any manner interested in the results thereof.
8         This 11th day of September 2006.
9
10
11
     _____
     Lisa J. Nix, Registered
12   Professional Reporter and
     Commissioner for the State
13   of Alabama at Large
14
15
16
17
18
19
20
21
22
23