Page 47

1        an error on the paperwork and that in order

2        to fix it the way that they wanted it to

3        be, it would require a separate document.

4        So Exhibit 12 was written up, but it is an

5        incorrect -- it was written up incorrect by

6        me.

7    Q.  Well, let's go over that in a minute.

8        But the -- with regard to your annuity

9        license, did you ever see any rules,

10       regulations and procedures of Lincoln

11       National Life?

12   A.  I'm sure I did.

13   Q.  What did those consist of?

14   A.  It could have consisted of a lot of things.

15   Q.  I mean, was there a manual with the rules,

16       regulations and procedures of Lincoln

17       National Life?

18   A.  If you're asking me whether or not I had a

19       manual, I can't answer that.  I'm not

20       sure.  It was a lot of -- a lot of

21       paperwork, a lot of -- a lot of manuals.

22   Q.  Well, in connection with your licensing

23       file, you applied to get your annuity

EXHIBIT
15
Group

1    A.    That's correct.

2    Q.    And you knew all those things, correct?

3    A.    Yeah.  Unfortunately -- Unfortunately, it

4          was a human error.

5    Q.    And you had a copy of the rules and

6          regulations and policies of Lincoln

7          National with regard to how to fill out

8          these forms and the explanation of how to

9          do it and what it meant, correct?

10   A.    That's correct.

11   Q.    And you also knew that you could call

12         Lincoln National for advice with regard to

13         these matters, correct?

14   A.    Well, the realization that I had written it

15         wrong was not -- I didn't realize that I

16         had made the mistake until I received the

17         letter from Lincoln.  Do you have a copy of

18         that letter?

19   Q.    Well, yes, I have a copy --

20   A.    May I look at that, please?

21   Q.    I have a copy of a letter that I'll get to

22         in just a moment if you don't mind.

23              I want to focus on the day that the

Page 38

1    Q.   We meaning did you individually or did --

2    A.   Yes --

3    Q.   -- AmSouth Investments --

4    A.   -- I as an agent.

5    Q.   -- or AmSouth Bank?

6    A.   I as an agent kept a file.

7    Q.   And what other file was kept?

8    A.   I'm sorry.  I don't understand.

9    Q.   I mean, did -- were you aware if somebody

10        else kept a file regarding this contract?

11   A.   My instructions were to distribute

12        paperwork to AmSouth Investment Services

13        and to Lincoln National as well as keeping

14        a copy for my file.

15   Q.   And how did you maintain that file?

16   A.   I'm sorry.  What do you mean, how did I

17        maintain the file?

18   Q.   Well, how did you, Ronda Robinson, maintain

19        the client file with regard to this

20        annuity?

21   A.   There was -- I kept a separate file where

22        all my fixed annuity sales were filed

23        basically in alphabetical order, so ...

1   A.   They should.

2   Q.   As far as you know, they should have the

3        information, shouldn't they?

4   A.   The bank -- well, the bank should.

5   Q.   And should be able to provide it to us,

6        shouldn't they?

7   A.   As long as it's not out of record

8        retention, they could.

9   Q.   Well, I mean, this lawsuit was started in

10       2002.  What is the record retention period?

11  A.   I don't know for AmSouth.  I'm sorry.

12  Q.   Well, what was it when you were there?

13  A.   I'm not sure.  With CDs, I'm not sure.

14  Q.   Well, how about with checking accounts?

15  A.   I don't know.  I'm sorry.  Been gone from

16       there for two years.  I'm not sure what

17       their retention is.  And I don't recall

18       what it was when I was there.

19  Q.   Well, did AmSouth Bank or AmSouth

20       Investments or both have a policy,

21       procedure, rules, regulation book that

22       talked about what sort of documentation you

23       had to keep, how one husband could sign for

Videotaped Deposition of Rhonda Robinson                              August 23, 2006

Page 139

```
 1              his wife or vice versa to bank documents,

 2              what the protocols, the rules, the

 3              regulations were?  Did they have that from

 4              1997 through 2001?

 5      A.      Did they have what?

 6      Q.      Rules and regulations, a policy and

 7              procedure book, a manual, a set of

 8              instructions that would tell you what do

 9              you have to do in those circumstances, what

10              do you have to do or keep or get from the

11              client in a request for a cashier's check

12              like this, what the record retention policy

13              was, any of those things.

14      A.      Well, there's a record retention policy I'm

15              sure.

16      Q.      Was it in the policy and procedure manual,

17              is that what it's called, or standard

18              operating procedures?

19      A.      Well, at my current bank, it's just record

20              retention.

21      Q.      I know.  But aren't there a whole set of

22              instructions and rules and guidelines for

23              how you handle things at the bank by way
```

1        of --

2    A.   I'm sure there are.

3    Q.   And you've seen that at the bank, correct;

4         that is, at AmSouth during '97 through

5         2001?

6    A.   Sure.  I mean, there's instructions.

7         There's manuals.

8    Q.   What are they called?

9    A.   I don't know.

10   Q.   And there were instructions on what you

11        were supposed to do if somebody signed a

12        document for somebody else, weren't there?

13   A.   I'm sure that there were.

14   Q.   And what were those instructions, those

15        rules, regulations, guidelines, policies,

16        standard operating procedures, whatever you

17        want to call them?

18   A.   I think that would depend on your

19        transaction.

20   Q.   Are you saying you don't recall what the

21        requirement was at the bank?

22   A.   Well, I'm saying that it would depend on

23        the transaction as to what your policy and

1                      conclusion.

2                MR. WALDROP:  Objection.

3    A.   I don't know that I --

4    Q.   In your mind.

5    A.   -- know the answer to that.

6    Q.   Just like it didn't make any difference if

7         your name was on --

8    A.   Sir, as an agent, if it had been crooked, I

9         don't guess I would have minded, but he

10        wanted her to sign for him.

11   Q.   And you know that the only signature that

12        was necessary or required or proper to

13        change an annuitant beneficiary designation

14        such as we had in the Crouch annuity was

15        the signature of James Earl Crouch?

16                MR. WALDROP:  Objection.

17                MR. PATERSON:  Objection.

18   A.   That's false.  That's not a true statement.

19   Q.   Based on what?

20   A.   To make changes on an annuity that is joint

21        ownership, it requires both owners to sign.

22   Q.   Where does it say that?  In the rules,

23        regulations, policies and procedures again?

Videotaped Deposition of Rhonda Robinson                                    August 23, 2006

1     A.    Yeah, it would be in there somewhere.

2     Q.    Of Lincoln National Life that you said that

3           you were going to comply with when you

4           applied in the fall of 1997?

5                 MR. WALDROP:   Objection.

6     Q.    In those?  In those regulations of Lincoln

7           National or in the AmSouth Bank ones or the

8           AmSouth Investment ones or where, or do you

9           know?

10                MR. WALDROP:   Same objection.

11    A.    Could you repeat all of that one more time?

12    Q.    I want --

13    A.    Because I think I've gotten lost.

14    Q.    I just want to know where the rule,

15          regulation, policy, procedure, standard

16          operating practice or procedure would be

17          and who would have issued it that would

18          deal with who had to sign the Crouch

19          annuity to change the annuitant beneficiary

20          designation that had been made pursuant to

21          the application.

22                MR. PATERSON:   Object to the form

23                    of that.

Page 150

1                    MR. WALDROP:   Same.

2    A.    I'm sure that I -- at this particular time,

3          I had access to those procedures.

4    Q.    Those procedures meaning procedures issued

5          by whom?

6    A.    Procedures would have been issued by

7          Lincoln National as to how to complete the

8          form.

9    Q.    Did you look it up to find out what the

10         procedure said before you had --

11   A.    I think that's something I just -- I knew

12         from training.

13   Q.    So you didn't look it up?

14   A.    No.  I knew that if it's a joint ownership,

15         that I needed both signatures.

16               (Brief interruption.)

17               (Brief recess was taken.)

18               (Plaintiff's Exhibit 19 was marked

19                for identification.)

20   Q.    Ma'am, taking your comments during the

21         break to heart, you signed an affidavit for

22         Balch & Bingham also in connection with

23         this case, didn't you?

# BRYAN NELSON P.A.

**ATTORNEYS AT LAW**
POST OFFICE DRAWER 18109
6524 U.S. HIGHWAY 98
HATTIESBURG, MISSISSIPPI 39404-8109

JACK W. LAND
EVE GABLE
HERMAN M. HOLLENSED, JR.
MARK A. NELSON¹¹
V. K. VICK SMITH
DAVID M. OTT
SAMUEL S. McHARD²
RICHARD D. NORTON
JOSEPH A. O'CONNELL
JOE D. STEVENS
WILLIAM A. WHITEHEAD, JR.
KATHERINE L. HOWIE
STEPHEN B. JACKSON
ERICA R. McHARD²
STACY L. NEAMES
DARIUS O. TAYLOR
KRISTOPHER A. POWELL
TRACY K. BOWLES
MARK E. NORTON

JOHN F. BRYAN III (1914-1994)
E. S. NED NELSON (1928-1985)

TELEPHONE
(601) 261-4100

FACSIMILE
(601) 261-4106

¹ Also Admitted in Louisiana
² Also Admitted in Illinois
  And Iowa

August 31, 2006
*Via Facsimile*

Charles B. Paterson
Balch and Bingham LLP
Post Office Box 78
Montgomery, AL 36101

Re:   *James E. Crouch vs. Amsouth Bank, Ina Sue Crouch and John and Jane Does 1 – 10*
      Civil Action No. 2:06cv111-CSC
      Our File No.: 999-784

Dear Charles:

In follow-up to our discussions at the deposition of Ronda Robinson on August 23, 2006, I again request that you provide me with the following documents:

1.   the papers missing from the Client Profile, which was Exhibit 11 to Ms. Robinson's deposition;

2.   the copies of your e-mail correspondence with Ms. Robinson; and

3.   Ms. Robinson's manual calendar showing the date that she received the exhibits to her Affidavit.

Due to failure to discuss our objections to AmSouth's and Ina Sue Crouch's response and your statement that I should just take it up with the Magistrate in a Motion to Compel, I will draft and file same as soon as possible.

If you have any questions or need anything further, please advise.

Very truly yours,
BRYAN NELSON P.A.

Samuel McHard
For the Firm

SMH/ral
cc:   Counsel of Record

**EXHIBIT**
16

IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA

JAMES E. CROUCH                                             **PLAINTIFF**

VS.                                      CIVIL ACTION NO. 2:06-CV-00111-MEF

AMSOUTH BANK, INA SUE                                    **DEFENDANTS**
CROUCH, AMSOUTH INVESTMENT
SERVICES, INC., LINCOLN
NATIONAL LIFE INSURANCE
COMPANY, and
JOHN and JANE DOES 3-10

## <u>AFFIDAVIT OF SAMUEL S. MCHARD</u>

STATE OF MISSISSIPPI
COUNTY OF LAMAR

COMES NOW, Samuel S. McHard, after first being duly sworn, and deposes and states as

follows:

1.      My name is Samuel S. McHard. I am an attorney licensed to practice law in the States

of Illinois, Iowa, and Mississippi, and I am admitted to practice law *pro hac vice* before this Court.

I am one of the attorneys of record for the Plaintiff, James E. Crouch. I began to represent Mr.

Crouch in April 2005.

2.      On or about February 7, 2005, this case was removed to the United States Court for

the Southern District of Mississippi. On April 27, 2005 at the first federal court status conference,

counsel for AmSouth stated that AmSouth planned to move to change the venue of this action to

Alabama. The Court instructed counsel for AmSouth to produce the annuity documents so that

Plaintiff's counsel could determine whether the signature on the change of beneficiary forms was

valid. If forgery or unauthorized signature was indicated, AmSouth was directed by the Court to

Page 1 of 4



EXHIBIT

17

promptly file its motion to be taken up at the rescheduled conference on June 24, 2005. On May 5, 2005, Plaintiff's counsel received AmSouth's Pre-Discovery Disclosure. Although the documents failed to contain the annuity contract that has been repeatedly requested for more than two and one half years, the disclosure did contain the original application and the purported "change of beneficiary" form. (Both the application and the form are also Exhibits 1 and 7, respectively to the affidavits of James Edward Crouch and Teresa Crouch, which are also attached to the Plaintiff's Motion to Continue AmSouth's Motion for Summary Judgment, Lincoln National's Motion for Summary Judgment, and Ina Sue Crouch's Motion for Summary Judgment). Those exhibits clearly demonstrated that the signature of James Earl was forged on the change of beneficiary form and that his purported signature on the form is identical to that of Ina Sue. Despite this, counsel for AmSouth represented that the signature of James Earl was valid and was witnessed by AmSouth's employee, Ronda Robinson.

3.    Plaintiff is unable to respond fully to Defendants' Motions for Summary Judgment because AmSouth and Ina Sue Crouch failed to cooperate in discovery objected to in Interrogatories, Requests for Production, and Requests to Admit resulting in discovery disputes outstanding and documents outstanding which parties have promised to produced, or which should be ordered to be produced. Attached hereto as Exhibits 1 and 2 are the good faith discovery objections which I timely served on counsel opposite. In order to prevent unduly burdening the Court with discovery disputes, I awaited receipt of the transcripts of the depositions of the August 17, 2006 depositions which were not received until September 12, 2006, to review same and to include the discovery disputes which arose therein with the disputes from the aforesaid written discovery into a single Motion to Compel. Lincoln National has not yet participated in written discovery and has promised to tender certain

documents which are outstanding. To date, no certified copy of the annuity contract has been produced. This leaves the Plaintiff unable to fully respond to Defendants' Motions.

4.    However, as set forth in Plaintiff's Motion to Continue filed simultaneously herewith and the Preliminary Combined Response to AmSouth Bank's Motion for Summary Judgment (hereinafter, "Preliminary Response") filed previously with this Court on March 24, 2006, Plaintiff and his counsel possess a reasonable belief that such facts confirming forgery and the unauthorized signature on the purported change of beneficiary form and facts confirming the breach of duties by Ronda Robinson would be discovered if this Court continued Defendants' Motions and permitted the parties to continue to conduct discovery. Attached hereto as Exhibit 3 are Interrogatories, Requests for Production, and Requests to admit which Plaintiff proposes to serve upon Lincoln National.

5.    As set forth in the Preliminary Response, the testimony of Ina Sue and Ronda Robinson is inconsistent with the position that AmSouth and Ina Sue Crouch are taking in the instant case, and justice demands that the Plaintiff should have opportunity to explore the inconsistencies.

6.    Because Plaintiff has been denied the fundamental right to conduct full discovery, Plaintiff cannot present by affidavit further facts to justify Plaintiff's opposition to the summary judgment and therefore requests that Defendants' Motions for Summary Judgment be continued and the right to conduct further discovery.

Further affiant sayeth naught.

SAMUEL S. MCHARD

Page 3 of 4

SWORN TO AND SUBSCRIBED BEFORE ME, this 3rd day of October, 2006.

_____
NOTARY PUBLIC

My commission expires:

MISSISSIPPI STATEWIDE NOTARY PUBLIC
MY COMMISSION EXPIRES JAN 21, 2008
BONDED THRU STEGALL NOTARY SERVICE

Page 4 of 4

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA

JAMES E. CROUCH                                                        PLAINTIFF

VERSUS                                        CIVIL ACTION NO. 2:06-CV-00111-MEF

AMSOUTH BANK, INA SUE CROUCH
AND JOHN DOES 1 – 10                                              DEFENDANT

### AFFIDAVIT OF JAMES EDWARD CROUCH

STATE OF MISSISSIPPI
COUNTY OF LAMAR

COMES NOW, James Edward Crouch, after first being duly sworn, and deposes and states

as follows:

1.    My name is James Edward Crouch (hereinafter "James"). I am of adult age. My date of

birth is March 8, 1957. I am competent to testify and I am making this affidavit based upon

my personal knowledge. I have been married to Teresa Crouch since October 21, 1978.

2.    My father was James Earl Crouch (hereinafter "James Earl") who was born April 12, 1928,

and died February 14, 2001.

3.    In May or June, 1998, Ina Sue Crouch and James Earl called me and explained that James

Earl had purchased a $250,000.00 annuity at AmSouth Bank and that I would receive the

money from that annuity when James Earl died.

4.    The May 7, 1998, Application for Annuity signed by James Earl and Ina Sue is clear and

unambiguous in stating the intention of James Earl that James was to be the sole beneficiary

of the annuity. (Attached as Exhibit 1). That application shows that on May 12, 1998, at

Page 1 of 5



EXHIBIT
18

8:24 a.m. AmSouth Investments stamped the application and authorization form that indicated that the principal had approved the Crouch application for the Lincoln National Life Insurance Company Annuity and received a check in the amount of $250,000.00 for its purchase. Further, the confirmation letter from Lincoln National to my father dated May 18, 1998, (Attached as Exhibit 2) confirmed the facts surrounding the issuance of the annuity and that there were no amendments, changes or corrections intended.

5.  Prior to and after my marriage to my wife, Teresa Crouch, my father, James Earl, reminded me and my wife that he had prepared his Will which left One Dollar ($1.00) to each of his other children with the remainder of his property to be divided with half to go to my mother, Ina Sue, and half to me.

6.  In early January, 2001, my wife, Teresa Crouch, and I visited my parents' at my father's home located at 360 Old 231 North, Wetumpka, Alabama. During our visit, James Earl stated that his health was failing and reminded me and my wife, Teresa, that when he died he didn't care what Ina Sue did but I would get all the money from the annuity at AmSouth.

7.  In late January or early February, 2001, James Earl's health continued to deteriorate. Ina Sue made repeated efforts to have an attorney prepare a Power of Attorney and a new Will for James Earl and to have the doctor for James Earl declare him incompetent.

8.  On February 14, 2001, James Earl died.

9.  The day before the funeral for James Earl, I and my half siblings agreed to read James Earl's Will at the Wetumpka homestead the following morning before the funeral. When my wife and I arrived, David Shaddix, Ina Sue's son from a prior marriage, went out into the yard and began burning documents in the burn barrel behind the home. He and Ida Sue advised me

and my wife that they could not find the Will of James Earl.

10.    In connection with James Earl's estate, Barbara Middleton, one of my siblings, filed under oath a Petition for Letters of Administration (Attached hereto as Exhibit 3) stating that Ina Sue refused to tender the Will of James Earl for probate. Furthermore, Barbara Middleton filed in the Probate Court of Elmore County, Alabama an Objection to Motion to Intervene in her father's estate (Case #01-272) (Attached hereto as Exhibit 4) in which she alleged:

> Paragraph 4 - Sue Crouch was the last known possessor of the Will of James Earl Crouch.
>
> Paragraph 5 - The Will has disappeared under mysterious and suspicious circumstances.
>
> Paragraph 6 - There has been a great deal of activity concerning the assets of James Earl Crouch subsequent to his death, which may be contributed to the widow, Sue Crouch.
>
> Paragraph 7 - The widow, Sue Crouch, in her Motion to Intervene, does not come before the Court with "clean hands".

11.    Although James Earl had prescription "reading glasses" for several years prior to 1998, he rarely wore them and did not need them to sign his name. In fact, he rarely took them with him when he left the home.

12.    That in connection with the said probate proceedings, the deposition of Ina Sue Crouch was taken pursuant to notice (Attached as Exhibit 5). In that deposition, Ina Sue Crouch admitted the following:

    A.    Page 74/Line 23 - Page 75/Line 9

Q.   Have you ever signed Mr. Crouch's name to anything?

A.   Unh-unh.

Q.   Never?

A.   Unh-unh. Unh-unh. Never. Mr. Crouch was always able to sign his own name whenever we done business. No, I've never signed his name to nothing.

B.   Page 44/Line 11 - Page 45/Line 5

A.   There was never no money changes or nothing unless he was there and aware of it. We had no money changes. No bank changes was made since May the 8th, 1998. And I think very he was very, very aware then.

Q.   And when you say bank changes, you mean –

A.   Changed something.

Q.   – y'all didn't transact any business?

A.   No. Transact no business whatsoever after May the 8th, 1998.

Q.   Okay. And it's your testimony from May the 8th, 1998, until he died, your husband transacted no business?

A.   Well, we just had CDs; and when they come due, we just let them review theirselves.

Q.   So it's an automatic renewal.

A.   We didn't take them out. Just automatic renewal.

C.   Page 93/Line 11 - Line 23

Q.   Tell me about the annuity that your husband had.

A.   I told you that a while ago.

Q.   Okay. Tell me again. I'm slow.

A.   Well, we just had an annuity with Lincoln Life Insurance Company.

Q.    And how many times has the beneficiary been changed on that?

A.    Never.

Q.    Never.  So from the time it was first purchased until the time of your husband's death, the beneficiary was you?

A.    Yes. Right.

(Attached as Exhibit 6)

13.    Ronda Robinson represented that she assisted James Earl and Ina Sue in completing the change of beneficiary form (Attached as Exhibit 7) and that the change of beneficiary form was signed by each of them.  Also, Ronda Robinson represented to Paul DelCambre that both James Earl and Ina Sue signed the change of beneficiary form in her presence and that James Earl's signature was not a forgery signed by Ina Sue.

14.    I am familiar with the signature of my father and witnessed that signature many times throughout the course of my life.  The purported signature of my father on the "Change of Beneficiary" form (Attached as Exhibit 7) is not the signature of my father.

Further affiant sayeth naught.

JAMES EDWARD CROUCH

SWORN TO AND SUBSCRIBED BEFORE ME, this ___22nd___ day of March, 2006.

NOTARY PUBLIC

My commission expires:

MISSISSIPPI STATEWIDE NOTARY PUBLIC
MY COMMISSION EXPIRES JAN. 23, 2009
BONDED THRU STEGALL NOTARY SERVICE

Page 5 of 5



IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA

JAMES E. CROUCH                                                    PLAINTIFF

VERSUS                                    CIVIL ACTION NO. 2:06-CV-00111-MEF

AMSOUTH BANK, INA SUE CROUCH
AND JOHN DOES 1 – 10                                        DEFENDANT

## AFFIDAVIT OF TERESA CROUCH

STATE OF MISSISSIPPI
COUNTY OF LAMAR

COMES NOW, Teresa Crouch, after first being duly sworn, and deposes and states as follows:

1.    My name is Teresa Crouch. I am of adult age. My date of birth is February 23, 1959. I am competent to testify and I am making this affidavit based upon my personal knowledge. I have been married to James Edward Crouch (herinafter "James") since October 21, 1978.

2.    My father-in-law was James Earl Crouch (hereinafter "James Earl") who was born April 12, 1928, and died February 14, 2001.

3.    In May or June, 1998, Ina Sue Crouch and James Earl called my husband, James, and explained that James Earl had purchased a $250,000.00 annuity at AmSouth Bank and that my husband would receive the money from that annuity when James Earl died.

4.    The May 7, 1998, Application for Annuity signed by James Earl and Ina Sue is clear and unambiguous in stating the intention of James Earl that James was to be the sole beneficiary of the annuity. (Attached as Exhibit 1). That application shows that on May 12, 1998, at

Page 1 of 5


EXHIBIT
19

8:24 a.m. AmSouth Investments stamped the application and authorization form that indicated that the principal had approved the Crouch application for the Lincoln National Life Insurance Company Annuity and received a check in the amount of $250,000.00 for its purchase. Further, the confirmation letter from Lincoln National to my father-in-law dated May 18, 1998 (Attached as Exhibit 2) confirmed the facts surrounding the issuance of the annuity and that there were no amendments, changes or corrections intended.

5.  After our marriage, my father-in-law, James Earl, reminded me and my husband that he had prepared his Will which left One Dollar ($1.00) to each of his other children with the remainder of his property to be divided with half to go to Ina Sue, and half to my husband

6.  In early January, 2001, my husband, James, and I visited his parents' at his father's home located at 360 Old 231 North, Wetumpka, Alabama. During our visit, James Earl stated that his health was failing and reminded us that when he died he didn't care what Ina Sue did but my husband would get all the money from the annuity at AmSouth.

7.  In late January or early February, 2001, James Earl's health continued to deteriorate. Ina Sue made repeated efforts to have an attorney prepare a Power of Attorney and a new Will for James Earl and to have the doctor for James Earl declare him incompetent.

8.  On February 14, 2001, James Earl died.

9.  The day before the funeral for James Earl, my husband and his half siblings agreed to read James Earl's Will at the Wetumpka homestead the following morning before the funeral. When we arrived, David Shaddix, Ina Sue's son from a prior marriage, went out into the yard and began burning documents in the burn barrel behind the home. He and Ida Sue advised me and my husband that they could not find the Will of James Earl.

10.    In connection with James Earl's estate, Barbara Middleton, one of my husband's siblings,

filed under oath a Petition for Letters of Administration (Attached hereto as Exhibit 3) stating

that Ina Sue refused to tender the Will of James Earl for probate.  Furthermore, Barbara

Middleton filed in the Probate Court of Elmore County, Alabama an Objection to Motion to

Intervene in her father's estate (Case #01-272) (Attached hereto as Exhibit 4) in which she

alleged:

> Paragraph 4 - Sue Crouch was the last known possessor of the Will of James Earl
>
> Crouch.
>
> Paragraph 5 - The Will has disappeared under mysterious and suspicious
>
> circumstances.
>
> Paragraph 6 - There has been a great deal of activity concerning the assets of James
>
> Earl Crouch subsequent to his death, which may be contributed to the widow, Sue
>
> Crouch.
>
> Paragraph 7 - The widow, Sue Crouch, in her Motion to Intervene, does not come
>
> before the Court with "clean hands".

11.    Although James Earl  had prescription "reading glasses" for several years prior to 1998, he

rarely wore them and did not need them to sign his name.  In fact, he rarely took them with

him when he left the home.

12.    That in connection with the said probate proceedings, the deposition of Ina Sue Crouch was

taken pursuant to notice (Attached as Exhibit 5).  In that deposition, Ina Sue Crouch admitted

the following:

A.    Page 74/Line 23 - Page 75/Line 9

Page 3 of  5

Q.    Have you ever signed Mr. Crouch's name to anything?

A.    Unh-unh.

Q.    Never?

A.    Unh-unh. Unh-unh. Never. Mr. Crouch was always able to sign his own name whenever we done business. No, I've never signed his name to nothing.

B.    Page 44/Line 11 - Page 45/Line 5

A.    There was never no money changes or nothing unless he was there and aware of it. We had no money changes. No bank changes was made since May the 8th, 1998. And I think very he was very, very aware then.

Q.    And when you say bank changes, you mean –

A.    Changed something.

Q.    – y'all didn't transact any business?

A.    No. Transact no business whatsoever after May the 8th, 1998.

Q.    Okay. And it's your testimony from May the 8th, 1998, until he died, your husband transacted no business?

A.    Well, we just had CDs; and when they come due, we just let them review theirselves.

Q.    So it's an automatic renewal.

A.    We didn't take them out. Just automatic renewal.

C.    Page 93/Line 11 - Line 23

Q.    Tell me about the annuity that your husband had.

A.    I told you that a while ago.

Q.    Okay. Tell me again. I'm slow.

A.    Well, we just had an annuity with Lincoln Life Insurance Company.

Q.    And how many times has the beneficiary been changed on that?

A.    Never.

Q.    Never.  So from the time it was first purchased until the time of your husband's death, the beneficiary was you?

A.    Yes.  Right.

(Attached as Exhibit 6)

13.    Ronda Robinson represented that she assisted James Earl and Ina Sue in completing the

change of beneficiary form (Attached as Exhibit 7) and that the change of beneficiary form

was signed by each of them.  Also, Ronda Robinson represented to Paul DelCambre that both

James Earl and Ina Sue signed the change of beneficiary form in her presence and that James

Earl's signature was not a forgery signed by Ina Sue

Further affiant sayeth naught.

_Teresa Crouch (signature)_

TERESA CROUCH

SWORN TO AND SUBSCRIBED BEFORE ME, this __22nd__ day of March, 2006.

_Notary signature_

NOTARY PUBLIC

My commission expires:

MISSISSIPPI STATEWIDE NOTARY PUBLIC
MY COMMISSION EXPIRES JAN. 23, 2009
BONDED THRU STEGALL NOTARY SERVICE



Page 5 of 5

AL Br. 124

# LINCOLN NATIONAL LIFE INSURANCE CO.
A part of LINCOLN NATIONAL CORPORATION

**Flexible Premium Deferred Fixed Annuity Application**

Product Name: *Investor's Choice*

MARKET: ☒ Non-Qualified  ☐ New IRA (Year _____)  ☐ IRA Transfer  ☐ IRA Rollover  ☐ Other: _____

---

**ANNUITANT INFORMATION** (Please Print)

Full Name: James E. Crouch

Sex: ☒ M  ☐ F  Birthdate: 4 / 12 / 28

Soc. Sec. #: 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  Maturity: AGE 100

Primary Beneficiary: James Edward Crouch

Relationship: Son

Contingent Beneficiary: _____

Relationship: _____

**MAILING ADDRESS** (All policy correspondence will be sent to this address).

Name: James E. or Sue Crouch

Address: 360 Old 231 N.
Wetumpka, AL 36092

Phone #: (334) 567-0183

Replacement: Will the proposed contract replace any existing annuity or insurance contract?
☐ Yes  ☒ No  If "Yes", give details in "Remarks" section.

**Initial Premium Deposit** $ 250,000.00

Optional Contribution Modes:
☐ Monthly/PAC  ☐ Annual  $ _____
☐ Quarterly  ☐ Semi-Annual

---

**OWNER INFORMATION**

Contract Owner: _____

Birthdate: __ / __ / __  Tax ID #: ___ - __ - ____

Relationship to Annuitant: _____

**JOINT OWNER INFORMATION**

Joint Owner (if any): Sue Crouch

Birthdate: 10 / 13 / 23  Tax ID #: 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

Relationship to Owner: Wife

Note: Joint Owners have equal rights under the contract. Upon a non-annuitant Owner's death, Surrender Value proceeds will be paid to any surviving Owner as beneficiary. Only spousal beneficiaries may continue the contract.

**OWNER BENEFICIARY INFORMATION**

Owner's Beneficiary: _____

Relationship: _____

Note: Owner Beneficiary designations are applicable only when there is no Joint Owner.

Remarks:
**Principal Approved**
Signature _____
Date _____ MAY 12 1998

LN COPY

AMSOUTH INVESTMENTS  98 MAY 12  AM 8:2_

---

Signed at Wetumpka / City    AL / State    5/7/98 / Date

ANN MAY 13'98 11:11

X James E. Crouch
Signature of Owner

X Sue Crouch
Signature of Joint Owner (If applicable)

---

**AGENT'S REPORT**

Do you have any knowledge or reason to believe that the Proposed Contract will replace any existing annuity or insurance Contracts (including Lincoln National Life Insurance Company Contracts) which have been premium amount, placed on paid-up, or surrendered?

☐ Yes  ☒ No  If "yes", list company, plan, year issued.

**CHECK RECEIVED**
5/12/98
250,000⁰⁰

x Ronda Robinson
Agent's Signature

Ronda Robinson #1069
Joint Agent Name & Number

LN 437 PAB 7010

Home Office Endorsement

Lincoln/Crouch 00063

**EXHIBIT 20**

LN 256308 -Flex