### Page 42

1    of all the important events in connection
2    with the Crouch annuity?
3  A. Well, I can't say that everything was
4    listed there, no.
5  Q. But that was your practice, wasn't it, to
6    list all of the important issues or
7    questions or problems or changes that came
8    up, right?
9  A. Repeat that again. I'm sorry. I was
10    thinking.
11  Q. Your custom and habit, practice in
12    connection with the file that you
13    maintained for each annuity would be to
14    write down on this chronological listing
15    for that file the date and whatever your
16    description of the event was that you felt
17    was important as it affected the annuity or
18    the clients to keep the file up to date,
19    correct?
20        MR. PATERSON: Is this in general
21        or with respect to the Crouch
22        file?
23        MR. MCHARD: Both.

### Page 43

1  A. Yeah, in most cases, yes, we would. We
2    would document concerns or we would
3    document things that we would want to keep
4    in mind so that when a customer would come
5    back, we would be familiar with what was
6    going on with them.
7  Q. And that was your habit that you exercised
8    in connection with this case, too, wasn't
9    it?
10  A. In most cases, yes.
11  Q. And exercised in this case, correct?
12  A. I would -- I would say that there -- yeah,
13    there would be some documentation on the
14    client profile.
15  Q. That is, on the back side or separate
16    sheet?
17  A. It could be anywhere on that profile, but
18    it doesn't look like the back copies are
19    here.
20  Q. That is, there are pieces of paper that are
21    missing from the client profile? Is that
22    what you're saying?
23  A. Well, it appears there's something

### Page 44

1    not here.
2  Q. What is that? What is it to your
3    understanding is missing from Exhibit
4    Number 11?
5  A. Well, there would be some documentation on
6    there or either it could have been on a
7    separate sheet in the file.
8  Q. Listing these important events, issues,
9    concerns, correct?
10  A. There should be some documentation there.
11  Q. And you would hand write those, it was your
12    habit, onto this separate sheet when that
13    event or concern came up; is that correct?
14  A. It would be either handwritten or there
15    would be a memo typed for the file.
16        MR. PATERSON: And, again, y'all
17        are talking about the Crouch
18        file individually --
19        MR. MCHARD: Right.
20        MR. PATERSON: -- as opposed to
21        any other file?
22        MR. MCHARD: Right.
23  Q. Now, the ...

### Page 45

1  A. Can I make a comment about Exhibit 12?
2    This is the actual application for the
3    annuity. This particular paperwork was
4    fairly new. My license were obtained in
5    '97. This was in May of '98. Annuities
6    was not necessarily something that you sell
7    a lot of every day. The paperwork being
8    new -- On a fixed rate annuity, they are
9    annuitant-driven which is --
10  Q. What do you mean by that?
11  A. Well, it means that basically you have to
12    name a beneficiary for the annuitant, even
13    though you may have a joint owner. That's
14    not the case with a bank product, with a CD
15    product. Those are -- Those are joint.
16    And our practice --
17  Q. Those are ownership-driven, the bank ones?
18  A. The bank ones would be ownership-driven.
19  Q. As opposed to these that are annuitant-
20    driven, correct?
21  A. Yes.
22        So in doing the paperwork, this works
23        differently. I made an error on this


EXHIBIT D

Page 150

1    MR. WALDROP: Same.
2 A. I'm sure that I -- at this particular time,
3    I had access to those procedures.
4 Q. Those procedures meaning procedures issued
5    by whom?
6 A. Procedures would have been issued by
7    Lincoln National as to how to complete the
8    form.
9 Q. Did you look it up to find out what the
10   procedure said before you had --
11 A. I think that's something I just -- I knew
12   from training.
13 Q. So you didn't look it up?
14 A. No. I knew that if it's a joint ownership,
15   that I needed both signatures.
16     (Brief interruption.)
17     (Brief recess was taken.)
18     (Plaintiff's Exhibit 19 was marked
19     for identification.)
20 Q. Ma'am, taking your comments during the
21   break to heart, you signed an affidavit for
22   Balch & Bingham also in connection with
23   this case, didn't you?

Page 151

1    MR. PATERSON: For me.
2 A. For -- yeah, this one that's dated March,
3    the 6th day of March.
4 Q. Right. And Mr. Paterson typed it up and
5    gave it to you to sign, didn't he?
6 A. I would have had to have given him the
7    information. His office would have
8    prepared it. I would have proofed it, read
9    it, made sure I agree with it and signed it
10   and send it back.
11 Q. Well, do you have any of the correspondence
12   that indicates that's how it happened?
13   MR. WALDROP: Objection.
14 A. Not with me, no.
15 Q. But you do have --
16 A. If I do, it may be -- it could be from an
17   e-mail possibly.
18 Q. There were e-mails that went back and forth
19   between you and Mr. Paterson's office with
20   regard to this?
21 A. On this right here.
22 Q. Yeah.
23 A. I think we did --

Page 152

1 Q. With regard to Plaintiff's Exhibit Number
2    19, correct?
3 A. I think we -- I think we did through
4    e-mail.
5 Q. And you can provide me copies of those
6    e-mails that went back and forth because
7    they'd still be on your computer, right?
8 A. I would hope.
9 Q. And that would be at home or at work?
10 A. That would be at work.
11 Q. And you don't have any problem providing
12   those to me, do you?
13 A. I wouldn't want to have to hunt them up.
14 Q. Well, you could simply look at --
15 A. I mean, what do you need?
16 Q. Any e-mails that have gone back and forth
17   between you and Balch & Bingham regarding
18   this.
19 A. Well, I would think that -- I would think
20   that the attorney's office would have the
21   same thing I would.
22 Q. Well, I agree and that they probably should
23   have been produced, but they haven't been

Page 153

1    so far. And I'm asking you on the record,
2    will you provide me all of those?
3 A. Well, since it's on -- since it's on my
4    current employer's computer, I would think
5    I'd have to get their permission to do
6    that.
7 Q. Well, did you get their permission in order
8    to receive e-mails, send e-mails with
9    regard to this affidavit?
10 A. They were aware that I was involved in a
11   case from my previous employment.
12 Q. Your current employer is Peoples Bank.
13 A. That's right.
14 Q. So, I mean, I could subpoena your current
15   employer to get that information, but --
16 A. Sure.
17 Q. -- just asking you, are you willing to
18   provide that to me?
19 A. I think you could subpoena it and let them
20   make that decision, and they would have to,
21   I guess.
22 Q. Is that what you want me to do? You're not
23   willing to do that short of a subpoena; is

Page 154

1    that correct?
2  A. Well, is that what you really want me to
3    do? You tell me what you want. Are you
4    asking -- are you asking me -- Are you
5    telling me that you need that information?
6  Q. Yes, ma'am. I want that information.
7  A. You want it or you need it?
8  Q. Well, I think it's both, one and the same.
9    I think I want it, need it, and I'm
10   entitled to it.
11 A. Then I guess you could subpoena it, and
12   then that way the bank would officially
13   have that knowledge that you needed that
14   information.
15 Q. Who would I send the subpoena to at your
16   bank?
17 A. I would assume you could send it to -- my
18   employment address would get it to the
19   correct people.
20 Q. Which is what?
21 A. 148 East Main Street, Prattville, Alabama
22   36067.
23 Q. Attention whom?

Page 155

1  A. You could send it to Steve Steele. That's
2    my regional president.
3  Q. At that address, correct?
4  A. Uh-huh. (Positive response.)
5  Q. Yes?
6  A. Yes. Sorry.
7        MR. MCHARD: Unless you're willing
8    to provide that -- all of that
9    information to me?
10       MR. PATERSON: I don't really know
11   what it is sitting here
12   today. I can't recall what it
13   is frankly. Without seeing
14   it, I won't commit to you one
15   way or the other.
16       I think the safest thing
17   to do -- she's uncomfortable
18   producing her employer's
19   records without a subpoena, so
20   just subpoena the records. In
21   the meantime, I'll search and
22   if there's something that
23   I think I can readily give

Page 156

1    you, I will.
2        MR. MCHARD: They're clearly not
3    her employer's records.
4        MR. PATERSON: Well, they come
5    from --
6        THE WITNESS: They come from my
7    employer's computer, so I
8    would think we need to do it
9    that way. Since I can't call
10   and ask that question, I
11   guess ...
12       MR. MCHARD: No further questions.
13       MS. HUGHES: I don't have any.
14       MR. PATERSON: I've got one quick
15   question, a couple of quick
16   questions of you.
17       THE WITNESS: I'm through with
18   you?
19       (Brief interruption.)
20            EXAMINATION
21 BY MR. PATERSON:
22 Q. You were asked about an exhibit, Number
23   27. Will you get that exhibit in front of

Page 157

1    you.
2        I think 27 was the notes of the
3    conversation you made with Mr. Crouch. The
4    plaintiff, Mr. Crouch, called you. It's
5    dated July 6, 2001.
6  A. That's it.
7  Q. That's it?
8  A. Yeah.
9  Q. Okay. You were asked about a sentence in
10   that exhibit. It says: He went on to say
11   that I did an annuity for his father. I
12   told him I could not release that
13   information one way or another. He said he
14   had the paperwork in front of him.
15       And my question to you is, did he tell
16   you he had the paperwork regarding his --
17   the annuity that Mrs. Crouch, the
18   defendant, and the decedent, Mr. Crouch,
19   purchased?
20       MR. MCHARD: Well, I'm going to --
21   I'm going to object to the
22   form of this --
23 Q. What did he tell you?

**Page 162**

1  MR. MCHARD: Object as to form.
2  A. That's correct. He was there, and I heard
3     him ask her specifically to sign that for
4     him because he had forgotten his glasses.
5        MR. GREGGS: Thank you.
6        MR. PATERSON: No further
7     questions.
8        EXAMINATION
9  BY MR. MCHARD:
10 Q. Did you just e-mail this document back
11    then?
12 A. I thought I was finished with you.
13 Q. I know that that's your erstwhile desire,
14    but you -- this affidavit, Exhibit 19, you
15    said that you e-mailed it back and forth.
16 A. If I recall correctly, I think it was
17    e-mailed to me.
18 Q. With exhibits that had been scanned in?
19 A. No, I --
20 Q. Did you ever see the exhibits that were
21    attached or what?
22 A. Did I see these?
23 Q. Yeah.

**Page 163**

1  A. Well, I had -- yes, I had a copy of the
2     affidavit and the -- and the forms here.
3  Q. Had those been supplied to you by
4     Mr. Paterson?
5  A. Had the affidavit been supplied?
6  Q. No. Had the exhibits that are attached to
7     your affidavit been supplied by
8     Mr. Paterson?
9  A. I can tell you ... I don't know if I have
10    everything that's in here, but I do have a
11    copy of the profile and a copy of the
12    contract.
13 Q. How did you get the exhibits?
14 A. When or how did I get these?
15 Q. How and when, from whom did you get them?
16 A. This was given to me by Mr. Paterson.
17 Q. When were you first given the exhibits in
18    connection with the affidavit Mr. Paterson
19    wanted from you?
20 A. I would need to look at my calendar. That
21    would have been ...
22 Q. That's a manual calendar or is that on your
23    computer, too?

**Page 164**

1  A. It's a manual calendar.
2  Q. And you would have kept a notation of when
3     you would have gotten those?
4  A. I would have -- yeah, I would have made a
5     note on my calendar.
6  Q. Was that because you came here to get them?
7  A. No, I did not.
8  Q. Well, were they mailed to you?
9  A. No, they were not.
10 Q. Were they faxed to you?
11 A. No.
12 Q. Were they scanned in and e-mailed to you?
13 A. No, they were not scanned in an e-mail.
14 Q. Well, then how did you get them from
15    Mr. Paterson?
16 A. These were -- these were given to me when I
17    saw the -- well, no, it wouldn't have been
18    at that point. Last ... I can't remember
19    if it was Wednesday or if it was maybe
20    Tuesday.
21 Q. So you didn't see the exhibits until --
22    that were attached to your affidavit until
23    last --

**Page 165**

1  A. It was last week.
2  Q. -- last week; is that correct?
3  A. That -- that would be correct.
4  Q. And that's when you came here and got ready
5     for your deposition, discussed the matter
6     with Mr. Paterson?
7  A. Actually, I did not come here.
8  Q. Well, how did that work then?
9  A. Mr. Paterson met me.
10 Q. For how long?
11 A. Maybe 20 minutes.
12 Q. Where?
13 A. At my --
14 Q. At work?
15 A. At work.
16 Q. And talked about what the deposition was
17    going to be and what questions we were
18    going to be going over?
19 A. Basically gave me these to review.
20 Q. That is, the affidavit?
21 A. Affidavit of myself and Mrs. Crouch.
22 Q. Both of them, right?
23 A. Yes.

```
 1    Q.    Yes?
 2    A.    Yes.
 3    Q.    And is this your signature on the bottom of
 4          that dated August 20th, '97?
 5    A.    That's correct.
 6    Q.    And you specifically agreed in paragraph
 7          four to comply with the rules, regulations
 8          and procedures of Lincoln National Life,
 9          didn't you?
10    A.    That's correct.  Yes.
11    Q.    And what I'm trying to find out, after you
12          certified to that, what rules, regulations
13          and procedures of Lincoln National Life did
14          you receive, review and attempt to follow?
15    A.    Well, that would be information presented
16          to us in our training.  But you asked
17          specifically about a manual, and I'm sure
18          that there was manuals there.  But, you
19          know, to tell you where that manual was at
20          that particular time, I can't tell you
21          that.  I don't know.
22    Q.    You also agreed not to alter, modify, waive
23          or change any of the terms or forms of
```

Page 47

| | | |
|---|---|---|
| 1 | | an error on the paperwork and that in order |
| 2 | | to fix it the way that they wanted it to |
| 3 | | be, it would require a separate document. |
| 4 | | So Exhibit 12 was written up, but it is an |
| 5 | | incorrect -- it was written up incorrect by |
| 6 | | me. |
| 7 | Q. | Well, let's go over that in a minute. |
| 8 | | But the -- with regard to your annuity |
| 9 | | license, did you ever see any rules, |
| 10 | | regulations and procedures of Lincoln |
| 11 | | National Life? |
| 12 | A. | I'm sure I did. |
| 13 | Q. | What did those consist of? |
| 14 | A. | It could have consisted of a lot of things. |
| 15 | Q. | I mean, was there a manual with the rules, |
| 16 | | regulations and procedures of Lincoln |
| 17 | | National Life? |
| 18 | A. | If you're asking me whether or not I had a |
| 19 | | manual, I can't answer that. I'm not |
| 20 | | sure. It was a lot of -- a lot of |
| 21 | | paperwork, a lot of -- a lot of manuals. |
| 22 | Q. | Well, in connection with your licensing |
| 23 | | file, you applied to get your annuity |

EXHIBIT E

1   A.   That's correct.
2   Q.   And you knew all those things, correct?
3   A.   Yeah.  Unfortunately -- Unfortunately, it
4        was a human error.
5   Q.   And you had a copy of the rules and
6        regulations and policies of Lincoln
7        National with regard to how to fill out
8        these forms and the explanation of how to
9        do it and what it meant, correct?
10  A.   That's correct.
11  Q.   And you also knew that you could call
12       Lincoln National for advice with regard to
13       these matters, correct?
14  A.   Well, the realization that I had written it
15       wrong was not -- I didn't realize that I
16       had made the mistake until I received the
17       letter from Lincoln.  Do you have a copy of
18       that letter?
19  Q.   Well, yes, I have a copy --
20  A.   May I look at that, please?
21  Q.   I have a copy of a letter that I'll get to
22       in just a moment if you don't mind.
23            I want to focus on the day that the

```
 1    Q.    We meaning did you individually or did --
 2    A.    Yes --
 3    Q.    -- AmSouth Investments --
 4    A.    -- I as an agent.
 5    Q.    -- or AmSouth Bank?
 6    A.    I as an agent kept a file.
 7    Q.    And what other file was kept?
 8    A.    I'm sorry.  I don't understand.
 9    Q.    I mean, did -- were you aware if somebody
10          else kept a file regarding this contract?
11    A.    My instructions were to distribute
12          paperwork to AmSouth Investment Services
13          and to Lincoln National as well as keeping
14          a copy for my file.
15    Q.    And how did you maintain that file?
16    A.    I'm sorry.  What do you mean, how did I
17          maintain the file?
18    Q.    Well, how did you, Ronda Robinson, maintain
19          the client file with regard to this
20          annuity?
21    A.    There was -- I kept a separate file where
22          all my fixed annuity sales were filed
23          basically in alphabetical order, so ...
```

1    A.    They should.

2    Q.    As far as you know, they should have the
3          information, shouldn't they?

4    A.    The bank -- well, the bank should.

5    Q.    And should be able to provide it to us,
6          shouldn't they?

7    A.    As long as it's not out of record
8          retention, they could.

9    Q.    Well, I mean, this lawsuit was started in
10         2002. What is the record retention period?

11   A.    I don't know for AmSouth. I'm sorry.

12   Q.    Well, what was it when you were there?

13   A.    I'm not sure. With CDs, I'm not sure.

14   Q.    Well, how about with checking accounts?

15   A.    I don't know. I'm sorry. Been gone from
16         there for two years. I'm not sure what
17         their retention is. And I don't recall
18         what it was when I was there.

19   Q.    Well, did AmSouth Bank or AmSouth
20         Investments or both have a policy,
21         procedure, rules, regulation book that
22         talked about what sort of documentation you
23         had to keep, how one husband could sign for

```
 1            his wife or vice versa to bank documents,
 2            what the protocols, the rules, the
 3            regulations were?  Did they have that from
 4            1997 through 2001?
 5    A.      Did they have what?
 6    Q.      Rules and regulations, a policy and
 7            procedure book, a manual, a set of
 8            instructions that would tell you what do
 9            you have to do in those circumstances, what
10            do you have to do or keep or get from the
11            client in a request for a cashier's check
12            like this, what the record retention policy
13            was, any of those things.
14    A.      Well, there's a record retention policy I'm
15            sure.
16    Q.      Was it in the policy and procedure manual,
17            is that what it's called, or standard
18            operating procedures?
19    A.      Well, at my current bank, it's just record
20            retention.
21    Q.      I know.  But aren't there a whole set of
22            instructions and rules and guidelines for
23            how you handle things at the bank by way
```

1                of --
2       A.       I'm sure there are.
3       Q.       And you've seen that at the bank, correct;
4                that is, at AmSouth during '97 through
5                2001?
6       A.       Sure. I mean, there's instructions.
7                There's manuals.
8       Q.       What are they called?
9       A.       I don't know.
10      Q.       And there were instructions on what you
11               were supposed to do if somebody signed a
12               document for somebody else, weren't there?
13      A.       I'm sure that there were.
14      Q.       And what were those instructions, those
15               rules, regulations, guidelines, policies,
16               standard operating procedures, whatever you
17               want to call them?
18      A.       I think that would depend on your
19               transaction.
20      Q.       Are you saying you don't recall what the
21               requirement was at the bank?
22      A.       Well, I'm saying that it would depend on
23               the transaction as to what your policy and

```
 1                       conclusion.
 2              MR. WALDROP:  Objection.
 3     A.   I don't know that I --
 4     Q.   In your mind.
 5     A.   -- know the answer to that.
 6     Q.   Just like it didn't make any difference if
 7          your name was on --
 8     A.   Sir, as an agent, if it had been crooked, I
 9          don't guess I would have minded, but he
10          wanted her to sign for him.
11     Q.   And you know that the only signature that
12          was necessary or required or proper to
13          change an annuitant beneficiary designation
14          such as we had in the Crouch annuity was
15          the signature of James Earl Crouch?
16              MR. WALDROP:  Objection.
17              MR. PATERSON:  Objection.
18     A.   That's false.  That's not a true statement.
19     Q.   Based on what?
20     A.   To make changes on an annuity that is joint
21          ownership, it requires both owners to sign.
22     Q.   Where does it say that?  In the rules,
23          regulations, policies and procedures again?
```

```
 1    A.    Yeah, it would be in there somewhere.
 2    Q.    Of Lincoln National Life that you said that
 3          you were going to comply with when you
 4          applied in the fall of 1997?
 5                MR. WALDROP:  Objection.
 6    Q.    In those?  In those regulations of Lincoln
 7          National or in the AmSouth Bank ones or the
 8          AmSouth Investment ones or where, or do you
 9          know?
10                MR. WALDROP:  Same objection.
11    A.    Could you repeat all of that one more time?
12    Q.    I want --
13    A.    Because I think I've gotten lost.
14    Q.    I just want to know where the rule,
15          regulation, policy, procedure, standard
16          operating practice or procedure would be
17          and who would have issued it that would
18          deal with who had to sign the Crouch
19          annuity to change the annuitant beneficiary
20          designation that had been made pursuant to
21          the application.
22                MR. PATERSON:  Object to the form
23                         of that.
```

```
 1                MR. WALDROP:  Same.
 2      A.   I'm sure that I -- at this particular time,
 3           I had access to those procedures.
 4      Q.   Those procedures meaning procedures issued
 5           by whom?
 6      A.   Procedures would have been issued by
 7           Lincoln National as to how to complete the
 8           form.
 9      Q.   Did you look it up to find out what the
10           procedure said before you had --
11      A.   I think that's something I just -- I knew
12           from training.
13      Q.   So you didn't look it up?
14      A.   No.  I knew that if it's a joint ownership,
15           that I needed both signatures.
16                     (Brief interruption.)
17                     (Brief recess was taken.)
18                     (Plaintiff's Exhibit 19 was marked
19                      for identification.)
20      Q.   Ma'am, taking your comments during the
21           break to heart, you signed an affidavit for
22           Balch & Bingham also in connection with
23           this case, didn't you?
```