Exhibit 1

DEPOSITION OF INA SUE CROUCH
IN RE: THE ESTATE OF JAMES EARL CROUCH

January 22, 2002

Page 1

```
 1           IN THE PROBATE COURT
 2                    OF
 3           ELMORE COUNTY, ALABAMA
 4
 5    IN RE: THE ESTATE OF
 6    JAMES EARL CROUCH,    CASE NO. 01-272
 7        Deceased.
 8
 9
10
11
12            * * * * * * * * * * *
13
14        DEPOSITION OF INA SUE CROUCH, taken
15    pursuant to stipulation and agreement before
16    Andrea E. Martin, Registered Merit Reporter and
17    Commissioner for the State of Alabama at Large,
18    in the Law Offices of Jobe T. Ott, 631 South
19    Perry Street, Montgomery, Alabama, on Tuesday,
20    January 22, 2002, commencing at approximately
21    10:00 a.m.
22
23            * * * * * * * * * * *
```

Page 2

```
 1              APPEARANCES
 2    FOR THE PETITIONERS:
 3    Mr. Jobe T. Ott
      Attorney at Law
 4    631 South Perry Street
      Montgomery, Alabama 36104
 5
      Ms. Evans H. Marshall
 6    Attorney at Law
      458 South Lawrence Street
 7    Montgomery, Alabama 36104
 8    FOR THE RESPONDENT:
 9    Ms. Glenda W. Hughes
      Attorney at Law
10    103-B Commerce Street
      Wetumpka, Alabama 36092
11
      ALSO PRESENT:
12
      Ms. Barbara Middleton
13    Ms. Brenda Cobb
14            * * * * * * * * * * *
15           EXAMINATION INDEX
16    INA SUE CROUCH
         BY MS. MARSHALL        5
17       BY MS. HUGHES         96
18            * * * * * * * * * * *
19              STIPULATIONS
20        It is hereby stipulated and agreed by
21    and between counsel representing the parties that
22    the deposition of INA SUE CROUCH is taken
23    pursuant to stipulation and agreement; that all
```

Page 3

```
 1    formalities with respect to procedural
 2    requirements are waived; that said deposition may
 3    be taken before Andrea E. Martin, Registered
 4    Merit Reporter and Commissioner for the State of
 5    Alabama at Large, without the formality of a
 6    commission; that objections to questions other
 7    than objections as to the form of the questions
 8    need not be made at this time but may be reserved
 9    for a ruling at such time as the deposition may
10    be offered in evidence or used for any other
11    purpose as provided for by the Alabama Rules of
12    Civil Procedure.
13        It is further stipulated and agreed by
14    and between counsel representing the parties that
15    the filing of the deposition is hereby waived and
16    that the deposition may be introduced at the
17    trial of this case or used in any manner by
18    either party hereto provided for by the Statute.
19        It is further stipulated and agreed by
20    and between the parties hereto and the witness
21    that the signature of the witness to this
22    deposition is hereby waived.
23            * * * * * * * * * * *
```

Page 4

```
 1        MS. MARSHALL: Usual stipulations, and
 2            we'll go on record.
 3            Ms. Crouch, my name is Evans
 4            Marshall. I'm an attorney, and
 5            I'm going to be asking you some
 6            questions today. You'll be under
 7            oath. Okay?
 8        MS. CROUCH: Yes, ma'am.
 9        MS. MARSHALL: I'm expecting that if
10            you don't understand a question,
11            you'll ask me to repeat it or
12            rephrase it or say it in some
13            other way or don't talk lawyer or
14            whatever you want to say.
15        MS. CROUCH: Okay.
16        MS. MARSHALL: If you answer, I'm going
17            to assume that you understood the
18            question and that you realize you
19            are under oath. Is that okay?
20        MS. CROUCH: I know that.
21              INA SUE CROUCH
22        The witness, having first been duly
23    sworn to speak the truth, the whole truth and
```

1 (Pages 1 to 4)

DUNN, KING & ASSOCIATES
toll-free (800) 359-8001

431 South Court Street

Montgomery, AL 36104

**EXHIBIT 6**

DEPOSITION OF INA SUE CROUCH
IN RE: THE ESTATE OF JAMES EARL CROUCH

January 22, 2002

Page 73

1  with any of your family members about the
2  estate of your late husband?
3  A. What you talking about? When?
4  Q. The conversation that you had Monday morning
5  at 7 a.m.
6  A. That's right. That's right. That's the
7  first time I knowed that — I never dreamed
8  that something like that was going to blow up
9  because I knew everything that we had was
10 made to me as the survivor, which would have
11 been the same thing to him if I had've died.
12 Everything would have went to him. And I'm
13 sorry. My children wouldn't have been acting
14 crazy like that about it, either, if I'd have
15 died first.
16 Q. Okay.
17 A. If it hadn't have been for them, I don't know
18 what I would have done since my husband has
19 been gone. They have been a lifesaver to me
20 coming and working for me and helping me.
21 And they don't come down there for money, and
22 they don't take off nothing. I think some
23 people might think it, but they don't.

Page 74

1  Q. Did you ever talk to Ms. Cobb again about the
2  estate or about wills?
3  A. She called me again the next morning. And my
4  son from Nashville, John David, he told her
5  don't be calling me and bothering me anymore,
6  I had enough problems. And I think I did.
7  Q. Did you talk to her or did he talk to her?
8  A. He talked to her, too.
9  Q. Both of y'all talked to her?
10 A. Yes, sir. After he got tired of it and he
11 got the phone out of my hand and told her
12 don't call me and bother me anymore, that I
13 was going through enough without being
14 bothered.
15 Q. Do you consider that harassment?
16 A. Yes, I do.
17 Q. Did you call the police?
18 A. No, I didn't.
19 Q. Did you call the phone company?
20 A. No, I didn't.
21 Q. Did you talk to your lawyer about it?
22 A. Yes.
23 Q. Have you ever signed Mr. Crouch's name to

Page 75

1  anything?
2  A. Unh-unh.
3  Q. Never?
4  A. Unh-unh. Unh-unh. Never. Mr. Crouch was
5  always able to sign his own name whenever we
6  done business. No, I've never signed his
7  name to nothing.
8  Q. Did you ever practice writing his name?
9  A. No. Nope. Unh-unh.
10 Q. What discussions have you had with the
11 probate court about your husband's will?
12 A. I ain't had no discussion with them.
13 Q. Have you been down there?
14 A. My lawyer and Mr. Ott has been down there at
15 the probate judge office, had a status
16 hearing. I was there, me and my
17 daughter-in-law; but Mr. Ott — you know, we
18 had to excuse out. I wasn't in there. I
19 don't — no, I don't have no discussions with
20 the probate judge.
21 Q. Have you had any discussions with your
22 children?
23 A. They just knew — they just know what's going

Page 76

1  on. They don't know — they don't know all
2  my — don't know my business, but they do
3  know — they knew I was coming down here
4  today. I don't hide anything from my
5  children. They don't hide nothing from me,
6  and I don't hide anything from them. I had
7  two to call me this morning before I come.
8  Q. Have you had any discussions with anybody
9  else outside your family since your husband's
10 death, about your husband's estate?
11 A. No. Brenda, Ms. Cobb, called my brother, so
12 he said, and wanted to know who my lawyer was
13 and all. That's all I know. And he told her
14 he didn't know. Now, that's just what he
15 told me, now. I didn't hear the
16 conversation.
17 Q. Since your husband's death, have you
18 conducted any business?
19 A. Any business?
20 Q. Any estate business.
21 A. Nope. I just got my same routine of stuff.
22 Of course, you know, since he died, his name
23 is not on stuff anymore because he's dead.

19 (Pages 73 to 76)

DUNN, KING & ASSOCIATES
toll-free (800) 359-8001

431 South Court Street
website: www.dunnking.com

Montgomery, AL 36104

DEPOSITION OF INA SUE CROUCH
IN RE: THE ESTATE OF JAMES EARL CROUCH

January 22, 2002

Page 41

1  Q. What were the anticipated changes?
2  A. Well, I don't really — I don't know, really,
3     what we would have put on there because we
4     never got into it. We was just going to do
5     it, but I don't know. I couldn't tell you
6     exactly what we was going to do. I mean, I
7     couldn't tell you what we was going to do for
8     each child because we never did write it
9     down.
10 Q. Well, let me see. You weren't going to
11    change the names of the children, were you?
12 A. No, no, no. We wasn't going to change the
13    names.
14 Q. And you weren't going to change the number of
15    beneficiaries?
16 A. No.
17 Q. So was there anything left to change except
18    the amount?
19 A. We was just going — we might have been —
20    change the amount. We might have been doing
21    that. We might have had a little something
22    else we wanted to put on it because we had
23    changed things around a little. And we

Page 42

1  really didn't know what we was going to do.
2  We was going to sit down and discuss it with
3  an attorney whenever he felt like going. He
4  didn't feel like fooling with it, he said.
5  Q. Y'all plan to go back to Mr. Henig?
6  A. No.
7  Q. No? Who were you going to?
8  A. I was going to get Mr. Thornton to write it.
9     I even went down one day to his office to get
10    him to come up to my house and get the
11    information from Earl like that. And he was
12    on a case that day, so I —
13 Q. He?
14 A. Mr. Thornton.
15 Q. Okay. Did your husband go with you?
16 A. No. He was — he didn't feel like going.
17    And I was going to have him come up to the
18    house and see, you know, about taking the
19    information from the house, but he was in
20    court. So that was the end of the dream. I
21    didn't see him. And that's the only time —
22    that was the last discussion that we had
23    about it.

Page 43

1  Q. And that was when?
2  A. That was in 2001.
3  Q. Do you remember which month?
4  A. I'm going to say it was about August.
5  Q. And in August, it's your testimony that your
6     husband didn't feel well enough for y'all to
7     follow your usual practice of going
8     everywhere together making these decisions
9     together, so you went to Mr. Thornton's
10    office to induce Mr. Thornton to come up to
11    your house and make a new will for both of
12    y'all?
13 A. Well, yeah. We was going to discuss it.
14 Q. And it's your testimony that Mr. Thornton was
15    in court, so you didn't see him?
16 A. I did not see him.
17 Q. Did you leave a message for him?
18 A. I just saw his secretary.
19 Q. Did you leave a message for him to call you
20    or anything?
21 A. No, I did not.
22 Q. Did you tell your husband where you had been?
23 A. Yes.

Page 44

1  Q. How alert and aware was he at this time?
2  A. Oh, he was alert. He didn't get where he
3     didn't know things till way in January. He
4     might forget a few things, but — you know,
5     maybe mix it; but, no, no, it was way in
6     January before he got where he didn't know a
7     lot about things. And there was never
8     nothing discussed no more after he got where
9     he didn't — wasn't aware. And I never done
10    nothing after he wasn't aware.
11    There was never no money changes or
12    nothing unless he was there and aware of it.
13    We had no money changes. No bank changes was
14    made since May the 8th, 1998. And I think
15    very he was very, very aware then.
16 Q. And when you say bank changes, you mean —
17 A. Changed something.
18 Q. — y'all didn't transact any business?
19 A. No. Transact no business whatsoever after
20    May the 8th, 1998.
21 Q. Okay. And it's your testimony from May the
22    8th, 1998, until he died, your husband
23    transacted no business?

11 (Pages 41 to 44)

DUNN, KING & ASSOCIATES
toll-free (800) 359-8001

431 South Court Street

Montgomery, AL 36104